1                 * * * ROUGH DRAFT TRANSCRIPT * * *

2                     - - - - - - - - - -

3       CASE NAME:  STEED, et al. vs. EQUIFAX

4       WITNESS NAME:  MICHAEL A. TURNER, Ph.D.

5       DATE OF DEPOSITION:  Thursday, December 10, 2015

6                     - - - - - - - - - -

7                 This is an unedited, unproofread,
        uncertified transcript for attorneys' information
8       only. This transcript may NOT be cited or quoted in
        documents or used for examination purposes.
9
                  This raw transcript may contain the
10      following:

11                1. Conflicts - an apparently wrong word
        that has the same stenotype stroke as a less-used
12      word. Conflicts are remedied by the reporter in
        editing.
13
                  2. Untranslates/Misstrokes - a stenotype
14      stroke appears on the screen as a result of the
        computer dictionary not having the stroke previously
15      identified or a misstroke or partial translation of
        the word.
16
                  3. Reporters' Notes - a parenthetical
17      word or phrase from the reporter. Since the reporter
        must write each word instantly, a misunderstood word
18      or phrase will not be apparent until some time
        later. Reporters' notes provide the opportunity to
19      correct such situations.

20                        ---------------

21                  REALTIME UNCERTIFIED TRANSCRIPT

22                        ---------------

23

24

1        REALTIME ROUGH DRAFT AND UNCERTIFIED TRANSCRIPT

2

3             THE FOLLOWING FILE IS NOT AN OFFICIAL

4             TRANSCRIPT. IT IS INTENDED ONLY TO AID

5          IN CASE PREPARATION.  THE FINAL TRANSCRIPT

6        WILL BE DIFFERENT, BOTH IN FORM AND SUBSTANCE,

7             FROM THIS ROUGH DRAFT TRANSLATION.

8

9           YOU MAY SEE ERRORS AND OMISSIONS DURING

10            THE REALTIME TRANSLATION.  THIS IS

11          NOT AN UNUSUAL PROCESS, AND THESE ERRORS

12             AND OMISSIONS WILL BE CORRECTED

13                ON THE FINAL TRANSCRIPT.

14

15           PLEASE DO NOT TRY TO BRING THESE

16      DISCREPANCIES TO THE ATTENTION OF THE REPORTER

17          DURING THE COURSE OF THE DEPOSITION.

18

19

20         THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT!

21

22

23

24

```
 1   PRESENT:

 2

 3         ROBERT S. SOLA, P.C.

 4         8835 SW Canyon Lane

 5         Suite 130

 6         Portland, Oregon 97225

 7         BY:  MR. ROBERT S. SOLA

 8         503-295-6880

 9         rssola@msn.com

10             Appeared on behalf of the Plaintiffs;

11

12         KING & SPALDING, LLP

13         1180 Peachtree Street, N.E.

14         Atlanta, Georgia 30309-3521

15         BY:  MS. MERYL ROPER

16         404-572-2812

17         mroper@kslaw.com

18             Appeared on behalf of the Defendant.

19

20

21

22

23   REPORTED BY:  JENNIFER L. WIESCH, CSR, RPR, CRR

24               Certificate No. 84-4528.
```

```
 1                 (WHEREUPON, the witness was duly
 2             sworn.)
 3             MICHAEL A. TURNER, Ph.D.,
 4   called as a witness herein, having been first duly
 5   sworn, was examined and testified as follows:
 6                             EXAMINATION
 7   BY MR. SOLA:
 8       Q.    Please state your name.
 9       A.    Michael Turner.
10       Q.    Mr. Turner, my name is Robert Sola.  I
11   represent Charles Steed and Amy Summers, Plaintiffs
12   in this case.  Do you understand we're here to take
13   your deposition?
14       A.    Yes.
15       Q.    Do you understand you're under oath?
16       A.    Yes.
17       Q.    There is a court reporter here and a
18   transcript will be made that can be used in the
19   trial or other proceedings.  Do you understand that?
20       A.    Yes.
21       Q.    I'm going to be asking you some questions
22   today, and I want to be sure you understand the
23   questions.  So if I ask you a question and you do
24   not understand it, will you ask me to clarify or
```

1  rephrase it?

2      A.   Sure.  Absolutely.

3      Q.   If you do not ask me to clarify or

4  rephrase the question, then I'm going to assume that

5  you understood the question I asked and answered

6  that.  Is that okay?

7      A.   Yes.

8      Q.   Are you on any medications or other

9  substances that would interfere with your ability to

10 testify today?

11     A.   No.

12     Q.   Now, am I correct that you've been hired

13 by Equifax to serve if deemed qualified as an expert

14 wince in this case?

15     A.   I'm not sure if my agreement was with

16 Equifax or King & Spalding but yes.

17     Q.   Okay.  But you would be testifying on

18 behalf of Equifax, the Defendant, correct?

19     A.   Yes.

20     Q.   And you have prepared a report in this

21 case, is that right?

22     A.   Yes.

23     Q.   Okay.  I've asked the court reporter to

24 mark that as Exhibit 1.

1          MR. SOLA:  And I have a copy for you, Meryl,

2     if you need it.

3          MS. ROPER:  Thank you.

4                    (WHEREUPON, a certain document was

5                    marked Turner Exhibit No. 1, for

6                    identification.)

7     BY MR. SOLA:

8          Q.    And can you identify Exhibit 1 as the

9     report you prepared in this case?

10         A.    Yes.  It appears to be a copy of the

11    report I prepared.

12         Q.    Okay.  Now if you go down to -- it's

13    actually the third page in, but it's the first page

14    of the report.

15         A.    Okay.

16         Q.    And then you see at the very bottom next

17    to number three, it says my opinions are as follows,

18    do you see that?

19         A.    Yes.

20         Q.    Okay.  And then if we turn the page, we

21    see on the next two pages paragraphs four, five,

22    six, seven and eight.  Well, four, five, six and

23    seven?

24         A.    Yes.

1        Q.    Those are opinions you have in this case,
2   is that right?
3        A.    Yes, sir.
4        Q.    All right.  And those are all the
5   opinions you have in this case, is that correct?
6        A.    Yes.
7        Q.    And you're not offering any other
8   opinions in this case, correct?
9        A.    No.
10        Q.    Have you been deposed before?
11        A.    Yes, I have.
12        Q.    How many times?
13        A.    I think this is my fourth time.
14        Q.    And what were the occasions in which you
15   were deposed?  Were they lawsuits?
16        A.    They would have been lawsuits, yes.
17        Q.    Okay.  And who were the parties?  Why
18   don't we start with the most recent one.
19        A.    So the most recent one was Sony Pictures
20   Entertainment.  It was the class action lawsuit
21   against them for the data breach involving the north
22   Korean military and so forth that got a lot of
23   publicity.
24        Q.    Okay.  And who was bringing that class

UNOFFICIAL DRAFT TRANSCRIPT

1    action?

2         A.    The current and former employees of SPE.

3    Sorry, SPE being Sony Pictures Entertainment.

4         Q.    Okay.  And what was their claim?

5         A.    Their claim was that Sony was negligent

6    in their data protection and security measures.

7         Q.    And were you a witness on behalf of Sony?

8         A.    I was.

9         Q.    All right.  And what was the general

10   subject of your testimony?

11        A.    The extent to which the compromised data

12   could impact the punitive class from an economic or

13   credit perspective.

14        Q.    All right.  So it was solely as to harm,

15   would that be fair to say?

16        A.    Yeah.

17        Q.    Okay.  And what was your opinion?

18        A.    Most of the information that was released

19   had already been breached in the myriad previous

20   breaches as evidenced by the history of the named

21   plaintiffs themselves, and that the incremental risk

22   from that specific breach would be very difficult to

23   quantify but most likely would be negligible.

24        Q.    And other than deposition, did you do any

1    other work in the case?  Well, did you prepare a

2    report?

3         A.    I did.  I did a -- I guess I began with

4    an expert report but sort of morphed that into a

5    rebuttal report, because the experts for the

6    defendants had submitted their reports and had been

7    deposed, so I had a lot more information on which to

8    act.

9         Q.    What year was this?

10        A.    This was just a few months ago.  And so I

11   did raise this with counsel yesterday.  In reviewing

12   the materials submitted for my deposition, I noted

13   that there seems to have been a versioning issue on

14   my CV that I didn't have the Sony Pictures

15   Entertainment case as one of the cases in which I've

16   been deposed or testified.  And that's the only one

17   that was omitted.

18        Q.    All right.  And you're --

19        A.    And then also in reviewing the report, I

20   did find a few minor calculation errors; for

21   example, one on page, I think it's page 26 or 27,

22   where I talked about 10 percent of a FICA score and

23   I should have had the range.  So instead of 85

24   points, it should be 55 points.  So there are

UNOFFICIAL DRAFT TRANSCRIPT

1   changes that aren't of magnitude of order, they're

2   marginal.  They don't affect any conclusions or the

3   direction of the findings.

4         Q.   All right.

5         A.   And I --

6         Q.   You mean --

7         A.   -- can -- I can --

8         Q.   You mean --

9         A.   -- either get you the corrections during

10  the break, I could write them, or I could -- I don't

11  know what the -- I'm not experienced at this, but

12  the -- whatever channel you'd prefer, I can submit

13  the errata to you.

14        Q.   Okay.  And we can address those.

15             And you mean in terms of the FICO score,

16  you mean because there's a range between 300 and

17  850 --

18        A.   Yeah.

19        Q.   -- and that would mean that the variance

20  could only be -- ten percent of that would be 55?

21        A.   Right.

22        Q.   All right.  And you're referring to the

23  omission of this Sony case from your expert report.

24  Are you referring to Appendix B, page 32?

1     A.    I believe that would be it, but let me
2  just confirm.  Yes.
3     Q.    All right.  And then the other cases in
4  which you've given expert witness testimony are
5  listed in Appendix B on page 32, is that right?
6     A.    Yeah, and again this is a versioning
7  issue.  I think that one of my colleagues just sort
8  of cut and paste incorrectly.  But the last two I
9  did not testify at or give -- or was deposed.  Only
10  the IMS Health, both cases I was both deposed and
11  testified, and then Sony and then today.  So four --
12  four instances where I would have been deposed or
13  testified and/or testified.
14     Q.    All right.  And I'm sorry, what year did
15  you say the Sony Pictures case was?
16     A.    This year.
17     Q.    2015?
18     A.    Yeah.
19     Q.    All right.  And then if we look at this
20  list, the -- it looks like the most recent case that
21  you have either submitted or testified is the one on
22  the bottom, October 2009?
23     A.    No, that was -- that shouldn't be -- I
24  mean, you mean submitted like a report.  I was asked

UNOFFICIAL DRAFT TRANSCRIPT

1    to provide -- my understanding was just cases where

2    I was either deposed and/or testified.  And so those

3    two I was not -- I was neither deposed nor

4    testified.  I submitted reports.  But I mean there

5    would be a very different list.  If it was

6    submitting reports versus being deposed and/or

7    testifying.  So I've only been involved in four

8    cases in which I have been deposed or testified,

9    including this one.  So the bottom two actually

10   should be stricken.  And I should add SPE and that

11   would be actually the more accurate list.

12        Q.   All right.  So the bottom two you were

13   not deposed?

14        A.   Correct.

15        Q.   And you did not testify?

16        A.   Correct.

17        Q.   Okay.  How about previous to the Sony

18   Pictures Case, a case where you were hired even if

19   you weren't deposed or testified as an expert

20   witness?

21        A.   I could generate that list.  I don't have

22   that with me, but yeah I've probably been involved

23   in maybe a dozen different cases over the years.

24        Q.   And in those, have you submitted expert

1   reports?

2        A.   Most of them, yeah.  I think some were

3   settled before I completed a report.  There was an

4   instance where I was asked to review the adequacy of

5   a proposed settlement, so, you know, there wasn't

6   really a report.  There was more of an opinion, I

7   guess, of like an affidavit.  Or I'm not really sure

8   what it was called, but yeah.

9                    (WHEREUPON, a recess was had from

10                   9:24 a.m. to 9:29 a.m.)

11  BY MR. SOLA:

12       Q.   So you indicated that there are other

13  cases where you've been hired as an expert and some

14  you believe you prepared a report, others you may

15  not have, is that correct?

16       A.   That's correct, yeah.

17       Q.   And you agreed to provide a list of

18  those?

19       A.   Yeah, we should have that before the next

20  break.

21       Q.   Okay.  What about cases where you've

22  testified in regard to credit reporting?

23       A.   That would be the majority.

24       Q.   Okay.  And is there some subject that you

UNOFFICIAL DRAFT TRANSCRIPT

1    tend to testify on particularly?

2         A.    I mean, broadly, I would think the data

3    accuracy and potential impacts from including or

4    excluding data elements or pieces of information

5    that are contained on an individual credit file.

6         Q.    And have you been hired by Equifax in any

7    of those cases?

8         A.    This, I think, is my first case I've ever

9    done with Equifax, yeah.

10        Q.    Okay.  How about TransUnion?

11        A.    Yes, I've done some work with TransUnion.

12        Q.    All right.  And that includes this

13   Jackson case that's listed --

14        A.    Correct.

15        Q.    -- from Oregon?

16        A.    Correct.

17        Q.    And what other cases for TransUnion?

18        A.    You know, I'll provide you the list.  I

19   don't remember.  I mean, this isn't a big part of

20   what I do, so -- and it's spread over ten or 15

21   years so, I mean, I don't really have an

22   encyclopedic command of the particulars of any of

23   these cases.  But generally they've been plaintiff

24   alleging that a CRA has damaged their credit

UNOFFICIAL DRAFT TRANSCRIPT

1    standing going to some, you know, inclusion or

2    omission, and I'll examine the facts and offer an

3    opinion.

4         Q.    All right.  How about on behalf of

5    Experian, have you been a witness?

6         A.    I think once, yeah.

7         Q.    How about any other consumer reporting

8    agencies?

9         A.    I don't think so, no.

10        Q.    How about any data furnishers?

11        A.    IMS Health, which is a data company, so

12   I've worked with them.

13        Q.    Was that in a credit reporting case?

14        A.    No, that was in a script data case.  So

15   my organization deals with different aspects of

16   information and information policy, primarily, you

17   know, financial inclusion and credit but you know

18   other aspects of you know data privacy, data

19   security as well.

20        Q.    Now, in these cases where you mention

21   that -- yeah, the consumer's bringing a claim, I

22   assume that's -- well, you said based on the

23   inclusion or omission of information, is that right?

24        A.    Right.

UNOFFICIAL DRAFT TRANSCRIPT

1       Q.    And then are most of those cases brought

2    where the consumer claims the credit report is

3    inaccurate?

4       A.    Mostly, yeah, I would think that's fair,

5    yeah.

6       Q.    And the consumer's claiming harm from

7    that, correct?

8       A.    You know, I don't know.  I mean, that's

9    sort of a -- sometimes it's a legal issue.  I think

10   they're more about policy and procedure compliance

11   rather than harm.  I mean, even in today's case, I

12   believe it's Steed isn't actually claiming any harm,

13   but is claiming a violation of the FCRA.  So I don't

14   know that all of those cases involved allegations of

15   consumer harm.  I think, you know, some did but some

16   didn't.

17      Q.    Well, do you believe that the failure to

18   remove information that's inaccurate after it's been

19   disputed by a consumer is not harm?

20      MS. ROPER:  Objection to the form, calls for

21   a legal opinion.

22   BY THE WITNESS:

23      A.    I don't really know what you mean by harm

24   in this case.  But the failure to exclude

UNOFFICIAL DRAFT TRANSCRIPT

1    information that's inaccurate after it's been

2    contested causes a harm.  It may or may not.  It

3    really depends on the circumstances and the behavior

4    of the individual and a lot of other variables, but

5    it's possible.  But it's also possible there could

6    be no harm at all.

7    BY MR. SOLA:

8        Q.   Okay.  Can you give me an instance where

9    there'd be no harm at all?

10       A.   Sure.  We'll look at the case of hard

11   inquiries.  If an individual has an inquiry on their

12   report that they discover after 12 months, it's no

13   longer factored into a FICO or VantageScore or most

14   generic scores, and it would have no effect on their

15   credit report.  Or an individual who has no contents

16   in their credit report other than an inquiry would

17   not be harmed, because they're unscorable.  Or an

18   individual who has an inaccurate hard inquiry on

19   their credit report from a mortgage or auto lender

20   during a period that they were comparative shopping

21   for a mortgage or auto loan, and it's bundled into

22   that scenario and is counted as a single inquiry,

23   wouldn't have any impact on their score, wouldn't

24   have any impact on any decision-making, wouldn't

UNOFFICIAL DRAFT TRANSCRIPT

1    have a harm from a credit perspective.  I think

2    those are three immediate instances where an

3    individual would have no harm from the inclusion of

4    an inaccurate piece of information after having

5    contested it.

6         Q.   Okay.  You limit your definition of harm

7    as to whether it would impact a credit score, is

8    that right?

9         A.   Well, I'm here to talk about, you know,

10   economic or credit damages, that's my domain.  I

11   know that, you know, your expert, Evan Hendricks,

12   talked about psychological and psychological and

13   physical harm.  I'm not an expert in those areas, so

14   I can't really offer a qualified opinion as to

15   whether or not that's even a possibility.

16        Q.   Okay.  My question was, though, that your

17   definition of harm is limited to effect on credit

18   score, is that right?

19        MS. ROPER:  Objection to form.  Go ahead.

20   BY THE WITNESS:

21        A.   Yeah, I mean, I'm an economist by

22   trading.  I try to quantify things.  We're talking

23   about a data element in a credit report.  Credit

24   reports have permissible purposes so they've got

UNOFFICIAL DRAFT TRANSCRIPT

1    finite uses.  They're measurable impacts.  I can,

2    you know, look at and speculate and offer opinions

3    on impacts based on what I know in a credit market

4    context.  That's the primary use for credit reports.

5              I know they're insurance underwriting and

6    employment and tenant screening.  But I also know

7    that the impacts from these variables and those

8    markets are likely to be equally as significant as

9    nonexistent going to what I understand is the value

10   of these -- or this -- these data elements and

11   either scores or, in fact, in many cases, you know,

12   the scores aren't disclosed.

13        MR. SOLA:  All right.  I'll move to strike as

14   nonresponsive.

15   BY MR. SOLA:

16        Q.   My question was:  Is your definition of

17   harm limited to the effect on credit score?

18        MS. ROPER:  Objection to form.

19   BY THE WITNESS:

20        A.   It's limited to credit market impacts

21   and, by extension, economic impacts.  That's what

22   I'm qualified to speak on, so again --

23   BY MR. SOLA:

24        Q.   Okay.  But you --

1        A.    Yes.

2        Q.    Well, but my question is about credit

3    score.  That seems to be what you keep pointing out.

4        A.    No, I've --

5        Q.    But I'm not asking about score.

6        A.    I've extended this to credit market

7    impacts.  I mean, a score is something that's used

8    in an origination process for credit decisioning for

9    eligibility determination, and that would be credit

10   market, not credit score.  So it's in the

11   origination process so I do, in fact, include that.

12       Q.    And you agree inquiries by themselves are

13   considered in credit decisions, right?

14       MS. ROPER:  Objection to form.

15   BY THE WITNESS:

16       A.    Inquiries by themselves are considered,

17   yeah.

18   BY MR. SOLA:

19       Q.    They're a factor?

20       A.    They are a factor, yes.

21       Q.    And, in fact, one of the standard reason

22   codes on an adverse action letter is too many recent

23   inquiries, correct?

24       A.    That is a reason code, absolutely.

1        Q.   Okay.  So not even considering the effect

2   on the score, the number of inquiries could cause a

3   credit denial?

4        MS. ROPER:  Objection to form.

5   BY THE WITNESS:

6        A.   Yeah, the number of inquiries is a

7   variable that's included in a credit score, yes.

8   BY MR. SOLA:

9        Q.   Okay.

10       A.   And it's in the reason code section

11   specifically because of its link to a credit score,

12   absolutely.

13       Q.   Well, don't you agree -- okay.  Do you

14   believe that it's only in the reason code because of

15   its link to a credit score?

16       A.   The reason codes in a credit report are

17   reasons why you basically don't have a perfect

18   credit score.  So if you apply for a credit score

19   and a credit report, they're going to offer you

20   reasons why you don't have an 850.  It's basically

21   information that could help a consumer take measures

22   or change their behavior to improve their score.

23   Now, there's adverse action notifications which have

24   reasons.  So an adverse action could be taken or by

1    a lender and would provide reasons why an adverse

2    action was taken that would include, you know,

3    potentially a high number of inquiries, yes,

4    absolutely.

5        Q.    That's right.  And so that adverse action

6    based on the high number of inquiries could occur

7    regardless of whether there was a score provided to

8    that creditor or not, correct?

9        MS. ROPER:  Objection to form.

10   BY THE WITNESS:

11       A.    I'm unaware of an instance where a lender

12   would pull a credit file without a score and would

13   use that as a reason -- I mean, they could

14   potentially just use credit file data in their own

15   proprietary score and report back that's a reason,

16   but it would generally be linked to their own score.

17   I mean, I -- I'm not familiar with a manual

18   underwriting process that generates a reasons code

19   section that would have that in.  I think almost in

20   every instance in this environment of pervasive

21   automatic underwriting would be linked to a score,

22   whether it's a generic credit bureau score like a

23   FICO or Vantage or whether it's a proprietary score

24   that is internal to a creditor.

UNOFFICIAL DRAFT TRANSCRIPT

1   BY MR. SOLA:

2        Q.    Now, your opinions in these cases where

3   you're testifying on behalf of a credit reporting

4   agency, are you generally defending the actions of

5   the credit reporting agency; in other words, saying

6   that they're procedures or policies were proper?

7        A.    I think I've done most of my work for the

8   defendant, yeah, that would be correct.

9        Q.    Okay.  And in those cases where you talk

10  about harm, is your opinion generally that the

11  consumer has not suffered any harm?

12       A.    I don't think I would simplify it as

13  such.  I think I would provide a more objective

14  perspective that there are cases in which an

15  individual may have suffered harm even possibly

16  quite considerable harm.  But there are also cases

17  where a consumer likely has not experienced any harm

18  at all and they're lots of shades of gray in

19  between.  I think, you know, oftentimes it's a

20  matter of cases being brought with overly simplified

21  positions where reality is far more complex.  So I'm

22  trying to provide the trier of fact with a

23  consideration of facts based on expert knowledge and

24  opinion and evidence.

UNOFFICIAL DRAFT TRANSCRIPT

1          Q.   Is it your opinion that having inaccurate

2    information on your credit report itself is not

3    harm?

4          MS. ROPER:  Objection to form, misstates his

5    testimony.

6    BY THE WITNESS:

7          A.   That having inaccurate credit information

8    on a credit report by itself is not harm.  So if you

9    mean by itself, do you mean that the data subject

10   doesn't have any awareness of it, that a third party

11   never pulls it, that it's never run through a score

12   card, that it just exists on a database --

13   BY MR. SOLA:

14         Q.   No, that --

15         A.   -- but it's never used?

16         Q.   No, that's a good -- that's a good

17   question.  Let's add that one, a couple of those

18   variables.

19              Is it your opinion that there is no harm

20   to a consumer if inaccurate information is reported

21   about them on a credit report?

22         MS. ROPER:  Objection to form.

23   BY THE WITNESS:

24         A.   You know, I'll just foreshadow what

UNOFFICIAL DRAFT TRANSCRIPT

1   you're going to hear a lot today.  It depends.

2   Let's say that an old credit line, credit card with

3   a very high limit that's never had a late payment

4   finds itself on to my credit report and it's

5   accurate, inaccurate, it's not mine.  I know it's

6   not mine, but by credit score goes from a 550 to a

7   720.  Am I harmed by the presence of an inaccurate

8   piece of information on my credit report?  I mean,

9   from a credit market perspective, I'm probably

10  helped.  And that's the area that I'm here to talk

11  about.

12          If you want to go into other domains

13  about morality or, you know, emotion, I mean, I

14  could be wrestling with the correctness of knowingly

15  including inaccurate information that could

16  potentially benefit me, so I may be harmed in terms

17  of moral degradation, but I mean that's speculative.

18  But I mean there are lots of scenarios where

19  inaccurate information on your credit report not

20  only wouldn't harm you but could benefit you from a

21  credit market perspective.

22          Q.   Okay.  Let's take that scenario.  So

23  let's say there was something on your credit report

24  that was inaccurate that actually raised your credit

UNOFFICIAL DRAFT TRANSCRIPT

1    score, okay, and then a lender made a decision based

2    on that score.  Okay.  Then the lender's making a

3    decision on an inaccurate score, right?

4        A.    Correct.

5        Q.    Okay.  Then the lender's harmed, right,

6    aren't they, because they're making a decision on

7    inaccurate data?

8        MS. ROPER:  Objection to form.

9    BY MR. SOLA:

10        Q.    Let me say they could be harmed if that

11    loan -- if that person wasn't qualified when they

12    made the loan?

13        MS. ROPER:  Objection to form.

14    BY THE WITNESS:

15        A.    I mean, it depends.  Like again, you

16    know, if the person makes the minimum payments,

17    never misses a payment, turns out to be a good

18    customer, you know, they've beaten the odds and

19    they've got a new customer making payments.  Yes, if

20    they extend -- if it results in overextension, then

21    everybody would be harmed.  But I mean it also could

22    be a scenario -- I mean you're positing where now

23    I've got an inaccurate piece of information that

24    increases my score and then I apply for credit.  And

 1   then I get credit that I can't afford, so I mean

 2   you're sort of narrowing the scenario based -- you

 3   know, yes.  There are lots of scenarios to your

 4   point where if we look at the individual

 5   circumstances that are tied to their behavior; the

 6   contents of their credit report, the nature of the

 7   inaccurate piece of information, an individual could

 8   be harmed or benefit.  And by extension, a lending

 9   institution could be harmed or benefit.  And by

10   further extension, the general population which then

11   has to account for the risk premium because of the

12   degradation in the portfolio performance could also

13   be harmed because their interest rate will go up

14   marginally.  So, I mean, we can take this the whole

15   way to the macroeconomy if you want but, I mean,

16   yes.

17   BY MR. SOLA:

18        Q.   Okay.  Would you agree that when a

19   customer buys a credit report from Equifax, they

20   believe the information is accurate?

21        MS. ROPER:  Objection to form.

22   BY THE WITNESS:

23        A.   I think they believe it's -- you know,

24   it's an accurate piece of information based on their

1   past experience with credit reports from Equifax.

2   BY MR. SOLA:

3        Q.   All right.  And, in fact, that's what

4   they're paying for, accurate information, right?

5        A.   Yes, they are.

6        Q.   All right.  And if they get inaccurate

7   information, then they're not getting what they

8   bought, paid for, right?

9        A.   Correct.

10        Q.   All right.  Let's talk about trial

11   testimony.  Have you ever given trial testimony?

12        A.   I have, yes.

13        Q.   Okay.  In credit reporting cases?

14        A.   No.

15        Q.   In what kind of cases?

16        A.   IMS Health, I think Sorrell, and I've

17   forgotten the other one, but it's on the appendix.

18   They were effectively questions of the relationship

19   between access to script data, which is basically

20   data on the prescriptions offered by physicians and

21   filled by pharmacies to pharmaceutical companies and

22   used in detail, which is the ability of pharma sales

23   staff to prioritize different physicians for

24   different treatments, different therapeutic

1    treatments.  And there was an alleged link that this

2    was driving up the cost of prescription drugs.  And

3    we were involved to testify --

4         Q.   Do you mind me cutting you off?

5         A.   That's fine.  That's fine, yes.

6         Q.   That's enough.  You're not a lawyer, is

7    that correct?

8         A.   No, I'm not.

9         Q.   Okay.  And you're not offering any

10   opinion in this case on whether Equifax's actions or

11   procedures related to disputes of inquiries complies

12   with the Fair Credit Reporting Act, correct?

13        A.   No, sir, I'm not.

14        Q.   All right.  And you're not offering any

15   opinion on whether Equifax's actions or procedures

16   regarding disputes of inquiries was in reckless

17   disregard of the Fair Credit Reporting Act?

18        A.   No.

19        Q.   In fact, you don't know the provisions of

20   the Fair Credit Reporting Act, is that fair to say?

21        MS. ROPER:  Objection to form.

22   BY THE WITNESS:

23        A.   I'm fairly familiar with the Fair Credit

24   Reporting Act.  I mean, I've read it dozens of times

1    over my life, and I've testified in Congress on

2    considerations of amendments to the Fair Credit

3    Reporting Act, so I would say I have an above

4    average familiarity with the Fair Credit Reporting

5    Act.  But I'm not a lawyer, and I'm not here today

6    to offer an opinion on compliance with the FCRA.

7    BY MR. SOLA:

8         Q.    All right.  And you're not here to offer

9    an opinion on interpretation of any section of the

10   FCRA, is that right?

11        A.    No.

12        Q.    Or of any reading of the FCRA would be

13   considered reasonable?

14        A.    No.

15        Q.    And you have no knowledge of the position

16   of the Federal Trade Commission in regard to a

17   credit reporting agency's obligations regarding

18   disputes of inquiries, is that right?

19        A.    I mean, I -- I don't know that I'd say I

20   have no knowledge.  You know, we've consulted with

21   and advised the FTC over the years particularly in

22   regard to their congressionally mandated study on

23   the accuracy of data contained in the database used

24   of the three nationwide consumer reporting agencies.

 1    And a component of that was the dispute resolution

 2    process simply because from a methodological

 3    perspective in crafting our study and in advising

 4    the FTC on how they should craft their study, this

 5    was certainly a consideration, especially because

 6    both their study and our study directly involved

 7    consumers.

 8              And so I have some familiarity with

 9    staff, if the staff that were involved in the study

10    and their perspective on the dispute resolution

11    process generally and then you know specifically

12    with regard to different types of either information

13    or data elements.  But, no, I don't know that it was

14    necessarily so granular as to get into hard

15    inquiries.  But I wouldn't agree with your blanket

16    statement that I have no knowledge.  But --

17        Q.   Well, let me ask you --

18        A.   I'm not here to opine on, you know, FTC

19    perspectives on compliance of the dispute

20    reinvestigation and resolution process with respect

21    to hard inquiries and in my report or today.

22        Q.   Okay.  Would you agree you don't know if

23    the FTC's position is that disputed inquiries have

24    to be reinvestigated by consumer reporting agencies?

1        A.   Yeah.  I mean, you're getting into legal

2    definitions and, you know, parsing, and I -- whether

3    or not the FTC thinks that a piece -- a data

4    element, you know, of factual record of access

5    should be treated the same as a piece of a data

6    that's furnished to a credit bureau, I'm unaware

7    that they've published anything in that regard.  I

8    likely would have seen it, but I don't have any

9    recollection of that.

10       Q.   So it's fair to say you have no knowledge

11   of the Fair Credit -- Federal Trade Commission's

12   position as to whether inquiries that are disputed

13   should be reinvestigated by consumer reporting

14   agencies?

15       A.   Yeah.

16       MS. ROPER:  Objection to form, misstates his

17   prior testimony.

18   BY THE WITNESS:

19       A.   And I would just again state that we've

20   worked with the FTC, they've never raised the issue.

21   I would have thought if they would have believed

22   that there were some inadequate measure in place by

23   any of the three nationwide CRAs with which they and

24   we work, that would have come to the fore during

1    those methodological discussions, and it didn't.  So

2    again I wouldn't say that I have no knowledge, but I

3    would say that, you know, if you're seeking very

4    specific granular information on, you know, one data

5    element in a consumer credit report, you know, I

6    don't have a detailed knowledge of a potentially

7    nuanced opinion, but I also know that the FTC in the

8    course of that had they had any problems with it,

9    they most likely would have advised and counseled

10   the three credit bureaus to change their practice.

11   And that they didn't I think is consistent with they

12   probably didn't have an issue with it.

13   BY MR. SOLA:

14       Q.   Well, you're sake you worked with the

15   FTC.  How far back are you going?  Are you going

16   back to the '90s?

17       A.   2004.

18       Q.   Oh, 2004.  Okay.  So just in the last 11

19   years?

20       A.   Yeah.

21       Q.   Okay.  And you know the FTC has regulated

22   the --

23       A.   Oh, yeah.

24       Q.   -- the FCRA for more than 40 years,

1    right?

2         A.    Correct.

3         Q.    Okay.  And am I correct you have no

4    knowledge of the position of the Consumer Financial

5    Protection Bureau in regard to a credit reporting

6    agency's obligations to reinvestigate disputes of

7    inquiries?

8         MS. ROPER:  Objection to form.

9    BY THE WITNESS:

10        A.    Yeah.  I would offer the same answer that

11   I did with the FTC.  I mean, we've worked with and

12   advised the CFPB on consumer credit information and

13   sharing issues since their inception.  I know Corey

14   Stone very well.  We've advised them on

15   congressionally mandated studies.  We've briefed

16   them extensively and repeatedly on data quality

17   analysis while I was in the field on the aspects of

18   the methodology and separately on the findings and

19   conclusions.  And again I think at any point had

20   they or the FTC had any problems with the practices

21   around dispute resolution on hard inquiries or any

22   data element or trade line, that would have come to

23   the fore.  So I don't know represent myself as

24   having no knowledge.  But again it's very possible

UNOFFICIAL DRAFT TRANSCRIPT

1    that someone at the CFPB presently may have an issue

2    and they may be investigating it.  I can't claim to

3    have inside information on, you know, emerging

4    concerns, if any, from the CFPB on this specific

5    issue.

6         Q.   And, in fact, you're not aware of any

7    enforcement actions related to disputes of

8    inquiries, is that right?

9         A.   Correct.

10        Q.   I notice on page 30 and 31 of your report

11   you indicate the documents and materials you relied

12   on in forming your opinions.  Do you see that?

13        A.   Correct.

14        Q.   Okay.  And I don't -- I don't see in

15   there the complaint.  You didn't read that, is that

16   fair to say?

17        A.   No, I did read the complaint.  It's an

18   oversight.  And so with your permission, I'll revise

19   that to include the complaint.

20        Q.   All right.  And am I correct you did not

21   review the Equifax credit reports on Mr. Steed?

22        A.   Correct.

23        Q.   And you did not review Mr. Steed's

24   dispute letter to Equifax?

1          A.    Correct.

2          Q.    And you did not review the results of the

3    disputes that Equifax send to Mr. Steed?

4          A.    Correct.  I mean, I read what was in the

5    materials that I've listed here, and there were

6    discussions about those contents.  But based on

7    those discussions, I didn't see any need to read the

8    underlying documentation, the credit reports or the

9    forms.

10         Q.    All right.  And the same with

11   Ms. Summers, you didn't look at her credit reports

12   from Equifax or her disputes or the results?

13         A.    That's right.

14         Q.    And you did not review Equifax's

15   responses to interrogatories that the plaintiffs

16   submitted?

17         A.    I think -- the general contents were

18   contained in these documents.  And some of the

19   language was sited that I think even in the

20   depositions you may have read what you called the

21   robo letters or the robo form, the aspects about

22   the -- their having contacted the inquirer and so

23   forth.  But I am familiar with the form.  I've seen

24   the form.  I've been provided with a general form

1    that would have been, I believe, was represented to

2    me the letter that Mr. Steed and Ms. Summers would

3    have received.

4        Q.    Okay.  And by form, you mean the form

5    results --

6        A.    Yeah.

7        Q.    -- Equifax uses?

8        A.    Correct.

9        Q.    And did you review any documents to

10   prepare for the deposition?

11       A.    I did.

12       Q.    What did you review?

13       A.    The complaint, my own report.  I think

14   that's it.

15       Q.    Okay.  When were you hired to work on

16   this case?

17       A.    I don't know the exact date.  I think I

18   was contacted when I was in Montreal this summer, so

19   it would have been sometime in July or August, I

20   think.  And I don't know if I was hired at that

21   point.  I think that was when I was reached out to.

22   It may have been some weeks later.  So it's possible

23   it could have been September.

24       Q.    All right.  And who contacted you?

1          A.     Meryl.

2          Q.     Meryl Roper?

3          A.     Yes, Meryl Roper.

4          Q.     Counsel for Equifax?

5          A.     The woman sitting right next to me.

6          Q.     Okay.  Have you had any contacts with

7    anyone else -- well, have you had any contacts with

8    anybody at Equifax in regard to your work on this

9    case?

10         A.     Before or after?

11         Q.     After.

12         A.     Oh, after.  Okay.

13         Q.     After you were contacted by Ms. Roper?

14         A.     Yes, I had a half day meeting in Atlanta

15   at the law offices of King & Spalding, at least

16   that's where I think I was.  And general counsel

17   of --

18         THE WITNESS:  Troy, was that his name?

19   BY THE WITNESS:

20         A.     -- was there.  And then another Equifax

21   lawyer whose name presently escapes me.  I want to

22   say Jennifer, but it's a common name.

23   BY MR. SOLA:

24         Q.     All right.  Now, are you -- would you

UNOFFICIAL DRAFT TRANSCRIPT

1   claim attorney-client privilege for those

2   discussions?

3       MS. ROPER:  I would.  It was after Mr. Turner

4   was retained and started work on the case.

5       MR. SOLA:  All right.

6   BY THE WITNESS:

7       A.    Sorry.  I also had at least one other

8   phone call with Gary Pock, I think is his name.  I

9   had read his deposition and had some questions that

10  I wanted clarification on, so there was also that

11  conversation.  And then I did have another phone

12  call with someone from Equifax legal on some

13  questions regarding their materials and just again

14  clarification, so I think three communications all

15  in, yes.

16  BY MR. SOLA:

17      Q.    And was this prior to you preparing your

18  expert report?

19      A.    I think it would be during the course

20  would be more accurate, yes.

21      Q.    So prior to the date you submitted your

22  report, is that fair?

23      A.    Yes, sir.

24      Q.    Okay.  What's your understanding of

1    Mr. Steed's claim in this case?

2         A.   Mr. Steed is claiming effectively mixed

3    file and that, you know, he -- the response from

4    Equifax was inadequate given his actions and

5    communications with Equifax.

6         Q.   And response in regard to what?

7         A.   A hard inquiry on his report from like

8    clear something.  I can't remember the furnisher,

9    and the furnisher was coded differently at different

10   points in time.  But, yes -- the inquirer rather.

11        Q.   All right.  And you agree there were

12   errors on his Equifax credit report?

13        MS. ROPER:  Objection to form.

14   BY THE WITNESS:

15        A.   Yeah, I mean, possible, those are

16   inaccurate.  I mean it's likely based on what I

17   read.

18   BY MR. SOLA:

19        Q.   Okay.  You don't know, is that fair to

20   say?

21        A.   You know, it seems based on what I've

22   seen that the inquiry may have been inaccurate may

23   have been the result of a mixed file, yes.

24        Q.   Okay.  And what's your understanding of

1    what a mixed file is?

2         A.   Well, it conventionally, it's when

3    information or a data element that belongs to person

4    A ends up on another person, let's say person B's

5    credit file, going to any number of reasons, it

6    could be similarity in their names.  Could be

7    similarity in their SSN.  Could be that they reside

8    at the same address.  There's just some manage issue

9    that led to populating one person's credit file with

10   data or information about another person.

11        Q.   And you agree that Mr. Steed had a mixed

12   file?

13        MS. ROPER:  Objection to form.

14   BY THE WITNESS:

15        A.   Yeah.  I mean, you know, again, I think

16   based on my review, that's certainly a distinct

17   possibility.

18   BY MR. SOLA:

19        Q.   All right.  Do you agree that Equifax

20   when they received his dispute of the inquiry at

21   issue in this case treated his file as a mixed file?

22        MS. ROPER:  Objection to form.

23   BY THE WITNESS:

24        A.   Yeah.  I'm not really an expert on the

UNOFFICIAL DRAFT TRANSCRIPT                42

1    application of, you know, their policies and

2    processes, and I know you had an opportunity to

3    speak with Equifax employees about that.  So I'm,

4    you know, really here to talk about whether or not

5    the practices and policies of Equifax are adequate

6    and you know given the nature of the dispute and are

7    consistent with industry practices so that's a

8    different level of analysis than an individual

9    application.

10       Q.    All right.  So you don't know if they

11   treated his file as a mixed file when they got his

12   dispute, is that fair to say?

13       A.    Sure.

14       Q.    All right.  And you don't know when he

15   made his dispute that's at issue in this case, do

16   you?

17       A.    You know, I don't have the date at hand,

18   but I've read in the documents in the complaint and

19   in his deposition when the date was, yes.

20       Q.    And do you know what item he was

21   disputing that he's claiming in this case?

22       A.    There was a hard inquiry from like C --

23   it was clear -- I can't remember what the acronym

24   stands for.  But it was a lender or a card issuer

1   that he's claiming is not his effectively.

2        Q.   And you don't know what he sent to

3   Equifax in regard to that dispute, do you?

4        A.   You know, I -- my understanding is

5   there's inconsistencies in his representations and

6   there was a lengthy period of time between

7   communications, but I believe there was initially an

8   oral, like a phone call that he placed, and I don't

9   believe there was any follow-up after that for more

10  than a year.  But again, I mean, that's something

11  that I've looked at.  It's different than

12  Ms. Summers, who seems to have provided much more

13  information and gone to much further lengths to have

14  the variety of inaccuracies removed from her credit

15  file than did Mr. Steed.

16       Q.   And you're not aware of the results that

17  were sent to Mr. Steed other than that it was the

18  form letter?

19       MS. ROPER:  Objection to form.

20  BY THE WITNESS:

21       A.   Yeah, it's my understanding that he

22  received a communication from Equifax that his

23  record had been accessed, there had been a

24  disclosure and then the contact information from the

1    inquirer and was directed to communicate directly

2    with them.

3    BY MR. SOLA:

4        Q.    Okay.  And do you understand he wasn't

5    disputing that his record had been accessed but

6    rather that that record access did not pertain to

7    him and should not be on his report?

8        A.    Right.

9        Q.    All right.  He was right about that,

10   wasn't he?

11       MS. ROPER:  Objection to form.

12   BY THE WITNESS:

13       A.    You know, if his obligations were true,

14   that if someone else accessed his credit file or if

15   his credit file was provided without his

16   authorization, that would be true, yes.

17   BY MR. SOLA:

18       Q.    Okay.  But Equifax never looked into

19   whether that was true, did it?

20       MS. ROPER:  Objection to form.

21   BY THE WITNESS:

22       A.    You know, my understanding is that

23   Equifax responded by suggesting or stating clearly

24   that his credit report had been provided to that

1    specific inquirer on that particular date and, you

2    know, if it was unauthorized, he should contact them

3    and communicate with them.

4    BY MR. SOLA:

5        Q.   But my question is:  Equifax never looked

6    into the fact as to whether that access of his

7    credit report actually belonged to him?

8        MS. ROPER:  Objection to form.  Robert, so I

9    don't keep interrupting you.  Could I have a

10   standing line of objections to the specifics of

11   Mr. Steed's dispute with Equifax?  He's already

12   testified that what he looked at and what he did,

13   and I don't want to keep interrupting.

14       MR. SOLA:  Okay.  Well, what's the basis for

15   the objection?  You said --

16       MS. ROPER:  That is --

17       MR. SOLA:  -- a form objection, right?

18       MS. ROPER:  I'm sorry?

19       MR. SOLA:  A form objection, so what's wrong

20   with --

21       MS. ROPER:  Well, the --

22       MR. SOLA:  -- the form?

23       MS. ROPER:  -- form of my objection is that

24   it misstates his testimony, that it assumes facts

1    that are not in evidence.  Mr. Turner has already

2    testified as to the documents that he's reviewed,

3    the documents that he hasn't reviewed.  He's already

4    stated that he didn't review any of the dispute

5    letters from Mr. Steed.  He didn't -- he's not here

6    to testify as to what was done specifically with

7    respect to Mr. Steed or Ms. Summers but more

8    generally as to hard inquiries and whether the way

9    that Equifax handles them are consistent with

10   industry practices.

11       MR. SOLA:  Well, just because that's not what

12   he wants to testify about doesn't mean I can't ask

13   him about that.

14       MS. ROPER:  I'm not saying --

15       MR. SOLA:  I mean, it's --

16       MS. ROPER:  -- you can't ask him -- I'm not

17   saying you can't ask him that.  You can certainly

18   ask him the questions.

19       MR. SOLA:  All right.  Well --

20       MS. ROPER:  I'm not preventing him from

21   answering, I just don't want to keep objecting to

22   form to every single one, but I'll just continue to

23   do that.  Go ahead, Mr. Turner.

24

1   BY THE WITNESS:

2       A.   I mean, all I can speak to are the facts

3   that were provided and the documents I reviewed, so

4   I don't know if I haven't been provided the

5   documents by Equifax.  I mean, in --

6   BY MR. SOLA:

7       Q.   Well, let me --

8       A.   -- the complaint --

9       Q.   Let me ask you.  I'm asking --

10      A.   -- and what was -- if I could finish.

11      Q.   Okay.

12      A.   In the complaint and the depositions I

13  read, you all have presented opinions and evidence

14  that suggests that, you know, this was a mixed file

15  or, you know, Ms. Summers was a victim of identify

16  theft, and this data remained on their credit file

17  after they've been contacted.  I understand that.  I

18  don't know how the dispute was handled when the

19  dispute was filed with Equifax other than that again

20  in the facts here, there was a letter sent to both.

21  It's the letter we've already discussed.  So, yeah,

22  I mean --

23      Q.   Okay.  So you don't know -- basically

24  you're saying you don't know what Equifax did in

1   response to Mr. Steed's dispute?

2        A.   I mean, my understanding is that they

3   communicated, you know, a factual record of access,

4   you know, they provided both named plaintiffs with

5   the same letter that access was made of your credit

6   file by different inquirers on these dates and

7   here's their contact information, that this was

8   unauthorized, please communicate with them.  And

9   that's my understanding of what happened with the

10  initial communication.

11            I know there was oral communication with

12  Ms. Summers.  She mailed in information, two

13  different letters, one pertaining to her daughter,

14  one pertaining to her, and pieces of information

15  were revealed.  So they're different.  But I'm --

16  I'm, you know, the details of what person and what

17  day and that sort of thing, I've never been

18  provided, so I can't speak to that.  Nor do I think

19  that's necessarily relevant to the larger question.

20  But I'll stop.

21        Q.   All right.  So fair to say other than

22  your knowledge that in response to Mr. Steed's and

23  Ms. Summers's disputes, they received the letter,

24  which we've refer to sometimes as the form letter,

1    you don't know what Equifax did?

2        MS. ROPER:  Objection to form, asked and

3    answered.

4    BY THE WITNESS:

5        A.    Yeah, I mean, again, I know that an

6    errant address associated with identify theft for

7    Ms. Summers was removed.  I think it was a Charlotte

8    address.  I know that a credit card trade line, I

9    think also associated with the identify theft, was

10   removed.  I know that an auto loan that was linked

11   to her three-year-old daughter, I think, was also

12   removed.  So all of the information that was

13   contested, my understanding, by Ms. Summers but for

14   the three hard inquiries, the two from DirecTV or

15   DISH Network and one from the other, were dealt

16   with.  So the issue was at that juncture the

17   presence of the hard inquiries, but nothing else.

18   So, you know, now do I know what happened to have

19   all those removed?  No.  But I know that those were

20   removed.

21   BY MR. SOLA:

22       Q.    All right.  Let's talk about the disputes

23   of the hard inquiries.  Other than the fact that she

24   received back the form letter, you don't know what

1    Equifax did in regard to any reinvestigation of the

2    hard inquiries, correct?

3         MS. ROPER:  Objection to form, asked and

4    answered.

5    BY THE WITNESS:

6         A.   Yeah.  So again I know there was a phone

7    call by Ms. Summers from her deposition maybe a

8    year-and-a-half after the hard inquiries hit her

9    credit report.  And maybe a year after she sent the

10   letters.  And I think she was told that they no

11   longer have any impact on her credit score and that

12   they're deleted after two years and the two years

13   were coming up for one and within I think two

14   quarters they would both be deleted.  But, no, I

15   don't know specifically what they did internally.  I

16   know they were provided with information.  I know

17   they acted on that information regarding everything

18   but the hard inquiries, but the hard inquiries

19   remained.  And so there was an oral communication,

20   yes.

21   BY MR. SOLA:

22        Q.   And you understand that Ms. Summers

23   claims she's a victim of identify theft, correct?

24        A.   I do, yes.

UNOFFICIAL DRAFT TRANSCRIPT                              51

1      Q.    And it seems like you're aware that the

2    information she disputed resulting from identify

3    theft other than the hard inquiries was deleted?

4      A.    That's my understanding, correct.

5      Q.    Okay.   Do you know whether Ms. Summers

6    ever sent Equifax a police report?

7      A.    I do.   I mean, she -- well, I have not

8    seen a copy of it.   But my understanding from the

9    materials I've read and sited here is that she

10   claims to have sent two police reports, one from

11   Charlotte, Mecklenburg County, and the other from

12   the North Pole, Alaska, so.

13     Q.    Now, I -- am I correct you don't have any

14   opinion as to whether Equifax -- well, as to

15   Equifax's handing of Ms. Summers' disputes, is that

16   fair to say?

17     A.    Yeah, I'm not specifically offering

18   opinions on applications of Equifax's policy.  I was

19   asked to opine on the consistency of Equifax's

20   dispute resolution practices given the nature of the

21   dispute and given my knowledge of industry practices

22   and standards.

23     Q.    All right.   And that's also true, you

24   have no opinion as to Equifax's handling Mr. Steed's

1   disputes?

2        A.    Correct.

3        Q.    Did you speak with anyone at Equifax to

4   prepare for the deposition?

5        A.    Other than the conversations for -- oh,

6   for the deposition?  Sorry, I misunderstood.  One of

7   the lawyers from Equifax was involved in the dep

8   prep yesterday.  Again I don't remember her name.

9   She didn't really offer much, but she was on the

10  call, yes.  I'm really embarrassed I don't remember.

11  I'm sorry, I don't remember the name.  I can find

12  that for you.

13       Q.    All right.  And did you meet with anybody

14  outside of Equifax to prepare for the deposition?

15       A.    I mean, I had discussions with my

16  colleague, Patrick Walker, who had done some of the,

17  you know, fact-checking and, you know, editing of my

18  report, but other than that, no.

19       Q.    All right.  Could you tell me about your

20  educational background starting with your -- if you

21  have an undergraduate degree.

22       A.    Sure.  So I have a double major BA from

23  Miami University in Ohio in economics and in

24  political science.  And then I have an MIA, Masters

1    International Affairs, from Columbia University in

2    New York City.  And then a Masters of Arts, Masters

3    of Philosophy and Ph.D. from Columbia University in

4    international political economy and the department

5    of political science.

6         Q.   Okay.  And so --

7         A.   And then I also, sorry, have some MBO

8    work I've completed with Harvard University.

9         Q.   All right.  Now, your graduate degree,

10   could you explain again what subject that was?

11        A.   Sure.  It's from the department of

12   political science but it was an interdisciplinary

13   degree with economics and political science.

14        Q.   Okay.  Did that deal with credit

15   reporting?

16        A.   No.

17        Q.   So am I correct that you have no formal

18   education in the field of credit reporting?

19        A.   I'm unaware of a formal discipline

20   offered at universities called credit reporting.

21   But different functions of the credit reporting

22   industry certainly have -- involve aspects of my

23   education, you know, including econometrics,

24   statistics on the quantitative side, you know,

UNOFFICIAL DRAFT TRANSCRIPT

1    finance, business training and they run an

2    operations, the government affairs, which involves

3    legal and policy, so I have certainly skill sets

4    that are eminently relevant to the industry in

5    various facets of the industry.

6         Q.    And what's your job?

7         A.    I'm the president and CEO of the Policy

8    and Economic Research Council.

9         Q.    And how long have you been in that job?

10        A.    14 years.

11        Q.    And what is the Policy and Economic

12   Research Council?

13        A.    It's a 501(c)(3) IRS tax exempt nonprofit

14   research and development organization.  And our

15   mission is to promote financial inclusion

16   domestically and globally through the use of

17   information and information solutions.

18        Q.    What do you mean by financial inclusion?

19        A.    There are a majority of people on earth

20   who have no formal relationship with a bank, a

21   lender, a creditor.  Their credit needs, which are

22   real, are most often met either via the black market

23   or via predatory lenders, pawnshops, check cashing

24   services, pay day lenders, money users or money

UNOFFICIAL DRAFT TRANSCRIPT

1    lenders far less formal than we have in the states

2    here in most cases.

3        Q.    And I think you said financial inclusion

4    through --

5        A.    The use of information and information

6    solutions.

7        Q.    All right.  And what kind of information

8    are you referring to?

9        A.    So in the vernacular of the development

10   world, we talk about financial infrastructure, so

11   that would include consumer and credit information

12   sharing systems and value added services, which

13   would be generally models built from that data and

14   then collateral and asset registries as well as

15   payment systems.

16       Q.    All right.  And so that information would

17   include credit reports, right?

18       A.    Absolutely.

19       Q.    Okay.  And so your work in a way would

20   be -- well, actually I'd say your work is committed

21   to having more credit reports, right?

22       A.    Our work is committed to making sure that

23   those aspects of the financial infrastructure are

24   fairer and more inclusive.  And so that would mean

 1    that it's not about quantity of credit reports, per

 2    se, it's about contents in the credit reports.  I

 3    mean, so, for instance, the crusade I've been on

 4    since 2004 has been to have more non-financial

 5    payment data populate credit bases here in the

 6    United States and globally, things like payments for

 7    gas, water, electricity, landline, wireless phones,

 8    cable telephony, broadband, to help people thicken

 9    their credit reports or help people be seen, in

10    fact, by lenders, so they don't have to have their

11    credit needs met by high cost lenders.

12         Q.    Okay.  So then there'd be -- you're

13    looking to get more information on credit reports,

14    such as the type you described?

15         A.    Among other things.  I mean, again, I'll

16    go back to inclusiveness and fairness.  We're

17    looking to -- so, for example, the reforms I worked

18    on in Australia and New Zealand for seven years,

19    where the national reporting -- credit reporting

20    systems in those countries was what we call negative

21    only, where your -- the data that's on your credit

22    file is only your derogatory information, your late

23    payments, collections, bankruptcies, liens, sort of

24    public record data, which becomes an instrument for

UNOFFICIAL DRAFT TRANSCRIPT

 1   exclusion rather than inclusion, and it makes it
 2   very difficult to enter into the system by any means
 3   ironically other than an inquiry.  So we promoted
 4   reform there and did some original quantitative
 5   economic research for the Australian government and
 6   were able to change the laws in both countries to
 7   promote a more inclusive system.  In fact, it's
 8   called a fair file system.
 9            So it's again, I think, very inaccurate
10   to suggest we're just about more credit reports or
11   more information.  You know, our constituency are
12   what we call -- or who we call the credit invisible
13   or the missing middle, the people who cannot access
14   credit to generate wealth or build assets through
15   either home ownership or starting a small business,
16   not because of any past behavior and not because of
17   limits on their capacity, but because there's no
18   information available on them for lenders to make a
19   decision.
20        Q.   Now, in the United States, you agree that
21   the accuracy of credit reports is essential to the
22   functioning of our credit economy?
23        A.   I think that's universally true, yeah,
24   not just the United States.

1          Q.     All right.

2          A.     I mean, if you have inaccurate data, it's

3    garbage in, garbage out, right.

4          Q.     And what's your income at PERC?

5          A.     I think I might -- I don't know.  It

6    depends on cash flow.  But around $150,000 a year.

7          Q.     Do you have any other sources of income?

8          A.     No.  I mean, my wife earns an income, so

9    we have a household income.

10         Q.     But how about through your expert

11   witness?

12         A.     No.  All that done is done through PERC.

13   I don't get anything personally for this.

14         Q.     All right.  So your payment in this case

15   will go to PERC?

16         A.     Correct.

17         Q.     And now PERC gets funding from several

18   private businesses, is that correct?

19         A.     PERC has a very diverse funding body.  We

20   get money from government agencies.  We get money

21   from non-profits, from charities and philanthropic

22   organizations, from multilaterals and regional

23   development banks, from -- and from the private

24   sector, so yes.

1        Q.    All right.  And I want to ask you about

2    some of these private organizations that provide

3    funding to PERC?

4        A.    Uh-huh.

5        Q.    Okay.  You agree that one of them is

6    Equifax, the defendant in this case?

7        A.    Sure.  Yes.

8        Q.    And how much does Equifax gives to PERC?

9        A.    I think this particular work I'm doing

10   for them right now would be the first instance we've

11   received money from Equifax in probably six or seven

12   years.  They're not a major funder.  I wouldn't even

13   say they're a significant minor funder of PERC.

14       Q.    Well, do you understand they're listed on

15   your website as an organization that --

16       A.    I do.

17       Q.    -- supports PERC?

18       A.    We're transparent.  We try to list all

19   organizations that are funders of PERC.

20       Q.    Okay.  And Equifax Chile?

21       A.    Yeah, we did some small work for them

22   many years ago.

23       Q.    All right.

24       A.    Because Chile also is a negative only

1   country, and it was very punitive to low-income

2   Chileans who couldn't build assets or generate

3   wealth, so we worked with the government to

4   promote -- I mean, it's -- and it was an incredible

5   case, because they were actually publishing credit

6   files in Chile.  You could go and pull credit files

7   on your neighbors if they had negative data.  And it

8   was run by their Chamber of Commerce, and they felt

9   they were doing a service because they considered

10  people with negative information criminals.  They

11  even told me to my face they thought they were

12  criminals --

13       Q.   Well, let me --

14       A.   -- so --

15       Q.   Why was Equifax Chile funding PERC?

16       A.   Because of our brand and our expertise

17  globally on credit reporting and in developing

18  inclusive and fair credit reporting regimes.  And

19  the nature of the regime in Chile, which was very

20  discriminatory.  And so we were brought in as a

21  credible third party.  We've done work with the

22  Inter-American Development Bank in the region and

23  with the World Bank IFC and CGAP.  So we were

24  brought in as a voice to address some of the policy

1   shortcomings with the relevant government agencies.

2        Q.   All right.  And PERC also gets funding

3   from Experian, correct?

4        A.   We do, yes.

5        Q.   And that's one of the three national

6   credit reporting agencies, right?

7        A.   That's correct.

8        Q.   And you also get funding from TransUnion,

9   correct?

10       A.   We do, yes.

11       Q.   Do you get funding from the Consumer Data

12   Industry Association?

13       A.   We have, yes.  It's been several years

14   but, yes, we have.

15       Q.   And that's known as CDIA?

16       A.   Yes, sir.

17       Q.   And that's the trade organization for the

18   credit reporting agencies, correct?

19       A.   That's correct.

20       Q.   Okay.  And then you also get funding from

21   Acxiom, A-c-x-i-o-m, is that right?

22       A.   That's correct.  And that's probably been

23   more than ten years but, yes, they were a funder of

24   ours at some point in time.

1      Q.    Okay.  And what is Acxiom?

2      A.    Acxiom is an information service provider

3   based in Conway, Arkansas.

4      Q.    Okay.  Is that what's known as a data

5   broker?

6      A.    I think part of what they do could be

7   labeled as being a data broker, yes.

8      Q.    All right.  And then you also get funding

9   from Bank of America, is that right?

10     A.    Correct.

11     Q.    Okay.

12     A.    We have had funding from them.  You know,

13   again, you seem to be reading a list --

14     Q.    Yeah.

15     A.    -- published from --

16     Q.    From your website.

17     A.    -- our website.  It's interesting you're

18   not focusing on Bill and Melinda Gates or NEKC or

19   the Kauffman Foundation or the United States

20   Treasury or the Department of Housing and Urban

21   Development or any of the myriad other agencies to

22   paint a balance perspective of our funding sources.

23   In many cases, they're much more significant funders

24   of ours.

UNOFFICIAL DRAFT TRANSCRIPT

1        Q.    Yes, but you're not hired as an expert

2   witness by the Gates --

3        A.    No.

4        Q.    -- Foundation, are you?

5        A.    I understand.  But the intent, I'm

6   assuming, is to try and paint a biased picture of

7   influences on my perspective.  And again the reason

8   we're transparent is because we're intellectually

9   pluralists and eclectic, and it's quite, you know,

10  difficult to draw that picture given the diversity

11  of our funding sources.

12       Q.    Well, aren't you required to indicate

13  your funding sources?

14       A.    No, not at all.  I don't have to have

15  that on the website.  You can get my 990.  And I'm

16  required to divulge that to the IRS but not to

17  anybody on my website.

18       Q.    Okay.

19       A.    That's voluntary.  That's again because

20  of the transparency, our preference to be

21  transparent.

22       Q.    All right.  Citigroup, that's another

23  company that funds you, right?

24       A.    Sure.  Everyone on your list that you've

1    pulled from the website has funded us or funds us

2    historically.

3         Q.    All right.  Well, I just want to make

4    sure it's accurate.  Okay.  Credit Bureau Singapore,

5    is that a funder?

6         A.    Sure.

7         Q.    DataStat?

8         A.    Sure.

9         Q.    And what's DataStat?

10        A.    DataStat is a tiny reseller in Minnesota

11   verification that owns an asset called the

12   verification of income and employment, which was a

13   product created by Wells Fargo and Norwest ten years

14   ago, 15 years ago, that enables lenders to access

15   with the prior uncoerced affirmative consent of the

16   data subject their gross quarterly wages and

17   earnings as reported by their employer to the State

18   Unemployment Agency or State Workforce Agency.

19        Q.    D&B, what is that?

20        A.    Oh, Dun & Bradstreet.

21        Q.    And what do they do?

22        A.    They are a global consumer and commercial

23   credit information bureau.

24        Q.    Am I correct they give -- one of their

1    primary areas is they do credit reports on

2    businesses?

3         A.    They do.  And they also in certain

4    countries like in Australia and New Zealand, they

5    offer consumer credit reports as well.  And they

6    were competing with an intrenched monopoly in both

7    countries, and we were helping them reform the law

8    and helping them promote any competitive issues in

9    those countries as well.

10        Q.    FICO, F-I-C-O, that's a company that

11   creates credit scores, right?

12        A.    That's their primary line of business.

13   They're a value added service provider and the

14   vernacular of the industry, yes.

15        Q.    And FICO, they provide their credit

16   scores to Equifax, Experian and TransUnion, is that

17   right?

18        A.    They do.

19        Q.    What is that?

20        A.    They're an IP backbone provider, so they

21   provide the conduits through which most of the

22   transactional information from the furnishers

23   reaches the three nationwide CRAs.  They also have

24   other information assets, check verification, other

1   data that's financial data.  But they're, you know,

2   financial information services and IP backbone

3   provider.

4         Q.    Fidelity National Information Services,

5   that's another funder, right?

6         A.    Yeah.

7         Q.    All right.  And then GE Money, that's a

8   lender, is that right?

9         A.    Correct.

10        Q.    HSBC, that's a bank?

11        A.    Correct.

12        Q.    IMS Health, I think you've indicated

13  that's an information provider?

14        A.    Correct.  Yeah.

15        Q.    And who did they provide their

16  information to?

17        A.    All different concerns in the health care

18  industry.

19        Q.    Have they provided to consumer reporting

20  agencies?

21        A.    That's not my belief that they provide

22  data to consumer reporting agencies.

23        Q.    Okay.  You understand that there are

24  consumer reporting agencies that report health

1   information?

2          A.    They collect health information, yeah,

3   the payment information generally, yes.

4          Q.    Okay.  And then Intel, that's the --

5          A.    Chip manufacturer.

6          Q.    -- technology company, right?

7          A.    Yep.

8          Q.    JPMorgan Chase and Company, that's a bank

9   and a lender?

10         A.    They are, yes.

11         Q.    Kroll Factual Data, that's a consumer

12  reporting agency?

13         A.    That's one of their lines of business,

14  yes.

15         Q.    LexisNexis, that's a large data provider?

16         A.    Correct.

17         Q.    Also a consumer reporting agency?

18         A.    Correct, yes.

19         Q.    SAS?

20         A.    They're like FICO.  They're a value added

21  service provider.  They provide software to lenders,

22  you know, one of their primary lines of business, to

23  enable them to develop proprietary models.  So

24  Statistical Aptitude Software is what SAS stands

1    for.

2         Q.    Shinsei Bank, S-h-i-n-s-e-i, that's a

3    bank?

4         A.    In Japan, yeah, that we work with them in

5    Japan, yes.

6         Q.    Sinocredit?

7         A.    That's a consultancy in Beijing that's

8    now defunct, yeah.

9         Q.    Standard and Poor's?

10        A.    Ratings agency.

11        Q.    Rates investment products, is that right?

12        A.    Sure.  That's one of their primary lines

13   of business, yes.

14        Q.    All right.  TransUnion, we already talked

15   about them?

16        A.    Uh-huh.

17        Q.    Veda Advantage?

18        A.    That's the large credit bureau in

19   Australia and New Zealand, and they've got

20   subsidiaries in other countries.

21        Q.    Visa, that's the credit card company?

22        A.    Yes, sir.

23        Q.    And then Webster, Chamberlain and Bean?

24        A.    That's a law firm.

1      Q.    Okay.  Where is that?

2      A.    I think in Washington, D.C.

3      Q.    And do they represent financial

4   institutions?

5      A.    In this case, I believe that was their

6   affiliation with CDIA, so they were a funder of

7   ours, so, you know, again for transparency, they

8   were on the list.

9      Q.    Who's CEIA?

10     A.    CDIA.

11     Q.    CDIA?

12     A.    Yes.  Correct.

13     Q.    Okay.  The Consumer Data Industry

14   Association?

15     A.    Yes.  So -- and do we have more on the

16   list, or is that --

17     Q.    That was all I had.  Are you aware of

18   more?

19     A.    Yeah.  So FinMark Trust, USAID.  So

20   FinMark Trust is a nonprofit, charitable,

21   philanthropic org that -- org that's concerned with

22   financial inclusion.  USAID is the development arm

23   of the U.S. Government.  Fannie Mae and Freddie Mac,

24   the FHFA --

1        Q.    I was asking about other private

2  organizations.

3        A.    Oh, I'm sorry, I thought you wanted an

4  accurate picture of all of our funding sources,

5  so -- but okay.

6        Q.    Any other private organizations you're

7  aware of that I didn't list?

8        A.    Not that I'm aware of, no.

9        Q.    Okay.  Now, PERC, is that okay to refer

10  to your organization as PERC?

11        A.    Sure.  That's my preference.

12        Q.    Am I correct they've done reports on

13  credit reports?

14        A.    Sorry, it just sounds funny.  Yes, we

15  have conducted research on different aspects of

16  consumer and commercial credit information sharing

17  in the U.S. and globally.

18        Q.    All right.  And I think you might have

19  listed some of those reports here.  Do you remember

20  what the most recent report PERC issued?  Actually

21  let me just to -- I see it's on the list of

22  publications.

23        A.    Yes.

24        Q.    Okay.  All right.  Let's go down to the

1    fourth from the bottom.  We're on page 33.  U.S.

2    consumer credit reports measuring accuracy and

3    dispute impacts, do you see that?

4         A.    Yes, sir.

5         Q.    All right.  So that was a report you

6    issued about the accuracy and dispute impacts on

7    consumer credit reports, correct?

8         A.    Yes.

9         Q.    Okay.  And that -- that was funded by the

10   CDIA, right?

11        A.    CDIA provided support for that, that's

12   correct.

13        Q.    Okay.  And not only did they provide

14   funding, but they provided assistance in preparing

15   it, correct?

16        A.    Yeah, I mean, they coordinated

17   communications with different stakeholder

18   organizations, including the three nationwide CRAs

19   and central source and others that we needed to work

20   with to execute and implement the project.  But the

21   project design was ours as with any of our projects.

22   We're not a consultancy, so, you know, we have full

23   discretionary authority over the design of the

24   methodology, the implementation of the project and

1    then the results.

2         Q.    And Equifax, they were a funder of that

3    study as well, right?

4         A.    I'm assuming that CDIA collected money.

5    I mean, they're a trade association, and that's

6    generally how trade associations finance projects is

7    they collect money from their membership.  But we

8    never received a check directly from Equifax.

9         Q.    Okay.  Were there any other financial

10   industry groups that funded that study or financial

11   industry businesses?

12        A.    I'm trying to think.  No, I think -- I

13   think -- I mean, it would be in the acknowledgments.

14   Again we disclose funding sources in the

15   acknowledgments of our report.  And I believe this

16   one was CDIA.

17        Q.    All right.  Have you had other reports

18   that you've done on the credit reporting industry

19   that were funded by CDIA?

20        A.    I think the 2006, 2007, the first report

21   on called give credit where credit is due, CDIA was

22   a minor funder among, I don't know, 15 different

23   funders.  So they would have been a contributor to

24   that particular project.  And then the work from

1    2003 on the Fair Credit Reporting Act.  Let's see,

2    the name of the study, I'll find it for you.  Yeah,

3    Fair Credit Reporting Act, access efficiency and

4    opportunity, both one and two, for in 2003, CDIA

5    would have been a member of a group of organizations

6    that funded those two studies.  And I think that's

7    it.

8         Q.    Now, I notice on that study, I think it

9    mentions the National Chamber Foundation of the

10   United States Chamber of Commerce.  Actually, that's

11   the author of the report?

12        A.    They're the publisher, I mean, they --

13   but, you know, U.S. Chamber is a trade association

14   of sorts, and they raise money from members of the

15   chamber.  And, you know, in this case, funders would

16   have included, you know, all sorts of different

17   financial entities that were interested in this

18   analysis.  But, I mean, again, I mean, CDIA sure was

19   a funder of that.

20        Q.    Now, prior to your employment at PERC,

21   what was your employment?

22        A.    Immediately prior I'd work for several

23   years for the Information Services Executive

24   Council, which was a 501(c)(6) group of information

 1   service providers, interested in addressing emerging

 2   data privacy and data security policy challenges in

 3   the states and federally.

 4        Q.   Now, you say that this group, which you

 5   abbreviated ISEC?

 6        A.   I say ISEC, sorry, it's easier to say.

 7        Q.   ISEC was a research and advocacy group --

 8        A.   Correct.

 9        Q.   -- comprised of the nation's largest

10   information services providers, including the three

11   national credit bureaus, and then you mention

12   others?

13        A.   Correct.

14        Q.   Okay.  So this group, ISEC, who you

15   worked for, advocated on behalf of Equifax, Experian

16   and TransUnion?

17        A.   Well, no, we advocated on behalf of, you

18   know, industry positions.  It was a subsidiary of an

19   industry trade association.  You know, my principal

20   task was bringing research skills to quantify, you

21   know, benefits and costs from information flows in

22   different contexts.  And that was what I spent most

23   of my time doing.  I actually resigned from ISEC

24   owing to ethical disputes I had with the mothership

UNOFFICIAL DRAFT TRANSCRIPT

1    and hung up my own shingle, which is how PERC was

2    born.

3         Q.    The mothership meaning ISEC?

4         A.    No.  Meaning the direct marketing

5    association.  Most of the data in that context was

6    not really the credit data, it was more marketing

7    data.  Data that -- you know, online and offline

8    data that's collected, self-reported and through,

9    you know, companies like Google, through

10   DoubleClick, and I just -- you know, I was not

11   comfortable with certain practices by certain

12   industry players and 9/11 happened, a few months

13   later my father died, and I decided life was short,

14   and I quit and I resigned and hung up my own

15   shingle.

16        Q.    All right.  When you say you hung up your

17   own shingle, what do you mean by that?

18        A.    I founded what was then called the

19   Information Policy Institute that morphed into the

20   Policy and Economic Research Council.  As our issue

21   area sort of expanded, we needed a more appropriate

22   name.

23        Q.    All right.  And when you -- what was the

24   first group you mentioned before PERC?

1          A.    The Information Policy Institute.

2          Q.    Okay.  And where did you obtain funding

3    for that?

4          A.    Different sources.  I wrote grants and

5    got grant funding.  I developed projects and passed

6    the hat for different interested parties, so it

7    included public and private sector sources.

8          Q.    And were the private sector sources

9    including credit reporting agencies?

10         A.    In some cases, absolutely, yes.

11         Q.    And banks?

12         A.    In some cases, that would be true.

13         Q.    All right.  Now, do you consider yourself

14   an expert in any fields?

15         A.    In any fields?

16         Q.    Yes.

17         A.    Sure.

18         Q.    Okay.  How about related to credit or

19   credit reporting, do you consider yourself an expert

20   in any field related to credit or credit reporting?

21         A.    Yeah, I mean, yes.

22         Q.    Okay.  In which fields?

23         A.    I have a high degree of familiarity with

24   the structure of the credit reporting industry in

UNOFFICIAL DRAFT TRANSCRIPT

1    the United States and in many emerging markets.  I

2    have familiarity with global practices and trends,

3    the interplay between public credit registries and

4    private credit bureaus and credit reporting policy

5    practices and patterns globally.  Credit modeling,

6    we've built score cards and then social and economic

7    impact analysis based on analysis of credit file

8    data and credit file contents.

9         MS. ROPER:  I'm sorry to interrupt, can we

10   just take a five-minute --

11        MR. SOLA:  Sure.

12        MS. ROPER:  -- kind of like bathroom break?

13        MR. SOLA:  That's fine.

14             (WHEREUPON, a recess was had from

15             10:39 a.m. to 10:51 a.m.)

16   BY MR. SOLA:

17        Q.   In the field of credit reporting, is

18   there a specific area you consider yourself an

19   expert?

20        A.   Yeah, I mean, you know, I've done a lot

21   of work with credit consumer and commercial credit

22   reports, so I'm familiar with the format and their

23   reporting practices and the dispute resolution

24   practices.  I've done a lot of research in terms of

UNOFFICIAL DRAFT TRANSCRIPT

1   the social and economic impacts of including or

2   excluding certain data elements and the accuracy of

3   data.  I've done a lot of work in terms of the

4   inclusion of particularly of non-financial payment

5   data and have built models, production models,

6   generic score cards, then file bankruptcy models and

7   have done a fair amount of work in terms of the

8   reporting from microfinance institutions and SACCOs,

9   both reporting to credit bureaus and using value

10   added services, including randomized control trial,

11   a multicountry, multiyear, randomized control trial

12   I'm running right now for the World Bank.

13       Q.   Now, you understand in this case the

14   primary claim is Equifax is handling the disputes of

15   inquiries, correct?

16       A.   Correct.

17       Q.   Okay.  And do you consider yourself an

18   expert in that area?

19       A.   In terms of the earlier statement I made

20   about the credit information sharing networks in the

21   U.S. and in other countries, yeah, I'm very familiar

22   with information sharing credit information sharing

23   in the United States, particularly with the big

24   three credit bureaus.

1     Q.    Okay.  Well, I'm not asking about
2  information sharing, I'm asking about Equifax's
3  procedures for handling disputes of inquiries.
4     A.    Correct.  Yes, and I'm sorry that's an
5  umbrella term.  So, yes, for the inquiry dispute
6  resolution process and their reinvestigation process
7  for Equifax, I am offering myself as an expert in
8  terms of their consistency with industry practices
9  and the adequacy of their policies given the nature
10  of the dispute, yes.
11     Q.    Okay.  Have you ever been qualified as an
12  expert by any court in the field of credit
13  reporting?
14     A.    No.
15     Q.    Have you ever been not -- found not to be
16  qualified as an expert by a court in the field of
17  credit reporting?
18     A.    Never.
19     Q.    Okay.  So it's never come up?
20     A.    Never.
21     Q.    Okay.  Now, have you ever worked as an
22  expert on any other case that dealt with one of the
23  big three CRAs procedures for resolving disputes?
24     A.    Yeah, you know, I think many of the cases

1    in which I've been involved have -- as I mentioned

2    earlier, have, you know, surrounded allegations made

3    by plaintiffs about the responsive of the -- any one

4    of the big CRAs regarding disputes they made and

5    contents on their credit report and potential harms

6    from -- including disputed information.

7         Q.    Okay.  But that --

8         A.    The reality is they wouldn't be taking

9    something to court if they never dispute it with the

10   CRA.

11        Q.    Okay.  But you mention three areas,

12   disputes, inaccurate information on report and harm,

13   and so --

14        A.    Well, and --

15        Q.    -- I want to just focus on the first.

16        A.    They're sort of hand in glove, right?  I

17   mean, they're disputing something that's perceived

18   to be inaccurate and, you know, asserting a

19   potential harm as a result of a preservation of a

20   perceived inaccurate piece of information.  So, I

21   mean, you can sort of like an Easter egg doll, you

22   know, take them apart, I suppose, but, I mean, you

23   know, in this case and others I've worked on,

24   they've all been sort of inherently interrelated.

1        Q.    Okay.  But you understand, I mean, you

2    could test -- you could be somebody to testify about

3    harm and know nothing about --

4        A.    Oh, I understand.

5        Q.    -- you know, the accuracy, just --

6        A.    Right.

7        Q.    -- simply testifying on harm, let's say,

8    if you're a lender --

9        A.    But we're a very unique organization.

10   We're the only organization on earth that has

11   dedicated itself full-time to an examination of the

12   relationship between information, information uses

13   and financial inclusion and that gives us a specific

14   focus generally on credit information both consumer

15   and commercial but overwhelmingly consumer.  So I

16   think I have a very unique perspective and set of

17   experience that you probably haven't encountered in

18   other expert witnesses.  But I'll leave that for you

19   to question.

20       Q.    Okay.  Why do you believe if you do

21   believe that you're an expert in discussing

22   Equifax's procedures in regard to disputes of

23   inquiries?

24       MS. ROPER:  Objection to form.

UNOFFICIAL DRAFT TRANSCRIPT

1   BY THE WITNESS:

2        A.    Yeah.  I have worked with credit

3   reporting agencies including, but not limited to,

4   the three major repositories since 1999 in various

5   aspects of their direct to consumer relationships,

6   including their dispute resolution processes.  I

7   have through the course of conversations with senior

8   executives in many different CRAs had an opportunity

9   to gain a fairly unique understanding of practices

10  and policies.  I've also in the course of conducting

11  research as with the study that we mentioned and

12  referenced earlier on data quality and dispute

13  resolution processes have an opportunity to work in

14  depth for a period of years with senior executives

15  from the big three, from CDIA working with FTC

16  staff, discussing with their consultants who were

17  running their pilots, different aspects of the

18  dispute resolution process and how it would

19  interface with our attempt to measure the accuracy

20  of data in consumer credit files, so yes.

21  BY MR. SOLA:

22        Q.    Okay.  In working in the field of dispute

23  resolution procedures, did you ever encounter or

24  look into differences in procedures for the disputes

 1    of inquiries versus disputes of other information?

 2         A.    Absolutely.  In the study from 2011, and

 3    the reason being that inquiries are data that's

 4    considered the -- that we considered and certainly

 5    we discussed this with different stakeholders and

 6    different parties including the FTC and their team

 7    that they're endogenous pieces of information.  That

 8    is to say that they're not the data that's generated

 9    through an inquiry rather than a furnished piece of

10    information.  And so the question would be when an

11    individual disputes that, you know, what's the more

12    accurate source of data?  Are we to rely -- and our

13    conclusion was that given the nature of the data and

14    where it's generated that it's sort of a -- end

15    produced as a result of an inquiry to a bureau, that

16    that practice was sufficient.  We had to compare

17    practices on --

18         Q.    Wait, what --

19         A.    -- dispute resolution --

20         Q.    I'm sorry, what practice was sufficient?

21         A.    The utilization of the internal database

22    for assessing the accuracy of a disclosure as a

23    result of an inquiry.

24         Q.    Okay.  Which study are you referring to?

UNOFFICIAL DRAFT TRANSCRIPT

1     A.   The 2011 study on the accuracy of

2   consumer credit file data and dispute processes.

3     Q.   Okay.  And you're saying that PERC

4   concluded that inquiries should be handled

5   differently than other disputes?

6     A.   That's not what I said.

7     Q.   Okay.

8     A.   I said that in the course of our

9   developing our methodology, we looked at how

10  consumers who were the focal point of our study, you

11  know, we engaged thousands of consumers and had them

12  review credit reports from all three bureaus, in

13  most cases all three reports from all three --

14  reports from all three bureaus.  And we had to

15  understand how different data elements or pieces of

16  information would be disputed in differences in the

17  policies potentially among the participating CRAs

18  and whether that would impact our findings.  So we

19  had to have consistency.  If we've got radically

20  different procedures, they could have impacts on the

21  outcomes, which could have impacts on the score,

22  which could have impacts on our conclusions.  So

23  there's a lot of work that goes into the research

24  design even data definitions and you know, I'm

1   sure --

2        Q.    Well, let me -- let me just --

3        A.    But yes.

4        Q.    -- ask you --

5        A.    So refocusing on hard -- on inquiry

6   disputes, we were very comfortable in our

7   examination of the policies of dispute resolution

8   from the three participants, Equifax, Experian and

9   TransUnion that they were sufficient in all cases.

10       Q.    Okay.  Sufficient in what way?

11       A.    They were sufficiently consistent, so

12  that there weren't differences, you know, of any

13  degree that would effect outcomes; in other words,

14  if CRA A funneled all of the inquiry disputes

15  through e-OSCAR, and they don't, I'm just saying

16  hypothetically, while CRA B had very high threshold

17  evidentiary standards to have any, you know, person

18  actually investigate and C decided that any inquiry

19  from any media would result in a deletion of the --

20  I'm sorry, any dispute of any inquiry from any media

21  would result in the deletion.  Those three

22  scenarios, hypothetical scenarios, would result in

23  very different outcomes for disputes and would

24  pollute or make very difficult for us to compare

1   findings across the three bureaus.  So you have to

2   have sufficient consistency in the policies and

3   practices to be able to have an apples to apples

4   comparison of outcomes.  And, you know, again we're

5   looking at accuracy of disputes as initiated by

6   consumers.  So that was an essential piece of that,

7   absolutely.

8        Q.   Okay.  So you say you found they were

9   sufficient in terms of being consistent across the

10  three bureaus?

11       A.   Correct.

12       Q.   Okay.  Any other way in which they were

13  sufficient?

14       A.   And, you know, to my earlier point, we

15  had a discussion about the endogeneity of the data

16  source, because these aren't through e-OSCAR, right,

17  and so --

18       Q.   You mean the disputes are not --

19       A.   Correct.

20       Q.   -- processed through e-OSCAR --

21       A.   Correct.

22       Q.   -- which is a choice of the bureaus,

23  right?

24       A.   Correct.  Yeah.

UNOFFICIAL DRAFT TRANSCRIPT

1          Q.    Okay.

2          A.    And we were comfortable with that

3    justification, you know, among the three bureaus.

4          Q.    Okay.

5          A.    Sorry, that's actually my phone on one.

6    Sorry, I just need to see if it's -- no, it's not.

7    I'm sorry.

8          Q.    All right.  And now in terms of

9    sufficiency, of course, you did not look at

10   sufficiency under the Fair Credit Reporting Act,

11   right?

12         A.    Correct.

13         Q.    So did you have access to the

14   confidential procedures and policies of other

15   bureaus than Equifax in regard to their dispute

16   process for inquiries?

17         A.    We had a lot of access to a lot of

18   different information that was coming -- I mean, we

19   were bound with all sorts of NDAs, but, you know,

20   there was nothing that we wanted or asked for to

21   which we were denied access.  If there was any level

22   of detail about any policy or practice, I mean, we

23   had -- you know, yes, we've had very good access

24   to --

UNOFFICIAL DRAFT TRANSCRIPT

1        Q.    Well --

2        A.    -- materials.

3        Q.    Let me ask.  In this case, you've been

4    provided with Equifax's policies and procedures

5    for --

6        A.    Right.

7        Q.    -- disputes of inquiries?

8        A.    Right.

9        Q.    Have you been given that access by

10   Experian or TransUnion?

11       A.    I'm sure at different points in the past

12   we have, absolutely.

13       Q.    We being PERC, not necessarily --

14       A.    PERC.

15       Q.    -- you?

16       A.    Right.  But, I mean, again, most of our

17   work is not done for -- I mean, I'm not a

18   professional expert witness.  So much of our work is

19   done in the context of research so, you know, we

20   would have had needs for -- you know, I've seen the

21   data dictionaries, I mean, I've -- yes, I've had a

22   lot of confidential -- I mean, I've had confidential

23   financial information shared, so.

24       Q.    And so you believe that you're an expert

UNOFFICIAL DRAFT TRANSCRIPT

1    because of the work you've done through PERC and

2    prior to that in the fields of credit reporting?

3          A.    Yeah.  You know, I -- yeah, I think my

4    belief is validated by, you know, public statements

5    made by industry executives from the world's leading

6    consumer credit information sharing companies.  I've

7    been invited in to address executive teams.  I've

8    been, you know, retained as an expert in other

9    cases.  You know, our work has been cited in

10   Congress.  I've testified before Congress.  I've

11   been invited to advise the Federal Trade Commission,

12   the CFPB.  I've been invited in to give talks by the

13   OCC, the FDIC and others.  So, I mean, I'm sort of a

14   globally recognized expert on different aspects of

15   consumer and commercial credit information sharing,

16   absolutely.

17         Q.    Okay.  But a lot of that work wasn't

18   necessarily dealing with the dispute resolution

19   process, right?  In fact, a lot of it wasn't dealing

20   with the dispute resolution process, was it?

21         MS. ROPER:  Objection, misstates his prior

22   testimony.

23   BY THE WITNESS:

24         A.    Yeah, I mean, I don't know what a lot --

UNOFFICIAL DRAFT TRANSCRIPT

1    that's sort of a subjective term.  I mean, I -- you

2    know, I could be engaged in one project for five

3    years and spend a lot of time in the field and

4    interact with, you know, myriad different players

5    and different facets of an issue and on paper it's

6    one project out of 50, so is that a lot?  You know,

7    I mean, it's -- you know, have I had sufficient

8    exposure to people who are responsible for dispute

9    resolution practices and policies on the industry

10   side?  Have I had discussions with regulators about

11   different aspects of this?  More than, you know, a

12   nonexpert, absolutely.  I mean, absolutely.

13        Q.   Well, when I asked you about PERC, you

14   talked a lot about information and inclusion, and

15   you didn't say anything about dispute resolution.

16        A.   Yeah, so here's the thing and -- you

17   know, and I can --

18        Q.   Wait, let's start -- but that's correct,

19   isn't it?  When you --

20        MS. ROPER:  Object --

21   BY MR. SOLA:

22        Q.   -- described PERC, you did not --

23        A.   No, I, you know --

24        Q.   -- use the words dispute resolution?

UNOFFICIAL DRAFT TRANSCRIPT

1      MR. SOLA:  Objection to form, misstates his

2  testimony.

3  BY THE WITNESS:

4      A.   Yeah, I'm -- you know, are we an

5  organization that our mission is on dispute

6  resolutions?  No.  But if you're trying to

7  pigeonhole the work, it's a very overly simplistic

8  statement.  I mean, when I'm looking, for example,

9  much of the work we've done is focused on the

10  inclusion of non-financial payment data.  One of the

11  principal challenges of populating CRAs here and

12  globally with non-financial data is convincing a

13  furnisher that they would have a benefit from

14  reporting this information and that the cost for

15  compliance for dispute resolution won't overwhelm

16  that benefit and that they have the technical

17  capacity to do so and what that involves and what it

18  doesn't involve, so -- and the process of onboarding

19  data and going to meetings with legal teams and

20  executives at big gas companies or media companies

21  or elsewhere, this is part and parcel of what I'm

22  trying to do.  So, you know, you can't really

23  disentangle dispute resolution from a lot of the

24  work we do.  So if we're going to use the generic

1   term a lot, a lot of the work I've done has involved

2   dispute resolution.  Whether it's in the field or

3   from a methodological perspective and research are

4   from, you know, different policy facets, but, you

5   know, have I -- have I -- sorry, but I'll stop.

6   BY MS. ROPER:

7        Q.   But that involves -- you just talked

8   about noncredit information, right, that's what

9   you're saying you spend a lot of your -- I think you

10  used a word a lot.  But, you know, focusing on --

11       A.   No, I --

12       Q.   -- trying to get --

13       A.   -- intentionally used a lot, yes.

14       Q.   Trying to get noncredit information into

15  the field of credit reporting or consumer reports,

16  right?

17       A.   Right.  But the dispute resolution

18  process would be identical for them, so that's an

19  immaterial difference.

20       Q.   Now, you've indicated that you have been

21  hired by credit reporting agencies as an expert

22  witness, correct?

23       A.   Correct.

24       Q.   Have you ever been hired by consumers as

UNOFFICIAL DRAFT TRANSCRIPT

1    an expert witness?

2        A.    Let's see.  So there was a case some

3    years back where I was asked to assess the fairness

4    or I've forgotten the legal term again not what I

5    do, of a proposed settlement in a class action

6    lawsuit against the three credit bureaus, and so in

7    the course of doing that work, some classes were

8    joined and I discontinued the work.  But I did

9    accept that work and that would have been for

10   plaintiffs, slash, consumers against the big three.

11       Q.    Okay.  And were they consumers that were

12   opposing the settlement?

13       A.    No, that group had agreed to a

14   settlement.  But there was another group that had

15   opposed the settlement and --

16       Q.    I see.

17       A.    -- I don't know how that works.

18       Q.    Okay.

19       A.    Honestly I don't.

20       Q.    But you were hired by the group that

21   wanted the settlement --

22       A.    Had reached a settlement and, you know,

23   were -- yes.  Yes.

24       Q.    And --

UNOFFICIAL DRAFT TRANSCRIPT

1        MS. ROPER:  Robert --

2        MR. SOLA:  Oh, okay.

3        MS. ROPER:  -- sorry to interrupt.  Here's a

4   list that we got from Mr. Turner's office on other

5   cases.  And I don't know if this is a good time.

6   BY MR. SOLA:

7        Q.   Okay.  Well, do you have the list here?

8             Well, let me ask before I get to the

9   list.  Okay.  Other than that one instance you just

10  mentioned, you've never been hired by a consumer or

11  consumer group as an expert, right?

12       A.   No, right, that's right.

13       Q.   Okay.  Have you ever given an opinion

14  that a credit reporting agency was at fault or acted

15  unreasonably in any report or testimony you've given

16  in a case?

17       A.   Acting unreasonably?  I mean, I've given

18  congressional testimony against prevailing industry

19  practices on a number of issues, yeah.

20       Q.   Okay.  But how about as an expert

21  witness?

22       A.   No.

23       Q.   Okay.  So you've never testified that a

24  credit reporting agency was at fault or acted

1   unreasonably, is that right?

2        A.    I think that's correct, yeah.

3        Q.    Okay.  Looking at this list, let's see --

4        MS. ROPER:  Do we want to -- Robert, just

5   logistically, do you want to mark this as a separate

6   exhibit, or do you want to just include it in with

7   the reports since it's actually part of the exhibit

8   or Appendix B?

9        MR. SOLA:  Why don't we just mark it as

10  Exhibit 2.

11               (WHEREUPON, a certain document was

12               marked Turner Exhibit No. 2, for

13               identification.)

14  BY MR. SOLA:

15       Q.    Okay.  The first one, is this the one

16  we've already discussed?

17       A.    Correct.

18       Q.    Okay.  Then the next case, Kroenig versus

19  Maxim Healthcare Services, what was that about?

20       A.    It was about the -- it was a data

21  reporting issue, reuse by an unauthorized party and

22  who was liable for that and generally that was it,

23  right.

24       Q.    Okay.  So it had to deal with -- it dealt

UNOFFICIAL DRAFT TRANSCRIPT

1    more with whether someone improperly used

2    information?

3         A.   Correct.

4         Q.   Okay.  And you were a witness for Maxim

5    Healthcare, is that right?

6         A.   I think so, yeah.

7         Q.   And was your testimony that there was --

8    well, what was your testimony?

9         A.   You know, I don't remember the details.

10   But it was that there was a third party that was

11   misusing the data that didn't have a per admissible

12   purpose but that they had pretexted and that, you

13   know, Maxim wasn't culpable for that, so I don't --

14        Q.   That was -- your testimony was that Maxim

15   wasn't culpable?

16        A.   Yeah, I believe that's the gist of it.  I

17   mean, the details are lost on me.  It was a pretty

18   minor case, yeah.

19        Q.   How did the case resolve?

20        A.   I don't know that it has been.  I

21   submitted a report and, you know, sometimes if it's

22   settled, I don't even find out, you know.  If they

23   need me for anything further, they will contact me.

24        Q.   All right.  Then this 2014 case, Roberto

1    Sevi?

2            A.    Sevi, right.

3            Q.    Sevi versus Experian, TransUnion and

4    Nationstar Mortgage, what was that case about?

5            A.    My recollection of the fact was that

6    Roberto Sevi was a person of very low moral scruples

7    and had even an online brand for conning people and

8    he was in financial distress and trumped up

9    allegations of, you know, harms from allegedly

10   inaccurate information in his credit report against

11   the bureaus in an attempt to gain money to get

12   himself out of financial duress, and, you know,

13   it -- so I think my testimony was to assess the

14   impacts and from a credit market perspective of the

15   alleged inaccurate information and whether it would

16   have resulted in anything he actually claimed.  And,

17   you know, I think this case too was settled.  I

18   don't know that -- I mean, it was a very baseless

19   case.  I mean, this is one of the shortcomings with

20   our judicial system that it's not as tough as it

21   should be on frivolous cases.

22           Q.    And so was your opinion dealing with harm

23   or dealing with liability?

24           A.    You know, it was the impacts of the

UNOFFICIAL DRAFT TRANSCRIPT

1    information and, you know, what it would have done

2    to his score and his creditworthiness and, you know,

3    eligibility for personal and business credit.  He

4    was mixing the two.

5         Q.    And was it you are opinion that he was

6    not harmed in terms of a credit impact?

7         A.    His credit was so horrible already.  I

8    mean, he was bankruptcy and collections and all

9    kinds of derogatories and, I mean, he was clearly

10   robbing vendor -- he would subcontract out projects

11   and not pay them and take the money from the client

12   and, I mean, he was -- it was just a big shell game

13   with this guy.

14        Q.    It would help just --

15        A.    Sorry.

16        Q.    Listen to my question.

17        A.    Sorry.

18        Q.    Okay.  My question was:  Was it your

19   opinion that he was not harmed in terms of credit

20   impact?

21        A.    Correct.

22        Q.    All right.  Then the next case, Maclovia

23   Duarte, D-u-a-r-t-e --

24        A.    Yeah, right.

UNOFFICIAL DRAFT TRANSCRIPT

1      Q.    V. JPMorgan Chase, that involved -- what
2  did -- what was involved there?
3      A.    It was a -- you know, I believe this was
4  one regarding the coding of a modified loan,
5  modified home mortgage loan.  And the claim was that
6  the -- that Chase by reporting the -- and coding her
7  modification under Metro 2 as such had, you know,
8  negatively impacted her credit standing and,
9  therefore, lots of ill would befall to her in her
10  ability to access affordable credit moving forward.
11  And so, you know, I was asked to discuss the
12  appropriateness of coding the modified loan as such
13  under Metro 2 and also then assess the impacts in
14  different scoring models of such a code and whether
15  or not, you know, there was any merit to the claims
16  put forward by the plaintiff.
17      Q.    All right.  You were hired by Chase,
18  right?
19      A.    Chase or their counsel.  I mean, I don't
20  know if that's important or not.  Sometimes they say
21  retained by the company, and sometimes they want you
22  to say you're retained by the law firm.  But yes.
23      Q.    All right.  And in the prior case with
24  Mr. Sevi, you were -- who was -- who were you

UNOFFICIAL DRAFT TRANSCRIPT

1   retained by in that?

2        A.    You know, I want to say Experian, but it

3   may have been TransUnion, and just honestly don't

4   remember.

5        Q.    Okay.  One of the defendants?

6        A.    Right.  One of the defendants.

7        Q.    Okay.  Now back to Duarte, was it your

8   opinion that the coding was proper?

9        A.    It was absolutely proper.

10       Q.    Okay.

11       A.    I mean, I conferred with many

12   authoritative sources to, you know, substantiate my

13   belief.  And, yes, moreover it's a case where that

14   that coding -- it was in a note.  It's ignored by

15   every major score card that's used.  I mean, it's a

16   nonquantitative variable and, hence, it's not put

17   into a score card, so it's just -- it was sort of

18   a -- I can't believe it even got that far type case.

19       Q.    All right.  And then you also mentioned

20   one claim was that there was harm.  Did you give an

21   opinion that there was no harm?

22       A.    Yeah, I did.  I mean, again from a credit

23   market perspective, not from, I don't know,

24   emotional or physical or, I mean, I'm not an expert

UNOFFICIAL DRAFT TRANSCRIPT

1    in those domains.

2          Q.    All right.  And then the next case Mayor

3    Tom Murphy lee L. I. versus TransUnion?

4          A.    Uh-huh.

5          Q.    Was that a person making a claim that

6    TransUnion had reported inaccurate information?

7          A.    I think this was a mixed file case.

8          Q.    Okay.

9          A.    And, you know, dispute resolution given

10   the mixed file and again the dispute process, the

11   alleged inaccurate and the potential consequences

12   that sort of Russian doll metaphor I used earlier,

13   yes.  And that case was settled, I think, when I was

14   midstream on the report, so I didn't -- I don't know

15   if I technically submitted a report on that or not.

16   I think I didn't.  So I don't know why it's on

17   there, but I was retained.  I think you asked for

18   retained, so that's why.

19         Q.    All right.  And the next one looks

20   like --

21         A.    Mixed file.

22         Q.    It looks like a father and son --

23         A.    Correct.

24         Q.    -- Lopez, Jr. and Lopez, Sr. --

1          A.   Right.

2          Q.   -- mixed file?  Which -- I don't see the

3    courts mentioned here.

4          A.   I'll go back and get that.  I don't know.

5          Q.   Several of them, they don't have the

6    court --

7          A.   Okay.  So --

8          Q.   -- just the case number.

9          A.   I think I'll just have Patrick fill it

10   out.

11         Q.   Okay.

12         A.   He was just trying to get you something

13   quickly.

14         Q.   Yeah.  Lopez, who was the defendant in

15   that one?

16         A.   I think TransUnion.

17         Q.   And you were hired by them?

18         A.   Correct.

19         Q.   And did you give an opinion --

20         A.   And same with Sykes and Harris, that

21   would be TransUnion as well.

22         Q.   Okay.  Did you give an opinion in Lopez?

23         A.   I'm pretty sure I did.  But, you know,

24   I'll have to go back and clarify.  This was some

UNOFFICIAL DRAFT TRANSCRIPT

1  time ago, a couple years ago.  A lot of these that

2  we take on, they're pretty clearly, you know, on one

3  side.  And this might have settled --

4      Q.   What do you mean by that, one side?

5      A.   We seem to get cases where the issue at

6  hand is sort of really minor and I mean there's no

7  harms, it's more procedural and/or the plaintiff has

8  so much else happening in their credit file that

9  what's being asserted is -- it just impossible, so.

10      Q.   Let's talk about.  But a mixed file case,

11  I mean, that's bad, right, when you have someone

12  else's credit information on a consumer's report?

13      A.   Well, I mean, that's again like an overly

14  simplistic statement.  There are mixed file cases

15  that could be unintentional.  There are mixed file

16  cases that could be intentional, where a father and

17  son live in the same house, they work at the same

18  company, they are authorized users on each other's

19  accounts, they may actually take out a line of

20  credit in the other's name because they have access

21  to that information.  Some of these cases are

22  borderline, you know, intentionally fraudulent.  So,

23  you know, there's no such thing as a mixed file case

24  outside of the context.  You really have to look at

1    the context.  And so again I'd have to review the

2    particulars of this case.  But if it were something

3    that were very clearly where the defendant were in

4    the wrong, we never would have agreed to take that

5    on, I mean, reputationally.  We're a small

6    think-tank, and we don't get most of our revenue

7    from industry despite your efforts to portray us as

8    such.  And, you know, should we begin actually doing

9    things that show for industry, we would suffer

10   greatly in our ability to have traction with our

11   projects and credibility with audiences that matter

12   to us.  So I can't believe we would have taken on,

13   you know, any case that were so cut and dry.

14        Q.   But you agree that mixed files -- well,

15   would you agree that mixed files is a problem in our

16   credit reporting industry?

17        A.   To the extent that there is a mixed file,

18   you know, for -- from the individual perspective,

19   that could be a big problem.  But would I say mixed

20   files is a huge problem with credit reporting?  Not

21   by any objective standard.  I mean, again, our

22   analysis of credit file accuracy in the United

23   States and the FTC's -- and our findings were

24   statistically identical, by the way -- shows the

1    data to be remarkably accurate.  So mixed files is

2    one thing that contributes to the marginal

3    inaccuracy, but it's -- I wouldn't say it's a big

4    problem, no.

5         Q.    Really?  You're not aware of the

6    testimony in the Julie Miller case in Oregon

7    regarding mixed files, right?

8         A.    No.  I don't have granular knowledge

9    of --

10        Q.    Okay.

11        A.    -- testimony in a case in Oregon.  Sorry,

12   my knowledge isn't that fast.

13        Q.    You don't know how many mixed files there

14   are, right, in terms of a raw number or percentage

15   of all the files that the big three retain, right?

16        A.    No.  We examined that particular aspect

17   in our data accuracy analysis.  I don't have that at

18   my fingertips, but it's something that, you know,

19   either through the course of a single e-mail or

20   phone call or, you know, reviewing a -- at that

21   time, I mean, any time you look at credit file data,

22   you, of course, realize you're looking at a

23   snapshot, right, I mean, and then you have to look

24   at it longitudinally and, you know, draw conclusions

1   about the prevalence, that things could change, you

2   know, for different reasons, you know, for example,

3   if the policy of a CRA were to change to allow a

4   disputant to assert mixed file and have, you know,

5   that trade line or inquiry deleted based on the

6   assertion alone, that would result in a spike of

7   allegations of mixed files.  Because as you're well

8   aware, credit repair clinics would see that as a

9   vulnerability, and they would, you know, begin, you

10   know, challenging everything on the basis of mixed

11   file.  So I'm not aware that it's, you know,

12   especially or relatively bigger than other causes of

13   inaccuracies in credit reports, and there are a

14   number.  I mean, collections is also a driver of

15   inaccuracies and so on and so forth.  But it

16   didn't -- doesn't jump out as, you know, threatening

17   the integrity of the system.  I mean, the data is,

18   you know, at the end of the day very accurate,

19   highly accurate and materially so.

20        Q.    All right.  Well, let's talk about

21   inaccuracy and identify theft, because you agree

22   identify theft is a very big problem in this

23   country?

24        A.    Okay.  Sure.  I mean, identify theft is a

UNOFFICIAL DRAFT TRANSCRIPT

1    crime that's around.

2        Q.    But I mean for those of us older than 20

3    or 30, this is something we really didn't even deal

4    with 15 years ago or 20 years ago or at least not

5    often?

6        A.    Right.

7        Q.    Fair to say?

8        A.    I mean, the frequency of identify theft,

9    you can't look at the trend and then say it's a very

10   big problem from an individual perspective.  I mean,

11   yes, if my identify is stolen and someone goes to

12   jail in my name and causes all sorts of nightmares

13   from new account creation and -- which is more

14   difficult than existing account take over, then

15   individually identify theft can be a big problem for

16   me again using your terms.

17           But again if someone takes over my credit

18   card and runs up a few charges at Walmart or a big

19   box store and I get a call from, you know, Chase

20   saying are you making these charges and I say

21   absolutely not, and they cancel my card and I get a

22   new one two days later, I'm not sure how big of a

23   problem that is for me.  I mean, you know, again, by

24   extension, if it grows, there's more of a risk

1    premium, we pay more, you know, one millionth of a

2    percent on our APR.  But what I can say factually is

3    that financial services has been getting better at

4    reducing fraud losses from identify theft.

5        Q.    Okay.

6        A.    Now, other areas like state governments

7    and healthcare providers aren't doing so well.

8    They're softer targets.

9        Q.    Okay.  Now you mentioned a problem with

10   someone opening an account in your name.  It's going

11   to be a bigger problem for you if it goes on our

12   credit report, right?

13       A.    Yeah.  So if you've got new account fraud

14   as opposed to existing account take over, that could

15   be -- could be more challenging to clean up.  I

16   mean, it's not as easy as the scenario I just

17   described where you get a call from Chase and you

18   get a new card two days later, you would have to

19   contact a bureau, you would have to, you know,

20   freeze your file or put a fraud alert on your file.

21   There are steps you can take that are costless and

22   relatively simple.

23            But yeah to say it would be no burden

24   would be inaccurate.

1        Q.    All right.  And you agree that identify

2    theft leads to a lot of inaccurate information on

3    credit reports?

4        A.    Again, I don't -- I don't know.  I mean,

5    I have a predilection for sort of quantifying

6    things, and I'm really uncomfortable with the term a

7    lot.

8        Q.    Okay.

9        A.    You know, I --

10        Q.    What about millions of --

11        A.    I -- I --

12        Q.    -- inaccurate entries, would you agree

13    with that?

14        A.    Again, you know, billions and billions of

15    pieces of information and data elements, I mean, the

16    reality is that the FTC report and our report

17    completely changed the whole discussion of accuracy

18    of credit file data.  The reports that were

19    released -- the first generation reports, let's call

20    them, and again I don't want to be dismissive --

21        Q.    Well, let's --

22        A.    -- of them --

23        Q.    -- let me focus on --

24        A.    -- but they were --

1          Q.    -- my question.  Okay.

2          A.    But they were -- I am actually.  You

3    know, give me an opportunity to complete my train of

4    thought.  We're asserting, you know, inaccuracy

5    rates of 40 to 75 percent, which just, you know, on

6    face value is nonsense.  We couldn't have a

7    functioning consumer lending system if that were

8    true.  But quite apart from that, you know, we did

9    look at in a very detailed manner, as did the FTC

10   report, the different contributors to inaccuracies

11   in consumer credit files in the major repositories.

12   And, you know, there's nothing even approaching the

13   magnitude that was believed prior to our report.  So

14   you'll notice that since 2011 and 2012, there

15   haven't been, you know, consumer advocates coming

16   out and saying that ten percent of credit files are

17   inaccurate because of identify theft, because it's

18   not true.  It's empirically untrue.  Are identify

19   thieves contributing to inaccuracies in credit

20   reports?  Absolutely.  Is it a big factor that's

21   threatening the integrity of the system?  Absolutely

22   not.

23         Q.    No, but it can threaten the integrity of

24   one consumer's report; in fact, destroy their

1    financial --

2          A.    I've already --

3          Q.    -- ability --

4          A.    -- attested to that, yes, individually,

5    and then that's really how you have to approach

6    that.  It could also have zero impact at all.

7          Q.    Well, I mean, you agree having a

8    fraudulent item on your credit report is not zero

9    impact, right?

10         A.    Again I'll go back to my earlier example

11   if someone opens up credit and pays it and thickens

12   my file, my credit score could increase.  I mean, if

13   I'm a person who is comfortable with that, they

14   might actually benefit from that.  I mean, you know,

15   it's just not manicheistic.  There's not right or

16   wrong, black or white, you know, hurts, harms.

17   There are lots of shades of gray in this.  I mean,

18   you have to understand the context.

19         Q.    Yeah, I can't imagine someone would be

20   comfortable being a victim of identity theft, but

21   you think that's possible?

22         A.    I do think that's possible.  I think, you

23   know, that if -- again if your credit report is

24   populated with trade lines and they're paying them,

1    and that's happened, then, you know, you could be

2    comfortable with that benefit.  Personally I

3    wouldn't be.  But I'm not here representing the

4    mindset of every individual man, woman or credit

5    eligible adult in this country.

6         Q.    All right.  Let's talk about Sykes versus

7    Mel S. Harris & Associates, the next case.

8         A.    Uh-huh.

9         Q.    And you say you think that -- well, you

10   thought -- I wrote down TransUnion, but maybe I made

11   a mistake there.

12        A.    Yeah, I think it's TransUnion.  And I

13   honestly -- I don't remember these cases.  Like

14   they're just -- I mean, I know they dealt with

15   credit reporting and I'm sure we probably did

16   simulations and looked at their credit files and I

17   don't really remember the particulars of these

18   cases.  I don't, I'm sorry, it just --

19        Q.    But you were testifying on behalf of

20   TransUnion?

21        A.    I didn't testify.

22        Q.    Okay.

23        A.    The list of cases in which I either

24   testified or was deposed is quite short and it was

1   the four, the two IMS, this one and Sony.  These are

2   ones in which I was retained.  You had ask for

3   anything which I was retained regardless of whether

4   or not I completed a report or submitted a report.

5   So all of these would have been either submitted a

6   report, either an expert report or rebuttal report

7   or wrote something but, you know, it was settled in

8   midstream.

9        Q.   All right.  And could you supplement this

10  list to put the court, the parties and if you did --

11       A.   Yeah.

12       Q.   -- submit a report --

13       A.   I'm so sorry.

14       Q.   Let me ask about the last part.  But if

15  you did submit a report --

16       A.   Yeah.  Yes.

17       Q.   Because if you didn't, there really

18  probably isn't much I'd want to ask about.

19       A.   Right.

20       Q.   Okay.  I see 2011, Donna Soutter, a class

21  action against TransUnion.  What was that about?

22       A.   I don't remember.  I don't.  I just --

23  they all kind of --

24       Q.   How about civil judgments in the state of

1   Virginia, does that ring a bell?

2        A.   Oh, right.  Right.  Right.  So yes, so I

3   actually did simulations for that case, and so the

4   issue -- it was again more of looking at the

5   impacts, the credit market impacts, of including or

6   excluding a piece of information or data element

7   and, you know, in my hypothesis was for many

8   persons, you know, just knowing what I know about

9   patterns and behavior and, you know, what's

10  reflected in a credit report leading up to

11  bankruptcy, there are delinquencies starting with

12  mild derogatories and they go into substantial

13  derogatories.  And, you know, typically by the time

14  someone files for bankruptcy, their credit's

15  destroyed, so, you know, including --

16       Q.   Well --

17       A.   -- or excluding a discharged piece of

18  information usually is going to have a minimal

19  impact because they're deep subprime.  So again sort

20  of like assessing credit market impacts, right, so

21  that's, I believe, much of what I did in that case.

22       Q.   Okay.  Now, I believe, you know, but you

23  were the expert.  I believe it was about the failure

24  of TransUnion to update judgments that had been

UNOFFICIAL DRAFT TRANSCRIPT

1    satisfied or vacated or otherwise negated.

2         A.   Yeah, we're talking about the same thing.

3         Q.   Okay.  And so you agree that if somebody

4    had a judgment that's been reported on their credit

5    report and then they satisfied it, that it should be

6    reported to satisfied, right?

7         A.   Yeah, sure.

8         Q.   And if it was reversed or vacated, well,

9    it shouldn't be on their credit reporting, correct?

10        A.   Correct.

11        Q.   And the reporting of a judgment that's

12   been vacated or reversed could cause harm?

13        A.   Yep, absolutely.

14        Q.   All right.  And that Xerox versus Paul

15   baker printing, what's that case?

16        A.   Again I don't remember.  This is

17   something to do with -- yeah, I don't remember.  I'd

18   have to go back and look.  That was four or five

19   years ago, I just --

20        Q.   Okay.

21        A.   I mean, this would have been like an

22   impact like damages impact assessment sort of an

23   economist perspective.

24        Q.   All right.  Let's look at your report.

1          A.    Sure.

2          Q.    All right.  Page two.  All right.  And

3    the first paragraph, paragraph four, and your first

4    sentence is that Equifax's reinvestigation process

5    in response to consumer disputes of inquiries is

6    consistent with established industry practices,

7    correct?

8          A.    Uh-huh.

9          Q.    Oh, you know, while we're talking about

10   inquiries, why don't we just first distinguish hard

11   and soft inquiries.  Okay.  Which you do, I believe,

12   in your report.  And actually I have here -- you

13   said you read the Equifax policies and if you note,

14   there is a definition of Equifax uses for hard

15   inquiries?

16         MS. ROPER:  Robert, are you introducing this

17   as Exhibit 3?

18         MR. SOLA:  No, I just want to ask him about

19   it.

20         MS. ROPER:  Okay.

21   BY MR. SOLA:

22         Q.    And you see that definition?

23         A.    Yeah, I'm just reading it.  I'm sorry.

24   Yep, okay.

1          Q.    All right.  And Equifax defines a hard

2    inquiry as an inquiry that result from transaction

3    initiated by the consumer when applying for credit

4    as defined by the SRA, such as a mortgage, credit

5    card, auto loan or personal finance loan, correct,

6    that's the first sentence?  And do you agree with

7    that?

8          A.    Yes, you read that accurately.

9          Q.    Okay.  And, I mean -- but you agree that

10   is what a hard inquiry is?

11         A.    That seems to me to be a reasonable

12   definition, yes.

13         Q.    Okay.  So a hard inquiry is a

14   reflection -- well, inquiry means that, at least in

15   the industry parlance, an inquiry indicates that a

16   credit report was provided, correct?

17         A.    Yes.  An inquiry, I think, indicates a

18   process that a permissible purpose, a credentialed

19   permissible purpose entity such as a lender has

20   obtained consent from the data subject to obtain a

21   copy of that data subject's credit report.

22         Q.    Okay.

23         A.    So it's -- and that that request was

24   fulfilled.

UNOFFICIAL DRAFT TRANSCRIPT

1     Q.    All right.  And so a hard inquiry

2   reflects that the consumer went into that creditor

3   to seek credit or some other service and authorized

4   the obtaining of their report?

5     A.    Correct.

6     Q.    And the way the reports are obtained is

7   the party who wants the report, they're generally

8   known as subscribers, right?

9     A.    Correct.  Yes.

10    Q.    They're the customers of the credit

11  reporting agencies, right?

12    A.    Right, yes.

13    Q.    And the credit reporting agencies like

14  Equifax, their business is to sell credit reports,

15  right?

16    A.    That's one of their lines of business,

17  yes.

18    Q.    Okay.  And so when a subscriber wants a

19  credit report from Equifax, what the subscriber does

20  is contact Equifax and give identifying information

21  on the consumer --

22    A.    Uh-huh.

23    Q.    -- correct?

24          So that Equifax can find the report that

 1    pertains to that consumer?

 2         A.    Correct.  Matching data, yes.

 3         Q.    Okay.  And the subscriber has already got

 4    a contract with Equifax to obtain their reports,

 5    right?

 6         A.    Correct.

 7         Q.    Generally?

 8         A.    Yes.

 9         Q.    Well, actually, they do have to have --

10         A.    They're --

11         Q.    -- contracts?

12         A.    Yes.  They're credentialed, there's a

13    process --

14         Q.    Yes.

15         A.    -- and Equifax sends someone to verify

16    that they are who they say they are and that

17    they're -- they've got a permissible purpose and

18    there's a contract that binds, you know, the use and

19    reuse and et cetera, so yes.

20         Q.    Okay.  And as part of that contract or as

21    a result of that contract, the subscriber is given a

22    code, right?

23         A.    Uh-huh.  A subscriber code.

24         Q.    And the subscriber has to identify their

UNOFFICIAL DRAFT TRANSCRIPT

1   business name and their business address to Equifax?

2        A.   Right.

3        Q.   Okay.  And so when the subscriber makes

4   an inquiry in addition to providing the identifying

5   information on the consumer, they'll provide their

6   subscriber code, right?

7        A.   Yeah.  There's auto trail information,

8   yeah.

9        Q.   And that subscriber code enables Equifax

10  to identify which subscriber, correct?

11       A.   Yes.

12       Q.   By name and address?

13       A.   Right.

14       Q.   Okay.  And then Equifax provides the

15  report, right?

16       A.   Yes, if there is a report on file for

17  that person, it's provided.  Otherwise it's a no

18  hit.

19       Q.   Okay.

20       A.   And they're told there's no file.

21       Q.   Okay.  That's right.  So they look to see

22  if they have a file that matches who they believe

23  the consumer is based on the identifying information

24  and if they find a file, they sell it, right?

1          A.    Correct.  Well, right, but as you're

2     pointing out, there could be a subscription, I could

3     buy 500,000 over a year and that's just one of the

4     500,000, so it's just already sold.  But some buy

5     them one off too, so, yes, it could be -- yes,

6     anyway.

7          Q.    Okay.  And so then the inquiry is then

8     placed in the consumer's file, right?

9          A.    The inquiry is included in the credit

10    report that's shared with the creditor, yes.

11         Q.    Okay.

12         A.    The hard inquiry is, yes.

13         Q.    Okay.  Yeah.  So a hard inquiry -- so the

14    hard inquiry will indicate the company that got the

15    report, right?

16         A.    Correct.

17         Q.    Their name and address, right?

18         A.    So the hard inquiry would reflect --

19    yeah, it would -- I don't know that -- I don't know

20    that it has the address on the --

21         Q.    Okay.

22         A.    -- credit report.

23         Q.    You don't know that.  All right.  And

24    it'll have the date, right?

UNOFFICIAL DRAFT TRANSCRIPT

1        A.    Okay.  Sure.

2        Q.    Well, I mean, isn't that true, it has the

3   date?

4        A.    Of the inquiry?

5        Q.    Yeah.

6        A.    I don't know that it does or not, no.

7        Q.    Okay.  And so on that consumer's file,

8   let's say it was a request from Chase, Chase will be

9   listed and you're not sure, but there may also be

10   the date --

11        A.    Yeah.

12        Q.    -- that Chase --

13        A.    But they're contained for 24 months, so

14   it's within the last 24 months.  And if it's a

15   factor in the score, it's 12 months or less old, so.

16        Q.    Okay.  But the inquiry information, that

17   goes on the reports that Equifax sells to third

18   parties?

19        A.    Correct.

20        Q.    Okay.  And the reason that Equifax --

21   now, Equifax chooses to put that on the report, they

22   don't have to, right?

23        A.    Correct.  Yes.

24        Q.    Okay.  They could --

1          MS. ROPER:  Objection to form.  Go ahead.

2     BY MR. SOLA:

3          Q.    Okay.  Like there's something called soft

4     inquiries, right, we know those?

5          A.    Correct.

6          Q.    And Equifax does not put those on reports

7     it sells to third parties?

8          A.    That's correct too.

9          Q.    Okay.  And you agree that the reason

10    Equifax puts the hard inquiries on the reports it

11    sells to third parties is because that's considered

12    part of the consumer's credit history?

13         MS. ROPER:  Objection to form.

14    BY THE WITNESS:

15         A.    I think the reasons, plural, that they

16    include hard inquiries on reports that are provided

17    to inquirers and consumers are twofold.  One, for

18    consumers if the --

19    BY MR. SOLA:

20         Q.    Could you -- I just want you to talk

21    about third party reports.  This case isn't about

22    reports to consumers.  Okay.  So I want you to --

23         A.    Okay.  Well, because --

24         Q.    It also just complicates things because

1    they're --

2         A.    That's fine.

3         Q.    Can I just explain?

4         A.    That's fine.

5         Q.    There are different reports, aren't they,

6    to consumers versus third parties?

7         A.    They are.  But hard inquiries are

8    included in both.

9         Q.    I know.  But soft inquiries aren't,

10   right?

11        A.    Correct.

12        Q.    Okay.  And then --

13        A.    But I thought we were talking about hard

14   inquiries.

15        Q.    We are.  But I just want --

16        A.    So --

17        Q.    -- to talk about why they're on the

18   reports to third parties.

19        A.    To third parties, right.  And it is, in

20   fact, because it's a variable that effects the

21   credit profile of an individual, their assessment of

22   risk and their creditworthiness.  It's a known

23   predictive variable.

24        Q.    Okay.  So in other words it's something

UNOFFICIAL DRAFT TRANSCRIPT

1   that the creditors want to know to assess risk?

2       A.   Correct.

3       Q.   Because what the inquiries show is where

4   the consumer sought credit and how often?

5       A.   I think it's used as a predictive

6   variable because it's perceived as a leading

7   indicator of potential financial distress and risk.

8   It's less important, you know, where they've

9   received it, you know, the name of the lender

10  isn't -- isn't a variable that's scored.  The number

11  of hard inquiries and the recency of hard inquiries

12  are variables that are scored.  But, you know, where

13  you got it is not scored.  Now, the type matters

14  because if it's an auto or a mortgage and it occurs

15  within a time frame, they're bundled together.  But,

16  you know, that I got it from Chase versus Citi is

17  not anything that really would be relevant at all.

18      Q.   Okay.  But you agree the number of times

19  a consumer sought credit is some relevant to the

20  creditors risk assessment?

21      A.   Yeah, as I've mentioned, the quantity of

22  hard inquiries is a consideration, absolutely.

23      Q.   Okay.  And that inquiries on -- so let's

24  just say there's an inquiry and it's made by Robert

1    Sola -- I'm sorry, there is an inquiry --

2         A.    On behalf of you.

3         Q.    Yes.  Okay.  And then it goes on my

4    credit reporting, right?

5         A.    Correct.

6         Q.    The hard inquiry?  And then when that

7    report's sent out to let's say to Chase they see

8    that inquiry on my file, right?

9         A.    Okay.

10        Q.    Right.  And it's on Robert Sola's file

11   because Robert Sola was the one seeking the credit,

12   right?

13        A.    Correct.  In your scenario, absolutely.

14        Q.    So it's on the file of the consumer whose

15   the subject of the report because it pertains to

16   that consumer, right?

17        A.    Yes.

18        Q.    And the inquiry results from two things.

19   Well, let me see if you agree with this.  The

20   inquiry results from the identification of the

21   consumer from the subscriber, right?

22        A.    That -- are you suggesting that the

23   inquiry is enabled because the inquirer has

24   fulfilled all of your customer requirements, that

1    they have said --

2         Q.    No, there wouldn't be -- to make an

3    inquiry, you've got to identify the subject, right?

4         A.    I'm sorry, the inquiry is enabled because

5    the personal identifying information, the match

6    data, is sent from the inquirer to the credit

7    bureau, is that --

8         Q.    Yes.

9         A.    Oh, yes.  Yes.  Sorry.

10        Q.    It's a given?  Okay.

11        A.    We're two people divided by common

12   language sometimes --

13        Q.    All right.

14        A.    -- so you just have to bear with me.

15        Q.    So the inquiry results from one, the

16   identifying information that the subscriber

17   provides --

18        A.    Uh-huh.

19        Q.    -- right?

20        A.    Yes.

21        Q.    And then the fact that the report is sent

22   to the subscriber?

23        A.    Yes.

24        Q.    Okay.

1          A.   And that's consistent with what I said

2    earlier, yes.

3          Q.   Yeah, okay.  And the identifying

4    information that the -- well, we indicated based on

5    the identifying information from the subscriber,

6    that's how Equifax chooses which consumers file to

7    provide, right?

8          A.   That's generally how it's done.  You

9    match the identifying information of the data

10   subject from the permissible purpose inquirer with

11   the data fields that comprise a credit report or

12   credit file in this case and assemble it and fulfill

13   the request.  It's a disclosure, yes.

14         Q.   And then Equifax takes the record of that

15   inquiry, puts in that consumer's file whose report

16   was provided, right?

17         A.   Yeah.  I mean, they haven't -- I'm sure

18   they have it in multiple databases.  They've got an

19   audit trail database and, yes, that it would

20   populate a credit file and credit report in the

21   future for either the individual or a permissible

22   purpose third party, yes.

23         Q.   Okay.  And they put it in the consumer's

24   file, and then if it's a hard inquiry, they also put

1    it on the consumer's report they sell to third

2    parties, right?

3        A.   Well, they put it in the file they'd sell

4    to third parties, and that would also be in the

5    report they give to the individuals, yes.

6        Q.   And you agree that the inquiry would not

7    arise unless the subscriber furnished certain

8    identifying information on the consumer?

9        A.   Yes, if they didn't know the consumer's

10   name, they couldn't provide an inquiry.

11       Q.   Yeah.  Well, they have to provide certain

12   information beyond name?

13       A.   Oh, of course.  But I'm just starting

14   with that piece to make your point trivially true,

15   yes.

16       Q.   Okay.  Would you agree in your view of

17   credit reporting industry that the inquiries are

18   part of the consumer's credit history?

19       A.   Yeah, I mean, it's a scored variable on

20   their credit file and reflects an element of their

21   risk profile.  So is it a part of their history, I

22   guess, you know, I could understand how one sort of

23   conventional language, you know, it's their behavior

24   over time they're seeking credit, so, you know, yes,

1   conventionally, absolutely.  And I --

2        Q.   All right.

3        A.   And not to belittle that.

4        Q.   No.

5        A.   When I say that, because credit history,

6   you know, is most frequently understood as how well

7   you've met your past payment obligations.  So I want

8   to distinguish inquiries from, you know, what's

9   conventionally understood as credit history.  But

10  you know if we're talking about their past behavior

11  over the last two years there was an inquiry as a

12  result of credit seeking behavior, technically it's

13  in the past, so it would be irrelevant data element

14  in, you know, their credit history broadly.

15       Q.   Yeah, that's what I mean.  History that

16  would include credit seeking --

17       A.   Then it's just --

18       Q.   Okay.

19       A.   It's just the use of jargon, and I want

20  to make sure that we're -- because there is a

21  category if you go to like myFICO.com, there's a

22  credit history, and then they're talking about

23  accounts and did you pay it and derogatories and

24  public -- and so it's not in that FICO category of

1    credit history, they put it, you know, into new

2    credit, right, but --

3         Q.   Yeah, so they put it -- inquiries into

4    new credit?

5         A.   Yes, so --

6         Q.   Okay.

7         A.   That's the reason for --

8         MS. ROPER:  And just --

9         THE WITNESS:  Sorry.

10        MS. ROPER:  So on behalf of the court

11   reporter, we just need to make sure that you guys

12   aren't talking over each other so that the record --

13        THE WITNESS:  Oh, sorry.

14        MS. ROPER:  -- is clear, so --

15        MR. SOLA:  Yeah, okay.

16        MS. ROPER:  -- Mr. Sola can ask the question;

17   if I object, I will; and then, Mr. Turner, you can

18   give an answer.  That way it's easier for the court

19   reporter to take everything down.

20        THE WITNESS:  Apologies.

21   BY MR. SOLA:

22        Q.   All right.  But in the normal use of the

23   word history to reflect past conduct, you agree an

24   inquiry is part of a consumer's credit history?

UNOFFICIAL DRAFT TRANSCRIPT                    132

1          A.    Correct.

2          Q.    Okay.  Let's look at page two, item

3    number four, I read the first --

4          A.    Sentence.

5          Q.    -- sentence, yes, okay.  And we discussed

6    what inquiries are.  You indicate inquiries are

7    maintained as a factual record on a consumer's

8    credit report that the credit file was provided to a

9    permissible purpose entity.  And then go down to

10   that sentence that says when a consumer disputes an

11   inquiry without alleging fraud or mixed file and --

12   well, actually, I don't want to read that.

13         But you agree that Steed and Summers --

14   well, Steed alleged mixed file, and Summers alleged

15   fraud when they disputed the inquiries, right?

16         A.    I'm aware that Summers alleged fraud.

17   I'm aware that in the complaint and deposition,

18   Steve alleged mixed file, although I'm not sure how

19   he represented that in his communication with

20   Equifax.  He may have said it's not mine or --

21         Q.    Okay.  That's fair.  Yeah, you don't know

22   if he used that term in his dispute to Equifax?

23         A.    Correct.

24         Q.    All right.  Now, there might be inquiries

1    that appear on a consumer's credit report that don't

2    belong to them, right?

3         A.    Yes.

4         Q.    Okay.  And one example we've used is one

5    that arises from identify theft, correct?

6         A.    Correct.

7         Q.    Okay.  And a consumer might get their

8    credit report and see that inquiry and not recognize

9    it, right?

10        A.    Correct.

11        Q.    Because they might say Chase, I never

12   went to Chase for credit and they don't know why

13   it's on their report, right?

14        A.    Yes.

15        Q.    Okay.  In fact, I think you indicate

16   these can -- well, let me start again.

17              That consumer could dispute that inquiry,

18   correct?

19        A.    Yes, they have that right.

20        Q.    Okay.  But they wouldn't know if it's

21   identify theft when they disputed it, right?

22        A.    They may not, that's correct.

23        Q.    They may not.  Okay.  And you agree that

24   consumers that dispute inquiries even if they don't

UNOFFICIAL DRAFT TRANSCRIPT

1    say they're a mixed file or identify theft, they're

2    entitled to have those disputes investigated,

3    correct?

4         MS. ROPER:  Objection to form, calls for a

5    legal conclusion.

6    BY THE WITNESS:

7         A.   So, you know, I agree that people may not

8    know the source of an inquiry, that it may have been

9    a third party financier for a retailer and, hey, I

10   got a card from, you know, Saks Fifth Avenue or

11   Target, but I don't know -- I didn't know that it

12   was underwritten by HSBC, and there's this HSBC

13   inquiry, and so they -- they would, you know,

14   exercise their right to contact the credit bureau or

15   HSBC, but let's say in this case they contact

16   Equifax and then they're informed that, in fact,

17   there was a disclosure to HSBC on your behalf and if

18   you -- this wasn't authorized, you should contact

19   them, so they can make a phone call to HSBC with the

20   number provided and they would be told this is for

21   your Saks Fifth Avenue or Target card and then they

22   would uh-huh.  You know, it's still not --

23        Q.   You really need to listen to my question.

24   My question was if the consumer disputes an inquiry

UNOFFICIAL DRAFT TRANSCRIPT

1    but doesn't indicate fraud or mixed file, aren't

2    they entitled to have that dispute investigated?

3         MS. ROPER:  Objection to form, calls for a

4    legal conclusion.

5    BY THE WITNESS:

6         A.   Yeah.  My assessment of the resource

7    available to the consumer is that the current

8    practices permit them to have that investigated.

9    BY MR. SOLA:

10        Q.   My question was:  Are they entitled to

11   have --

12        A.   Yeah, that's --

13        MS. ROPER:  And that's still -- sorry,

14   Mr. Turner.  Objection to form, calls for a legal

15   conclusion.  Go ahead.

16   BY THE WITNESS:

17        A.   Yeah, I'll have to leave the

18   interpretations of the hard inquiry and its -- you

19   know, the requirements under the FCRA to, you know,

20   the legal minds and qualified legal experts.

21   BY MR. SOLA:

22        Q.   Okay.  Now, your first sentence says

23   Equifax's reinvestigation process in response to

24   consumer disputes of inquiries is consistent with

 1   established industry practices, right?

 2        A.   (No audible response.)

 3        Q.   Okay.  That doesn't make it legal, does

 4   it?

 5        A.    It is consistent with -- so, I mean, I

 6   guess theoretically industries -- any industry could

 7   have practices that are consistent that may or may

 8   not be legal or may or may not be illegal.  But

 9   again I'm -- I was asked to address whether or not

10   Equifax's specific policy were consistent with

11   industry practices or why they deviated and that's

12   some sort of proxy measure as to the adequacy or

13   sufficiency given the nature of the dispute.  And

14   that's what I've assessed.

15        Q.   Okay.

16        A.   So I'm not offering an opinion on whether

17   or not it's legal.

18        Q.   That's right.  And if what they do -- you

19   know our claim is that Equifax has violated the Fair

20   Credit Reporting Act, correct?

21        A.   I understand that, yes.

22        Q.   And I know you're not giving an opinion

23   on whether they complied with the Fair Credit

24   Reporting Act, okay, but if their procedure violates

UNOFFICIAL DRAFT TRANSCRIPT

1    the Fair Credit Reporting Act, of what relevance is

2    it that it's consistent with industry practices?

3         MS. ROPER:  Objection to form, argumentative.

4    BY THE WITNESS:

5         A.   So again I'm, you know, not assessing the

6    legality.  I can, you know, suggest that the

7    adequacy based on consistency with industry

8    practices and given the longstanding nature of these

9    practices and the intense scrutiny to which the

10   three bureaus are now subjected with the CFPB and

11   the 40 plus years of scrutiny under the FCRA, that

12   if all three are doing this, one could reasonably, I

13   think, defensibly infer that it's probably been

14   vetted by regulators and has most likely been found

15   to be illegal.  But I'm not offering an expert

16   opinion on the legality.  I'm offering this as one

17   way of assessing the adequacy and appropriateness of

18   the dispute resolution process of Equifax in the

19   context of the broader industry.

20        Q.   All right.  But you agree that if it's

21   illegal, then the fact that it's consistent with

22   industry practices is not a defense?

23        MS. ROPER:  Objection to form, asked and

24   answered, argumentative.

UNOFFICIAL DRAFT TRANSCRIPT

1    BY THE WITNESS:

2         A.    Yeah, you know, defense, I'm not offering

3    a legal defense of legality or illegality.  That's

4    not the objector -- or the objective of this

5    particular opinion.

6    BY MR. SOLA:

7         Q.    All right.  But you understand the

8    Plaintiffs' claim isn't that Equifax acts

9    inconsistent with its own policies and procedures,

10   right?

11        A.    I understand your claim, yes.

12        Q.    Yeah.  And it's --

13        THE WITNESS:  Sorry, if you wanted to object,

14   sorry, I apologize.

15   BY MR. SOLA:

16        Q.    Okay.  Now look at the second opinion,

17   that's paragraph five.

18        A.    Correct.

19        Q.    And you say changing the current inquiry

20   dispute resolution process in a manner described by

21   the plaintiffs would be costly and then you go on

22   and on about why you think it's not worthwhile,

23   right?  Well, let me just ask:  What's the cost

24   you're talking about?

UNOFFICIAL DRAFT TRANSCRIPT

1       A.      Okay.  So this is a fairly virgin soil in

2    the absence of any cost benefit analysis offered by,

3    you know, either Evan Hendricks or in anything I've

4    read generated by the depositions or the complaint.

5    When we propose a solution, we PERC, for a policy

6    challenge or economic or social challenge, we'll

7    engage typically in cost benefit analysis.  And this

8    would involve, okay, what is the change that we're

9    looking to implement?  Here, you know, you're

10   looking at basically modifying a system for

11   communicating between furnishers of information on

12   the one hand and 603(p) regulated credit bureaus on

13   the other hand.  And so simplistically you could

14   say, well, gee, this is just a matter of coding and

15   sending out a software patch.  Maybe.  But there's

16   still a cost.  But, you know, scratching below the

17   surface, you understand that this is a voluntary

18   reporting system.  And this data may not all reside

19   in the same databases and that, for example,

20   furnishers that are also users of credit reports may

21   have their application data in one database that's

22   entirely separate from and subject to different

23   restrictions and different internal policies and

24   access than their account information for an

 1    established business customer, the borrower, for

 2    example.  And so it may not be so simple.  And it

 3    may not be so simple in terms of, you know,

 4    reconciling them and the cost they're going to

 5    assume.

 6            And then that's also an internal -- and

 7    you know how large corporations work.  Here's a

 8    proposed change from industry from online data

 9    exchange and CDIA and the administrators of metro --

10    or of e-OSCAR, it has to go to compliance and

11    business and there are meetings and discussions and

12    it takes time.  And that's replicated across the

13    thousands and thousands and thousands of furnishers,

14    not all of which have the same capacity or ability

15    to implement.  But that's even --

16    BY MR. SOLA:

17        Q.    Okay.

18        A.    -- in the best case.  No, but you're --

19    you want to hear the cost, so --

20        Q.    I want to hear a number.  Do you have a

21    number?  You said you're into quantitative --

22        A.    Right.  But I am in a position where I'm

23    looking at I can infer great cost just from what I

24    understand that would be associated with the

1    implementation of the solution.  There is no

2    equivalent that's been offered by plaintiffs side.

3    Nothing.  It's just been put forward as it's easy to

4    do and dismissive of all of these processes.  So

5    that's why I'm -- that's why I'm critical of that,

6    that proposed solution.  You know, the second cost

7    would be trying to exhort or persuade inquirers who

8    aren't also furnishers because they're currently not

9    at all associated with the e-OSCAR system and now

10   they would have to adopt that.  And I can personally

11   attest to the fact from having many conversations

12   with executives, business side and legal, from

13   furnishers I've tried to exhort to begin reporting,

14   it's not easy.  It is costly, it takes a lot of

15   time.

16        Q.   How much --

17        A.   You have to have a very strong value

18   proposition --

19        Q.   You're really -- okay.  How much does it

20   cost to join e-OSCAR?

21        A.   The cost of joining e-OSCAR?

22        Q.   Yeah.

23        A.   It's going to vary by individual

24   organization, I mean, depending on the size,

1    depending on their technology, depending on their

2    technical and capacity.

3        Q.    Okay.  Now, businesses have to bear the

4    cost of complying with the law, you agree with that?

5        A.    Yes.

6        Q.    Okay.  So in other words, if contacting

7    the furnisher of the inquiry information is required

8    by law, then that has to be done even if it costs

9    money, right?

10       A.    Yes, absolutely.

11       Q.    Okay.  Now, and you mentioned it, you

12   said the second thing, it's disruptive for data

13   furnishers, do you see your language there,

14   disruptive for data furnishers?

15       A.    Uh-huh.

16       Q.    And you mean because Equifax then

17   contacts them about the dispute?

18       A.    You're talking about the proposed

19   solution, so it's not --

20       Q.    Okay.

21       A.    You're talking about two different

22   things, so let me just try and -- what I'm talking

23   about is that the proposed solution would be

24   disruptive to data furnishers.

UNOFFICIAL DRAFT TRANSCRIPT

1      Q.    All right.  Let me --

2      A.    And for all the reasons that I just

3   elaborated upon earlier before I was interrupted.

4      Q.    Okay.

5      A.    Yes.

6      Q.    And you say proposed solution here.  All

7   we're -- all I want you to talk about is contacting

8   the furnisher, okay, that's what I'm -- I don't know

9   where you came up with proposed solution.  I'm just

10  talking about contacting the furnisher?

11     A.    I guess I'm inferring from the

12  depositions and complaint where e-OSCAR is -- adding

13  a field into e-OSCAR was bandied about as a proposed

14  mechanism for communicating with inquirers, which

15  are -- may or may not be furnishers, yes.

16     Q.    Well, I think that Equifax was asked

17  about doing that, right?

18     A.    Okay.

19     Q.    Okay.

20     A.    But I don't think it's unreasonable to

21  infer on my part that that was put forward as a

22  possible solution to this perceived problem.

23     Q.    Well, okay.  Anyway, in terms of

24  contacting the data furnishers, let's say Equifax

UNOFFICIAL DRAFT TRANSCRIPT

1    contacting the data furnishers in regard to a

2    disputed inquiry, how would that be disruptive?

3         A.   Oh, well, again I just suggested the

4    processes involved with modifying the e-OSCAR

5    platform which is what this refers to.

6         Q.   No, no, they don't have to use e-OSCAR to

7    contact the data furnishers, right?

8         A.   Okay.  So --

9         Q.   So --

10        A.   They can call them or they can send a

11   person there or they can e-mail --

12        Q.   That's --

13        A.   -- or fax.

14        Q.   Yes.

15        A.   Right.

16        Q.   Yes, right, all those ways?

17        A.   Sure.

18        Q.   Okay.  So other than the fact that the

19   furnisher is going to be contacted about a dispute,

20   which is, I guess, some disruption because --

21        A.   Yeah.

22        Q.   -- they're going to have --

23        A.   It's a new process, yeah.

24        Q.   Okay.  So you agree -- okay.  Is that

1    what you mean by disruptive?

2         A.    It is.   It's a new process, there has to

3    be training, there have to be documents that are

4    updated, I mean, they have to make that as a

5    business decision, so yes.

6         Q.    Okay.   But I think we all agree Equifax

7    in its form letter tells the consumer to contact the

8    data furnisher --

9         A.    Right.

10        Q.    -- right?   So same disruption, right?

11        MS. ROPER:   Objection to form, assumes facts

12   not in evidence.

13   BY MR. SOLA:

14        Q.    You're saying that Equifax's contact

15   would be disruptive, but Equifax tells the consumer

16   to contact, so it's really the -- no different

17   disruption if the consumer contacts, right?

18        A.    I don't necessarily agree.   If you look

19   at the FACT Act and where Congress really recognized

20   the need to disintermediate third parties really, in

21   this case, CRAs to enable direct communications for

22   more efficient functioning of the system.   I mean,

23   if I contact the CRA and the CRA contacts and then

24   it goes back to the CRA, and then I'm communicating

1    to the consumer, that's just a multistep process and

2    it's less efficient.  And the CRA is not going to

3    have the capacity to provide necessarily all the

4    details that the data subject would know.  It just

5    strikes me as far less efficient, you know, sort of

6    logically and intuitively than having direct

7    discourse, which is what Congress recognized and why

8    they've not only enabled but are encouraging

9    consumers to directly contact data furnishers, which

10   are not inquirers by the way in every case, or the

11   inquirers, the same logic would apply.  So, you

12   know, I'm not sure it would be more or less

13   disruptive in how you're envisioning it, but I can

14   see that it could be more onerous and tedious and

15   less efficient because the ability of a CRA to

16   communicate all the information, provide all the

17   detail that they may need might take more time, more

18   effort, more expense and is just far less efficient.

19        Q.   Okay.  Well, first, you're aware that if

20   Equifax contacts the furnisher about a dispute, then

21   Congress mandated that the furnisher must

22   investigate that dispute?

23        A.   Okay.  That's for trade line information,

24   yes.

1      Q.    No, it's for any information.

2      A.    No, I'll leave that --

3      Q.    Okay.  Where do you get trade line?

4      A.    I think --

5      Q.    Where do you get trade line?

6      A.    I think that's -- that's a legal fact

7   that isn't at heart here.  But the reality is that a

8   hard inquiry is not a furnished piece of

9   information, it's endogenous to the CRA.  So, you

10  know, when you communicate to Equifax that I'm

11  disputing this inquiry and they -- unless, you know,

12  you meet the conditions for mixed file or fraud and

13  you've got an account associated with it that -- I

14  mean, you know, you're talking about a really narrow

15  sliver here where there's a single or a few hard

16  inquiries that are contested in isolation that don't

17  have any supporting evidence and -- but it's

18  endogenous, it's not furnished information, and

19  Equifax would say it was accessed.  And if it wasn't

20  you, then, you know, more appropriately, you should

21  go to the inquirer who may or may not be a

22  furnisher.

23     Q.    Okay.

24     A.    I just -- I just don't see any

1    improvement from -- you know, or any benefit.  I see

2    a lot of cost and no benefit over the status quo.

3         Q.    Okay.  Wait, so you're saying if Equifax

4    contacts a furnisher about a disputed inquiry, the

5    furnisher doesn't have to do an investigation in

6    that?

7         A.    That's not what I said.

8         Q.    Because you said trade line.  That's what

9    I thought --

10        A.    No.

11        Q.    -- you said.

12        A.    You talked --

13        Q.    Okay.

14        A.    -- about -- you talked about piece of

15   information, and I'm --

16        Q.    Okay.

17        A.    -- specifying --

18        Q.    Let me ask --

19        A.    -- that -- you know, again, because I

20   know you're a lawyer and lawyers love to parse.

21   Piece of information technically would include trade

22   line information.  It does not include necessarily

23   header information or other information in a credit

24   report that's not furnished, you know, for --

 1  information could have been self-reported, it could

 2  be created endogenously as in the case of a hard

 3  inquiry.

 4        Q.   Okay.  Let me just -- are you saying that

 5  if Equifax contacts the source of the inquiry,

 6  indicating that the consumer disputes the inquiry,

 7  that that source does not have to investigate it,

 8  that inquiry?

 9        MS. ROPER:  Objection to form, calls for a

10  legal opinion.

11  BY THE WITNESS:

12        A.   Yeah, you know, I don't know what the

13  obligations, the -- I mean, that's --

14  BY MR. SOLA:

15        Q.   Okay.

16        A.   -- an interpretation.  But what I can --

17  you know, what I talk about is the appropriateness

18  of Equifax's policy given the endogeneity of a hard

19  inquiry and how that's handled.  And again, you

20  know, I'd ask if you're talking about hard

21  inquiries, you know, and disputes, you might want to

22  qualify whether or not it's a -- with supporting

23  evidence, mixed file, fraud or just an

24  unadulterated, I'm contesting, you know, this -- the

UNOFFICIAL DRAFT TRANSCRIPT

1    accuracy of this, this inquiry, hard inquiry.

2         Q.    Okay.

3         A.    Because they're treated differently and

4    then that's significant.

5         Q.    Well, but the reason I bring up the --

6    we'll call it the furnisher's obligation is because

7    you brought up that the consumer can directly

8    dispute to the furnisher --

9         A.    Uh-huh.

10        Q.    -- right, that's what you said?  That's

11   an --

12        A.    Uh-huh.

13        Q.    -- alternative means?

14        A.    Uh-huh.

15        Q.    But does the furnisher have any

16   obligation to re -- to investigate a dispute from --

17   directly from a consumer --

18        MS. ROPER:  Objection to form, calls for --

19   BY MR. SOLA:

20        Q.    -- I mean --

21        MS. ROPER:  -- a legal --

22   BY MR. SOLA:

23        Q.    -- right?

24        MS. ROPER:  -- opinion.

1    BY MR. SOLA:

2         Q.    Do you know?  You said --

3         A.    Yeah, so no --

4         Q.    -- you didn't know if they did --

5         A.    No, I didn't say that.

6         Q.    Well --

7         A.    They're -- the FCRA enumerates data

8    furnisher obligations, so -- and again I'm not

9    offering an --

10        Q.    Okay.

11        A.    -- opinion on the application of the

12   obligations or interpretation of those obligations

13   but furnishers of information absolutely have

14   obligations under the FCRA.  And that would include

15   reinvestigating in a timely manner, less than 30

16   days, the dispute.

17        Q.    Okay.  Even if it's an inquiry?

18        MS. ROPER:  Objection to form, asked and

19   answered, calls for a legal opinion.

20   BY THE WITNESS:

21        A.    I don't agree with that.

22   BY MR. SOLA:

23        Q.    Okay.  So you don't -- so in other words,

24   you're saying you don't know if the consumer went

1    directly to the furnisher with their dispute whether

2    the furnisher would even be obligated to

3    reinvestigate -- to investigate it, correct?

4         MS. ROPER:  Objection, misstates his

5    testimony, asked and answered, calls for a legal

6    opinion.

7         MR. SOLA:  No, asking if he knows.  That's

8    not --

9    BY THE WITNESS:

10        A.    Yeah, no.

11   BY MR. SOLA:

12        Q.    Restating your testimony.

13        A.    What I'm saying is that there's a

14   difference between a furnisher and inquirer, and

15   that a furnisher -- if there's a dispute of

16   furnished information and it -- you know, I

17   would posit that, you know, to the extent that

18   they're -- an inquiry is something that's generated

19   from that exchange, they would -- they would have an

20   obligation.  But again this is a legal matter to

21   respond in a timely manner, so yes.  And that would

22   be hence why Equifax and other CRAs are asking the

23   consumer to contact the inquirer when the inquirer

24   is not a furnisher to resolve that issue as well.

1   And if there's no resolution from the inquirer,

2   Equifax and the other CRAs are legally bond to

3   resolve in the consumer's favor just in default.  So

4   there should be some satisfaction for the consumer

5   regardless of, you know, an interpretation on an

6   inquiry.

7        Q.   Okay.  When you say there's no resolution

8   in the consumer's favor, then --

9        A.   No, I said there should be if there's no

10  resolution --

11       Q.   Oh, okay.

12       A.   -- then -- so comma then the CRA would

13  have to default, you know, modify in the consumer's

14  favor if they said delete or, you know, an inquiry

15  really -- it would really just be delete --

16       Q.   Yes.

17       A.   -- right, so --

18       Q.   Okay.  But so you would agree that if the

19  consumer disputed to Equifax the accuracy or

20  ownership of an inquiry or really basically just

21  mostly talking about ownership, in other words does

22  the inquiry belong to this consumer?

23       A.   Okay.

24       Q.   And then Equifax went back to the source

1    of the inquiry, okay, and the source of the inquiry

2    did not verify it, then it would be deleted, right?

3         MS. ROPER:  Objection to form, misstates his

4    testimony, asked and answered.

5    BY THE WITNESS:

6         A.    Yeah.  So my understanding is that a hard

7    inquiry is endogenous and that when they have that

8    as a factual record of access, that actually is the

9    source of the data.  It's not furnished information.

10   And if that -- if, you know, it's insufficient if

11   Equifax hasn't determined that it's a mixed file

12   because we have an associated account or if this

13   person has a history of mixed file or it's fraud and

14   there's paperwork, if we're talking about that

15   sliver of circumstances where there's an inquiry

16   dispute, that's completely devoid of any other

17   context other than mixed file or fraud, and they

18   have no internal means of verifying, you know, that

19   it's inaccurate owing to either of those, then it's

20   a matter of factual record.  They did make a

21   disclosure.  Now, whether it was authorized or

22   unauthorized, the party that's best situated to make

23   that determination would be the inquirer, which is

24   why the data subject would be instructed to

1    follow-up with the inquirer.  If they do follow-up

2    with the inquirer, and there's -- there's no

3    response, I would assume as with furnished data that

4    Equifax would as a matter of policy -- and I don't

5    know Equifax's policy on that particular unique

6    scenario, but they would remove that, I mean, the

7    FC -- I mean, again, that's --

8    BY MR. SOLA:

9        Q.    Okay.

10       A.    -- an interpretation of the FCRA, and I'm

11   not opining on that.

12       Q.    You didn't answer my question.  My

13   question was:  If Equifax contacted the source of

14   the information that made the inquiry, okay, and

15   that source did not verify that the inquiry was

16   accurate, then you agree that under the Fair Credit

17   Reporting Act, correct, information that's not

18   verified as accurate must be removed, if that

19   inquiry would be removed?

20       MS. ROPER:  Objection to form, asked and

21   answered, assumes facts not in evidence, calls for

22   legal opinion.

23   BY THE WITNESS:

24       A.    I guess I'm going to disagree, because I

1    actually just described that exact scenario in

2    painstaking detail.

3    BY MR. SOLA:

4         Q.    You left out the contact to the --

5         A.    Of the --

6         Q.    -- furnisher.

7         A.    -- FCRA?  No, I didn't.  I didn't.

8    Because I'm not suggesting that an inquirer is

9    always a furnisher.  In fact, I'm really trying to

10   establish that they can and frequently are different

11   things.  And in this case, in this scenario, the

12   hypothetical scenario that you described, I did, you

13   know, present my assessment of what I believe

14   Equifax's policy would do.  Now, I'm not going to

15   suggest at all whether or not that complies with the

16   FCRA.  That's not my role.  And again I'll continue

17   to beat on that drum whenever you ask a leading

18   question that tries to get me to offer a legal

19   opinion.

20        Q.    All right.  Let me ask you this.  You

21   said one reason you thought it was preferable for

22   the consumer to go to the creditor, okay, I believe

23   was that if the consumer's dispute went from Equifax

24   to the -- we'll call it the furnisher, is that okay,

 1    or the source?

 2         A.    The inquirer, that's what they're called

 3    when it's an inquiry whether they're a furnisher or

 4    not.

 5         Q.    Or a subscriber?

 6         A.    Or an inquirer, that's fine.

 7         Q.    So you're saying if Equifax -- if

 8    plaintiff -- a consumer makes a dispute to Equifax

 9    and then Equifax goes to the inquirer, then the

10    inquirer would have to report back to Equifax and

11    then that would determine whether the inquiry stayed

12    on the credit report, right?

13         A.    That would determine whether -- so if

14    they don't report back, you're saying are they

15    legally bound?  And again --

16         Q.    No.

17         A.    -- I don't know whether they're --

18         Q.    Okay.

19         A.    -- legally bound --

20         Q.    Let me --

21         A.    -- so -- but this is -- this is a very --

22    this is a very unique scenario because, you know,

23    what you're suggesting, it's not mixed file, it's

24    not fraud, it's an inquiry, and they dispute the

1    inquiry and there's no internal means, you know, for

2    Equifax to assess the accuracy of that endogenously

3    generated data point, so they -- the consumer, the

4    data subject then contacts the inquirer and the

5    inquirer doesn't do anything, is Equifax bound to

6    delete that?  You know, again, I think that calls

7    for an interpretation of the FCRA.  I don't see --

8         Q.   Okay.

9         A.   I don't see that as furnished data, so I

10   don't know.  But, you know, that's certainly

11   something that you should take up with Equifax.

12        Q.   Okay.  Now, if -- so like in the

13   situation where the form letter gets sent, the

14   consumer's contacted Equifax, Equifax has written

15   back and says if you think it's unauthorized,

16   contact the creditor --

17        A.   Okay.

18        Q.   -- right?  So now another -- the

19   consumer's got to make another dispute --

20        A.   Right.

21        Q.   -- right?

22        A.   To the --

23        Q.   Which they wouldn't have had to do if

24   Equifax had --

1        A.    -- the inquirer.

2        Q.    -- reinvestigated it, right?

3        A.    So again because an inquiry is endogenous

4   and it's a factual record of access, you know,

5   Equifax has the internal process, they can look and

6   see if a disclosure was made.  And if a disclosure

7   was made, the very fact that they're reporting back

8   that, yes, this disclosure has been made is a

9   reinvestigation, so.

10       Q.    But the person like Summers, they're not

11  contesting the disclosure has been made, they're

12  saying it's a result of fraud?

13       A.    Uh-huh.

14       Q.    Do you understand the difference?

15       A.    I do understand the difference.

16       Q.    Okay.

17       A.    Yes.

18       Q.    So the fact that the disclosure has been

19  made isn't at issue, okay?

20       A.    I agree.  Absolutely.

21       Q.    Okay.  So the fact -- okay.  Now let's

22  get back to -- but you agree that if the consumer

23  has to contact the creditor, that's another task the

24  consumer has to take to try to get the inquiry

1  removed?

2      A.   The consumer in cases where they file a

3  dispute that's neither mixed file nor fraudulent nor

4  associated with any commensurate account and --

5      Q.   Wait, I have to cut you off, because

6  we're not assuming any of that.

7      A.   Okay.

8      Q.   Both Steed and Summers, I don't think

9  there's going to be much -- Steed was processed as a

10  mixed file --

11     A.   Right.

12     Q.   -- and Summers said fraud --

13     A.   All right.

14     Q.   So when that form letter comes even when

15  people say mixed file or fraud --

16     A.   Okay.

17     Q.   -- right?

18     A.   Okay.  So --

19     MS. ROPER:  Objection to form, assumes facts

20  not in evidence.  Go ahead.

21  BY MR. SOLA:

22     Q.   My question was:  Isn't having the

23  consumer contact the creditor another task the

24  consumer must take under the system that Equifax has

1   now?

2         A.    Right.  So the reinvestigation about the

3   endogenous -- I mean, again, you can't -- you're

4   throwing all this out there on inquiries choosing to

5   strip off the context.  No, in many cases where

6   there's an inquiry dispute, if there's an associated

7   file that's known to be fraudulent, if there's an

8   associated file that's, you know, trade line error

9   that's known to be a mixed file, then the inquiry is

10  deleted without any necessity for the consumer to

11  contact the inquirer.

12        Q.    But, sir, we're here because they

13  weren't.

14        A.    Okay.

15        Q.    Do you understand that?  Steed's inquiry

16  wasn't deleted.  Summers' inquiry wasn't deleted.

17  So your statement that it's -- that it would be

18  deleted is just wrong in the facts of this case,

19  right?

20        A.    Okay.  And so --

21        MS. ROPER:  Objection --

22        THE WITNESS:  Sorry, sorry, sorry.

23        MS. ROPER:  -- to form --

24

1    BY MR. SOLA:

2         Q.    I mean, sorry to get a little perturbed

3    but --

4         MS. ROPER:  Objection to form, misstates the

5    testimony, misstates the facts in evidence.  Go

6    ahead, Mr. Turner.

7    BY THE WITNESS:

8         A.    Yeah.  So my opinion again is on my

9    understanding of Equifax's policies and their

10   consistency with industry policies and practices

11   and, you know, I've included the details of how

12   Equifax handles inquiry disputes in cases of mixed

13   file and in cases of identify theft or fraud or

14   other kinds of fraud.  ███████ ██████ ██████ ██████ ██████

15   ██████ ██████ ████████ ██████ ████ ██████ ██████ █████

16   ██████ ██████ ████████ ██████ ██████ ██████ █████ █████

17   ██████████ ██████ ██████ ██████ ████ ██████

18   BY MR. SOLA:

19        Q.    They're a very limited -- well, okay,

20   let's just -- we won't argue what the policies are.

21   Those are there, right.

22              Okay.  Let me -- okay.  So if the

23   consumer does what Equifax suggests and contacts the

24   creditor about the -- I mean, the inquirer about the

1   unauthorized inquiry, okay, and the inquirer let's

2   say says okay we see that doesn't belong to you,

3   that doesn't remove it from the credit report, does

4   it, sir?

5        MS. ROPER:  Objection to form, assumes facts

6   not in evidence.

7   BY THE WITNESS:

8        A.   Yeah, my understanding is that if there's

9   a communication from the inquirer to Equifax, that

10  the -- the inquiry is not that of the data

11  subject's, that that would be removed.

12  BY MR. SOLA:

13       Q.   But the fact that the consumer goes to

14  the inquirer and the inquirer agrees it's wrong

15  doesn't remove it from the credit report, the

16  inquirer has to tell Equifax to remove it, right?

17       A.   Yeah, that would need to be communicated,

18  right --

19       Q.   All right.  So --

20       A.   -- because that was a verified

21  inaccuracy, yes --

22       Q.   Okay.  So --

23       A.   -- as opposed to an alleged inaccuracy.

24       Q.   Okay.  So that's something that the --

UNOFFICIAL DRAFT TRANSCRIPT

1    and that the inquirer would have to do, and they

2    would have to make that communication?

3         A.    Yeah.  And you raise an important point.

4    Because the reality is that again there needs to be

5    some standards in place for verifying inaccuracy;

6    otherwise, the system -- the gaming that would

7    happen in the system would be paramount, and we

8    would have a serious degradation of the integrity of

9    the database or of the national credit information

10   system, which would result in a contraction of

11   credit and higher priced credit, so it's very

12   important that there be some sort of evidentiary

13   standards for lack of a better term for, you know,

14   verifying the integrity of a dispute.

15        Q.    That's right.  And there need to be

16   procedures for investigating inquiries that are

17   disputed, right?

18        MS. ROPER:  Objection to form, calls for a

19   legal opinion.

20   BY THE WITNESS:

21        A.    Yeah, and there are procedures in place

22   that, yeah, I think what we're --

23   BY MR. SOLA:

24        Q.    Okay.

1          A.   -- debating is the appropriateness and

2    not in a legal context.

3          Q.   Okay.  Now, you agree that the reason a

4    consumer's disputing inquiries with Equifax is

5    because Equifax is the one reporting the inquiry?

6          A.   A reason that the consumer -- I mean,

7    I -- consumers can dispute pieces of information for

8    all sorts of reasons, I mean --

9          Q.   Okay.  I guess what -- what my point is

10   let's say they went -- let's say --

11         A.   And I'm not trying to be evasive.

12         Q.   No, no.

13         A.   I know you're trying to get little --

14         Q.   But we've already talked about Equifax

15   choosing to report the inquiries, right?

16         MS. ROPER:  Objection to form, that assumes

17   facts not in evidence.

18   BY THE WITNESS:

19         A.   The 603(p) consumer credit bureaus

20   include in credit files inquiries because it's been

21   established that they're predictive of a person's

22   credit risk, so it's a data element that's included

23   on a credit file, yes.

24

 1   BY MR. SOLA:

 2        Q.   Okay.  Now, isn't it logical if a

 3   consumer wants something off their Equifax credit

 4   report that they contact Equifax to get it off?

 5        A.   Absolutely.

 6        Q.   That's right.

 7        A.   And that's the first -- and then it's an

 8   endogenous piece of information and it's -- if there

 9   was a disclosure, then it's verified.  If it's part

10   of a mixed file or it was part of fraud, then they

11   have internal processes and procedures in place to

12   remove the account information and the associated

13   inquiry information.

14        THE WITNESS:  Also, I'm sorry, it's been a

15   little over an hour since our last break.

16        MR. SOLA:  Yeah, you want a break?

17        THE WITNESS:  Are we planning to break for

18   lunch at any point, or do you want to --

19        MR. SOLA:  Well, I don't want to --

20        MS. ROPER:  Let's go off the record.

21                  (WHEREUPON, a recess was had from

22                  12:22 p.m. to 12:35 p.m.)

23   BY MR. SOLA:

24        Q.   Now, you used this term, something with

1   an e, endogenous, or is that --

2        A.    Endogenous.

3        Q.    Okay.  And what do you mean by that?

4        A.    That it's a data element that's created

5   by Equifax internal to Equifax, that it's not

6   externally provided or exogenous, that it's not a

7   furnished piece of information.  So it's, you know,

8   endogeneity and it's common in economics.

9        Q.    Okay.  But that doesn't affect the

10  obligations of Equifax to investigate if it's

11  inaccurate, right?

12       MS. ROPER:  Objection to form, calls for a

13  legal opinion.

14  BY THE WITNESS:

15       A.    So my opinion would be about the

16  appropriateness of Equifax's current policies and

17  since it's endogenous, I feel it's entirely

18  appropriate for Equifax to rely on internal means of

19  reinvestigation as opposed to having to contact an

20  inquirer that's been suggested at least in my

21  interpretation of materials presented by plaintiff.

22  BY MR. SOLA:

23       Q.    Okay.  But Equifax tells the consumer to

24  contact the subscriber?

UNOFFICIAL DRAFT TRANSCRIPT                    168

1          A.   After they've confirmed the factual

2    record of access, yes --

3          Q.   Okay.

4          A.   -- so subsequent to.

5          Q.   So Equifax is basically conceding that

6    the inquirer may have information that would bear on

7    the accuracy of the inquiry?

8          MS. ROPER:  Objection to form, misstates his

9    testimony.

10   BY THE WITNESS:

11         A.   Yeah, I think Equifax is suggesting they

12   verify there's been a disclosure to the inquirer,

13   and if you think it's not authorized, then you, the

14   data subject, and the inquirer may be able to sort

15   that out, because they have application data that's

16   not shared with -- with Equifax, and there are other

17   means they have to sort out the ownership issue

18   that -- as you label it, yes.

19   BY MR. SOLA:

20         Q.   Okay.  But my question is:  Equifax is

21   conceding that the inquirer may have information

22   that's relevant to the accuracy of the disputed

23   inquiry?

24         MS. ROPER:  Objection to form, asked and

UNOFFICIAL DRAFT TRANSCRIPT

1   answered, calls for a legal opinion.

2   BY THE WITNESS:

3        A.   I think they're suggesting that the

4   inquirer may have information as to the ownership,

5   but the fact that there was a disclosure to that

6   inquirer is accurate, no, that's a factual record of

7   access.

8   BY MR. SOLA:

9        Q.   Okay.  But it -- now -- well, let me --

10  all right.  Go to page three, paragraph seven.  It

11  talks about harms, you see that?

12       A.   I do, yes.

13       Q.   Okay.  Okay.  You indicate a hard inquiry

14  can be a factor in a person's credit score but is

15  generally a minor one, right?

16       A.   Correct.

17       Q.   Okay.  But just one inquiry can lower a

18  consumer's credit score, correct?

19       A.   It may or may not.  It depends on a whole

20  host of other variables, but it can, yes.

21       Q.   Yeah, in fact, doesn't FICO say that one

22  inquiry could lower your credit score but probably

23  not more than five points?

24       A.   I think the preface to the FICO --

1      Q.    Let me restate --

2      A.    -- statement is for --

3      Q.    -- that.  I think I misspoke.

4      A.    Okay.

5      Q.    I'll stop, because I don't want to --

6      A.    No, that's fine.

7      Q.    I think the language is that it may lower

8   your credit score but likely less than five points,

9   is that fair to say?

10      A.    No.  I think the important qualifier is

11   for some people, and then also may.  So that's

12   consistent with what I've represented.  And by the

13   way, is distinct and different from what Evan

14   Hendricks represented that it always lowers your

15   credit score.  And we touched on that earlier.

16      Q.    And as we pointed out, that the person

17   making the credit decision, they consider the

18   inquiries in their risk assessment, right?

19      MS. ROPER:  Objection to form, misstates his

20   testimony.

21   BY THE WITNESS:

22      A.    A lender, you know, would consider credit

23   file contents and could include a credit bureau

24   score that would consider inquiries in a lending

1    decision, that's accurate, yes.

2    BY MR. SOLA:

3        Q.    And we said how an inquiry reflects where

4    the consumer has sought credit, right?

5        A.    An inquiry is a record of access that

6    would be indicative of a data subject seeking some

7    sort of credit or other -- yeah, yes, correct.

8        Q.    Okay.  And where that inquiry is

9    inaccurate, in other words, it doesn't belong to

10   that consumer because of identify theft in one

11   example then that inquiry misrepresents that the

12   consumer sought credit someplace that they actually

13   didn't, right?

14       A.    If it's an inaccurate piece of

15   information, it would misrepresent that they were

16   seeking credit from some place that they weren't,

17   yes.

18       Q.    Okay.  And you agree that that type of

19   inaccurate information shouldn't be on credit

20   reports to third parties?

21       MS. ROPER:  Objection to form.

22   BY THE WITNESS:

23       A.    Sorry, I should have pods more.  Yeah, I

24   mean, I would just agree that I think it's

UNOFFICIAL DRAFT TRANSCRIPT

1   universally recognized that credit reports should be

2   as accurate as possible, so the ability that any

3   party has, the data subject, the furnisher, the

4   credit bureau to improve the accuracy of a credit

5   report should be pursued, yeah, and, you know, sure.

6   BY MR. SOLA:

7       Q.   All right.  So you agree, inaccurate

8   inquiries shouldn't be reported?

9       MS. ROPER:  Objection to form, calls for a

10  legal opinion.

11  BY THE WITNESS:

12      A.   I think all parties interests would be

13  served if there were a practical means of improving

14  the quality and accuracy of any data element or

15  trade line, yes, I mean, including but not limited

16  to inquiries.

17  BY MR. SOLA:

18      Q.   Okay.  Page nine.  All right, it actually

19  starts at the bottom of page eight with your --

20      A.   Bottom of page eight, sorry.

21      Q.   Yeah, the sentence that is inquiry data

22  was found to contain useful information for risk

23  assessment that is not completely substitutable with

24  other data found in a consumer's credit file?

1          A.    Yes.

2          Q.    Okay.  And to put it in context, you're

3     talking about why credit scoring models factor in

4     inquiries, right?

5          A.    Correct.

6          Q.    Okay.  And you agree that they -- when

7     they factor them in, it never can help -- can raise

8     the score, right?

9          MS. ROPER:  Objection to form, assumes facts

10    not in evidence.

11    BY THE WITNESS:

12         A.     In the United States.

13    BY MR. SOLA:

14         Q.    Yeah.

15         A.    That's accurate.  It can never raise a

16    score, yes.

17         Q.    Okay.  So inquiries are considered a

18    negative item, right?

19         A.    I think that depends on the context

20    again.  This is why their modelers have developed

21    bundles when they recognize that a consumer is

22    competitively shopping or investing and doing

23    research on rates and terms for mortgage or auto

24    loans.  There's a recognition that that's a positive

UNOFFICIAL DRAFT TRANSCRIPT

1    thing, so they're bundled and they count as one as

2    opposed to counting, you know, six or eight or ten

3    or 12.  So I think that they're not always

4    considered to be negative.  I think that decision

5    suggests that there's a recognition that there's

6    responsible credit behavior happening.

7        Q.   Okay.  When you're talking about bundling

8    and shopping, I think what you're saying is

9    sometimes consumers when they're seeking credit they

10   might go to multiple sources to see where they can

11   get the best rate, right?

12       A.   Yes.

13       Q.   And so the credit scoring models, if they

14   see multiple inquiries around the same time, they

15   won't count those all separately, they'll bundle

16   them and consider it one inquiry, right?

17       A.   For home mortgage or residential mortgage

18   and auto, yes, but not for credit cards, for

19   example.

20       Q.   Okay.  And the reason they bundle them

21   into one is essentially not to penalize the consumer

22   for shopping around?

23       A.   That's one way of saying it, yes.

24       Q.   Okay.  Because if they counted them as

UNOFFICIAL DRAFT TRANSCRIPT

 1    multiple inquiries, that could lower the credit
 2    score?
 3          A.    It would have more of an impact on their
 4    score than bundling, yes.
 5          Q.    Than one?
 6          A.    Right.
 7          Q.    Okay.  But the one could lower their
 8    credit score, right?
 9          A.    It could.  There are also situations
10    where it wouldn't, so we've discussed that as well
11    before.
12          Q.    Yeah.  Okay.  Getting back to the top of
13    page nine where you talk about the reason the
14    inquiry data is considered, your first full sentence
15    on that page nine, you say as such use of inquiry
16    data in credit scoring improves risk assessment,
17    which, in turn, enables sounder lending and
18    increased access to credit?
19          A.    Yes.
20          Q.    Okay.  But to the extent that the inquiry
21    is false, then it undermines accurate risk
22    assessment, right?
23          A.    Again, you know, statements like this are
24    sort of trivially true out of context but any

1    inaccurate variable that's factored into a scoring

2    model would degrade or distort maybe because it

3    could be in either direction, if we're talking about

4    inquiries, it's possible it could lower a score

5    unfairly because the inquiry didn't happen.  It's

6    also possible, as I said before, if it happens in a

7    bundle, it would have no impact on the score.

8         Q.    And so the accuracy of credit reports is

9    important not just to the consumer but also to the

10   credit granter, correct?

11        A.    Yes, that's true.

12        Q.    Because they're making a business

13   decision assuming the report's accurate, correct?

14        A.    Correct.

15        Q.    And then you agree that if there are

16   false inquiries, that could inaccurately lower the

17   score?

18        A.    It may.  It may not.

19        Q.    Yeah.

20        A.    Yes.

21        Q.    Now, in paragraph 30 -- 21, you're

22   talking about an explanation as to why hard

23   inquiries and future negative outcomes such as

24   delinquencies are -- have a relationship?

1         A.   Yes.

2         Q.   Okay.  And you mention because looking at

3    the number of credit inquiries enables consumers to

4    be identified who are in financial stress, see that?

5         A.   Yes.

6         Q.   Okay.  In other words, you mean if people

7    are in financial stress, then they might be looking

8    for credit more than people that aren't, is that

9    right?

10        A.   Yes.

11        Q.   Okay.  And so then again if an inquiry

12   doesn't accurately reflect the consumer's seeking

13   credit because it's false, then it makes them look

14   like they're in stress when they're really not?

15        A.   It could.  I mean, it would have to

16   exceed a certain threshold, so one or two errant

17   inquiries is not going to create the impression of

18   financial distress.

19        Q.   Okay.  But it still will inaccurately

20   represent the consumer's credit history?

21        A.   If it's an inaccurate inquiry and again

22   depending on the context, I mean, if it occurred --

23   if it was an auto or mortgage and it occurred in the

24   period where they were competitive shopping, it

UNOFFICIAL DRAFT TRANSCRIPT

1    wouldn't have any impact at all.  But it's

2    potentially something that could have a minor effect

3    on their credit score, which may or may not be

4    material.

5         Q.   All right.  Turning to page 22 -- I mean

6    page ten, item 22.

7         A.   Yes.

8         Q.   Okay.  And there you're talking about the

9    impact on the credit score, right?

10        A.   The whole paragraph?

11        Q.   Well --

12        A.   Yes.  Yes.  So yes, the -- yes, that

13   inquiries are in an ensemble of considerations that

14   FICO has labeled as new credit, yes, and that

15   they -- their own -- this is just quotes from my

16   FICO, yes.

17        Q.   Okay.  And that new credit category,

18   which includes inquiries, accounts for ten percent

19   of the score?

20        A.   Yes.  But that the new credit is a pretty

21   nuanced category and inquiries are, you know, part

22   of that.  But not the ten percent.  So it would be a

23   subset of the ten percent, yes.

24        Q.   All right.  And the FICO scores go from

1    300 to 850 --

2         A.    Yes.

3         Q.    -- is that right?

4         A.    Yes.

5         Q.    Okay.  And so --

6         A.    And now VantageScore.

7         Q.    And now VantageScore, okay.  And so the

8    worst score you can get is 300, is that right?

9         A.    Correct.

10         Q.    And the best is 850?

11         A.    Correct.

12         Q.    So it can vary by 550 points?

13         A.    Correct.

14         Q.    And ten percent of 550 is 55 --

15         A.    Yes, sir.

16         Q.    -- right?  And that's I think you alluded

17    to earlier, that you had put in 85 but you wanted to

18    correct it to 55?

19         A.    Yes.

20         Q.    Okay.  So inquiries could affect a

21    consumer's credit score by up to 55 points?

22         A.    No.  Because inquiries are not all of new

23    credit.

24         Q.    Well, what if there isn't anything else

1    but inquiries in the new credit category?

2         A.    It would not affect it by 55 percent,

3    because it wouldn't be -- it says up to ten percent,

4    but then it wouldn't -- it wouldn't -- it just

5    wouldn't be weighted that way.

6         Q.    Okay.  But any effect a false inquiry

7    has -- well, let me -- how much could it affect it

8    then if it's not 55 points?

9         A.    I mean, I don't know FICO's proprietary

10   weights, I just -- I don't know.  I built models in

11   different environments.  I built them in Australia,

12   New Zealand and India, so -- and they're weighted

13   differently because they have different systems and

14   different other data assets, and so -- but I just

15   can't answer.  I can't speak for FICO.  But what I

16   can suggest is that it's less than ten percent.

17        Q.    All right.  Less than ten percent, so you

18   think less than 55 points?

19        A.    Yes.

20        Q.    All right.  And that's just FICO, right?

21        A.    Correct.  Well, and VantageScore is in my

22   report, it's five percent, so --

23        Q.    Okay.

24        A.    -- you know, yes.  It's not -- it's a

1    consideration, but it's not a major consideration.

2    It's not comparable to utilization rate, for

3    example, so yes.

4         Q.    All right.  And then other scores, you

5    would have different scoring models, right?

6         A.    Yeah.  And it's conceivable, by the way,

7    as with the models we developed for Australia and

8    New Zealand that some models at some lenders in the

9    United States may consider inquiries positively,

10   it's conceivable.

11        Q.    Or they might count for 20 percent of the

12   score --

13        A.    They may.

14        Q.    -- right?

15        A.    That's right.

16        Q.    Then you quote from the FICO website that

17   says for most people one additional credit inquiry

18   will take less than five points off their FICO

19   score?

20        A.    Yes, for most people, yes.

21        Q.    Okay.  So just one inquiry for most

22   people will lower their score, you agree?

23        A.    Just one inquiry for most people, and

24   most is just 50 percent plus one, could lower their

1   credit score by up to five points.  That could be

2   one point, that could be two points, yeah,

3   absolutely.

4        Q.   Actually, you said could, but FICO says

5   will?

6        A.   Will.  All right.  Will.  Could be one

7   point --

8        Q.   So for the majority --

9        A.   But it's also for most people.  I think

10  we need to recognize there could be a nontrivial

11  minority who have no impact, zero.

12       Q.   I understand.  But you would agree that

13  that's harm, that lowering of that score is harm?

14       A.   No, I wouldn't agree.  I would not agree

15  at all.

16       Q.   Isn't the higher the score, the better

17  terms for your credit?

18       A.   Again that's an extremely simplified

19  understanding of credit scores.  Stripped of context

20  and talked about in a theoretical manner.  I mean,

21  if there's no permissible purpose activity, if an

22  individual doesn't look at their credit report, if a

23  third party doesn't review it and it it's deleted in

24  the time frame or even after one year when it's no

1   longer scored, it's hard for me to imagine a

2   scenario in which that could conceivably and

3   reasonably be considered a harm.

4        Q.   So am I correct, your opinion is having a

5   lower credit score because of a false inquiry on

6   your credit report is not harm?

7        A.   My opinion is that if no third party

8   accesses your credit file during the 12 months after

9   the false inquiry is included in your credit report

10  and you've done no credit seeking behavior and you

11  don't look at your credit report in that 12 months,

12  there is no harm, absolutely.

13       Q.   Okay.  How about where it lowers your

14  credit score that does go to some third party, then

15  you agree there's harm?

16       A.   No.  Even in that, it depends on the

17  circumstances.  As I've discussed earlier when we

18  began this deposition, if you're a person who has

19  only inquiries on your credit report, then you're

20  not generating a score and you're not harmed.  If

21  you are a person who has the lowest possible score

22  of 300, another inquiry is not going to lower your

23  score, and you're not harmed.  If you're a person

24  who's been immaterially impacted, and this is

1    important, because this is where the regulators and

2    advocates and everyone has shifted their attention,

3    it's materiality, you know, my credit score could be

4    lowered by a single point.

5             And if I'm on that threshold, then that

6    could improve or diminish my credit standing, and it

7    could be consequential.  Similarly, if I'm deep

8    subprime or high super prime, my score could change

9    by 50 or even 100 points, and it would not affect

10   the eligibility decision, the accept, reject or the

11   terms I'm offered, so it really depends.  It depends

12   on a lot of things.  And again the age of the

13   inquiry, the other contents of the credit report,

14   the type of loan I'm applying for, you know, that

15   I'm applying for a mortgage re-fi and I've got false

16   inquiries about DirecTV --

17        Q.    Okay.  But let --

18        A.    -- I mean, it's a manual process.  But,

19   no, you're asking me --

20        Q.    No.

21        A.    -- that I --

22        Q.    No, I don't --

23        A.    -- was harmed --

24        Q.    You're bringing --

1        A.    -- and I'm telling you it doesn't, I

2   mean it --

3        Q.    Okay.  Let me --

4        A.    -- it's just not that simple.

5        Q.    Let me ask the question again.  I'm

6   talking about lowered score, and you said somebody

7   that's already --

8        A.    It doesn't -- I know what you're talking

9   about --

10       Q.    Okay.

11       A.    -- and I've answered the question.  A

12  lowered score does not necessarily result in a harm.

13  It's a lower score.  You could be receiving exactly

14  the same terms, get exactly the same decision, so I

15  don't understand how you're harmed, it just -- you

16  can't convince me that there's a harm.

17       Q.    Okay.  So that's what --

18       A.    My score does --

19       Q.    -- I can't convince you --

20       A.    My score varies --

21       Q.    Okay.

22       A.    -- from 700 to 750 in a week possibly.  I

23  don't -- I mean, I'm -- you know, I'm not applying

24  for credit, how am I harmed?

1         Q.    Okay.  Again my question was:  Is it your

2    opinion that where an inaccurate inquiry lowers the

3    consumer's credit score, and that lowered score is

4    then reported to a third party --

5         A.    Correct.

6         Q.    -- there is no harm?

7         A.    And again I've answered this question.

8    It depends on a whole host of other variables.  It's

9    very likely, in fact, because the minority of people

10   are along the cut off point that the impact from a

11   single inaccurate hard inquiry, which is negligible,

12   will materially affect them.  So in that case, there

13   is no harm.

14        Q.    Okay.  And by harm there, you're meaning

15   paying a higher interest rate or be denied credit,

16   is that what you mean?

17        A.    Yeah, that you're getting terms that

18   would differ from the terms you would have received

19   if that errant inquiry weren't on your credit

20   report.  The old but for in legal terms.

21        Q.    All right.  But you'd agree you cannot

22   say an inaccurate inquiry won't harm a consumer?

23   You can't make that generalization, right?

24        MS. ROPER:  Objection to form, asked and

 1   answered many times.

 2   BY THE WITNESS:

 3       A.   Again I've already discussed a number of

 4   scenarios whereby inaccurate inquiry wouldn't harm

 5   an individual, that they've got the lowest score,

 6   that their inquiry only -- that it's bundled because

 7   of the timing, it doesn't count at all, so it's

 8   just -- you know, yes, I disagree with that

 9   statement.

10   BY MR. SOLA:

11       Q.   And you agree, though, that the number of

12   inquiries by itself could be a reason for credit

13   denial?

14       A.   Yeah, absolutely.

15       Q.   Now let's go down to --

16       MS. ROPER:  Robert, the food is here.

17       MR. SOLA:  Oh, sure.  Sure.  Break for lunch?

18               (WHEREUPON, a recess was had from

19               12:57 p.m. to 1:18 p.m.)

20   BY MR. SOLA:

21       Q.   Mr. Turner, my understanding is Equifax

22   puts hard inquiries on a consumer's report for two

23   years, is that right?

24       A.   Correct.

UNOFFICIAL DRAFT TRANSCRIPT

1      Q.    Okay.  But it can report them longer if

2  it wants to, correct?

3      MS. ROPER:  Objection to form, assumes facts

4  not in evidence.

5  BY THE WITNESS:

6      A.    I don't know that there's a longer

7  constraint on that.  I mean, I suppose they could if

8  they wanted to, yeah.

9  BY MR. SOLA:

10      Q.    And you say FICO only considers hard

11  inquiries for one year, is that right?

12      A.    Correct.

13      Q.    And you mean in terms of their credit

14  scoring model?

15      A.    Correct.

16      Q.    Now, Mr. Steed was -- well, let's assume

17  Mr. Steed was only disputing one inquiry, all right?

18      A.    Okay.

19      Q.    That one inquiry could have lowered his

20  score, right?

21      A.    I did not see his credit file or credit

22  report, but, yes, that's one of the options for the

23  impact it could have had, yes.

24      Q.    Okay.  And if Summers was disputing three

1    inquiries, that could have lowered her score more

2    than five points, right?

3         A.   That's absolutely a possibility, yep.

4    Yes.  Sorry.

5         Q.   Are you aware of any time limit as to how

6    long Equifax could report inquiries?

7         MS. ROPER:  Objection to form.

8    BY THE WITNESS:

9         A.   I think I've answered that.  I mean, you

10   know, their current policy is they keep them on

11   record for two years.  That's, I think, primarily

12   related to modeling and that the primary function of

13   the inquiries is a signal of distress, and, you

14   know, over time if someone's still making good on

15   their obligations, then that's not the significance

16   of the signal.  That's why it's diminished even

17   after six months and why it's not scored after a

18   year and why it's removed after two.

19   BY MR. SOLA:

20        Q.   Okay.  Just to move it along, my question

21   was:  Are you aware of any limit on the amount of

22   time?

23        A.   No.

24        Q.   I just think if we -- if you answer my

UNOFFICIAL DRAFT TRANSCRIPT

1   question --

2        A.   Okay.

3        Q.   -- we'll get out of here faster.

4        A.   Got it.  No.

5        Q.   Now, the e-OSCAR system, that's an

6   electronic system that's been devised by the three

7   major credit reporting agencies to communicate with

8   furnishers, right?

9        A.   You know, with Innovis, but yes.

10       Q.   And Innovis too --

11       A.   Yeah.

12       Q.   -- the fourth agency?

13       A.   Right.

14       Q.   And all the major -- let's say all the

15   large banks, large lending companies, they're part

16   of e-OSCAR, right?

17       A.   The furnishers that are also inquirers,

18   yes.

19       Q.   Yeah.  And so you'd agree most person

20   making inquiries are creditors or furnishers that

21   are part of e-OSCAR?

22       A.   I don't know the exact ratio, but there's

23   a very significant portion of inquirers who aren't

24   furnishers, they're, you know -- this wireless phone

1    companies and Verizon, AT&T, Cingular, T-Mobile,

2    landline, cable TV, and electric utility companies,

3    gas, water, electric, and these are organizations

4    that have hundreds of millions of customers, and

5    they make inquiries, and so they're a very

6    nonsignificant minority, but I would say the

7    majority are absolutely credit file pulls, yeah,

8    for --

9    BY MR. SOLA:

10        Q.    Okay.  But they're --

11        A.    -- credit decisioning.

12        Q.    The majority of the people making

13   inquiries are part of e-OSCAR, you agree with that?

14        A.    The majority of inquiries would be from

15   creditors that would be on e-OSCAR.  But again not

16   to diminish that there's a very large number of

17   inquirers that aren't furnishers that account for

18   very possibly hundreds of millions of inquiries

19   annually.

20        Q.    Okay.  But isn't Verizon a furnisher?

21        A.    Verizon has begun recently becoming a

22   furnisher for wireless or I guess it's landline.

23   They just started with Equifax, yeah, so that's a

24   recent development.

1          Q.    Okay.

2          A.    And I think AT&T as well, but yeah.

3          Q.    All right.  And when you're talking about

4    some of these inquirers that have hundreds of

5    millions of customers, you're referring to these

6    either cable or telephone companies, right?

7          A.    And energy utility companies, yes.

8          Q.    All right.  Now, and energy utility

9    companies may start furnishing through these -- to

10   the bureaus, right?

11         A.    I very much welcome that outcome,

12   absolutely.  I've been fighting for that for years.

13         Q.    And if they start furnishing, they'll be

14   part of e-OSCAR, right?

15         A.    Yes, they would in all likelihood become

16   part of that platform, yes.

17         Q.    And now even these companies that aren't

18   part of e-OSCAR, they're subscribers who have

19   contracts with Equifax, right?

20         A.    Or one of the bureaus if they're pulling

21   reports, yes.

22         Q.    Okay.  But since this case is about

23   Equifax's --

24         A.    Yeah, sure.

UNOFFICIAL DRAFT TRANSCRIPT

1       Q.    -- inquiries, then you agree those

2  companies that are making inquiries to Equifax

3  already have a contract or relationship --

4       A.    Yes.

5       Q.    -- with Equifax?  Yes, okay.

6            And Equifax, if it chooses, it could say,

7  well, as part of being an inquirer, you've got to

8  respond if we send you a notice of dispute?

9       A.    They could.

10  MS. ROPER:  Objection to form, assumes facts

11  not in evidence.

12  BY THE WITNESS:

13       A.    But it wouldn't be a legal obligation.

14  They could do that, but it also could deter

15  business.  I mean, I've been with the inquirers that

16  aren't furnishers, and they look at data furnisher

17  obligations under the FCRA as being very onerous

18  and, you know, they maybe decide they'll use other

19  means.  They could start requiring larger security

20  deposits or contracting the service they offer in

21  the competitive dereg environment.  There are all

22  sorts of other outcomes that, you know, they may not

23  respond favorably to a requirement from Equifax.

24

1   BY MR. SOLA:

2        Q.    They could choose just not to get credit

3   reports is what you're saying?

4        A.    They could absolutely choose that.

5        Q.    Okay.  And just try to assess their

6   customers based on other means?

7        A.    Application data, other databases, I

8   mean, we're in an era of big data now, it could be

9   unstructured data, sure.

10        Q.    And Equifax, they have the -- because

11   they know all these inquirers, they have a

12   capability to communicate with them, right?

13        MS. ROPER:  Objection to form, assumes facts

14   not in evidence.

15   BY THE WITNESS:

16        A.    I mean, any person has a capability of

17   communicating with any other person, it's just the

18   degree of challenge and difficulty and relevance,

19   and so it's not just Equifax picking up the phone

20   and calling and saying hey did you make this injury,

21   that's again an oversimplification.  So yes,

22   theoretically any credit bureau could design a

23   program that could communicate facts to another

24   party, but that doesn't necessarily mean that's the

1   optimal outcome, but yes.

2   BY MR. SOLA:

3       Q.   Now, in paragraph 24 on page 11, you say

4   the e-OSCAR system was developed by the three

5   nationwide CRAs and Innovis as a means to enable

6   efficient large scale dispute resolution?

7       A.   Yes.

8       Q.   Okay.  By efficient, you mean fast,

9   right?

10      A.   You know, that's one consideration, time

11  is one consideration.

12      Q.   All right.  And there's some furnishers

13  that aren't on the e-OSCAR, isn't that true?

14      A.   It's possible.  I mean, that used to be

15  more prevalent as they were, you know, graduating to

16  toward e-OSCAR.  But I'm unaware of any significant

17  furnisher.  I mean, there might be some community

18  lender or credit union, small credit union somewhere

19  that's technologically constrained, but it would be

20  the exception and not the norm.

21      Q.   Now, e-OSCAR, that system, you indicate

22  it was developed by the three CRAs and Innovis,

23  right?

24      A.   Yes.

1        Q.    So they can change it, right?

2        A.    Sure, that's theoretically possible,

3   absolutely.

4        Q.    In fact, they have changed it

5   significantly, haven't they?

6        A.    Absolutely.

7        Q.    Okay.  And you're aware -- are you aware

8   of a change, oh, I think about ten years ago, where

9   they added a box called FCRA relevant information to

10  the ACDB form?

11       A.    I'm familiar with that, not in great

12  detail, but yes, I'm aware of it.

13       Q.    Okay.  And that allowed the CRAs to put

14  additional information they had received from the

15  consumer into the notice of dispute to the

16  furnisher, right?

17       A.    Correct.

18       Q.    Okay.  And then I think you're probably

19  aware that e-OSCAR was changed to allow the CRAs to

20  attach documents?

21       A.    Upload data, yes.

22       Q.    Okay.  And that again was one reason that

23  was done was so that information or so that

24  documents that were received from the consumer whose

1    making the dispute could be forwarded to the

2    furnisher, right?

3         A.    Yes.

4         Q.    Okay.  And both of those changes were to

5    enhance the thoroughness of the reinvestigation

6    that's being conducted into the consumer's dispute,

7    wouldn't you agree?

8         A.    Seems reasonable, yeah.

9         Q.    Okay.  Now, that FCRA relevant

10   information box, are you aware of any reason why

11   Equifax could not put the dispute of the consumer --

12   the consumer's dispute of the inquiry into that box?

13        MS. ROPER:  Objection to form, assumes facts

14   not in evidence, misstates test -- sorry, that's it.

15   Go ahead.

16        THE WITNESS:  You done?

17        MS. ROPER:  Yes.  Sorry.

18   BY THE WITNESS:

19        A.    Okay.  You know, from a technical

20   perspective, it's a matter of programming, right,

21   but I mean as I discussed earlier, this just isn't

22   simply about programming.  But, sure, I mean, you

23   can put in an unlimited number of fields for

24   communication in a platform, absolutely.

1    BY MR. SOLA:

2         Q.    Okay.  And then also if a consumer let's

3    say wrote a dispute by letter, would that include

4    the disputes of inquiries, Equifax could attach that

5    letter to the ACDB form that's sent through the

6    e-OSCAR system, right?

7         A.    Sure, yeah.

8         Q.    Okay.  Now talking about -- turn to page

9    12.  No, it might not be specifically in that

10   paragraph.  But I want to talk about what you

11   furnished information versus inquiry information.

12        A.    Sure.

13        Q.    Okay.  And you understand that credit

14   bureaus report public record information, right?

15        A.    Uh-huh.

16        Q.    Like Equifax, it reports a civil court

17   records, right?

18        A.    Correct.

19        Q.    Okay.  It doesn't report criminal

20   records?

21        A.    No.

22        Q.    So it chooses which public records it

23   wants to report, right?

24        A.    Well, right, within the limits of the

 1   law, correct.

 2        Q.   Okay.  And the civil courts, they don't

 3   report their records to Equifax, do they?

 4        A.   There's -- sorry, go ahead.  You were

 5   going to object.  There is an intermediary.

 6        Q.   So in other words, the creator of those

 7   records doesn't furnish that information, doesn't

 8   it?

 9        A.   That would --

10        MS. ROPER:  Objection to form.  Go ahead.

11   BY THE WITNESS:

12        A.   I mean, you know, given the intermediary

13   as I understand, yes, that's right.

14   BY MR. SOLA:

15        Q.   Okay.  In other words, Equifax either

16   examines the public records or hires somebody to

17   examine them for it, right?

18        A.   Yeah, that's right.

19        Q.   Okay.  That's what you mean by the

20   intermediary, right?

21        A.   Correct.

22        Q.   But if someone disputes a public record

23   item such as a judgment, you agree Equifax will

24   reinvestigate it through e-OSCAR, right?

1      MS. ROPER:  Objection to form, assumes facts

2   not in evidence, beyond the scope.

3   BY THE WITNESS:

4      A.   Right.  Yeah, so if there's a public

5   record dispute, that Equifax would reinvestigate,

6   correct.

7   BY MR. SOLA:

8      Q.   Yeah.  But they can't send the e-OSCAR

9   notice to the court that has that record, can they?

10      MS. ROPER:  Objection to form, assumes facts

11   not in evidence, beyond the scope of his expert

12   opinion.

13   BY THE WITNESS:

14      A.   Yeah, I mean, the can is about ability

15   and then do.  If there's a source of data that's not

16   linked to e-OSCAR, then, no, they cannot.  But, you

17   know, could they try and enroll and enlist and

18   expand e-OSCAR, that that's a capability they could

19   too.  But that's -- you know, again, you know,

20   there's a question of need, right, and so again with

21   the inquiry that we're discussing today, you know,

22   it's endogenous.  Court record data is not

23   endogenous, right, so, I mean, you're talking about

24   furnished and unfurnished.  But again I think the

UNOFFICIAL DRAFT TRANSCRIPT

1    more relevant feature is -- or more salient

2    certainly is that the data sources endogenous to

3    Equifax in the case of inquiries.

4         Q.   Okay.  But I guess my point is that the

5    courts whose records Equifax is reporting, they're

6    not part of e-OSCAR?

7         A.   Okay.  Yes.

8         Q.   Right?

9         A.   Yeah.

10        Q.   But Equifax still has a system to

11   reinvestigate disputed court records?

12        MS. ROPER:  Objection, asked and answered,

13   assumes facts not in evidence, beyond the scope of

14   his expert opinion.

15   BY THE WITNESS:

16        A.   Yes.

17   BY MR. SOLA:

18        Q.   Okay.  Now you say that endogenous word.

19   But the inquiry resulted from information provided

20   by an inquirer, right?

21        A.   No, that -- well, in part.  But it's also

22   that a disclosure was made, and so it's unique to

23   that particular consumer credit bureau as opposed to

24   any of the inquirers.  So, you know, a record of

1    access to Equifax is not going to be contained on a

2    credit file in Experian or TransUnion or any other

3    CRA.

4         Q.   Okay.

5         A.   So it's unique and endogenous and it's

6    from that communication to them and their

7    fulfillment of that request.

8         Q.   I understand.  But some inquirers don't

9    report to all three credit bureaus, right?

10        A.   Yes, that's true.

11        Q.   Okay.  So some items are --

12        A.   But that's furnished, that's again we're

13   comparing apples and oranges.

14        Q.   Okay.  But not every item that's on

15   Equifax's reports is on TransUnion and Experian,

16   right?

17        A.   Again, the same response.  That's true,

18   but that's exogenous, that's furnished, we're

19   talking now in my opinion about endogenous.

20        Q.   Okay.  But again the inquiry only

21   resulted because an inquirer provided identifying

22   information on a consumer, right?

23        A.   I mean, technically you could -- if

24   you're -- if we could extend that logic and say only

1   it happened because an individual decided they

2   wanted to visit a borrower and get credit so, you

3   know, I mean, they're equally as culpable for that

4   inquiry as the subscriber, inquirer, you know.  I

5   mean, so the reality is the best source in this case

6   where the record the data was generated was yes, but

7   for the consumer deciding they needed a loan and but

8   for the bank existing saying we loan to consumers

9   and but for the existence of a contract between the

10   lender and the CRA, you know, none of this would

11   matter.  But the reality is it ends up, it's the end

12   point.  It's -- you know, the data is created

13   because they contacted Equifax and Equifax fulfilled

14   it.  So that last part, the fulfillment, isn't there

15   with the consumer until they -- you know, see, oh,

16   is this on my file or not, and they have the right

17   to contest it or the bank, you know, accepting their

18   application base.

19        Q.    Okay.  So the --

20        A.    So they're --

21        Q.    The inquiry is a product of two things, I

22   think we agree?  One is the inquirer making the

23   request and providing the information and Equifax

24   selling them the credit report?

 1        A.    Yes.

 2        Q.    Okay.  So it's not wholly Equifax data

 3   that produces the inquiry, in fact, it starts with

 4   the furnisher data, right?

 5        A.    Yes.  If nobody inquired, there would be

 6   no inquiries.

 7        Q.    And if the furnisher had not provided the

 8   information with the can inquiry, there would be no

 9   inquiry?

10        A.    Well, that would -- that's the definition

11   of an inquiry.  If the furnisher wasn't, you know,

12   commissioned by the data subject to make the

13   inquiry, there would be no inquiry; hence, no record

14   of inquiry.

15        Q.    Now, is it your understanding that

16   Equifax, Experian and TransUnion have similar

17   procedures for handling disputed inquiries as a

18   result of them all using the e-OSCAR system?

19        MS. ROPER:  Objection to form, misstates the

20   report, misstates his testimony.

21   BY THE WITNESS:

22        A.    No.  The handling of e-OSCAR or the --

23   sorry, the use of e-OSCAR and the handling of

24   inquiries and my knowledge of how they handle

UNOFFICIAL DRAFT TRANSCRIPT

1    inquiries -- sorry, I'm talking fast -- and their

2    similarities, they're separate issues.  So, I mean,

3    I have familiarity with their practices and policies

4    for all of the reasons we discussed earlier, the

5    communications that we detailed earlier, the

6    research that I detailed earlier.  And that's quite

7    separate from them using e-OSCAR for furnished

8    information.

9    BY MR. SOLA:

10        Q.    Okay.  Do they -- the big three bureaus,

11   do they have similar procedures for handling

12   disputed accounts?

13        A.    Well, for handling disputed accounts,

14   those are pieces of information, that's e-OSCAR, so

15   yes.

16        Q.    Okay.  Do they have similar procedures

17   for handling disputed public record information?

18        MS. ROPER:  Objection to form, beyond the

19   scope.

20   BY THE WITNESS:

21        A.    Yeah, I mean, you know, generally

22   speaking, the practices of the big three, and I

23   would throw Innovis into this, have converged over

24   time.  They're generally fairly similar, they're

1    nuance differences, but, you know, generally fairly

2    similar.

3    BY MR. SOLA:

4         Q.    Yeah.  In other words, they all do their

5    reinvestigations the same way?

6         A.    Roughly, yeah.

7         Q.    Roughly.  And a part of that is because

8    they all use e-OSCAR, right?

9         A.    For account information, yes.

10        Q.    Now, your second sentence in paragraph

11   25, you're talking about the similar procedures, and

12   you say at the core of their policies is the shared

13   definition of an inquiry as a factual record, right,

14   you see that?

15        A.    Yes.

16        Q.    Okay.  But as we saw, that's not what --

17   how Equifax defines a hard inquiry, is it?

18        MS. ROPER:  Objection to form --

19   BY MR. SOLA:

20        Q.    This is referring to the definitions in

21   the policy manual.

22        MS. ROPER:  Objection to form, misstates the

23   testimony, misstates the document referred to.

24

UNOFFICIAL DRAFT TRANSCRIPT

1    BY THE WITNESS:

2         A.    Yeah, I'm sure I could easily produce for

3    you documents from Equifax where they refer to

4    inquiries as factual records of access.

5    BY MR. SOLA:

6         Q.    No, I understand.  But their definition

7    is an inquiry that result from transaction initiated

8    by the consumer when applying for credit such as a

9    mortgage, credit card, auto loan or perjury finance

10   loan.  That's how they define hard inquiry, right?

11         MS. ROPER:  Objection to form, argumentative,

12   it misstates the document, misstates his prior

13   testimony.

14   BY THE WITNESS:

15         A.    So I write reports for different

16   audiences, and I'll use the same term and provide

17   different definitions depending on the technical

18   aptitude of the audience.  So I may use detailed --

19   BY MR. SOLA:

20         Q.    Sir, that's not my question.

21         A.    No, it -- in fact, if you'll --

22         Q.    I'm asking you --

23         A.    -- if you'll allow --

24         Q.    -- if that was your --

UNOFFICIAL DRAFT TRANSCRIPT                    208

1        A.    -- me to finish --

2        Q.    Well, it's just --

3        A.    So you're --

4        Q.    -- nonresponsive.

5        A.    You're referring to a single document and

6    a single source, again entirely devoid of context,

7    particularly who is the intended audience, if this

8    is a communication to consumers, you're not going to

9    use factual record of access necessarily, you're not

10   going to use a lot of parlance and jargon.  They

11   have departments for external communications that

12   goes through legal, and that is my point.  I mean,

13   the intended audience would largely determine the

14   language that's used.  So all three -- I can

15   confidently assure you that all three of the

16   nationwide CRAs and Innovis consider inquiries

17   factual records of access, and that's the organizing

18   principal for their dispute resolution process.

19       Q.    All right.  Your sentence says shared

20   definition of an inquiry as a factual record.  Do

21   you see that?

22       A.    Uh-huh.

23       Q.    Okay.  And don't they consider trade

24   lines factual records?

1        A.     Not of access.

2        Q.     No, but factual records?

3        A.     Correct.

4        Q.     And public --

5        A.     But that's a significant difference.

6        Q.     Isn't everything on a credit report
7    supposed to be a factual record?

8        A.     You know, there is an obligation under
9    the FCRA to ensure maximum possible accuracy, and I
10   would assume that's a fairly blanket statement for
11   all of the elements on a credit report, whether it's
12   a data element or a piece of information, yes.

13       Q.     Okay.  Now, if a -- an identify thief
14   impersonates somebody and seeks credit, we've
15   already talking about that, that can result in an
16   inquiry that goes on a consumer's report, right?

17       A.     Yes.

18       Q.     All right.  And we'll just call that a
19   fraudulent inquiry.  Now, sometimes, and hopefully
20   most times, that identify thief doesn't get the
21   credit if the creditor's fraud detection procedures
22   work, right?

23       A.     We would hope that, yes.

24       Q.     Yeah, okay.  So oftentimes the

UNOFFICIAL DRAFT TRANSCRIPT

1    application doesn't result in an account, right?

2        A.    The application doesn't -- yeah, so there

3    would be an inquiry, a record of application with

4    the creditor and if they're rejected, the account

5    information would be preserved on the account, you

6    know, that database with -- or I'm sorry, the

7    application database with the information that an

8    inquiry was made.  But it wouldn't result in an

9    account with the credit bureau, correct, if that's

10   what you mean.

11       Q.    Yeah.  There would be no account with the

12   creditor, right?

13       A.    Correct.  Or with a credit bureau.

14       Q.    Another -- okay.  You mean or the credit

15   bureau, assuming that the creditor --

16       A.    Yeah, there's no --

17       Q.    -- would report the -- let me finish

18   this, and I'll try to let you finish --

19       A.    Sure.

20       Q.    -- for her sake if not ours.

21             Okay.  And you're -- so what we're saying

22   is if no account's open, then there's no account

23   that could appear on a credit report, right?

24       A.    Correct.

UNOFFICIAL DRAFT TRANSCRIPT

1      Q.   And in those instances, Equifax's

2   procedure for deleting inquiries won't remove the

3   inquiry, right?

4      MS. ROPER:  Objection, assumes facts not in

5   evidence.

6   BY THE WITNESS:

7      A.   Yeah, again, I think again -- not to

8   belabor the point but it depends on the nature of

9   the dispute. ███ ██ ██████ ████████ █████

10  ████ ████ ████ ████ ████ ████ ████ ████ ████

11  ████ ██ ██ ████ ████ ████ ████ ████ ██ ████

12  ███ ██

13      ██   ████ ████ ██ ██

14      ██   ██ █████ ██

15      ██   ██ ████ ██ ██ ██

16      ██   ██    ██

17      ██   ████ ████ ██

18      ██   ██ ██ ████ ████ █ ████ ████ ██

19  ████ ████ ████ ████ █ ████ ████

20  ████ ██ ████ ████ █ ████ ████ ████

21  ████ ████ ████ ████ ██ █ ████ ██ ██

22  ███ ████

23      ██   ████ ████ ████ ████ ████ ████

24  ████ ██ ████ ████ █ ████ ████ ██ ████

UNOFFICIAL DRAFT TRANSCRIPT

1 ████ █ █ ███ █ ███ █ ███ █ ███ █ ███ █ ████

2 ███ ████ █ █ ████████ ██████ ████ ████

3 █████ ██ ███████

4      ██ █ ████ ████ █████ ████

5      Q.   And you mentioned the fact of amendments.

6 Those were in large part spurred by the problem of

7 fraudulent or identify theft information appearing

8 on credit reports, correct?

9      A.   I think that's a contributing factor,

10 that would be correct, yes.

11      Q.   In fact, the whole new section of the --

12 was added to the FCRA dealing with identify theft

13 information, wasn't it?

14      A.   Yeah, in part from some of the research

15 we had done leading up to that, yeah.

16      Q.   And I know you're not a lawyer, but maybe

17 you're familiar with there's a section that if the

18 consumer sends in a police report and identify -- or

19 an identify theft report, to use the legal term, and

20 identifies information that results from identify

21 theft, then the credit reporting agency has to block

22 that information within four days, are you familiar

23 with that?

24      A.   Okay.  Yep, sure.  No, I mean, not the

 1   terms, but I mean in terms of the definitions, but

 2   yes.

 3        Q.   But just that provision?

 4        A.   Yeah.

 5        Q.   Okay.  So people could get fraudulent

 6   information off their reports, that's the purpose of

 7   that?

 8        A.   Correct.

 9        Q.   And so it's your understanding that if

10   someone sends a police report, Equifax has a duty to

11   block that information under a different section

12   than the section that deals with regular disputes?

13        MS. ROPER:  Objection to form, calls for a

14   legal opinion.

15   BY THE WITNESS:

16        A.   Yeah, I'm not sure I could answer that.

17   BY MR. SOLA:

18        Q.   Okay.

19        A.   You know, I've seen police reports

20   submitted to credit bureaus, and I can attest to

21   wild variance in the thoroughness of the reports.

22   Sometimes they're simply a sentence or two.  They

23   don't provide detail.  So it would be hard for me to

24   extrapolate from the receipt of a police report.

UNOFFICIAL DRAFT TRANSCRIPT

1    And I have to respect the difficulty in validating

2    the legitimacy of the police report given the

3    technology.  But what they could and shouldn't

4    delete and what they would be obligated to under the

5    FCRA but, yeah, I'll stop there.

6         Q.   Okay.  Now, let's talk about where an

7    identify thief opens an account.

8         A.   Okay.

9         Q.   And then that account gets reported to

10   the credit bureau.

11        A.   Okay.

12        Q.   Okay.  So let's just -- I always use

13   Chase.

14        A.   So new account takeover or new account --

15        Q.   New account.

16        A.   -- fraud.

17        Q.   Yeah.

18        A.   And Chase is fine.

19        Q.   Chase.  And so then there's this Chase

20   account, okay.  Now, that Chase account on a report,

21   would you consider that's a factual record that

22   there was an account opened?

23        A.   In that person's name, yeah, I mean,

24   sure.

 1      Q.   Okay.  But we all agree that because that

 2 person didn't open the account, you know, it doesn't

 3 belong to them and shouldn't be on their report,

 4 right?

 5      A.   Yes.

 6      Q.   And isn't that an -- that's analogous

 7 with the fraudulent inquiry, right, that if it

 8 wasn't them seeking the credit that resulted in the

 9 inquiry, it doesn't belong to them and it shouldn't

10 be on their report?

11      MS. ROPER:  Objection to form, misstates his

12 test -- sorry, let me start over.  Objection to

13 form, just leave it at that.

14      THE WITNESS:  I'm getting better at pausing.

15 BY THE WITNESS:

16      A.   Sorry, that if -- could you repeat the

17 question?

18 BY MR. SOLA:

19      Q.   Okay.  So we talked about the fraudulent

20 account.

21      A.   Yeah, okay.

22      Q.   That even though it did get opened,

23 there's no question of fact that there is that

24 account --

UNOFFICIAL DRAFT TRANSCRIPT

1        A.    Right.

2        Q.    -- I think we agreed since it's not

3    belonging to that consumer that it should come off

4    their file if disputed, right?

5        A.    Yeah, so I'm sorry, and then you're

6    applying that to inquiries?

7        Q.    Yeah.  And isn't that analogous, that the

8    inquiry does not belong to that consumer, it's a

9    product of identity theft, and if they dispute it,

10    assuming it's verified as not belonging to them or

11    assuming it's determined it doesn't belong to

12    them --

13        A.    Right.

14        Q.    -- it should come off?

15    ████ ██████ ██ █████ █████ ██████ ████

16    █████ ██████ ████ █████ ██████ ██████ █████

17    ██████ █████ ████ ██████ █████ ████ █████

18    ██████ ████ █ █████ ████ ██████ ████

19    ██████ █████ █████ █████ █ █████

20    █████ █ ████ █████ ████ ██████ █████

21    █████ ██████ ████ █████ █████ █████

22        Q.    But you'd agree at Equifax they don't

23    even look to determine if the inquiry that's

24    disputed is fraudulent is fraudulent?

UNOFFICIAL DRAFT TRANSCRIPT

1          MS. ROPER:  Objection to form, misstates his

2     testimony, misstates the documents.

3     BY THE WITNESS:

4     ████  ██ ██ █ ██  ██  █ ██  ██  ██

5     ██████  ███  ███  ███  ███  ████  ███  █

6     █████  ███  ███  ███  ███  ███

7     ███  ███  ███  ███  █ █  ███  ███  ██

8     BY MR. SOLA:

9          Q.   No.  But my question, though, and let's

10    take Amy Summers, she went online, she submitted a

11    dispute, she identified three inquiries as

12    fraudulent, but Equifax didn't even check to

13    determine if they were fraudulent, did it?

14         MS. ROPER:  Objection, assumes facts not in

15    evidence misstates his testimony.

16    BY THE WITNESS:

17         A.   Yeah, and again, as per my earlier

18    response, that I'm not here today to talk about

19    individual applications of Equifax's policy.  I'm,

20    you know, here to talk about Equifax's policy and

21    its consistency with industry standards and the

22    adequacy or appropriateness given the nature of the

23    inquiry or the nature of the dispute rather.

24

UNOFFICIAL DRAFT TRANSCRIPT

1    BY MR. SOLA:

2         Q.    Okay.  Well, let's take it then in a

3    general policy.  If a consumer disputes an inquiry

4    as fraudulent to Equifax, Equifax does not conduct

5    an investigation to determine if the inquiry is

6    fraudulent, does it?

7         MS. ROPER:  Objection to form, assumes facts

8    not in evidence.

9    BY THE WITNESS:

10        A.    You know, again, I can repeat myself.

11   ████ ███ ████ ████ █ ███ ██ ████ ██ ███ ████

12   ███ ██ ██████ █████ ████ ███ █████ ██ █████

13   ████ ██ ████ █████ █ █████ ████ ██ ████

14   ██████ ███ █████ █████ █ ███ ████ ██ ██ ████

15   █████ ████ ████ ██████ ████ ██ ████

16   █████ ████ ███ ████ ███ ████ ██ ████

17   ████

18   ██ ██ ███

19      ██ ████ ████ ████ ███ ████ ████

20   █████ ████ ████ ████ ███ ████

21      ██   ████

22      ██   ███ ██

23      ██   ██ █

24      ██   ████ █ ████ ███ ████ ████ ████ ██

UNOFFICIAL DRAFT TRANSCRIPT

1   ████████ █ ███ █████ ████ ████ █████ █

2   ███ ██████ ███ ████ █████ █████ █████ ████

3   ███ ██████

4          ██ █████████

5        Q.   Okay.   But there's no investigation into

6   whether the disputed inquiry is fraudulent, is

7   there?

8        MS. ROPER:   Objection, argumentative, asked

9   and answered --

10  BY THE WITNESS:

11       A.   Yeah, I think that --

12       MS. ROPER:   -- assumes facts not in evidence.

13  BY THE WITNESS:

14       A.   I think they're acting on evidence

15  provided by the disputant.   So if there's sufficient

16  evidence that meets their threshold, and that's

17  important again because for reasons we've elaborated

18  earlier.   Equifax itself had a policy, I want to say

19  seven, eight years ago for about six months, where

20  anyone who called and disputed an inquiry, the

21  inquiry would be deleted.   And this information got

22  out to credit repair organizations that have now

23  manifest themselves as law firms and there was a

24  spike in disputes of inquiries, because this was a

1    practice that was recognized as potentially being

2    able to increase someone's credit score.  So it was

3    the knowing removal of accurate but potentially

4    derogatory information.  So it's for that very

5    reason that there has to be again some threshold of

6    evidence provided by the data subject in order for

7    Equifax or any responsible credit bureau to delete

8    an inquiry that they're disputing as fraudulent.

9    BY MR. SOLA:

10        Q.    Well, I mean, to me, that policy was

11   preposterous, wasn't it, sir, to just delete

12   information on a bare dispute?  Don't you agree that

13   was just preposterous?

14        A.    I agree that it's preposterous.

15   Unfortunately it's a practice.  I mean, Equifax

16   curtailed that in, I think, six months, but it's a

17   practice that's out there with furnishers.  A lot of

18   the modifications made in the FTC report and in our

19   report from consumer disputes were simply furnishers

20   that don't want to deal with liability and don't

21   want to deal with consumer relations costs or

22   pushback and they'll just delete files that are

23   challenged.

24        Q.    Okay.

1        A.    I mean, it's certainly a deficiency in

2    our system, absolutely.

3        Q.    Okay.  But won't you agree that when an

4    item's disputed as inaccurate, the best procedure to

5    take is to determine whether it's accurate or not?

6        MS. ROPER:  Objection, argumentative.

7    BY MR. SOLA:

8        Q.    In terms of let's say and the best

9    procedure in terms of making credit reports more

10   accurate is to conduct an investigation to determine

11   if the disputed item is accurate?

12       A.    Yeah.  Counselor, I think we could sit

13   here all day quibbling.  My position is that the

14   data is endogenous and that the internal measures

15   that Equifax and the other CRAs are able to take is,

16   in fact, the best measure to determine whether or

17   not the inquiry is accurate as a factual record of

18   access.  In other words, whether there was a

19   disclosure of that data subject, the disputant's

20   credit file to the inquirer, the credentialed third

21   party permissible purpose end user.

22       Q.    Well, but that's not in dispute, right?

23       A.    It seems to be, because I've assessed

24   that as being adequate as a response to a dispute

1    about the accuracy of the data.  Now, in terms of

2    ownership, the term that you like to use, that's

3    something that's best sorted out between the

4    inquirer and the data subject.

5         Q.    Well, if we -- if we -- it sounds like

6    you're saying Equifax checks to see if there

7    actually was an inquiry made, is that what you're

8    saying, where they -- and then if so, they write

9    back and said inquiries are a factual record of file

10   access?

11        A.    If it appears on a credit file, it's a

12   record of access, it's happened, so it's just a

13   known fact.

14        Q.    Okay.  And so if that's all they're

15   looking to determine, then they would never delete

16   an inquiry, right?

17        MS. ROPER:  Objection to form, argumentative,

18   misstates his testimony, misstates the report.

19   BY THE WITNESS:

20        A.    Again we're sort of talking in circles.

21   There are circumstances which we discussed in which

22   they do, in fact, delete disputed inquiries.

23   BY MR. SOLA:

24        Q.    Okay.  So it's your opinion that if a

UNOFFICIAL DRAFT TRANSCRIPT

1    consumer disputes an inquiry, Equifax need not to

2    investigate to determine if the inquiry is accurate?

3        MS. ROPER:  Objection to form, asked and

4    answered, argumentative, misstates his prior

5    testimony.

6    BY THE WITNESS:

7        A.    And again it depends on the nature of the

8    dispute and evidence that's provided with the

9    dispute.

10   BY MR. SOLA:

11       Q.    Okay.  How about if they say it's

12   fraudulent?

13       A.    And if they provide supporting evidence.

14       Q.    How about if they do it online, then they

15   can't give any evidence, right?

16       A.    I'm aware that at least one of the

17   bureaus has an ability to add comments and attach

18   files so, I mean, they -- or they could -- if they

19   can't, then they certainly can pick up a phone or

20   fax or send a letter for -- what is the cost of a

21   postage stamp right now?  It's some trivial amount.

22   I don't think it's cost prohibitive for anyone.  I

23   mean, there are other -- we fortunately live in a

24   multimedia world, so there are plenty of means of

UNOFFICIAL DRAFT TRANSCRIPT

1    communication, so sure.

2        Q.    Okay.  And so you're saying if the

3    consumer doesn't provide evidence to support their

4    claim it's fraudulent, then Equifax doesn't have to

5    investigate that?

6        MS. ROPER:  Objection, misstates his

7    testimony, asked and answered, argumentative.

8    BY THE WITNESS:

9        A.    I think I've established there are

10   legitimate reasons for providing a threshold for

11   evidence to support claims of fraud otherwise there

12   would be large scale gaming of the system consistent

13   with prior evidence.

14   BY MR. SOLA:

15       Q.    I guess I don't understand this gaming of

16   the system.  Right now someone could make a false

17   dispute, right?

18       A.    They do.  Can and do.

19       Q.    All right.  And let's say they make a

20   false dispute of an account, and I think one thing

21   that comes through in your report is accounts are

22   much more harmful than inquiries, is that -- would

23   you agree, negative accounts?

24       A.    What I've suggested is that as a variable

1    in a credit score, a single inquiry is a fairly --

2    that its impact ranges from zero to some trivial

3    amount, a few points, and that may or may not by

4    material.  But in most instances, it's highly likely

5    to be immaterial because of its negligible impact,

6    yes.

7         Q.    Okay.  So right now if a consumer

8    disputes an account, and they don't provide any

9    evidence beyond their statement that it's

10   inaccurate, are you saying Equifax doesn't have to

11   do anything about it because it could be a gaming of

12   the system?

13        MS. ROPER:  Objection to form, misstates his

14   testimony, beyond the scope, asked and answered.

15   BY THE WITNESS:

16        A.    And, you know, I would harden back to my

17   earlier distinction about furnished information and

18   disputing a trade line information which there are

19   obligations for the CRAs or the credit bureaus to

20   investigate or reinvestigate and they would, in

21   fact, and they have a system in place as you're well

22   aware to verify the voracity of the claims of

23   accuracy or inaccuracy fraud or otherwise for the

24   endogenous data which is not furnished, the fact

1    that it's on the credit report does reflect a

2    factual record of access, it's endogenous.  They --

3    the credit bureaus each of them individually are the

4    best suited with the most comprehensive database to

5    record records of access of their credit files.

6         Q.   All right.  But you agree that -- well, I

7    won't -- we talked about this before.

8              Do you see any way that you think Equifax

9    could improve its system for handling disputed

10   inquiries that would result in greater accuracy in

11   the reporting of those inquiries?

12        A.   That's a great question.  You know, look,

13   I considered in detail in my report what I inferred

14   as a proposed solution of merely integrating this

15   into e-OSCAR and found very little potential benefit

16   against potentially considerable cost.  So just in a

17   back of a napkin cost benefit analysis, it just

18   seems that that wouldn't be a route to go.  Also in

19   our analysis of data quality and the FTC's, I don't

20   find inquiry data, hard inquiry data or soft inquiry

21   data, relatively more inaccurate than other and

22   certainly more consequential data elements and I

23   don't see that as a priority.

24              I don't feel like -- you know, if it's

1   not broke -- I guess I would say if it's not broke,

2   don't fix it.  I just -- you know, I mean, we're

3   talking about a relatively uncontested piece of

4   information that has a relatively negligible to no

5   impact on a consumer's score and, hence, material

6   impact, I just -- you know, I mean, if they were

7   like collections or other pieces of information,

8   maybe there would be cause to look at improving the

9   system, but that's simply not the case.  I mean,

10  there's no evidence to support or justify a need for

11  a systemic overhaul.

12       Q.   Why do you say relatively uncontested?

13  It sounds like you're not aware of the number of

14  disputes of inquiries.

15       MS. ROPER:  Objection to form, argumentative.

16  BY THE WITNESS:

17       A.   So why I'm saying relative is because in

18  the largest empirical study of consumers own

19  perceptions about the accuracy of contents of their

20  credit report, both from the Federal Trade

21  Commission and ours, hard inquiry disputes or any

22  inquiry disputes were relative to all other

23  categories of disputes quite small; hence, the use

24  of relative.

UNOFFICIAL DRAFT TRANSCRIPT

1   BY MR. SOLA:

2        Q.   Okay.  But you're not disputing that

3   there are millions of disputed inquiries that have

4   come into Equifax, let's say, in the last two years?

5        A.   Okay.  So now you're stripping them and

6   untethering them and saying here's an absolute

7   number that sounds big, relative to what?  Relative

8   to what other types of disputes?  How big is it

9   compared to collections disputes, for example?

10       Q.   No, I understand, you're talking about

11   relative terms.

12       A.   That's why I use the term relative.

13       Q.   Okay.  So you don't know the real numbers

14   as far as how many disputes of inquiries are made,

15   do you?

16       A.   I've read those to -- they're actually

17   part of the documents I reviewed, and there's some

18   millions over some year.

19       Q.   That's right.

20       A.   You know, it's not --

21       Q.   So it's not --

22       A.   -- trivial.

23       Q.   -- uncontested information?

24       A.   Correct.  That's right.  But just because

UNOFFICIAL DRAFT TRANSCRIPT                    229

1    something's contested and, you know, research bears

2    this out, doesn't mean it's inaccurate.

3        Q.   No, in fact --

4        A.   There's a -- there's a lower -- much

5    lower number of verified inaccuracies again back to

6    the gaming the system.  You go to the Lexington Law

7    Firm home page, and they'll talk about how many tens

8    of millions of pieces of information they've had

9    removed, most of which is accurate.

10       Q.   They've had removed by contacting the

11   credit bureaus?

12       A.   By gaming the system, yeah.

13       Q.   Okay.  So they dispute with the credit

14   bureaus, and the credit bureaus improperly remove

15   the information, is that what you're saying?

16       A.   I think they're under -- that it's a

17   deficiency in the legal requirements that they do it

18   and furnishers that just don't want to deal with

19   disputants will instruct them to delete them and

20   there are all sorts of reasons, absolutely.

21       Q.   What do you mean deficiency in the legal

22   requirements?

23       A.   What I mean is that you can choose to

24   modify or not modify if it's inaccurate and you know

1   it's accurate.  I mean, right now lenders because of

2   a decision in New York are knowingly deleting

3   millions of accurate derogatory trade lines because

4   they don't want to deal with liability.  They don't

5   want to end up with a guy like you in a room with a

6   class action lawsuit for some failure on a couple

7   of, you know, disputes.

8       Q.   All right.  But that's illegal what

9   they're doing, isn't it, sir?

10      A.   Its not illegal, they can do it, it's

11  legal.  That's why it's a deficiency in the legal

12  system.

13      Q.   You're not aware of the requirement in

14  the Fair Credit Reporting Act that furnishers have

15  to make an effort to report accurate information?

16      MS. ROPER:  Objection to form, it misstates

17  his testimony and --

18  BY MR. SOLA:

19      Q.   Okay.  Well, anyway, I mean, we had the

20  Equifax example where you said for a short period of

21  time they were just deleting all inquiries?

22      A.   Uh-huh.

23      Q.   Okay.  And you agreed that that was a

24  preposterous procedure?

UNOFFICIAL DRAFT TRANSCRIPT

1      A.   I think it was probably not the best

2 choice.

3      Q.   In other words --

4      A.   I think the intention was to be consumer

5 friendly.  But I think that the -- the impact was

6 not as much.

7      Q.   Okay.  And when a dispute comes in, I

8 think you'd agree, you shouldn't just take a blanket

9 approach and delete it, right, delete the disputed

10 information?

11      A.   That would be -- yes, I would agree with

12 that.

13      Q.   Okay.  And the furnisher shouldn't do

14 that either?

15      A.   I don't think they should.

16      Q.   Okay.

17      A.   Correct.

18      Q.   Because we want accuracy in credit

19 reports, right?

20      A.   We do.

21      Q.   We don't want inaccurate information

22 reported, right?

23      A.   Right.

24      Q.   And we don't want inaccurate -- I mean,

1    we don't want accurate information deleted?

2          A.    Correct.

3          Q.    Okay.  And so when a dispute comes in,

4    you're saying that the CRAs shouldn't just take the

5    consumer's word it's inaccurate?

6          A.    You know, if the dispute -- again you're

7    talking about just an allegation or assertion --

8          Q.    Yeah.

9          A.    -- that it's inaccurate, no, they

10   shouldn't.

11         Q.    No.  And would you agree that they should

12   investigate to determine whether it's accurate?

13         A.    I agree, but we also have discussed that,

14   you know, we disagree on what constitutes that

15   investigation.  I believe that, you know, with an

16   endogenous piece of -- or data point such as a hard

17   inquiry, the fact that it's on that data subject's

18   credit report reflects the fact that it was

19   accessed.  So the dispute over whether it's mine or

20   not is different whether it was accessed or not.

21         Q.    All right.  But you don't see many

22   disputes of inquiries where there's disputing other

23   than whether it's mine or not, do you?

24         MS. ROPER:  Objection to form.

1   BY THE WITNESS:

2        A.    Again they -- there are types of disputes

3   of whether it's mine or not, whether it's mixed file

4   or fraud and if they're coming in, but generally

5   speaking, that's right, yeah.

6   BY MR. SOLA:

7        Q.    Okay.  You have paragraph 26.  All right.

8   And you mention, you say that you had previously

9   talked about how they -- the big three bureaus had

10  similar procedures for dealing with disputes of

11  inquiries, but here you're pointing out some

12  differences?

13       A.    Uh-huh.

14       Q.    And do you know why they would be

15  different?

16       A.    No, I mean I assume that they make

17  decisions as an enterprise involve legal compliance

18  perspectives, business operation perspectives and

19  some unit head or operation heads says this is, you

20  know, among our choice set, this is what we'll do.

21  I mean, I don't know specifically why the individual

22  variance across the three exist, but it's pretty

23  minor.

24       Q.    Do you think when a consumer disputes an

1    inquiry to Equifax online, that someone at Equifax

2    should look at that dispute?

3         MS. ROPER:  Objection to form.

4    BY MR. SOLA:

5         Q.   In other words, that someone at Equifax

6    should consider the dispute, I'm not saying what

7    they should do as part of their consideration but

8    that somebody should consider it as opposed to just

9    a computer responding?

10        MS. ROPER:  Objection to form, vague, calls

11   for a legal conclusion.

12   BY THE WITNESS:

13        A.   To your earlier point about the volume of

14   inquiry disputes and, you know, part of the benefit

15   of online is a scale technology.  So, I mean,

16   obviously there's an ability to recognize the

17   dispute, recognize the nature of the dispute and

18   respond electronically akin to like an e-OSCAR

19   system.  I don't know that introducing a required

20   manual interface would necessarily benefit the

21   consumers at all.  It would certainly drive up

22   costs.  Would certainly result in a lot of people

23   being employed by Equifax.  But, you know, I don't

24   see any particular benefit.  Again, I don't see this

1    as a problem screaming for a solution.  There's just

2    no evidence that suggests that relative to other

3    pieces of information or data elements on a credit

4    report, this data is more inaccurate or causing

5    consumer harm.  I mean, quite the inquiry.

6    BY MR. SOLA:

7         Q.   Well, it seems like, you know, you say

8    not a problem screaming for solution.  You seem to

9    not consider whether the consumers have a legal

10   right to dispute information?

11        A.   Here --

12        THE WITNESS:  Sorry.

13   BY MR. SOLA:

14        Q.   I'm not saying you -- and I say that in

15   that you've already said you're not a lawyer, but

16   you agree that when you're -- when you're looking at

17   a problem and solution, you're not considering

18   whether there's a legal right to have disputed

19   information investigated, right?

20        MS. ROPER:  Objection, argumentative, calls

21   for legal conclusion, asked and answered.

22   BY THE WITNESS:

23        A.   I'm not considering because I'm not a

24   lawyer.  I'm not here as an expert on obligations

UNOFFICIAL DRAFT TRANSCRIPT

1   under the FCRA regarding this data element.

2   BY MR. SOLA:

3       Q.   And then page 14, this little chart you

4   drew up, okay.  This is just a -- you're --

5   essentially a summary of the procedures that Equifax

6   provided to you, is that right?

7       A.   I think it's -- I think it's even more

8   basic than that.  I think it's a cut and paste from

9   actual Equifax documents.  I think it's verbatim,

10  just organized and presented more consumer friendly,

11  I hope, and maybe not.

12      Q.   Well, I notice -- let's say look at the

13  far left column.

14      A.   Uh-huh.

15      Q.   The second box down, the response.  If

16  it's telephone, you say that the consumer will

17  receive a written letter that inquiries are a

18  factual record of file access.  You see that?  Okay.

19  And eventually they'll be given the name of the

20  furnisher to contact about the dispute, right?

21      A.   That's on the letter usually, yeah.

22      Q.   Okay.  Paragraph 28.  All right.  And you

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

UNOFFICIAL DRAFT TRANSCRIPT



  5                                                But

  6    you're not saying this was applied to Mr. Steed's

  7    dispute, right?

  8         MS. ROPER:  Objection, argumentative, asked

  9    and answered, beyond the scope.

 10    BY THE WITNESS:

 11         A.   Yeah, I'm not representing myself as an

 12    expert on the application of their policies, no.

 13    BY MR. SOLA:

 14         Q.   Okay.  Now, does a consumer have to

 15    provide a police report if they make -- for Equifax,

 16    if they make a dispute that an account is fraudulent

 17    for it to be reinvestigated by Equifax?

 18         MS. ROPER:  Objection to form, beyond the

 19    scope, assumes facts not in evidence.

 20    BY THE WITNESS:

 21         A.   Yeah, we touched on this earlier.  And

 22    for me, the significant differentiator is that --

 23    well, anyway, do they have to?  No, they don't.

 24    Sorry.  Let me just answer your question.  That's

UNOFFICIAL DRAFT TRANSCRIPT

1    improvement.

2    BY MR. SOLA:

3        Q.    And why not?

4        A.    Well, my understanding is that for trade

5    line or furnished information, there are furnisher

6    obligations under the FCRA, and there are CRA

7    obligations under the FCRA and for a dispute of a

8    furnished piece of information, the CRA is obligated

9    to communicate the nature of the dispute and seek

10   clarification on the accuracy or inaccuracy of the

11   dispute and make appropriate modifications when

12   necessary.

13       Q.    All right.  And that procedure, you agree

14   that applies to public record information that isn't

15   furnished; in other words, that isn't from a

16   furnisher to Equifax?

17       MS. ROPER:  Objection, asked and answered,

18   beyond the scope, assumes facts not in evidence.

19   BY THE WITNESS:

20       A.    I mean, let me provide a slightly

21   different answer for the sake of variety.

22   Technically even though from an intermediary would

23   be furnished, but it's not directly from, you know,

24   different courthouses, correct, but it's still

UNOFFICIAL DRAFT TRANSCRIPT

1   exogenous data, it's not endogenous data.  So I

2   think again that's a critical differentiator.

3   BY MR. SOLA:

4       Q.   And your opinion is that company that's

5   providing that public record information a furnisher

6   as you understand that term?

7       MS. ROPER:  Objection, beyond the scope,

8   calls for a legal opinion.

9   BY THE WITNESS:

10      A.   You know, they're furnishing data, I

11   don't know -- I don't -- I can't answer what their

12   liabilities are under the FCRA for, you know,

13   inaccurate data from a courthouse that they

14   aggregate and resell.  I don't know.  I'll leave

15   that to lawyers and judges to sort out.

16   BY MR. SOLA:

17   ███   ████   ████   ████   ████

18   ██████   ████   ████   ██   ████   ██   ████   ███

19   ██████   ███   ████   ████   ████   ████   ███

20   █████   ██   ██   ██   ████

21      ██   ████

22      ██   ███   ███   ████   ████   ████   ████████

23   ████   ████   ████   ████   ████   ████   ██

24   ████   ██   ███   ██   █   ██   ████   ████

UNOFFICIAL DRAFT TRANSCRIPT

1  ███████ ███████ ███████ ███████ ████ ███████ ███████████

2  ██████ ████ ███████ █████████ ███████ ████ ████████████

3  BY THE WITNESS:

4       A.   You know, again my understanding is that

5  if the disputant provides a police report or other

6  substantiating evidence, then the inquiry even

7  without a corresponding account would be removed.

8  BY MR. SOLA:

9       Q.   Okay.  But other than a police report,

10  Equifax's system won't result in deletion of an

11  inquiry if there is no corresponding account that's

12  determined to be fraudulent?

13       MS. ROPER:  Objection, asked and answered.

14  BY THE WITNESS:

15       A.   And again, as per my earlier response, my

16  understanding is that Equifax will accept

17  communications directly or indirectly from the

18  inquirer as to the inaccuracy of the inquiry and

19  would if it's deemed to be inaccurate by the

20  inquirer delete it.

21  BY MR. SOLA:

22       Q.   Okay.  But I'm talking -- well, anyway, I

23  won't belabor it.

24            Okay.  In the middle of paragraph 16 --

1    or page 16, the top paragraph, you talk about part

2    of fraud and ID theft is account takeover.

3         A.   Correct.

4         Q.   Okay.  And by that you mean where someone

5    has an account, but then the thief starts making

6    charges on the account, right?

7         A.   Basically, yes, that's right.

8         Q.   Okay.  So the existence of the account

9    isn't in dispute, it's just those charges, right?

10        A.   Correct.

11        Q.   Okay.  And so the inquiry leading to the

12   opening of the account, that wouldn't be fraudulent,

13   right?

14        A.   That wouldn't.  But if you're doing an

15   authorized user -- it's a good question.  I mean,

16   there must be an inquiry for an authorized user, and

17   that would end up -- that would -- yeah, that's --

18   I'd have to get back to you on that.  I don't know

19   how the authorized user inquiry, whether or not it

20   would end up on the original -- you know, the

21   original user's report.  I mean, it would end up on

22   the authorized user's report, but I'm not sure if

23   that would also -- that's a good question.  That's

24   kind of a -- I hadn't thought of that.

1        Q.    Okay.  Well --

2        A.    Anyway, I'm not --

3        Q.    I don't think --

4        A.    -- even sure that's --

5        Q.    -- there is any --

6        A.    -- what you're asking me.

7        Q.    Okay.  The person opening the account

8   gets the inquiry, not the authorized user?

9        A.    No.  But if like subsequently like if I

10   say, okay, now my wife -- I want my wife to be on my

11   account, I would think they would -- well, no, they

12   wouldn't really want to pull -- they wouldn't --

13   yeah, I just don't know how that works.

14       Q.    There won't be an inquiry, but it might

15   go on her credit report.

16       A.    Yeah, right.

17       Q.    Okay.  I just was -- because it seems to

18   me that's irrelevant, the account takeover, to this

19   issue, because there's no fraudulent inquiry.

20       A.    So it's irrelevant because there's no

21   fraudulent inquiry account takeover, yeah, okay.

22       Q.    All right.  But why'd you put it in here

23   then?

24       A.    I think I was trying to differentiate

UNOFFICIAL DRAFT TRANSCRIPT

1   between existing account fraud and new account

2   fraud.

3       Q.   Okay.  Then you -- near the end of that

4   paragraph, you say for cases of alleged fraud but

5   with no accompanying documentation or disputed

6   account, consumers are directed to contact the

7   creditor would have more relevant information and be

8   in a better position to resolve the issue and

9   potentially be alerted of fraud, right?

10      A.   Correct.

11      Q.   Okay.  So you believe in cases of fraud

12  that the creditor might have more relevant

13  information than Equifax, right?

14      MS. ROPER:  Objection to form, misstates the

15  document.  Go ahead.

16  BY THE WITNESS:

17      A.   Yeah.  So --

18  BY MR. SOLA:

19      Q.   You're talking about fraudulent inquiries

20  here.

21      A.   I understand.  What I'm referring to in

22  the sentence that you just read was that, you know,

23  a dispute without document evidence that the inquiry

24  is not mine, first, will establish that an inquiry

1   is made, so they've alerted the consumer that gee

2   there's an inquiry on your report that may be

3   fraudulent.

4        But Equifax doesn't have the same

5   obligations as the lender in terms of know your

6   customer and all the same information, so, yes, that

7   if that's the case, if there's no supporting

8   evidence, Equifax wouldn't delete t the data subject

9   would be instructed to address the inquirer and the

10  inquirer could then sort that out with them.

11       Q.   Okay.  It just seems to me that's

12  inconsistent with your statement that this is

13  endogenous information that Equifax would know about

14  but the furnisher wouldn't?

15       MS. ROPER:  Objection, argumentative,

16  misstates his testimony.

17  BY THE WITNESS:

18       A.   Yeah, I don't see how you draw that

19  conclusion --

20  BY MR. SOLA:

21       Q.   Because you --

22       A.   Well, if you'll let me finish.

23       Q.   Yeah, okay.

24       A.   The reality is the record of access is

UNOFFICIAL DRAFT TRANSCRIPT

1   endogenous whether or not it was authorized or

2   unauthorized without supporting evidence, the

3   consumer would have to resolve that with the

4   inquirer.

5         Q.   Or Equifax could contact the inquirer,

6   right?

7         A.   Again, you know, we've had this

8   discussion to my mind that's a less efficient

9   solution and I think that's also embodied in the

10  reform of the FCRA from the FACT Act, where

11  disintermediating the CRA and enabling the consumer

12  to directly contact the furnisher because it just

13  short-circuits the whole back and forth and

14  ping-ponging, they have the information, they have

15  comprehensive information, they can talk to them,

16  they can get them the documents they need, they can

17  fulfill all that directly.  I just don't really see,

18  you know, putting in an intermediary as necessarily

19  an optimal outcome --

20        Q.   Okay.  You talked --

21        A.   -- I mean --

22        Q.   -- about the fact that disintermediating

23  the CRA, but I'm not aware of anything in the FACT

24  Act that reduced any obligations of the FCRA.  Are

1   you?

2        A.   It enabled --

3        MS. ROPER:  Objection, argumentative.

4   BY THE WITNESS:

5        A.   It enabled -- what I'm referring to is it

6   enables the consumers to directly contact furnishers

7   where they couldn't before.

8   BY MR. SOLA:

9        Q.   That's right.  But it did not

10  disintermediate the CRAs from any obligations?

11       A.   That has the effect of disintermediating

12  CRAs because now consumers rather than contacting

13  the CRAs for the disputes are directly contacting

14  the furnishers.

15       Q.   Well, they can?

16       A.   That's the --

17       Q.   -- right?

18       A.   But that's disintermediation.

19       Q.   Okay.  But you're probably not aware --

20  okay.  The furnishers don't have to do anything if

21  they get contacted by the CRA, do they?

22       MS. ROPER:  Objection to form, argumentative.

23  BY MR. SOLA:

24       Q.   I mean, if they're -- I take it back.

UNOFFICIAL DRAFT TRANSCRIPT

1           If the consumer contacts the furnisher

2    directly, and the furnisher could say that's Equifax

3    reporting that inquiry, I don't know why you're

4    coming to us, right?

5           A.    They could.

6           MS. ROPER:  Objection --

7    BY MR. SOLA:

8           Q.    They could?

9           MS. ROPER:  -- argumentative.

10   BY MR. SOLA:

11          Q.    In fact, that's true --

12          A.    Sorry.

13          Q.    -- right?

14          A.    I talked over a little.

15          Q.    I guess that's what I don't under -- I

16   mean, it's Equifax reporting the inquiry, not the

17   furnisher?

18          MS. ROPER:  Objection to form, argumentative.

19   BY THE WITNESS:

20          A.    So again we're conflating two different

21   things.  Equifax has a record of factual access.  So

22   when they're contacted, it's endogenous data,

23   they're the best situated to ascertain whether or

24   not they made a disclosure of your credit file to

1    that inquirer.  They're not optimally situated to

2    determine whether or not that was unauthorized.

3    That's something that you would have to take up with

4    the inquirer.

5    BY MR. SOLA:

6          Q.    Okay.

7          A.    And then if the inquirer then acts on

8    that like they did for Ms. Summers, then that

9    information can be passed along to the CRA, and then

10   they may have a policy whereby they would delete the

11   inquiry in dispute given the relevant information.

12   BY MR. SOLA:

13         Q.    Okay.  So you would add as a -- for the

14   consumer, instead of just disputing to Equifax, one

15   dispute, you would say they have to contact the

16   furnisher and then the furnisher has to contact

17   Equifax, and that's two communications, right?

18         MS. ROPER:  Objection to form, argumentative,

19   misstates his testimony.

20   BY THE WITNESS:

21         A.    When you say dispute, are you referring

22   to account information, or are you referring to

23   inquiries?

24

 1  BY MR. SOLA:

 2      Q.   Inquiries.

 3      A.   Okay.  So they may dispute first with

 4  Equifax and they may then depending on the outcome

 5  or depending on what information they provide and

 6  depending on the nature of the dispute, they may be

 7  instructed to dispute with the inquirer and that's

 8  because the data as a factual record of access about

 9  an inquiry, it's not about ownership or unauthorized

10  access, which is something that if it's not the

11  outcome the consumer wants, they need to, yes, take

12  an additional step.

13      Q.   And then the creditor must take an

14  additional step to notify Equifax, right?

15      A.   Or they could provide documentation to

16  the consumer and the consumer could send their -- a

17  whole variety of things.  But, you know, you can --

18      Q.   So then --

19      A.   -- you have --

20      Q.   -- it has the consumer --

21      A.   There would be --

22      Q.   -- go back again?

23      A.   -- lots of back and forth.

24      Q.   Okay.

UNOFFICIAL DRAFT TRANSCRIPT

1          A.     -- between all different parties, right.
2     I mean, that they could report back to Equifax and
3     Equifax could say it's not modified and the consumer
4     could be unhappy and report back or contest, I mean,
5     disputes are oftentimes very complicated, you know,
6     again I think it's best if you get the two relevant
7     parties talking face to face rather than having an
8     intermediary.
9          Q.     Okay.  The two relevant parties would be
10    Equifax who's reporting it and the inquirer who made
11    the inquiry, right?
12         A.     Not in the hypothetical you gave where
13    there wasn't a deletion of a contested or an alleged
14    dispute, because it was unsubstantiated with either
15    a police report or an affidavit or evidence from the
16    inquirer they would need to -- they would need to
17    meet that threshold, yes.
18         Q.     Okay.  Now, you agree that Equifax is the
19    only party that can delete an inquiry on the reports
20    it sells, right?
21         A.     Yes.
22         Q.     Okay.  And so it's logical for the
23    consumer to dispute the inquiry they think is wrong
24    to Equifax?

1        MS. ROPER:  Objection to form, argumentative.

2   BY THE WITNESS:

3        A.   Yeah, sure.

4   BY MR. SOLA:

5        Q.   Okay.  And you agree that Equifax is

6   responsible for the accuracy of the inquiry

7   information on reports it sells?

8        MS. ROPER:  Objection to the extent it calls

9   for a legal conclusion.

10  BY THE WITNESS:

11       A.   Yeah, I think Equifax have compelling

12  market incentives alone to ensure that any

13  information on a consumer credit report is accurate.

14  BY MR. SOLA:

15       Q.   Now, your opinion of the procedures for

16  Equifax, you believe those are the best procedures

17  for Equifax, right, as opposed to for the consumer?

18       MS. ROPER:  Objection to form, argumentative.

19  BY THE WITNESS:

20       A.   I don't think the two are mutually

21  exclusive.

22  BY MR. SOLA:

23       Q.   Well, but you believe those are the best

24  procedures for Equifax?

1        MS. ROPER:  Objection, asked and answered,

2    argumentative.

3    BY THE WITNESS:

4        A.    Yeah, I opined on whether they were

5    appropriate given the type of data being disputed

6    and the industry practices and standards.  And I

7    deemed them to be appropriate.  I wasn't asked

8    whether they were best for Equifax.  I wouldn't

9    actually -- I'd have to get a little more specific

10   context in terms of what best means.

11   BY MR. SOLA:

12       Q.    Now, you mentioned sometimes that -- oh,

13   no, I'll strike that.

14             Now, you indicate that the inquiries of

15   record that the credit report was sold to company,

16   correct?

17       A.    Sure.

18       Q.    Yeah.  Okay.  And in the cases of fraud,

19   that sale itself shouldn't have happened, right?

20       MS. ROPER:  Objection --

21   BY THE WITNESS:

22       A.    Yeah, I'm, you know --

23       MS. ROPER:  --

24

1    BY THE WITNESS:

2         A.    -- the -- that's a normative question.  I

3    mean, that the credit bureau is acting on or relying

4    on information represented by the subscriber or the

5    inquirer that they have fulfilled their obligations

6    in terms of verifying the identity of the data

7    subject and, you know, these are reasons why they

8    have ongoing audits for compliance and so forth.

9    But, yes, I mean, I wouldn't say it shouldn't

10   happen.  There's some threshold for fraud and

11   inaccuracy in any industry.  I mean, it's

12   inevitable.  You can't have a standard of never

13   making an erroneous disclosure.  That's just

14   completely unreasonable.

15   BY MR. SOLA:

16        Q.    Okay.  No, but it shouldn't have

17   happened?  I'm not questioning whether you think

18   there's a way to stop it.  But it's just sort of

19   like murder, right, it shouldn't happen, but it's

20   probably unlikely we could ever stop it?

21        A.    Yeah, I mean --

22        MS. ROPER:  Objection, asked and answered,

23   argumentative.

24

1    BY MR. SOLA:

2         Q.    Bad analogy.

3         A.    Nothing wrong should ever happen, sure,

4    yes.

5         Q.    Okay.  But I guess where I'm going is the

6    whole problem started with the fraud inquiry started

7    with Equifax giving out the report, right, if they

8    didn't give out the report, there'd be no fraud

9    inquiry, would there?

10        MS. ROPER:  Objection to form, assumes facts

11   not in evidence, argumentative.

12   BY THE WITNESS:

13        A.    Yeah, I would have to disagree with that

14   again.  I think the inquirer was a reliable party

15   and that's a relevant relationship point that

16   they're an entity that makes an effort to prevent

17   fraud to the best of their ability.  I mean, none of

18   the lenders have an interest in facilitating new

19   account fraud or identify theft or fraud.  And, in

20   fact, they make great investments in preventing it.

21   But again the threshold can't be zero.  I mean, it

22   would be great if that didn't happen, but that's

23   just not practical or reasonable.

24

UNOFFICIAL DRAFT TRANSCRIPT

1  BY MR. SOLA:

2       Q.   Okay.  But what about Equifax's

3  procedures for preventing fraud?  Don't they need to

4  have reasonable procedures to make sure that their

5  reports are not enabling identify theft?

6       MS. ROPER:  Objection to form, calls for a

7  legal conclusion.

8  BY THE WITNESS:

9       A.   Yeah, I mean, I think that's a separate

10  issue.  But I would portend that they're

11  credentialing of subscribers is just that.  I mean,

12  that's how they do reduce fraud as they go to end

13  users and verify that they're an actual ongoing

14  enterprise and they have a legitimate interest, and

15  they don't just sell their reports to every Tom,

16  Dick and Harry who faxes a request.

17  BY MR. SOLA:

18       Q.   Okay.  You say in line four on page 17, a

19  consumer could be claiming fraud or not mine because

20  they don't recognize or remember the name of a party

21  initiating an inquiry or truly because of fraud,

22  right?

23       A.   I do say that.

24       Q.   Okay.  And you're saying the consumer can

 1    be mistaken about whether or not an inquiry belongs

 2    to them?

 3         A.    Correct.

 4         Q.    And that's true of an account as well,

 5    right?

 6         A.    Absolutely.

 7         Q.    Okay.  It's not a reason not to

 8    investigate when a consumer disputes an account, is

 9    it --

10         MS. ROPER:  Objection --

11    BY MR. SOLA:

12         Q.    -- that they --

13         MS. ROPER:  -- to form.

14    BY MR. SOLA:

15         Q.    -- that they might be wrong?

16         MS. ROPER:  Sorry, Robert.

17              Objection, beyond the scope, calls for a

18    legal conclusion.

19    BY THE WITNESS:

20         A.    Yeah, again, the -- when a consumer

21    disputes whether or not they recognize it, the CRA

22    has no way of knowing that.  But this is why they

23    have evidentiary standards and they have the

24    procedures in place they do.  That you may not

UNOFFICIAL DRAFT TRANSCRIPT

1    rec -- you know, here's the name of the inquirer,

2    contact them, and they might contact HSBC and say,

3    gee, you underwrite my Saks Fifth Avenue card, and I

4    didn't know that and I've learned something and

5    thank you very much.  That's a very possible

6    outcome.  Happens all the time.

7    BY MR. SOLA:

8        Q.   Now, you mention the -- going to

9    paragraph 33, examples of such entities include

10   energy utility companies, media, certain types of

11   insurance companies?  The insurance inquiries, those

12   are soft -- those are deemed soft inquiries, aren't

13   they?

14       A.   They are.

15       Q.   Okay.

16       A.   Same with landlords and employers.

17       Q.   That's right.

18       A.   Right.

19       Q.   Okay.  You mention this CFPB, which is

20   the Consumer Financial Protection Bureau, you see

21   that in paragraph 44?

22       A.   Yes.

23       Q.   All right.  And you say they have

24   oversight and rulemaking -- or they're the oversight

UNOFFICIAL DRAFT TRANSCRIPT

1    and rulemaking agency with jurisdiction over the

2    credit reporting industry, correct?

3         A.    Correct.

4         Q.    And they have authority over compliance

5    with the Fair Credit Reporting Act by the credit

6    reporting agencies, right?

7         A.    Yes.

8         Q.    Okay.  You agree that users of -- well,

9    in paragraph 35, you're talking a little bit --

10   you're trying to make a distinction, I think,

11   between users and data furnishers?

12        A.    Inquirers and data furnishers are, yeah,

13   users and inquirers, yes.

14        Q.    Yeah.  Well, inquirers are users, right?

15        A.    Yeah, they are.

16        Q.    Okay.  And by users, we mean persons who

17   obtain credit reports?

18        A.    Yes.

19        Q.    And they have obligations under the FCRA,

20   as well, users, don't they?

21        MS. ROPER:  Objection, calls for legal

22   opinion.

23   BY MR. SOLA:

24        Q.    Okay.  You're not aware of that, I guess?

UNOFFICIAL DRAFT TRANSCRIPT

1          A.    Pardon?

2          Q.    Are you aware of that?

3          A.    There are obligations for end users to

4    maintain credit files for, I think, five years, two

5    years for audit generally in contracts, yes, there

6    are obligations under the FCRA.

7          Q.    Yeah.  And there's limitations on the

8    purposes for which they can use the --

9          A.    Correct.

10         Q.    -- reports or obtain --

11         A.    There's restricted --

12         Q.    -- the reports?

13         A.    -- uses, of course.

14         Q.    Right.

15         A.    Yeah.

16         Q.    Okay.  So these inquirers, they're

17   already subject to the Fair Credit Reporting Act,

18   aren't they?

19         A.    For?

20         Q.    As users?

21         A.    As users, yes.

22         Q.    Okay.  Because you say in addition fear

23   over data furnisher obligations --

24         A.    Which are different from user

1    obligations, yes.

2         Q.    Okay.  But again anybody -- I mean, being

3    subject to the Fair Credit Reporting Act for these

4    people in the credit industry, that's a benefit to

5    everybody, right, because the Fair Credit Reporting

6    Act makes sure that credit reports are fair and

7    accurate?

8         MS. ROPER:  Objection, argumentative, calls

9    for a legal opinion.

10   BY MR. SOLA:

11        Q.    Right?

12        A.    Is being subjected to the Fair Credit

13   Reporting Act a benefit for -- yeah, I would say

14   just on the whole, it's beneficial to have rules for

15   the collection use for use storage, access and of

16   financial -- sensitive financial data, absolutely.

17        Q.    Okay.  So let me just -- okay.  You

18   mention -- go to the top of page 19, you -- in the

19   first line, you say the Congress empowered consumers

20   with the right to directly dispute credit report

21   data with data furnishers and then -- well, you

22   say -- well, I guess where I'm going, we talked

23   about this --

24        A.    Earlier.

1          Q.    -- direct dispute provision?

2          A.    Right.

3          Q.    Okay.  But it seemed like the -- on page

4     18, you were saying how these users are not data

5     furnishers?

6          A.    Yeah, there is --

7          Q.    -- right?

8          A.    Some subset of inquirers slash users that

9     aren't data fors, correct.

10         Q.    Okay.  And so if they're not data

11    furnishers, then there would be no right for the

12    consumer to dispute directly with them, right?

13         MS. ROPER:  Objection to form, argumentative,

14    calls for a legal opinion.

15    BY THE WITNESS:

16         A.    Right.  So look a consumer can call

17    whoever they want to call, right, I mean, they have

18    that right.

19    BY MR. SOLA:

20         Q.    Okay.  But --

21         A.    But before, the change as we discussed

22    earlier was on furnishers and the right for

23    consumers to contact furnishers, which didn't exist

24    prior to the amendment in the FACT Act that now

1    exists.

2         Q.   Okay.  But this right doesn't apply to

3    these users who aren't --

4         A.   To nonfurnishers?

5         Q.   -- furnishers?

6         A.   Yeah, it's limited to furnishers.

7         Q.   Okay.  And so that your reference to the

8    consumers ability to contact these users doesn't

9    apply, because there is no right?

10        MS. ROPER:  Objection to form, calls for a

11   legal opinion, asked and answered, argumentative.

12   BY THE WITNESS:

13        A.   Yeah, you know, because something is not

14   scoped out by the FCRA doesn't mean it's not a

15   possibility.  And indeed as the named plaintiff

16   Summers was successfully able to do, she reached out

17   to the inquirers and made her case and was satisfied

18   in terms of being provided with documents that, you

19   know, substantiated her claims, so, you know, it

20   doesn't necessarily -- everything doesn't need to be

21   defined by the law to be an option.  So, yeah, she

22   can -- it's a possibility and --

23   BY MR. SOLA:

24        Q.   All right.  And despite Ms. Summers'

UNOFFICIAL DRAFT TRANSCRIPT

1   efforts to contact the inquirers directly and you

2   said you indicated some success in that regard in

3   recognizing it was identify theft, Equifax still

4   wouldn't remove the inquiries from her credit

5   report?

6        MS. ROPER:  Objection to form, beyond the

7   scope --

8   BY MR. SOLA:

9        Q.   Right.

10       MS. ROPER:  Objection, beyond the scope,

11  asked and answered, argumentative.

12  BY THE WITNESS:

13       A.   Again I'm not here to testify on the

14  application of Equifax's policies --

15  BY MR. SOLA:

16       Q.   Okay.

17       A.   -- to a specific individual.

18       Q.   Now we talked about a consumer disputing

19  Equifax and talked about Equifax advising a consumer

20  to contact the furnisher, right?

21       A.   (No audible response.)

22       Q.   Okay.  But if a consumer disputes to

23  Equifax and then Equifax contacts the furnisher,

24  then we have both the Equifax and the furnisher

UNOFFICIAL DRAFT TRANSCRIPT

1   investigating that dispute, right?

2        MS. ROPER:  Objection to form, argumentative,

3   asked and answered.

4   BY THE WITNESS:

5        A.   In your hypothetical, yes.  But the

6   reality is then, you know, it's the question is

7   whether or not there's -- you know, in my mind a

8   cost or benefit, and having the consumer, you know,

9   contact the inquirer and having Equifax contact the

10  inquirer, I don't see, you know, why that's more

11  beneficial than having the consumer directly

12  contacting.  And again I can see reasons why it's

13  less efficient because you can end up ping-ponging

14  with three parties instead of ping-ponging with two

15  parties.

16  BY MR. SOLA:

17       Q.   Well, if the consumer's dispute to

18  Equifax is sent to the furnisher --

19       A.   No, the inquirer.

20       Q.   Well, okay.  The inquirer.  But they --

21       A.   Which may not be a furnisher, right, I

22  mean, that's --

23       Q.   Well, they furnish --

24       A.   And your named plaintiffs, that --

UNOFFICIAL DRAFT TRANSCRIPT

```
 1        Q.    Again, it's --

 2        A.    -- that's clear --

 3        Q.    -- semantics.

 4        A.    No, it's not.  It's actually a very

 5   significant distinction I beg to differ.  The named

 6   plaintiffs -- DirecTV and DISH Network are not

 7   furnishers, they're not, they're inquirers.  That's

 8   a significant difference.

 9        Q.    They furnished the inquiry information

10   though?

11        A.    They didn't furnish the inquiry

12   information.  They made an inquiry.

13        Q.    Okay.  Well, again --

14        A.    The fulfillment of that inquiry was

15   recorded by Equifax.  They didn't furnish the

16   inquiry information.

17        Q.    They sure did.  Their name's on it --

18        A.    They --

19        Q.    -- right, it --

20        A.    -- made it --

21        Q.    Don't they provide the name and address

22   that's on the inquiry?

23        A.    They made an inquiry, you're absolutely

24   right, but they didn't furnish the inquiry
```

1   information.

2        Q.    Did they provide the name and address --

3        A.    They --

4        Q.    -- for the company --

5        A.    They --

6        Q.    -- that's on the inquiry?

7        A.    They initiated an inquiry on behalf of a

8   data subject.

9        Q.    Okay.  Sir --

10        A.    But that's not --

11        Q.    -- but when they make the inquiry --

12        A.    Furnished information.

13        Q.    You agree that when a company makes an

14   inquiry, it provides Equifax with its business name?

15        A.    Yes.

16        Q.    And that's the name that's on the credit

17   report as the inquiring company?

18        A.    I don't think that's what's being

19   disputed.

20        Q.    Okay.

21        A.    I think what's being disputed is the

22   ownership of that information.  And again that's not

23   going to be more -- more efficiently resolved by

24   channelling everything through an intermediary; in

UNOFFICIAL DRAFT TRANSCRIPT

1    this case, Equifax.

2         Q.    They're not the intermediary, they're the

3    company reporting it.

4         A.    They would be an intermediary if it was

5    all, you know, in an e-OSCAR context.

6         Q.    All right.  You think that consumers that

7    want to dispute inquiries on their Equifax credit

8    report should not even contact Equifax and instead

9    contact the inquiring entity?

10        MS. ROPER:  Objection, misstates his

11   testimony.

12   BY THE WITNESS:

13        A.    So again I feel that there is a benefit

14   from contacting Equifax or any CRA if you believe

15   there is an inaccuracy in your inquiry.  And again

16   depending on the nature of the dispute and the

17   substantiating evidence, it may be just a one step

18   process, you provide documenting evidence to

19   substantiate your claim, the inquiry is deleted.  It

20   may be entirely unnecessary.  The other aspect is,

21   you know, in the case of a mixed file with

22   substantiating evidence, it might be deleted as

23   well.  And there are again other situations and

24   scenarios where simply contacting Equifax or any

 1   nationwide CRA will result in the appropriate

 2   outcome if, in fact, the information is deemed to be

 3   inaccurate.  But, you know, it just -- if the --

 4   there's no supporting evidence, the benefit the

 5   consumer gets is the contact information of the

 6   inquirer and the direction instruction to contact

 7   them and find out if something genuinely is amiss as

 8   opposed to, gee, I have a store card with Target

 9   that's underwritten by HSBC, and I just didn't

10   recognize HSBC.  So, no, I disagree with the

11   statement that they shouldn't contact Equifax.

12   BY MR. SOLA:

13       Q.   Okay.  So you agree that they should?

14       A.   Sure.

15       Q.   But you don't agree that Equifax should

16   reinvestigate the inquiry the same way they would

17   reinvestigate an account?

18       MS. ROPER:  Objection, asked and answered,

19   calls for a legal opinion.

20   BY THE WITNESS:

21       A.   I have mentioned a number of times the

22   critical distinguishing factor is the endogeneity of

23   the inquiry data versus furnished data.  And I

24   believe that is a first step.  Their recognition of

1    the fact that it's a factual record of access or

2    again if it's fraudulent or mixed file with

3    appropriate supporting evidence or a broader

4    context, the person has a history of fraudulent

5    activity on their account or past history of mixed

6    files, the -- that, yes, those policies and

7    practices are absolutely appropriate.

8    BY MR. SOLA:

9         Q.    Okay.  Now, let me see if I understand.

10   Are you saying that the reason you think that the

11   reinvestigation process for accounts should be

12   different than for inquiries is because you want

13   deem how that information originated?

14        MS. ROPER:  Objection, misstates his

15   testimony.

16   BY THE WITNESS:

17        A.    Yeah, so --

18   BY MR. SOLA:

19        Q.    In other words, that the inquiry you

20   consider endogenous and the account you don't --

21        A.    Correct.

22        Q.    -- is that a fair summary?

23        A.    Yeah, I think that's fair, yeah.

24        Q.    Any other reason why you think that the

```
 1    dispute resolution procedure should be different?
 2         MS. ROPER:  Objection, calls for a legal
 3    opinion, asked and answered.
 4    BY THE WITNESS:
 5         A.   Yeah, no, I'm not -- I think I've been
 6    very clear in my report and the discussion earlier
 7    and we've belabored that point a lot, so yes.
 8         MS. ROPER:  Robert, at a good point, can I
 9    just take like a two-minute --
10         MR. SOLA:  Yeah.
11         MS. ROPER:  -- bathroom break?
12         MR. SOLA:  Let's take a two-minute break.
13                   (WHEREUPON, a recess was had from
14                   2:41 p.m. to 2:46 p.m.)
15    BY MR. SOLA:
16         Q.   All right.  Would you agree that hard
17    inquiries can never have a positive impact on a
18    consumer's credit score?
19         A.   In the United States, I think that never
20    a -- yeah, I would say that's true.
21         Q.   Okay.  And would you agree -- or yeah
22    would you agree they could never have a positive
23    impact in a creditor's assessment of that consumer's
24    creditworthiness?
```

1      A.   Yeah, let me -- let me retract that

2   statement.  I can't.  I mean, based on my experience

3   in Australia and New Zealand and the use of inquiry

4   for scoring in a positive manner, it's possible that

5   some lender in the United States could have a

6   methodology that would integrate inquiries in a

7   positive manner.  So I don't want to say it's

8   impossible.  I don't want to say that at all.  It's

9   unlikely and probable but not impossible.

10      Q.   Okay.  I'm not clear.  My first question

11   was about score, and my second question was about

12   creditworthiness, so I didn't understand what your

13   retraction was.

14      A.   So to my earlier answer, I would retract

15   an earlier answer regarding scores.  It's possible

16   that a lender could have a score card, a proprietary

17   score card, think file or, you know, someone with a

18   damaged credit history that would factor in

19   inquiries in a positive manner.  It's possible.

20      Q.   Okay.  But you're not --

21      A.   It's not --

22      Q.   It's safe to say you're not aware of any

23   scoring models in which a hard inquiry would have a

24   positive impact on the score?

UNOFFICIAL DRAFT TRANSCRIPT

1       A.    Not in the United States, I'm not aware.

2  You know, the question was, was it possible, so --

3       Q.    Okay.  Then my second question was about,

4  do you agree that hard inquiries would never have a

5  positive impact on a creditor's assessment of

6  creditworthiness in the United States?

7       A.    Again, I think it depends.  I mean, if

8  you're looking at a manual in the writing process, I

9  can envision a scenario whereby a loan officer might

10  look at a competitive shopping or comparative

11  shopping for an auto or mortgage loan is being

12  credit responsible and, in fact, consider that good

13  behavior, and it could have a positive impact.  So I

14  mean, yeah.

15       Q.    Okay.  You don't know the effect that the

16  hard inquiries that were dispute by Mr. Steed and

17  Ms. Summers had on their credit scores, right?

18       MS. ROPER:  Objection, asked and answered,

19  beyond the scope.

20  BY THE WITNESS:

21       A.    Yeah, I did not see the credit reports of

22  the named plaintiffs.  All I had was the information

23  that I was able to glean from the depositions and

24  the complaint.

1   BY MR. SOLA:

2        Q.   All right.  So I don't know if I got a

3   yes, but I think that's what you were trying -- in

4   other words, you don't know the impact of the

5   disputed inquiries on the credit scores of Mr. Steed

6   and Ms. Summers, right?

7        MS. ROPER:  Same objections.

8   BY THE WITNESS:

9        A.   I mean, again, and not to be difficult,

10  but there were assertions made by named plaintiff

11  Steed that she may have been denied for a credit

12  card in 2012 and then in 2011 when she and her

13  husband jointly applied to refinance their mortgage

14  loan that he orally cited a frequent -- or the

15  number of hard inquiries as a reason why they didn't

16  receive the terms that they had hoped to receive.

17  So, you know, I'm inferring that they believe at

18  least that there was some effect in reduction of

19  their score.  But I don't know again the specific

20  impact, because I didn't see that information.  But

21  I don't think it was necessary.

22  BY MR. SOLA:

23       Q.   Okay.  And that statement that

24  Ms. Summers relaid about being told that the number

1   of inquiries affected -- well, I can't remember how

2   you stated it -- but affected their

3   creditworthiness, is that fair to say?  That would

4   be -- that's -- as we've already discussed,

5   inquiries can have that negative effect, right?

6        A.   As we've discussed, inquiries can have no

7   effect at all and can have a negative effect and it

8   can have an effect, a reduction on a score that has

9   absolutely no material effect on your credit

10  standing.

11       Q.   Okay.  So in other words, you can't say,

12  oh, no, no lender could say that because it's

13  impossible?

14       A.   No lender could say what?

15       Q.   That the hard inquiries effected the rate

16  that they're going to get?

17       A.   I would never say that.

18       Q.   Okay.

19       A.   I never have said that.

20       Q.   No, I understand.  Because it is possible

21  that the hard inquiries did affect the rate, right?

22       A.   Yes.

23       Q.   Do you think there's too much automation

24  in the dispute resolution process with CRAs?

1        MS. ROPER:  Objection to form, beyond the

2    scope, argumentative.

3    BY MR. SOLA:

4        Q.   And I mean too much that it diminishes

5    the effectiveness of determining whether disputed

6    information is accurate?

7        MS. ROPER:  Objection to form, argumentative,

8    beyond the scope.

9    BY THE WITNESS:

10        A.   So our empirical study of the dispute

11    resolution process generated very favorable

12    impressions from the disputants.  There was an above

13    90 percent satisfaction with the process that

14    involved an automated platform in the form of

15    e-OSCAR, so I don't see evidence from our study or

16    from the FTC study that automation is too much or is

17    inefficient or is not serving disputants' or

18    consumers' interests in that regard.

19    BY MR. SOLA:

20        Q.   Okay.  So you're saying your study

21    indicated that approximately 90 percent of consumers

22    were satisfied with the results of their disputes?

23        A.   Yes, above 90, yes.

24        Q.   Above 90.  And thus you're -- so

1    you're -- well, you consider that satisfactory?

2         A.    A 90 percent approval rating, are you

3    kidding me?  That's great.  Very few things in life

4    have 90 percent approval rating, yeah, that's

5    fantastic.

6         Q.    Really?  You don't think that it should

7    be --

8         A.    Marriage only has 50 percent, I mean --

9    seriously, right, that's a high number.  Not to

10   belittle it, but that's a very high number.

11        Q.    Really?  You don't think it should be

12   100 percent?

13        A.    I mean, if we keep using normative

14   things, yes, there should be no murder, there should

15   be no crime, everyone should treat their neighbors

16   the way they want to be treated themselves and, you

17   know, and it should be 100 percent accurate.  But

18   that's practically -- that's totally unreasonable

19   and impossible.  I mean, that's just -- and it's not

20   the objective of anything we're trying to do here.

21        Q.    Well, it --

22        A.    That's a completely unreasonable

23   standard, I'm sorry, but like -- you know, it is.

24        Q.    Okay.  So wait a minute --

1          A.    I mean, should --

2          Q.    -- you said it's not the objective?

3          A.    Should.  Should.

4          Q.    But, I mean, you're saying it's not --

5   let's just see.  Wouldn't it be a responsible CRA's

6   objective to have 100 percent satisfaction with the

7   results of its disputes?

8          MS. ROPER:  Objection, argumentative,

9   misstates his testimony, calls for a legal opinion.

10  BY THE WITNESS:

11         A.    Yeah, I don't know what ben -- yeah,

12  every firm wants 100 percent satisfaction and every

13  firm wants 100 percent market share.  Can't have the

14  two.  So, you know, I mean --

15  BY MR. SOLA:

16         Q.    Do you think it would be -- it's

17  acceptable, let's say, that the ten percent that

18  weren't satisfied was because inaccurate information

19  did not get deleted, do you think it's acceptable

20  that ten percent of inaccurate information that's

21  disputed doesn't get deleted?

22         MS. ROPER:  Objection, argumentative, asked

23  and answered, calls for a legal opinion.

24

1    BY THE WITNESS:

2         A.    Yeah.  First of all, let me dissect that.

3    The 90 percent who were satisfied, that doesn't mean

4    that their modifications or, you know, whatever it

5    was they were contesting, and it may not be

6    necessarily inaccurate information, they may have

7    contested accurate information and then been

8    satisfied that that was removed.  But, you know,

9    they could have been satisfied with, oh, you know, I

10   discovered that my Target card was actually

11   underwritten by HSBC or I learned something that I

12   didn't know before or I had a positive experience.

13   I mean, there are different reasons for

14   satisfaction.  Similarly, there are different

15   reasons for dissatisfaction.  People had

16   modifications who weren't satisfied and it could

17   have been just because they thought the person was

18   rude to them or they could have been having a bad

19   day.

20   BY MR. SOLA:

21        Q.    Okay.  But that wasn't my question.

22        A.    So, no, but you're drawing an entirely

23   inaccurate conclusion from satisfaction rates.

24   You're saying that the ten percent who were

1   dissatisfied didn't have -- or inaccurate

2   information removed.  And that you want -- that's a

3   complete non sequitur.

4        Q.   Okay.  But, you know, you've testified

5   that PERC -- part of PERC wants to make -- bring

6   people into the financial world, right, get people

7   able to get credit without going to payday lenders,

8   and you said part of that is increasing the amount

9   of information that might help them access credit,

10   right?

11        A.   Correct.  Predictive information.

12        Q.   Okay.  And so if somebody that's looking

13   at the credit industry and credit reporting, what

14   percentage of information that's inaccurate that's

15   disputed do you think should be removed as a goal

16   for Equifax?

17        MS. ROPER:  Objection, argumentative, calls

18   for a legal opinion, misstates his testimony, asked

19   and answered.

20   BY THE WITNESS:

21        A.   Yeah, I mean, look, again if you're --

22   I'll cede you that aspirationally everything should

23   be perfect.

24

1   BY MR. SOLA:

2        Q.   No, but I mean -- I'm just saying also

3   but based on --

4        A.   That's what you just said though.

5        Q.   No, but you think 90 percent's --

6        A.   Should I --

7        Q.   -- satisfactory --

8        A.   Goal.

9        Q.   -- let's say it's 90 percent.  Is -- from

10  your perspective as an expert, do you go home at

11  night and say I think 90 percent is the best we can

12  do?

13       MS. ROPER:  Objection, argumentative,

14  misstates his testimony, calls for a legal

15  opinion --

16  BY MS. ROPER:

17       Q.   No, I'm just --

18       MS. ROPER:  -- asked and answered.

19  BY MR. SOLA:

20       Q.   -- asking if 90 percent was the --

21       A.   90 percent if my -- if my client approval

22  rating and supporter approval rating were

23  90 percent, I'd be very happy.  You know, it's

24  just -- I mean, I live in the real world, and you

UNOFFICIAL DRAFT TRANSCRIPT                    281

1    can't please everybody all the time.

2         Q.   Really, sir, because, you know, if one

3    out of ten of my clients was not happy with my

4    service, I'd feel terrible.

5         A.   Well, you should check your online

6    rating, because it's a seven out of ten, so you

7    should work harder.  I don't know.  I mean, I'm glad

8    you feel terrible.

9         Q.   No, I don't know what you're referring

10   to.  I don't -- I don't know what you're referring

11   to, sir.

12        A.   Okay.  All right.

13        Q.   So you're saying Equifax should be

14   satisfied if they can correct 90 percent of the

15   dispute errors?

16        MS. ROPER:  Objection -- hold on a second

17   Mr. Turner.

18            Objection, argumentative, asked and

19   answered, calls for a legal opinion, misstates his

20   testimony.

21   BY THE WITNESS:

22        A.   You're convoluting statements and

23   twisting them.  I guess it's that time of the day.

24   What I said was that 90 percent of the participants

1    in our research who disputed different data

2    elements, header information, account information

3    with any of the CRAs reported that they were

4    satisfied with their experience.

5    BY MR. SOLA:

6         Q.   Okay.  And --

7         A.   That you cannot, therefore, conclude that

8    ten percent of disputed inaccurate information is

9    not modified or corrected.  The two have nothing to

10   do with one another.

11        Q.   Okay.  But you're talking about this

12   study that was funded by the credit reporting

13   agencies, is that what you're referring to?

14        A.   Oh, sure, but I -- yes, and --

15        Q.   Okay.

16        A.   -- yes, that's fine.

17        Q.   All right.

18        A.   Yes.

19        Q.   All right.  And that 90 percent figure --

20        A.   So we are at that time of day.

21        Q.   -- that wasn't found by the FTC, was it?

22        A.   I'm not aware that they queried the

23   participants for satisfaction with the mod -- the

24   dispute resolution rate.  We did that as an

```
 1  extension of our research.
 2       Q.    Does Equifax need TransUnion or
 3  Experian's permission to change its reinvestigation
 4  procedures?
 5       MS. ROPER:  Objection, lacks foundation,
 6  argumentative, assumes facts not in evidence.
 7  BY THE WITNESS:
 8       A.    Are we talking about any reinvestigation
 9  or --
10  BY MR. SOLA:
11       Q.    Yeah, well --
12       A.    Do you want to narrow it to inquiries or
13  what's the --
14       Q.    Well, in paragraph 41, you say there
15  would be substantial costs at the CRAs associated
16  with getting industry consensus on the definition --
17       A.    Sorry, what paragraph?
18       Q.    Paragraph 41.  And I guess what I'm --
19       A.    41.
20       Q.    And it sounds to me like you're saying
21  Equifax can't do this without Experian and
22  TransUnion's permission.  Maybe I'm misreading that.
23  But the word consensus means that the three agree.
24  And I don't understand why that would be required.
```

1          A.    Yeah.  I think the context in which I was

2    discussing this was my interpretation of the

3    solution that you all have offered in terms of the

4    modifying e-OSCAR.  And so modifications to e-OSCAR,

5    if we're going to fold inquiry dispute resolution

6    into e-OSCAR, would require a consensus.

7          Q.    Okay.  You know, the --

8          A.    Because the first sentence there, in

9    addition to implementing the solution proposed by

10    the plaintiffs, so that's what I'm referring to, the

11    e-OSCAR bit, yeah.

12          Q.    Yeah, okay.  You read the complaint.  I

13    don't -- I don't see anything -- any mention of

14    e-OSCAR in that at all.

15          A.    Okay.  So what I can do is I can get back

16    to you with cites where you in various points in

17    time and Evan Hendricks also, your expert witness,

18    suggests that this could be simply handled by

19    modifying e-OSCAR and including this into that

20    process.  And even in the questions today, you've

21    certainly alluded to that fact.

22          Q.    No, I understand, because e-OSCAR's a

23    system --

24          A.    Okay.

1      Q.    -- you use, right?

2      A.    Well, so that's all I'm -- that's all I'm

3  referring to.

4      Q.    Okay.  I mean, Equifax designed e-OSCAR,

5  right?

6      A.    So do you not agree that you would think

7  that e-OSCAR could be modified in a way to

8  facilitate this?

9      Q.    We are asking questions about e-OSCAR

10  because that's the system that you folks -- that the

11  defendant has, so we are asking questions about

12  that?

13      A.    Okay.  And I'm responding --

14      Q.    I don't --

15      A.    I'm responding --

16      Q.    I don't see --

17      A.    -- to those.

18      Q.    -- any proposal from Ms. Summers and

19  Mr. Steed that -- that's what I just don't

20  understand.

21            All right.  So you're saying if it's an

22  e-OSCAR change, then Equifax would have to get

23  consent from TransUnion and Experian?

24      A.    Yeah, I don't think they can

UNOFFICIAL DRAFT TRANSCRIPT

1   unilaterally --

2        Q.   Okay.

3        A.   -- change the platform without the

4   consensus of the other stakeholders.

5        Q.   All right.  But, of course, for most of

6   Equifax's existence, they didn't use e-OSCAR to

7   investigate, did they?

8        A.   But they do now.

9        Q.   I understand.

10       A.   Okay.

11       Q.   But for decades, they went on their own

12   and didn't do something that was also approved by

13   TransUnion and Experian, right?

14       A.   Absolutely.

15       Q.   Right.  And they went to the e-OSCAR

16   system because it was cheaper, right?

17       MS. ROPER:  Objection to form, assumes facts

18   not in evidence, argumentative.

19   BY MR. SOLA:

20       Q.   Wasn't it then sending paper, CDBs?

21       A.   Well, so they went to this to facilitate

22   to take advantage of new technologies that allow for

23   scaled communications, and it's just a more

24   practical and cost-effective and comprehensive

UNOFFICIAL DRAFT TRANSCRIPT

 1   solution, so there are a whole variety of reasons

 2   why all of them would have migrated from antiquated

 3   paper-based systems to an electronic system.

 4        Q.   It also requires less labor than having

 5   the old system, doesn't it?

 6        MS. ROPER:  Objection, argumentative, beyond

 7   the scope, asked and answered.

 8   BY THE WITNESS:

 9        A.   You know, that's I think a universal

10   truism of automation, yes, just with robots and auto

11   manufacturing facilities.  It doesn't mean the cars

12   aren't as good, just fewer people.

13   BY MR. SOLA:

14        Q.   Uh-huh.  And you don't believe that if

15   Equifax contacted the furnish -- we'll call them the

16   inquirer about a disputed inquiry, that would result

17   in less credit available to consumers, do you?

18        MS. ROPER:  Objection, argumentative, assumes

19   facts not in evidence, misstates his testimony.

20   BY THE WITNESS:

21        A.   Yeah, so that that -- those two are what

22   I represent.  The scenario where I discussed about a

23   potential contraction of credit was one whereby the

24   e-OSCAR advocates wouldn't necessarily need to

UNOFFICIAL DRAFT TRANSCRIPT

1   exhort inquirers that aren't furnishers into

2   uptaking that system, and they could decide that the

3   costs potentially in -- you know, specifically the

4   liability costs were excessive and exceeded any

5   benefits and would resort to other means for either

6   mitigating risk or ascertaining risk.

7   BY MR. SOLA:

8        Q.   All right.

9        A.   And that would, in fact -- and that's

10  supported by empirical and theoretical economic

11  literature -- absolutely result in a credit

12  contraction, it would result in more risky loans

13  being made because of the risk premium, would

14  attract riskier borrowers and would have a

15  degradation on access to credit, especially for

16  lower income Americans, younger Americans, elderly

17  Americans and members of protected classes,

18  absolutely.

19  BY MR. SOLA:

20       Q.   Okay, wait.  You're saying all that would

21  happen if Equifax contacted the inquirer in regard

22  to a dispute of an inquiry?

23       MS. ROPER:  Objection, that misstates his

24  testimony.

UNOFFICIAL DRAFT TRANSCRIPT

1    BY MR. SOLA:

2         Q.    Okay.  That was my question.

3         A.    I disagreed with your framing and I said

4    my reference to the contraction of credit was

5    specific to the scenario that I specify in my

6    report.

7         Q.    Okay.

8         A.    You're misstating what I said.

9         Q.    No, no, I'm just asking my question.  You

10   went -- my question was simply you believe that if

11   Equifax contacted the furnisher in regard to a

12   disputed inquiry, that would result in less

13   availability of credit?

14        MS. ROPER:  Objection, misstates his prior

15   testimony, asked and answered.

16   BY THE WITNESS:

17        A.    So what's not captured in court reports

18   is tonality and questions and pitch, which implies

19   certain things.  So when I interpret something

20   you're saying as a reference to something because of

21   your pitch and the uptake, then, you know, I -- if

22   I'm misinterpreting, I apologize.

23   BY MR. SOLA:

24        Q.    Okay.  But that's my question.

1         A.    But it seems to me like you were trying

2    to state something from my report, and it was not an

3    accurate representation of what I stated.

4         Q.    Okay.  Well, let me restate it.

5         A.    Okay.

6         Q.    Okay.  Because I'm not saying -- all I'm

7    doing is asking the question:  Do you believe that

8    if Equifax contacted the inquirer in regard to a

9    dispute of an inquiry, that would decrease the

10   amount of credit available?

11        A.    It's possible.  I mean, it could be the

12   case that given the volume, particular inquirers

13   could determine that the customer service and IT

14   costs for handling that, you know, from Equifax, I

15   don't know, it's possible they could determine that,

16   gee, what Equifax is suggesting by having the

17   consumers contact them directly currently could be

18   too onerous, and it might deter some from using

19   credit files because of that cost, it's possible.

20        Q.    No, that's what I was going to say.  So

21   that the same could result could happen if the

22   consumers did what Equifax said and contacted those

23   inquirers directly?

24        A.    It could, yeah.

1        Q.    Okay.  But Equifax -- well, okay.

2              Now, but, of course, if we remove

3    inaccurate inquiries from credit reports, then the

4    system benefits, the whole credit industry benefits,

5    correct?

6        A.    There would be benefits to removing

7    inaccurate information, absolutely.

8        Q.    Okay.  Okay.  Paragraph 46.  All right.

9    You say neither of the named plaintiffs asserts

10   actual damages linked to the inclusion of disputed

11   inquiries.  But I believe you said you read that

12   Ms. Summers said that they were told they were

13   paying a higher interest because of the inquiries.

14       A.    She believes that.

15       Q.    Okay.  So --

16       A.    But she's not -- she's not asserting it,

17   she's not filing those damages, she's not filing for

18   credit damages.  Am I incorrect in that?  Are you

19   suing Equifax for damages in their re-fi?  I mean,

20   if that were the case, I'd certainly want to see

21   more evidence, but I mean --

22       Q.    Okay.  So when you say asserts actual

23   damages, you mean seeking those damages in this

24   lawsuit?

UNOFFICIAL DRAFT TRANSCRIPT

1      A.    Right.  Yes.

2      Q.    Okay.  I just wanted to be clear on that.

3  And by -- let's -- by actual damages, what do you

4  mean?

5      A.    Well, I like to operate in the realm of

6  measurables, so in this case, you know, a denial of

7  credit would be a damage.  Any adverse action under

8  the FCRA would be a damage.  You know, foreclosure

9  of economic opportunity would be a damage.  Those

10  are the damages to which I could speak to.  I know

11  that evens asserted potential emotional or

12  psychological damages.  I can't speak to that.  I

13  find that highly implausible but you know it's

14  possible.  You know there's certain categories of

15  damages which people could assert.  I'm speaking

16  purely to economic and credit damages.

17      Q.    All right.  And I guess in answer to the

18  question do you consider having an inaccurate

19  inquiry reported to a company you're seeking credit

20  with is actual damages, you would say it depends?

21      A.    Yes.

22      Q.    We've learned something over five hours.

23  Okay.  And you would say the same thing in terms of

24  having a fraudulent account reported to a person

1    assessing your credit report, that whether you're --

2    you suffered actual damage as you understand it

3    would depend?

4         A.   Yes.

5         Q.   And, in fact, any item of information on

6    your credit report in your view may not cause you

7    damage even if it's wrong and negative?

8         A.   We discussed that early on about

9    scenarios under which the inclusion of inaccurate

10   information could improve your credit score and

11   improve your credit standing and conceivably benefit

12   you in that context, yes.  And there was a whole

13   industry on that with the authorized users and

14   people selling access to their long time established

15   accounts to again game the system to improve their

16   credit score.  And that's including inaccurate

17   information.

18        Q.   Now you'd agree that even consumers let's

19   say that only have a small amount of harm from

20   inaccurate information on their credit report, they

21   should still be able to get that inaccurate

22   information removed, right?

23        A.   Well, again I don't understand what you

24   mean by small amount of harm.  I mean, are you

UNOFFICIAL DRAFT TRANSCRIPT

1    talking about an immaterial negligible credit score

2    change?  I mean, you know, any person should have

3    the right to contest any piece of information or

4    data element on their credit file that they perceive

5    to be inaccurate, yes.

6          Q.    All right.

7          A.    Whether they're harmed or not.

8          Q.    And as every person should have the right

9    to inaccurate information investigated to determine

10   if it's accurate, right?

11         MS. ROPER:  Objection, calls for a legal

12   opinion.

13   BY THE WITNESS:

14         A.    As I've mentioned before, the steps and

15   processes that are in place by Equifax dealing with

16   a factual record of access constitute this.  I mean,

17   it's on your credit file if you're providing

18   information about mixed file or fraud, it can be

19   deleted.  If not, then that's something where, you

20   know, another step is required.

21   BY MR. SOLA:

22         Q.    Okay.  Now you -- page 27, paragraph 49,

23   just after footnote 31.  You say the FTC study found

24   just over 1 percent of credit reports examined

1    contain disputed inquiries hard and soft that were

2    modified.

3         A.   Correct.

4         Q.   Okay.  And you would agree that the

5    number of inquiries that are disputed inquiries that

6    are modified depends on the procedures that the

7    credit bureaus follow in addressing those disputes?

8         MS. ROPER:  Objection to form, argumentative.

9    BY THE WITNESS:

10        A.   Yes, the procedures would --

11   BY MR. SOLA:

12        Q.   Yeah?

13        A.   -- bear on that.

14   BY MR. SOLA:

15        Q.   Let's say it's 1 percent for Equifax,

16   okay?

17        A.   Okay.

18        Q.   Okay.  You'd say that's based on the

19   procedures that they have for modifying disputed

20   inquiries?

21        A.   Yes.

22        Q.   Okay.  And if those procedures were

23   different, the number could be higher, right?

24        A.   I mean, yeah, if they just deleted

1    inquiries that were disputed as they did in 2008,

2    2009, that number might be much higher, yes.

3        Q.   Okay.  Or if they contacted the inquirer,

4    the number might be much higher too?

5        A.   It may or may not be.  It may be simply

6    because the inquirer -- the inquirer has a policy of

7    just not dealing with disputes and deleting it.  It

8    doesn't necessarily mean that it was inaccurate.  I

9    mean, again, I think it's important to point out

10   just because something's disputed doesn't mean it's

11   inaccurate, and just because something is deleted

12   also doesn't mean it was inaccurate.

13       Q.   Yeah, you know, you've referenced that a

14   couple times with these creditors or furnishers just

15   not wanting to even do an investigation and just

16   delete the information.  What companies are you

17   talking about?

18       A.   Well, there are -- you know, there are

19   lenders that are asking for the deletion of --

20       Q.   No.  No, I'm sorry to cut you off.  No,

21   I'm talking about when they get a notice of dispute

22   from a CRA --

23       A.   Right.

24       Q.   -- are you -- can you name me a company

 1   that won't investigate, will simply tell the CRA

 2   just delete that?

 3        A.   No.  But that doesn't mean they don't

 4   exist.  I mean, it's a well-known fact.

 5        Q.   No, I know.  I want to find out who they

 6   are.

 7        A.   Yeah.

 8        Q.   You know, because I think it's

 9   deplorable.

10        A.   Right.  And they -- it's just something

11   that, I mean, to the extent that I'm a trusted third

12   party, there are limits of being a trusted third

13   party, right, and those are usually --

14        Q.   Okay.

15        A.   -- you know, with --

16        Q.   Okay.

17        A.   So sorry, yeah.

18        Q.   But you agree that's wrong?

19        A.   It is wrong.

20        Q.   Yeah.  They should determine if the

21   information is accurate or not, right?

22        A.   I'm just responding to the figure in the

23   study --

24        Q.   Okay.

UNOFFICIAL DRAFT TRANSCRIPT                    298

 1        A.    -- and, you know, making sure that it's
 2   interpreted correctly, that's all.  I'm not speaking
 3   to practices.  And I agree with you, it's a
 4   deplorable practice.  It's lazy.
 5        Q.    Okay.  Paragraph 51, now you -- the
 6   second sentence, you say, as such, hard inquiries
 7   resulting from fraud can be a very useful to
 8   consumers as an early warning for ID theft/fraud,
 9   right?  And I guess what you're saying is if they
10   see an inquiry that they don't recognize, that could
11   point to them, oh, someone might be out there trying
12   to get credit in my name --
13        A.    Yeah.
14        Q.    -- right?
15              And that's just true with accounts that
16   come on their credit report, they see an account
17   that they didn't open, that they might think they're
18   a victim of identify theft?
19        A.    That's -- that's, I mean, one of the
20   reasons that I've been arguing why non-financial
21   data should be important -- included --
22        Q.    Okay.
23        A.    -- because frequently identity thieves
24   will steal an identity and rent an apartment and

1   open up utilities in that person's name, and they

2   would actually see that and be able to nip that

3   problem in the bud before it escalated to new

4   account fraud --

5       Q.   All right.  Then --

6       A.   -- financial fraud.

7       Q.   Okay.  And then the next sentence, you

8   say, As such, the fact that inquiries that result

9   from fraud appear on a consumer's credit report

10  really should not be considered an error in the same

11  way that an incorrect inquiry resulting from mixed

12  file might appear on a consumer's credit report.  I

13  know you qualified that when you say -- you compared

14  the mixed file.  But you agree that an inquiry

15  resulting from fraud is inaccurate?

16      A.   Yeah.  No, I'm just saying there's a --

17  there's a benefit in terms of alerting the consumer

18  to take other steps.

19      Q.   Okay.  And one of those steps --

20      A.   I'm not saying that it shouldn't be

21  deleted.  I'm saying, you know, if it's proven to be

22  inaccurate from fraud, I'm saying that, you know,

23  it's -- you know, it's a little bit -- there's a

24  benefit to it.  It's just -- it's a very small

1  point.

2          Q.    Okay.  But you're talking on the report

3  that goes to the consumer, right?

4          A.    Correct.

5          Q.    Okay.  In which case -- and maybe you're

6  not aware, again in legal.  The inquiries have to be

7  reported, are you aware of that?

8          A.    I'm sorry?

9          Q.    When the -- when a consumer asks for

10  their credit file --

11          A.    Right.

12          Q.    -- okay, Equifax has to tell them the

13  inquiries?  I don't know if you're aware of that.

14          A.    No, I'm sorry, when a consumer --

15          Q.    Asks for --

16          A.    -- asks for --

17          Q.    -- their credit --

18          A.    When I --

19          Q.    -- file --

20          A.    I think you're talking about a DTC credit

21  report.

22          Q.    Oh, I'm talking -- yes.

23          A.    Okay.

24          Q.    Direct to consumer credit report?

1        A.    Yeah.  And then you have hard and soft

2    inquiries --

3        Q.    That's right.

4        A.    -- reported, yeah.

5        Q.    Yeah.  Those have to be on there, I don't

6    know if you're aware --

7        A.    No, I'm aware of that, yeah.

8        Q.    Okay.  They don't have to be on the third

9    party reports, you agreed to that, the inquiries?

10        A.    The soft inquiries don't go, the hard

11    inquiries are on the credit file that goes to the --

12        Q.    Third party?

13        A.    Correct.

14        Q.    But they don't have to be?

15        MS. ROPER:  Objection to the extent it calls

16    for a legal conclusion.

17    BY THE WITNESS:

18        A.    Yeah, I'm unaware of a legal obligation

19    to include them.  I'm not a legal expert but --

20    BY MR. SOLA:

21        Q.    Yeah.

22

23

24

UNOFFICIAL DRAFT TRANSCRIPT

1      A.    -- what I'd suggest is there are market

2   reasons for them to be included because they're

3   predictive variables.

4      Q.    Oh, no, I agree.  We both just talked

5   about that --

6      A.    Right.

7      Q.    -- why they're on there.

8      A.    Right.

9      Q.    Okay.  All right.  Then -- okay.  Then

10  the last sentence, that I have to ask you about.  So

11  one would not want inquiries resulting from fraud

12  not to show up on credit reports.  I've got to

13  assume you're meaning the report direct to the

14  consumer?

15     A.    Yeah, right.

16     Q.    Okay.

17     A.    Yes.

18     Q.    You agree they should not show up on

19  reports to third parties?

20     A.    Correct.  I mean, once it's been

21  established that they're inaccurate if it's a

22  fraudulent and inaccurate piece of information, then

23  any piece of information or data element, you

24  wouldn't want that going to -- into the eligibility

UNOFFICIAL DRAFT TRANSCRIPT

```
 1    determination process, whether it's a credit or

 2    otherwise.

 3         Q.   Okay.

 4         A.   But, yes, I'm just suggesting that the

 5    DTC, and that's -- I should have put a

 6    qualification --

 7         Q.   DTC is direct to consumer?

 8         A.   Right.  Yes.

 9         Q.   Okay.  Okay.  Then at the -- paragraph 52

10    ends with a statement.  I don't want to read the

11    whole thing, but you say one is hard pressed to

12    understand the merits of plaintiffs' case.  And I

13    assume by merits, you're not talking about legal

14    merits there, you're talking about something else?

15         A.   Yes, right.

16         Q.   Okay.  And you're not -- yeah, so you're

17    not talking about whether plaintiffs have a viable

18    claim for violation of the Fair Credit Reporting

19    Act?

20         A.   No.  I'm referring to what I've

21    consistently talked about in the report about a

22    suggestion that a whole scale systemic reform of the

23    industry's dispute resolution process regarding hard

24    inquiries is necessitated by evidence presented in
```

1   this case.

2          Q.    Okay.  And then your last sentence, you

3   end it saying, a beneficial outcome for any party

4   resulting from plaintiffs' proposed solution is

5   impossible to establish and defend either by logic

6   or fact.  Okay.  And by party, who do you mean?

7          A.    The varying stakeholders in the data

8   credit information sharing system, the data subject,

9   the inquirer and the credit bureaus.

10         Q.    Okay.  And by proposed solution, do you

11  mean investigating disputed inquiries through

12  e-OSCAR?

13         A.    Yes, that's correct.

14         Q.    Okay.  And just that?

15         A.    Correct.

16         Q.    Okay.  And then to defend either by logic

17  or fact, but that's your logic, right?

18         A.    I mean, I use my logic, yes.

19         Q.    Okay.  And then you're not addressing

20  legal requirements there, are you?

21         A.    No.

22         Q.    Okay.  Is it your opinion that inquiries

23  that resulted from identify theft should be reported

24  to third parties after a consumer has notified

1    Equifax that the inquiry resulted from identify

2    theft?

3         MS. ROPER:  Objection, asked and answered,

4    misstates his prior testimony, calls for a legal

5    opinion.

6    BY THE WITNESS:



20        Q.   One last question.  Are you aware that

21   Equifax can't consider a dispute frivolous or

22   irrelevant and then not have to act on it?

23        MS. ROPER:  Objection, assumes facts not in

24   evidence, beyond the scope, calls for a legal

1    opinion.

2    BY THE WITNESS:

3         A.   Yeah, I'm familiar with this topic from

4    the perspective of work I've done looking at CROA

5    and, you know, the volume of disputes that come in

6    from credit clinics that again are attempts to game

7    the system and determinations can be made if certain

8    disputes meet certain criteria to deem them as

9    frivolous, yes.

10   BY MR. SOLA:

11        Q.   Okay.  And you agree that's an effective

12   way for Equifax to deal with disputes from

13   unscrupulous credit clinics or consumers?

14        A.   I think --

15        MS. ROPER:  Objection, argumentative, beyond

16   the scope, calls for a legal opinion.

17   BY THE WITNESS:

18        A.   You know, I think absent more effective

19   enforcement of existing laws, that's probably the

20   best recourse open to Equifax and other credit

21   bureaus.

22        MR. SOLA:  Okay.  That's all the questions I

23   have.

24        MS. ROPER:  I have no questions.   And

1   Mr. Turner will read and sign.

2        MR. SOLA:  Okay.  I've got to run.  Thank

3   you.

4                  (WHEREUPON, at 3:22 p.m. the

5                  deposition concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24