# EXHIBIT 1

# DEPOSITION OF MICHAEL TURNER

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Charles Edward Steed, individually and
on behalf of others similarly situated, and
Amy Summers, individually and on
behalf of others similarly situated,

                  Plaintiffs,

     vs.

Equifax Information Services, LLC,

                  Defendant.

Case No. 1:14-cv-00437 SCJ ECS

## EXPERT REPORT OF MICHAEL A. TURNER, Ph.D.

TURNER 1
EXHIBIT NO. _____
FOR IDENTIFICATION
DATE: 12-10-2015
RPTR: J. Wiesch

## Table of Contents

A.  Introduction ............................................................................................................1

B.  Qualifications ..........................................................................................................3

C.  Hard Inquiries: A Background ................................................................................7

D.  eOscar: A Brief Overview .....................................................................................11

E.  Equifax's reinvestigation process in response to consumer disputes of inquiries is consistent with established industry practices........................................................12

F.  Expanding Scope of eOscar to Include Disputed Inquiries Likely Impossible: Plaintiffs' Proposed Solution Costly, Disruptive, and Would Dramatically Degrade Data Quality ...........................................................................................................18

G.  Plaintiffs have not demonstrated any harms resulting from the inclusion of the disputed inquiries in their credit files nor are they likely to be able to do so........................24

Appendix A:  List of Materials Relied On.....................................................................30

Appendix B:  Expert Witness Testimony.......................................................................32

Appendix C:  List of Publications .................................................................................33

## A.    Introduction

1.    I have been retained by Equifax Information Services LLC (hereafter "Equifax") to offer my expert opinion regarding the reinvestigation processes of Equifax in response to a consumer dispute of an inquiry (hard and/or soft) listed on their credit report.  I have also been asked to opine on the likely consequences resulting from a change in existing inquiry dispute resolution practices by Equifax—and by extension all three of the nationwide consumer reporting agencies including Equifax, Experian, and Trans Union—in the manner Plaintiffs propose.[1]

2.    My opinions are based upon 17 years of experience and knowledge I have gained as an academic and research analyst in the information industry, specifically as an employee of the Columbia Institute of Tele-Information at the Columbia Business School, the Information Services Executive Council (ISEC) of the Direct Marketing Association, the Information Policy Institute, and the Policy and Economic Research Council (PERC).  The findings presented in this report are also based on my review of documents from this case, research conducted for this report, and secondary research carried out by other organizations.  The materials I have relied on in preparing this report are presented in Appendix A.  I represent that all of the statements and opinions included in this report to be accurate and true to the best of my ability and knowledge at the time I drafted this report.

3.    My opinions are as follows:

---

[1]  Transcript from deposition of Alicia Fluellen, Pg. 169. Transcript from deposition of Gary Poch, Pg. 96. See also: Compl. ¶ 29 "If a consumer disputes an inquiry, Equifax must reinvestigate to determine whether the inquiry actually pertains to that consumer and should be part of that consumer's credit history. As part of the reinvestigation, Equifax must notify the source of the inquiry about the consumer's dispute and provide the source with all the relevant information provided by the consumer. Alternatively, Equifax can delete the inquiry."

4.      *First*, Equifax's reinvestigation process in response to consumer disputes of inquiries is consistent with established industry practices. Inquiries are maintained as a factual record on a consumer's credit report that the credit file was provided to a permissible purpose entity. They can act as an early warning for lenders of excessive credit seeking and as an early warning for consumers of ID theft/fraud. When a consumer disputes an inquiry—without alleging either fraud or mixed file and, in the case of fraud, without supporting documentation, such as a police report—notifying the consumer that the inquiry is accurate as a matter of factual record and providing them with instructions to contact the creditor (the permissible purpose entity that had submitted the inquiry on the consumer's behalf) via the contact information provided is entirely appropriate given the nature of the data element being disputed.

5.      *Second*, changing the current inquiry dispute resolution process in the manner described by the Plaintiffs would be costly to implement, disruptive for data furnishers, and would likely offer no additional benefit to any individual consumer while almost certainly resulting in a contraction in credit access and an increase in the cost of credit.

6.      *Third*, Plaintiffs' Complaint ignores the fact that consumers have additional recourse when disputing an inquiry. Namely, since 2004 Congress has given consumers the right to directly dispute perceived inaccurate information with the data furnisher—including but not limited to permissible purpose entities requesting a credit report via a hard or soft inquiry.  In the Fair and Accurate Transactions Act, Congress recognized that consumers have a vital role to play in improving the accuracy of their credit reports, and further empowered them by providing free annual disclosures to enable and encourage them to review their reports regularly, and by

2

granting direct access by consumers to data furnishers in addition to credit bureaus when they perceived a tradeline or other items of information to be inaccurate and wished to file a dispute.[2]

7.    *Fourth*, Plaintiffs have not demonstrated any harms resulting from the inclusion of the disputed inquiries in their credit files nor are they likely to be able to do so. While a hard inquiry (a request for a credit file by a permissible purpose entity for purposes of credit eligibility determination) can be a factor in a person's credit score, it is generally a minor one, is highly unlikely to have any material impact on an individual's credit standing, and only impacts credit scores (if at all) for a short period of time (typically twelve months or less with the impact decreasing over time).

8.    I have been compensated at an hourly rate of $400 for my work on this matter.  I received assistance from PERC staff on the production of the report.  Any tasks completed for this case by PERC staff was billed at a lower rate contingent upon the function performed (administrative work at $100 per hour, research at $275 per hour for senior researcher and $200 per hour from junior researcher).

**B.    Qualifications**

9.    I have a Ph.D. from Columbia University in International Political Economy. Currently, I am the President and Chief Executive Officer (CEO) at the Policy and Economic Research Council (hereafter "PERC"), an IRS designated 501c3 economic policy research and development organization focusing on issues of financial inclusion, credit access, and economic development. Established in 2002 as the Information Policy Institute, PERC is the only research and development organization in the world that primarily examines the important role played by

---

[2] § 312 (c) of the Fair and Accurate Credit Transactions Act of 2003. Public Law 108-159, 108th Congress, pp. 117 STAT. Downloaded from http://www.gpo.gov/fdsys/pkg/PLAW-108publ159/html/PLAW-108publ159.htm

data and information in facilitating asset building and wealth creation for economically disadvantaged groups in the United States and globally. In this capacity, PERC and its staff members have undertaken the largest and most transparent academically rigorous examination of the accuracy of consumer credit reports in the United States, and the consumer consequences from disputes of inaccuracies in the market for credit.[3] In addition, PERC staff have pioneered economic research methodologies and applications to quantify the social and economic impacts from data contractions (e.g. proposed restrictions on the use of prescriber identifiable data upon prescription drug prices and the quality of health care in the United States, or, the impacts of restricting the quantity or quality of credit information available to consumer or commercial credit bureaus in the US and elsewhere) and data expansions (e.g. the inclusion of non-financial payment data in credit files).[4] PERC research has been used by senior lawmakers and regulators in the United States as the basis for numerous consumer credit and credit reporting policy outcomes, including the permanent reauthorization of the FCRA's seven preemptive provisions in the Fair and Accurate Credit Transactions Act ("FACT Act") of 2003.

10. After the enactment of the FACT Act, at their request, PERC (then the Information Policy Institute) worked closely with senior economists at the FTC on a number of credit reporting policy matters identified by the FACT Act. Specifically, PERC advised the FTC on how to develop a sound methodology for measuring the accuracy of data contained in consumer credit files at credit bureaus. PERC was invited to participate in and, on behalf of PERC, I presented at the "InfoFlows" workshop hosted by the FTC for purposes of gathering input from a range of perspectives on credit file data accuracy and the development of a study to

---

[3] Turner, Michael. Robin Varghese and Patrick Walker. *U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts*. Durham, NC. PERC Press. May 2011.
[4] Turner, Varghese, et al. "The Fair Credit Reporting Act: Access, Efficiency, and Opportunity"; Turner, Varghese, et al. "The Fair Credit Reporting Act: Access, Efficiency, and Opportunity – Part II"; Turner, Varghese, Walker, et al. "Give Credit Where Credit Is Due"; Turner, Varghese, Walker, et al., "The Impact of Provider Identifiable Data on Healthcare Quality and Cost."

assess credit file data accuracy.[5] Following the workshop, PERC was one of a small group of organizations invited by the FTC to submit a proposal for running a credit file data accuracy pilot study, as per the Congressional mandate in the FACT Act.[6]

11.     Over the past 5 years, I have been routinely consulted on a range of consumer credit policy matters by senior members of the U.S. federal government including the White House, (the Council of Economic Advisors and the National Economic Council), the United States Department of Treasury, the Federal Reserve Board of Governors ("FRB") and individual Governors at the FRB, the Federal Trade Commission ("FTC"), the Federal Deposit Insurance Corporation ("FDIC"), the Federal Housing Finance Authority ("FHFA"), and the Government Accountability Office ("GAO"). I was also invited to testify before Congress on matters pertaining to consumer credit reporting.[7] More recently, PERC has been invited by the newly created Consumer Finance Protection Bureau (CFPB) to advise them on the concept design and methodology on Congressionally-mandated studies, as well as a range of issues pertaining to consumer credit reporting.

12. I have advised top government officials from over 24 countries on matters pertaining to consumer credit and consumer credit reporting, and I am a highly sought after advisor and speaker on the international circuit. I have keynoted three of the past four World Consumer Credit Reporting Conferences and have presented at a third. Dun and Bradstreet Australasia—a consumer credit bureau with operations in Australia and New Zealand—recently promoted me as "the world's leading expert on consumer credit reporting" in my capacity as

---

[5] "Information Flows: The Costs and Benefits to Consumers and Businesses of the Collection and Use of Consumer Information," June 18, 2003. Available at: http://www.ftc.gov/bcp/workshops/infoflows/index.shtml
[6] FACT Act § 319
[7] U.S. Congress. House Subcommittee on Financial Institutions and Consumer Credit. "The Importance of a National Credit Reporting System Consumers and the U.S. Economy". (Date: 5/8/2003)

keynote at the 1st and 3rd World Consumer Credit Congresses in Australia.[8] PERC runs the Asia-Pacific Credit Coalition ("APCC") that has as its primary objective the creation of a regional standard for consumer credit reporting in Southeast Asia. In my capacity as administrator of the APCC, I have advised and conferred with senior central bank officials, credit reporting industry executives, financial industry executives, and top bureaucrats from all 21 member economies of the Asia Pacific Economic Cooperation ("APEC").

13. In 2010, I was retained by the Inter-American Development Bank (IDB) to conduct field research on the national credit information sharing system in Mexico, and report to the Mexican Congress, the Mexican central bank, and the IDB my opinion on whether proposed amendments to national credit reporting laws would have the desired effects. In 2011, PERC was retained by the World Bank Group and International Finance Corporation (IFC) to undertake a multi-country, multi-year quantitative analysis of the impacts of credit reporting upon microfinance institutions and the performance and availability of microcredit.  Recently, I have been retained by the Organization of Economic Cooperation and Development (OECD) to review and comment upon the likely competitive effects of recently changed national laws in Mexico pertaining to credit information sharing.

14. In addition to my work with PERC on consumer and commercial credit reporting, I was appointed by Tom Ridge, former Secretary of the United States Department of Homeland Security ("DHS") to serve a two-year term on the first ever Data Privacy and Integrity Advisory Committee ("DPIAC"). In this capacity, I advised the DHS Chief Privacy Officer and Secretary Michael Chertoff on matters pertaining to data accuracy, data integrity, data privacy, and data security. I have also served as an Advisory Board member to the Brookings Institution's Urban

---

[8] World Consumer Credit Congress 2008 and 2011, available at:
http://dnb.com.au/library/scripts/objectifyMedia.aspx?file=pdf/23/23.pdf&siteID=1&str_title=D&B%20Consumer%20Credit%20Conference_program.pdf and http://www.creditcongress.com/2011/zp_agenda.html

Markets Initiative, and worked closely with Brookings staff on projects pertaining to consumer credit reporting and asset building and wealth creation, as well as related projects on commercial credit reporting.

15. Prior to working at PERC, I was the founding Executive Director of the Information Services Executive Council ("ISEC"). ISEC was a research and advocacy group comprised of the nation's largest information services providers including the three national credit bureaus, Time Inc., Dun and Bradstreet, Acxiom Corporation, InfoUSA, ChoicePoint, Lexis-Nexis, and a host of others. Among other responsibilities, a primary task while at ISEC was the generation of empirical studies quantifying the economic value of varying data flows in different sectors.

16. While at PERC, I have authored or co-authored a number of published and unpublished works that concern the data accuracy of US consumer credit reports,[9] as well as the social and economic impacts from modifications to credit information sharing systems. Additional publications I have authored or co-authored are listed in Appendix C.

17. Information concerning my prior expert testimony is listed in Appendix B.

**C.      Hard Inquiries: A Background**

18.      *Hard inquiry* data, data on the access of a consumer's credit file for purposes of an extension of credit, is used in credit scoring models because an empirical relationship between that data and future outcomes of interest (such as delinquencies, defaults, bankruptcies, and the like) have been found. Hard inquiries are different from soft inquiries, which include data on the access of a consumer's credit file by the consumer for review purposes, the review of credit files

---

[9] Michael Turner, Robin Varghese and Patrick Walker, *U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts*, PERC (2011).

for account maintenance, the review of a consumer's credit file for employment and screening, or extending prescreened firm offers of credit. Unlike hard inquiries, soft inquiries can only be seen by consumers and are not used in credit scores for risk assessment. Consequently, soft inquiries are irrelevant to this case as they pose no potential harm to consumers (they are not scored or even seen by third parties, and therefore could not result in denial of credit or other adverse actions). While the Complaint refers to both hard and soft inquiries, the discussion that follows will focus on hard inquiries, since only they can potentially impact risk assessment, with any reference to "inquiries" meaning exclusively "hard inquiries" unless otherwise specified.

19.     What makes the verification of hard inquiry data different than other CRA data is that it is not reported by a data furnisher but rather is collected by a CRA from their interaction with the data users. The inquiry data is unique to each CRA. So, a person's Equifax inquiry data does not actually indicate the number of times a person sought credit but how many times their credit file at Equifax was accessed in seeking credit. This is an important distinction. When a person seeks an auto loan and the lender accesses the consumer's TransUnion credit file, Equifax is not sent inquiry data. This is not an error or an omission. The inquiry data is not intended to capture all credit seeking of consumers, but just the number of times a particular CRA's files were accessed.

20.     FICO, VantageScore and others use hard inquiry data in their models.[10] Credit scoring models are based on empirical relationships. Credit model builders tend to be parsimonious. Consequently, the inclusion of inquiry data in a credit risk model only occurs because it was found to be unique, valuable, predictive information not found in other data elements (such as public records or account tradeline data). That is, inquiry data was found to

---

[10] See http://www.myfico.com/CreditEducation/New-Credit.aspx and
http://www.vantagescore.com/images/resources/VantageScore3-0_WhitePaper.pdf

contain useful information for risk assessment that is not completely substitutable with other data found in a consumer's credit file. As such, the use of inquiry data in credit scoring improves risk assessment, which, in turn, enables sounder lending and increased access to credit.[11]  Past work by PERC also found that the inclusion of particular data elements that improves risk assessment tends to disproportionately increase credit access for those at the credit margins, such as members of lower-income households. This is because those with well-established credit histories see less benefit from the addition of another data element. And higher income consumers also tend to have more collateral and credit options. It is consumers on the margins of mainstream credit and with few assets and lower income who are in most need of accurate risk assessment.[12]

21.    The narrative often used to explain *why* there is a relationship between the number of hard credit inquiries and future negative outcomes, such as delinquencies, is that looking at the number of credit inquiries enables consumers to be identified who are in financial stress and applying for substantial amounts of credit to cover expenses (including debt service). Ultimately, it is not such anecdotal stories but the strong empirical relationship found between data elements (such as number of credit inquiries) and outcomes (such as delinquencies) that drives credit score development and the use of inquiry data. As an example of such a relationship, a FICO webpage notes that "Large numbers of inquiries also means greater risk:

---

[11] Two excellent works on the basics of credit risk modeling and the inclusion/exclusion of discrete variables are were published by past PERC supporters, both of whom I have worked with on credit risk modeling projects. See: Siddiqi, Naeem.*Credit Risk Scorecards: Developing and Implementing Intelligent Credit Scoring*. Wiley. October 17, 2005. See also: Mays, Elizabeth. *Credit Scoring for Risk Managers: The Handbook for Lenders*. CreateSpace Independent Publishing Platform. February 3, 2011.
[12] Turner, Varghese, et al. "The Fair Credit Reporting Act: Access, Efficiency, and Opportunity"; Turner, Varghese, et al. "The Fair Credit Reporting Act: Access, Efficiency, and Opportunity – Part II"; Turner, Varghese, Walker, et al. "Give Credit Where Credit Is Due";

people with six inquiries or more on their credit reports can be up to eight times more likely to declare bankruptcy than people with no inquiries on their report."[13]

22.      Hard inquiries typically have only a minor impact on an individual's credit score. For the VantageScore 3.0 model, a VantageScore white paper points out that "Recent credit" that includes "Number of recently opened credit accounts and credit inquiries," contributes to about 5% of the credit score.[14]   For FICO, a FICO website notes that such "New Credit," accounts for about 10% of FICO scores.[15] Another FICO website notes that "For most people, one additional credit inquiry will take less than five points off their FICO score."[16] However, the exact impact of a hard inquiry on a particular consumer's credit score using a particular model will depend on the particulars of the model and the particulars of the credit file. Also, a particular inquiry may have no impact at all if it is lumped together with other hard inquiries and considered to be part of a consumer "shopping around."

23.      Further unlike account tradelines, collections, or public records that can impact a person's credit score for many years, the impact from credit inquiries (if any) tends to be short lived.  While hard inquiries stay on a person's credit reports for just up to two years (by contrast, tradeline data remains on a credit report for 7 to 10 years), FICO only considers them for one year.[17] And after six months other models may not count them; models that do, such as FICO's, may put less weight on them.[18] So, inquiries generally have only a relatively small and temporary impact. Late payments, bankruptcies, on-time payments, derogatory public records, or the like represent clear positive or negative bill payment habits/financial conditions and are

---

[13] http://myfico.custhelp.com/app/answers/detail/a_id/160/related/1
[14] VantageScore WhitePaper Series, December 2013. See
http://www.vantagescore.com/images/resources/VantageScore3-0_.
[15] See http://www.myfico.com/CreditEducation/New-Credit.aspx
[16] http://myfico.custhelp.com/app/answers/detail/a_id/160/related/1
[17] http://www.myfico.com/CreditEducation/New-Credit.aspx
[18] For a discussion see https://www.creditcardinsider.com/learn/credit-inquiries/ or
http://ficoforums.myfico.com/t5/Understanding-FICO-Scoring/How-many-inquiries-is-too-much/td-p/3266

valuable to consider for an extended period of time. Since the hard inquiries can act as an early

warning of financial stress, they become much less useful six months or twelve months after they

occur because by that point accounts could have opened up with payment histories reported or

the consumer could have had collections, public records, or other account late payments. That is,

a 15 month-old inquiry is of little use since if the inquiry was really indicating near future

negative outcomes, they should have already been manifested and have shown up in other

aspects of the consumer's credit record.

**D.     eOscar: A Brief Overview**

24.     The eOscar system is a Web-based platform for data furnishers (those parties that

report payment data to a consumer reporting agency (CRA) to share data with CRAs about

consumer disputes. It was developed by the three nationwide CRAs (Equifax, Experian, and

Trans Union) and Innovis as a means to enable efficient large-scale dispute resolution.[19] When a

consumer disputes one or more tradeline or account items on their credit report directly with a

CRA, the CRA relays the dispute to the relevant data furnisher or furnishers electronically using

eOscar. The CRA will send the disputing consumers identifying information for matching

---

[19] e-Oscar maintains a Web site that offers the following description: "e-OSCAR is a web-based, Metro 2 compliant, automated system that enables **D**ata Furnishers (DFs), and **C**redit **R**eporting **A**gencies (CRAs) to create and respond to consumer credit history disputes. CRAs include Equifax, Experian, Innovis and TransUnion, their affiliates or Independent Credit Bureaus and Mortgage Reporting Companies. e-OSCAR also provides for DFs to send "out-of-cycle" credit history updates to CRAs. The system primarily supports **A**utomated **C**redit **D**ispute **V**erification (ACDV) and **A**utomated **U**niversal **D**ataform (AUD) processing as well as a number of related processes that handle registration, subscriber code management and reporting. ACDVs initiated by a CRA on behalf of a consumer are routed to the appropriate Data Furnisher based on the CRA and subscriber code affiliations indicated by the DF. The ACDV is returned to the initiating CRA with updated cycle information (if any) relating to the consumer's credit history. If an account is modified or deleted, carbon copies are sent to each CRA with whom the DF has a reporting relationship. AUDs are initiated by the DF to process out-of-cycle credit history updates. The system is used to create the AUD and route it to the appropriate CRA(s) based on subscriber codes specified by the DF in the AUD record. The e-OSCAR AUD process is intended to provide the CRA with a correction to a consumer's file that must be handled outside of the regular activity reporting cycle process. e-OSCAR may not be used to add or create a record on a consumer's file or as substitute for "in-cycle" reporting to the CRAs." Downloaded from http://www.e-oscar.org/about-e-oscar.aspx

purposes to enable to the data furnisher to investigate the disputed piece(s) of information, as well as information about the nature of the dispute (e.g. "Paid on time" or "Not my account"). The data furnisher, after reinvestigating the claim(s) of the disputant, communicates the findings back to the CRA using eOscar, which are usually limited to "Confirmed as accurate," "Delete," or "Modify" with instructions on what should be modified. In summary, eOscar is a platform enabling data furnishers and CRAs to accurately and efficiently communicate facts about disputed information *furnished to CRAs* by data furnishers. Consequently, eOscar does not have a mechanism for transmitting disputes about inquiries as (among other reasons) they are not furnished pieces of information, nor are they always generated as a result of interactions between data furnishers and CRAs, as is discussed in more detail below.

### E.   Equifax's reinvestigation process in response to consumer disputes of inquiries is consistent with established industry practices.

25.     Equifax, Experian, and TransUnion have highly similar procedures for handling disputed inquiries. At the core of their policies is the shared definition of an inquiry as a factual record. In an industry with data collection, storage, manipulation, and transmission as core business lines, precisely defining data elements is essential. That all CRAs consider inquiries as factual records should not be taken lightly. They do this for good reasons. To begin with, unlike tradeline/account information, public records, and other pieces of data on a consumer credit report, inquiries are not considered to be "furnished" information, but are generated as a consequence of an action taken by a specific CRA—namely, the disclosure of a credit report to an inquirer. The only information that is provided to Equifax in connection with an inquiry is the identifying information for the individual consumer and the inquiring company's subscriber code.  Additionally, CRAs have a set of unique and compelling incentives to maintain highly

accurate records of all inquiries. First, CRAs are legally bound by the FCRA to maintain such a record and are regularly audited for compliance. Second, CRAs are contractually obligated to maintain such a record as per their agreements with permissible purpose inquirers. Third, inasmuch as the very business model of a CRA is predicated upon tracking credit report disclosures—credit reports are sold individually, and on a subscription basis, both of which require accurate records of disclosures—the CRAs are vested in ensuring a highly accurate record. In combination, then, the regulatory, legal, and market incentives unique to CRAs all contribute to ensuring that accurate records of inquiries are maintained.

26.     While the core principle undergirding the inquiry dispute resolution policies of the large market CRAs is universal, there are some minor differences among them in how certain types of inquiry disputes are handled. For example, when a consumer disputes an inquiry and asserts that the disputed item is the result of identity theft or identity fraud, some CRAs may require supporting documentation (e.g. a communication from the inquirer supporting the consumer's assertion, a valid police report, and/or a CFPB affidavit) while some may not require it. Similarly, with disputes of inquiries attributed to allegedly mixed files, some CRAs may permit such disputes online, while other CRAs may not allow an online challenge and instead direct the consumer to call or write to the CRA.

27.     The following table summarizes the procedures Equifax uses when they receive a dispute over inquiry data.

| Mixed File | Fraud/ID Theft | Not Mine/Other |
|---|---|---|
| If the disputed inquiry corresponds to a trade account that is or has been suppressed, the inquiry will be removed | If the disputed inquiry corresponds to a trade account that is or has been suppressed, the inquiry will be removed | If the consumer contacts Equifax via telephone, the consumer is informed that: (a) a third party may access the Equifax credit file to assist in the underwriting of the request for credit; (b) an application to obtain certain services, such as utilities, generally allows the company to make a credit inquiry; and (c) a signed application or affirmative consent to pull credit is not required if you have indicated you are applying for credit ((c) not applicable in VT) |
| If the corresponding trade account appears on the other consumer's file, the inquiry will be removed | If the consumer provides a copy of a valid police report, identity theft report, affidavit of fraud or a medical note signed by a treating physician that the consumer was a victim of fraud and was incapacitated during the time the fraudulent activity occurred, the inquiry will be removed | If the consumer contacts Equifax via telephone, the consumer will receive a written letter that inquiries are a factual record of file access |
| If the consumer is a confirmed mixed file, the inquiry will be removed | If the consumer is a confirmed fraud victim, the disputed inquiry will be deleted from the credit file | If the consumer contacts Equifax online or via mail, the consumer will receive a written letter that inquiries are a factual record of file access |
| If the disputed inquiry does not meet the above criteria, the consumer is informed that inquiries are a factual record of file access | If the disputed inquiry does not meet the above criteria, the consumer is informed that inquiries are a factual record of file access | |

14

28.      There is a clear logic to the procedures. First, in the case of a mixed file, Equifax works to examine and resolve the issue in-house, essentially by verifying that there was indeed a mixed file and then working to remove inquiries associated with another consumer and/or with trade lines that are removed or on another consumer's credit file.

29.      In the second column, where Fraud or ID theft is claimed, an inquiry can be removed if a valid police report (or other valid documentation) is submitted. This is reasonable since there is a real penalty for submitting a false police report and so consumers would be less likely to try to game the credit reporting system by submitting false police reports. CRAs, such as Equifax, would also want to have minimum standards for a report to be classified as valid to deter individuals from creating documents that looked like official police reports and so to make the reports verifiable, etc.

30.      For instances in which Fraud or ID theft is claimed and there is also a trade line associated with the inquiry, if the trade line/account is removed due to fraud, then the attendant inquiry would be as well. This process takes advantage a verification of fraud on a trade line/account. This efficiently and logically uses the fact that an account may be linked to a specific inquiry, so if the account is verified as existing due to fraud and removed, so too would the inquiry.

31.      For instances in which Fraud or ID theft is claimed and there is no account reported related to inquiries, taking advantage of a dispute for accounts or collections is not possible or could at least be highly problematic. Obviously, if there is no account or collection, the dispute mechanism for accounts or collections cannot be used. But, even in the case where there is a collection (with no account), it would not seem possible to have a general rule that uses

15

a dispute claiming fraud for a collection to also impact possible related inquiries. Collection accounts can be sold multiple times to multiple entities and can even combine different debts from different creditors. These facts mean that linking an inquiry to a specific account is challenging, thereby complicating a general rule linking the two together in a dispute resolution process. Also, part of fraud and ID theft is account takeover. An account could have been opened legitimately by a consumer (with a hard inquiry) but then taken over (account take over fraud versus new account fraud) and ultimately result in a collection. In this case, a collection could be disputed due to fraud, but the opening of the account in the first place should not be disputed/removed. So, with collections, unlike creditor accounts, there is much less of a clear relationship between their existence and the existence of inquiries. Thus, for cases of alleged fraud but with no accompanying documentation (to verify claims) or a disputed account (which can act to verify claims), consumers are directed to contact the creditor, who would have more relevant information and be in a better position to resolve the issue (and potentially be alerted of fraud). For cases that do not involve mixed files or ID theft/fraud, it would also be the case that consumers are directed to contact the creditor, who would have more relevant information and be in a better position to resolve the issue.

32.     Therefore, industry standards for resolving inquiry disputes are characterized by a logical division of effort predicated upon the nature of the dispute. If there is an alleged mixed file, then the CRA (in this case Equifax) removes the inquiries if (a) it corresponds to a trade line that is or has been removed, (b) the associated trade line appears on another person's credit file, or (c) if the person is confirmed to have a mixed file. In instances in which it is determined that the consumer's file was accessed as a result of fraud, then the inquiry would be removed if a valid police report/documentation is supplied or an account associated with the inquiry is

16

removed due to the fraudulent activity. Barring these events, and given the fact that the consumer's file was truly accessed, then the CRA would not delete the inquiry in the resolution of the dispute but instead would direct the consumer to the inquirer who would likely be in a better position to investigate the consumer's claims. A consumer could be claiming fraud or not mine because they don't recognize or remember the name of a party initiating an inquiry or truly because of fraud. In either event, it would seem logical that the consumer contact the party initiating the inquiry directly to determine whether access was indeed unauthorized.[20]

33.     It is also important to note that many inquirers-entities with an FCRA permissible purpose that may access consumer credit reports-are generally not data furnishers. Examples of such entities include energy utility companies (gas, water, electric, heating oil), media companies (wireless and wireline telecommunications service providers, cable and satellite television service providers, Internet service providers), certain types of insurance companies, landlords, and employers. As a consequence, some of these types of firms may not participate in either Metro2 (the platform and standards for furnishing tradeline information to CRAs) or eOscar (the platform for communicating information about consumer disputes), about which more will be discussed below.

34.     Within the United States, the three Nationwide CRAs (Equifax, Experian, and Trans Union) are classified as large market actors by the Consumer Finance Protection Bureau (CFPB), the oversight and rulemaking agency with jurisdiction over the credit reporting industry. As such, they are subjected to intense and ongoing scrutiny by the CFPB. The CFPB has publicly

---

[20] Section 312(c) of the Fair and Accurate Credit Transactions Act (FACTA) amended Section 623(a) of the Fair Credit Reporting Act to enable consumers to directly dispute an item on their credit report with the data furnisher. In granting consumers this right, Congress recognized that there may be a range of scenarios in which a consumer reporting agency is not optimally positioned to verify the accuracy of a disputed piece of information, and that a more effective dispute resolution system involves a degree of disintermediation by removing the CRAs as the proverbial middle man between the consumer and the data furnisher. Fair and Accurate Credit Transactions Act of 2003. Public Law 108-159, 108th Congress, pp. 117 STAT. Downloaded from http://www.gpo.gov/fdsys/pkg/PLAW-108publ159/html/PLAW-108publ159.htm

proclaimed that ensuring consumer credit report data quality is a top priority and has undertaken several key rulemaking proceedings in that regard.

**F.      Expanding Scope of eOscar to Include Disputed Inquiries Likely Impossible: Plaintiffs' Proposed Solution Costly, Disruptive, and Would Dramatically Degrade Data Quality**

35.     As was discussed above, there are good reasons why it is not practical to follow the same dispute procedures for inquiry data as for tradeline information and simply treat the inquirer as the *de facto* data furnisher. First, CRAs often have specific requirements, expectations, audits, and the like for data furnishers that they do not have for inquirers. A very small credit union or community lender that is not big enough to fully report account data to multiple CRAs cost-effectively may nonetheless perform credit checks on applicants as a user. Expecting such small users to then create business processes to handle automated disputes is impractical and economically infeasible.[21] In addition, fear over data furnisher obligations and associated legal implications may also dissuade small and even some larger credit data users that are not furnishers or full-file furnishers from using credit data (see discussion below on top of page 24 and footnote 28). If making the user's role more burdensome did reduce credit report usage this would not only impact the business of CRAs but also impact risk assessment and consumers. It is better to simply treat credit inquiry data as a separate type of data from public records, collections, and tradeline account data, which have clear data furnishers with clear roles and obligations. This does not mean that there should be no procedures in place for verifying the

---

[21] I have had discussions with small property management firms about furnishing data to CRAs and was repeatedly told that the cost benefit analysis was not favorable for participation. If this is true for data furnishing—were there are documented benefits to furnishers in terms of reduced delinquencies, charge offs, and improved cash flow—then it is even more the case for costs associated with participating in just a dispute resolution system. Interestingly, these same beliefs are deterring participation in the national credit information sharing system by larger energy utility companies (that are inquirers but not data furnishers) and media firms (cable TV, broadband, wireless and wireline telephone service providers that are also inquirers and mostly not furnishers). See: Turner, Michael A. Robin Varghese, Patrick Walker. *Credit Reporting Customer Payment Data*. Chapel Hill, NC. PERC Press. April 2009.

inquiry data elements—just that they be appropriate and reasonable. That Congress empowered consumers with the right to directly dispute credit report data with data furnishers—effectively disintermediating CRAs from some portion of consumer disputes—reflects Congressional awareness of the need to more directly involve data furnishers to increase the accuracy of credit report data (Title III of the Fair and Accurate Credit Transactions Act of 2003 or FACTA, in which Section 312 is found, is titled "Enhancing the Accuracy of Consumer Report Information").[22] Implicit in this policy change is Congressional recognition that some inaccuracies may caused by data furnishers (key stroke errors, systems glitches resulting in mixed files) and that having consumers directly communicate with the furnishers to resolve disputes may make the system more effective (by disintermediating the CRAs) and the data more accurate (by increasing the incentive of furnishers to focus on accuracy as a means of controlling customer service costs).

36.     Because inquiries are not furnished information, they have not been included in the industry-wide platform for dispute resolution, nor would it make sense to do so given that inquiries are endogenous to a CRA. The present inquiry dispute resolution system is well structured to handle the two primary types of inquiry disputes lodged by consumers—disputes over the accuracy of an inquiry and disputes over the ownership of an inquiry. Consumers dispute inquiries directly with the individual CRA regarding the *accuracy* of the inquiry— whether or not the inquirer received a disclosure on a given consumer—as the CRA is the data source. For disputes about the *ownership* of the inquiry—whether or not the data subject authorized the inquiry, or whether it was the product of fraud —could be taken either to the CRA (and would be modified should supporting documents be provided and validated) or directly to

---

[22] Op. Cit.

19

the inquirer (again, in many cases the inquirer is not also a data furnisher) for further

consideration. In such cases, the inquirer is better positioned to assess the merits of the disputed

inquiry, as lenders with "Know Your Customer" requirements maintain application data, for

example. In short, as inquiries are not furnished to CRAs but rather are internally generated by

CRAs, they are the logical place for consumer disputes to be lodged and investigated internally.

This data appropriately lies outside of the eOscar platform because it is neither furnished nor

entirely generated via transactions between data furnishers and CRAs. Even so, disputing

consumers are provided with contact information for the relevant inquirer(s) and have the right to

contact them to substantiate their claims. However, absent supporting evidence or documents—

from the inquirer, from a police department—removal of the disputed inquiry by a CRA based

solely on an assertion would be irresponsible and harmful.

37.     Given the options already available to consumers as discussed in the prior

paragraph, and the complexities and costs associated with designing and implementing the

Plaintiffs' proposed solution, modifying e-Oscar to automate the notification and routing of

inquiry disputes to creditors / data users would likely yield little benefit to consumers for

significant costs for many parties. For cases in which the consumer simply does not remember or

recognize the party initiating the inquiry, the consumer would no doubt be unsatisfied with an

automated response from a furnisher that the inquiry was accurate. For more complicated matters

involving fraud (but no police report or account disputed) the party initiating the inquiry would

likely first want to verify that the consumer didn't simply not remember or recognize the inquiry

and then want to have a more interactive exchange with the consumer. As such, adding an

automated dispute component that contacts parties initiating inquiries appears to provide minor

or uncertain consumer benefits relative to consumers simply contacting the inquiry initiating parties directly.

38.     As opposed to the minor or uncertain benefits from increased automation of inquiry disputes, the costs and disruptions involved could be significant. First, end users/inquirers that are not data furnishers may not relish the thought of needing to accommodate an automated system and needed business processes. The current credit reporting infrastructure (for furnishers and end users including inquirers) has been developed for long-established practices, in which non-furnisher users (inquirers) were not contemplating the need for automated dispute resolution systems and processes.

39.     Indeed, as I discussed above, there are good reasons to believe that in a voluntary credit reporting system—such as that in the United States—many data furnishers and inquirers would exit the system should the perceived costs of participation become to onerous; especially smaller inquirers and data furnishers. The larger data users that are not furnishers would no doubt need to create automated systems on their end to handle the automated disputes received, which could take significant time and resource to implement, particularly if legacy systems and separate systems are involved.  Smaller inquirers and data furnishers, by contrast, largely lack the capacity and wherewithal to participate in an automated dispute resolution system and would simply alter their business practices to avoid the costs.

40.     Just sending automated inquiry disputes to data users that are also data furnishers may not be effective or cost efficient, either. First, sending automated inquiry disputes to some parties but not others may create confusion with consumers. But, potentially, the bigger issue may be that large organizations that currently are data furnishers to CRAs can't simply report or exchange *any* data elements that they may have with current systems. In fact, it is typical for

21

application databases to be separate from databases for credit accounts. The credit account databases were typically designed to facilitate or connect to databases for purposes of data furnishing and automated dispute resolution purposes. As such, while reporting a new data element or modifying automated dispute handling on a credit accounts could *potentially* involve relatively minor re-coding or re-programming, enabling automated dispute resolution using separate data systems not designed for that combined with business processes not designed for that type of data would likely involve more substantial costs and disruptions. Such additional costs for data furnishers or non-data furnisher users could dissuade credit data furnishing and usage with the accompanying degradation is risk assessment.

41.    In addition to the above, implementing the solution proposed by the Plaintiffs carries additional complexities that render it further impractical. There would be substantial costs at the CRAs associated with getting industry consensus on the definition of the fields, achieving agreement on the inquiry dispute resolution procedures, and direct costs for both CRAs and eOscar participants around the requisite change of systems. These are significant hurdles that could make the proposed reform a lengthy and costly undertaking. The development of eOscar took considerable time and, moreover, was based on shared practices in place before eOscar was implemented, i.e., that were already in place. The fact that there would be costs associated with process changes means that consensus would be slow in coming, if at all possible.

42.    Despite these obvious challenges, Plaintiffs assert that the alleged inadequacies with the current way in which consumer disputes of inquiries are managed would be largely addressed by simply treating inquiry disputes the same as tradeline disputes (e.g. disputes of accounts such as mortgage loans or credit cards). While deposing Equifax employee Gary Poch,

22

counsel for the named plaintiffs puts forward the case for expanding the scope of eOscar to include inquiry disputes.[23]

43.     Even assuming that the plaintiffs' proposed solutions to the alleged problem were feasible—and I have established elsewhere in this report that such a modification is neither necessary nor feasible from both an economic and business process perspective—the most likely result of the proposed modification to eOscar would be a dramatic reduction in the quantity and quality of inquiry data in the repositories maintained by the nationwide consumer reporting agencies.

44.     As is well established in both theoretical and empirical economic literature, any reduction in the ability of a lender to assess a borrower's credit risk (as would be the case should accurate inquiry data be deleted) will result in a contraction of credit and an increase in the price of credit access to offset the adjusted risk premium.[24] Given the credit contraction and increased price of credit resulting from the reduced quantity of accurate inquiry data, both borrowers and lenders will be negatively impacted.  Higher prices for credit would further attract relatively riskier borrowers, adding further pressure to the safety and soundness of the national financial system.

45.     As has also been well-documented in empirical economic research, given an erosion in the ability of lenders to distinguish between goods (low-risk borrowers) and bads (high-risk borrowers), those most likely to be negatively impacted are lower-income persons, members of minority communities, and the credit inexperienced. Analysis conducted by PERC around the Fair and Accurate Credit Transactions Act (FACT Act) linked dramatic reductions in

---

[23] Poch deposition. Pg. 96. To accomplish what the Plaintiff's state Equifax must do, either eOscar would need to be modified or Equifax would need to design and implement an entirely new and separate process to fulfill this. The stated solution can be found in the Original Complaint in paragraph 29. Original Complaint of Charles Steed and Amy Summers v. Equifax Information Services. Civil Action 1: 14-cv-0437.

[24] Stiglitz, Joseph and Weiss. "Credit Rationing in Markets with Imperfect Information." *The American Economic Review*. Vol. 71, No. 3. June,1981. Pgs.393-410. Downloadable at http://www.jstor.org/stable/1802787

credit access to reductions in predictive data (e.g. removing late payment data after 3 or 5 years instead of 7 to 10, not reporting payments as late until 60 days instead of 30).[25] Lenders too will be harmed. Margins will be eroded as portfolio performance declines. Growth opportunities are constrained as lenders must choose between margins (that can be increased by being a more selective lender) and expansion that carries higher risk and lower profits.

**G.     Plaintiffs have not demonstrated any harms resulting from the inclusion of the disputed inquiries in their credit files nor are they likely to be able to do so.**

46.     Neither of the named plaintiffs asserts actual damages linked to the inclusion of disputed inquiries. Only named plaintiff Summers believes that inquiries may have resulted in a credit card rejection or an increase in her re-fi rate.[26] In the case of the credit card rejection, plaintiff Summers did not produce an adverse action notification with a reasons code section, nor could she verify that the card issuer cited the presence of the disputed inquiries or even used an Equifax credit report for its decision making. Further, depending upon when in 2012 she applied for the credit card, the impact of the two disputed inquiries on her credit score would have been negligible as the impact diminished greatly after the first year. Regarding her re-financed residential mortgage loan, she did not produce an adverse action notification with a reasons code section from CitiMortgage, but claims that the frequency of inquiries was an issue cited by a loan officer as a reason for the increase in the mortgage rate. Given that named plaintiff Summers applied for the re-fi jointly with her husband, there is no way to know whether the inquiries cited by the loan officer were hers or his, or a combination of both. Further, without access to both of

---

[25] For example, in the most extreme scenario modeled, it was found that delinquency rates could increase as much as 70% and as many as 41 million persons would be denied access to credit. See: Turner, Varghese, et al. "The Fair Credit Reporting Act: Access, Efficiency, and Opportunity." Washington DC. The United States Chamber of Commerce, National Chamber Foundation. June, 2003; Turner, Varghese, et al. "The Fair Credit Reporting Act: Access, Efficiency, and Opportunity – Part II" New York City. The Information Policy Institute. August, 2003.
[26] See Deposition Transcript of Amy Summers ("Summers Tr.") at p. 111 for credit card rejection and pp. 49-50, 177-78 for increase in her refinance rate.

their credit reports from when the applied for the re-fi and when the terms of the loan were finalized (a lender typically pulls a tri-merge three times during the loan application process, as per guidelines from Freddie Mac and Fannie Mae), it is impossible to know which of the myriad variables considered by the lender could have resulted in the modest increase in the re-fi rate for named plaintiff Summers. As named plaintiff Summers notes, the rate received was, nonetheless, better than her current rate.[27]   Named plaintiff Steed does not allege actual damages from the inclusion of the disputed inquiry on his Equifax credit report.[28]

47.     The inescapable conclusion to draw from the experience of the named plaintiffs is that the inclusion of a single or a small number (2 or 3) of disputed inquiries over has little impact on a consumer's credit risk profile. More specifically, soft inquiries aren't shared with third parties and therefore are not scored. Hard inquiries, by contrast, are shared with permissible purpose parties but typically have only a minor impact on an individual's credit score. For example, in the VantgeScore 3.0 model, "Recent credit" that includes "Number of recently opened credit accounts and credit inquiries," contributes to about 5% of the credit score.  This means that the presence of inquiries not attached to a recently opened account—as would be the case for all of the inquiries disputed by the two named plaintiffs—accounts for fraction (likely a small one) of the 5% for this category of information.  Evidence of this comes from FICO, that notes that "New Credit," accounts for about 10% of FICO scores, while further noting that "For most people, one additional credit inquiry will take less than five points off their FICO score."  Simple math suggests that 10% of a FICO score (the highest possible score on FICO 9 is 850) could be as much as 85 points, so a 10-point impact would account for just above 1% of a FICO score on the high end.  However, the exact impact will depend on the particulars of the

---

[27] See Summers Tr. at p. 154
[28] See Plaintiff Charles Steed's Responses and Supplemental Responses to Defendant Equifax Information Services LLC's First Set of Interrogatories

credit file. As was noted earlier, a particular inquiry may have no impact at all if it is lumped together with other hard inquiries and considered to be part of a consumer "shopping around." Further, the impact from credit inquiries tends to be short lived. While hard inquiries stay on a person's credit reports for two years, FICO only considers them for one year. And after six months other models may not count them or in models that do, such as FICO's, may put less weight on them. In sum, the presence of a single hard inquiry or a small number (2-3) of hard inquiries has at most only a modest and short-lived score impact, and is extremely unlikely to materially affect a person's credit standing.

48.     It is worth noting that the FTC found a material impact rate of 2.2% for modifications to credit report information resulting from disputes generally, including disputes about tradeline, collection, and public record information, and hard inquiries.[29] Overall, about 19.1% of credit reports contained some sort of potential material error alleged by the consumers. When these errors were verified and corrected, many produced little to no change in the consumers' credit scores. Only, roughly, one-in-nine resulted in a 25 or more point increase in the credit score or a change in the risk band (such as moving from subprime to prime). That is, about 2% of credit reports contained one or more alleged errors that resulted in credit score changes that could be material. If the practical gauge of accuracy are errors that result in changes to the consumer's risk, then 98% of credit reports are accurate. A PERC study found that around 1% of credit reports witnessed a 25+ point score change when disputes were resolved, and when

---

[29] *FTC Report to Congress under Section 319 of the Fair and Accurate Credit Transactions Act of 2003, Federal Trade Commission.* Available for downloading at https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf

adjusted for possible methodological differences between the two studies this rate rose to about 1.9%, which is statistically identical to the FTC's finding.[30]

49.     It bears repeating that these are for disputes of all types, the majority of which were either header data (that does not affect a person's credit score) and tradeline data. Narrowing the focus to disputes of data that had potentially material impacts, including hard inquiries, the overwhelming majority of disputes were either tradeline or collections accounts, with hard inquiries barely registering.[31] The FTC study found just over 1% of credit reports examined contained disputed inquiries (hard and soft) that were modified. By contrast, 9% of reports examined had tradeline disputes that were modified, and roughly 5% had collections disputes resulting in a modification.[32] Given the overall modification rate of 6.6% for all disputed information in the FTC's study, and the short-lived and relatively modest impact of a hard inquiry on a person's credit standing, the material impact rate for verified inaccurate inquiries is most likely well below the 5.2% rate found in the FTC study. Participating consumers in the FTC study found alleged errors among hard inquiries in 48 of the nearly 3,000 credit reports examined (about 1.6% of reports). In fact, just 34 of 584 modifications resulting from disputes of potentially material data were inquiries.[33] The 1.6% alleged error rate for hard inquiries can include actual errors as well as mistakes consumers may make (such as not remembering a particular credit pull or knowing the name of the creditor that pulled the report).

50.     Given the relatively small impacts of inquiry data, it stands to reason that a far smaller portion than 1-in-9 of the 1.6% credit reports with alleged inquiry data errors would have

---

[30] Turner, Michael A. Robin Varghese, Patrick Walker and Sukanya Chaudhuri. *Comparing FTC and PERC Studies on Measuring the Accuracy of U.S. Consumer Credit Reports*. PERC Press. Durham, NC. 2013.  The FTC separately confirmed that their results were comparable with those of the earlier PERC study. See FTC Section 319 Report, Pg. ii.
[31] FTC Section 319 Report. Pg V.
[32] Op. Cit. Pg. 51.
[33] Op. Cit. Pg. 51.

25+ point score changes or credit tier/band changes as a result of the modification of the inquiry data alone. That is, far fewer than 1-in-500 or 0.18% of credit reports. As such, the overall accuracy of credit inquiry data and the likely resulting impacts of the inaccuracy do not appear to be major problems for consumers or the lending system.

51.     On the other hand, as shown above, hard inquiries aid in risk assessment, which likely increases access to credit for consumers, and provides consumers with an ability to detect ID Theft and Fraud quickly. As such, hard inquiries resulting from fraud can be a very useful to consumers as an early warning for ID theft/fraud. As such, the fact that inquiries that result from fraud appear on a consumer's credit report really should not be considered an error in the same way that an incorrect inquiry resulting from a mixed file might appear on a consumer's credit report. The mixed file case a represents a classic error that CRAs work to prevent from occurring in the first place. This is not the case with inquiries resulting from fraud, which accurately show that the consumer's credit file was accessed and act as an early warning light for the consumer. Free consumer services, such as Credit Karma, as well as for-pay ID fraud and theft detection services, such as LifeLock, use this data to send consumers alerts. So, one would not want inquiries resulting from fraud *not* to show up on credit reports.

52.     Taken together, the facts that neither of the named plaintiffs experienced any demonstrable credit market harms as a direct result of the inclusion of disputed inquiries in their credit reports, and that the presence of a single hard inquiry or small number of hard inquiries (2 or 3) in a person's credit report is unlikely to have much impact on their credit score (roughly 10% or less, compared to approximately 35% for credit history, 30% for amount owed versus available credit or "utilization rate," 15% for length of credit history, and 10% for newly opened

accounts)[34] and even less likely to hold any material impacts on their credit standing by moving them into a higher or lower credit risk tier—one is hard pressed to understand the merits of the plaintiff's case.[35]

     53.    Put differently, given (1) the high rate of accuracy of credit file data generally; (2) the inconsequential impact of a single hard inquiry or small number of hard inquiries (2 or 3) on a person's credit standing; (3) that inquiries are not furnished to nationwide CRAs and are likely even more accurate than tradeline data; (4) the fact that inquiries associated with fraudulent and mixed file accounts are removed when identified as such by consumers and supported by a police report; and (5) the infeasibility of Plaintiffs' proposed solution (expanding eOscar to include disputed inquiries and to enroll all credit report end users as eOscar participants), a beneficial outcome for any party resulting from Plaintiffs' proposed solution is impossible to establish and defend either by logic or fact.

_Michael A. Turner_

Michael A. Turner

---

[34] FICO generic score ratios downloaded from http://www.myfico.com/crediteducation/whatsinyourscore.aspx
[35] Turner, Michael A. Robin Varghese, Patrick Walker. *U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts.* PERC Press. Durham, NC. May, 2011. Available for download at http://www.perc.net/wp-content/uploads/2013/09/DQreport.pdf .

**Appendix A:  List of Materials Relied On**

I relied on the following documents and materials in forming my opinions:

*Steed and Summers, et al. v. Equifax Information Services LLC*:

1.      Deposition transcripts for Plaintiffs Steed and Summers

2.      Deposition transcripts for Equifax corporate representatives Gary Poch, Dan Parzych and Alicia Fluellen

3.      Corporate Policies and Procedures

4.      Dispute Policy Handbook 2008

5.      Mixed File Policy Manual 2010

6.      Mixed Files Policy Manual 2012

7.      Mixed Files Indicating 2012

8.      Mixed File Policy Manual 2013

9.      Mixed File Policy Manual 2014

10.     Mail Indicating Manual 2013

11.     Mail Indicating Manual 2014

12.     Fraud Participant Workbook 2012

13.     Fraud Participant Workbook 2013

14.     Fraud Policy Manual 2010

15.     Fraud Policy Manual 2012

16.     Training Participant Notebook

17.     Dispute Policy Handbook 2010

18.     Policy Update on Inquiry Disputes

19.     Policy Addendums – Inquiries   Dated July 23, 2015

20.     Plaintiff Charles Steed's Responses and Supplemental Responses to Equifax Information Services LLC's First Set of Interrogatories

21.    Plaintiff Amy Summers' Responses and Supplemental Responses to Equifax Information Services LLC's First Set of Interrogatories

22.    Defendant Equifax Information Services LLC's Objections and Responses to Plaintiff's Interrogatories to Equifax


Other Documents

1.   Fair and Accurate Credit Transactions Act of 2003. Public Law 108-159, 108th Congress, pp. 117 STAT.
2.   Turner, Michael. Robin Varghese and Patrick Walker. *U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts.* Durham, NC. PERC Press. May 2011.
3.   Turner, Varghese, et al. "The Fair Credit Reporting Act: Access, Efficiency, and Opportunity." The Chamber Foundation of the United States Chamber of Commerce, Washington, DC. 2003.
4.   Turner, Varghese, et al. "The Fair Credit Reporting Act: Access, Efficiency, and Opportunity – Part II." Information Policy Institute. New York City. 2003.
5.   Turner, Varghese, Walker, et al. "Give Credit Where Credit Is Due." The Brookings Institution, Washington, DC. December, 2006.
6.   Turner, Michael A. Robin Varghese, Patrick Walker. *Credit Reporting Customer Payment Data.* Chapel Hill, NC. PERC Press. April 2009.
7.   Turner, Michael A., Robin Varghese and Patrick Walker, *U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts*, PERC (2011).
8.   Turner, Michael A. Robin Varghese, Patrick Walker and Sukanya Chaudhuri. *Comparing FTC and PERC Studies on Measuring the Accuracy of U.S. Consumer Credit Reports.* PERC Press. Durham, NC. 2013.
9.   Siddiqi, Naeem.*Credit Risk Scorecards: Developing and Implementing Intelligent Credit Scoring.* Wiley. October 17, 2005.
10.  Mays, Elizabeth. *Credit Scoring for Risk Managers: The Handbook for Lenders.* CreateSpace Independent Publishing Platform. February 3, 2011.
11.  http://myfico.custhelp.com/app/answers/detail/a_id/160/related/1
12.  http://www.vantagescore.com/images/resources/VantageScore3-0_WhitePaper.pdf
13.  from http://www.e-oscar.org/about-e-oscar.aspx
14.  *FTC Report to Congress under Section 319 of the Fair and Accurate Credit Transactions Act of 2003, Federal Trade Commission.*
15.  Stiglitz, Joseph and Weiss. "Credit Rationing in Markets with Imperfect Information." *The American Economic Review.* Vol. 71, No. 3. June,1981.

**Appendix B:  Expert Witness Testimony**

I testified in federal district court for *IMS Health Inc. v. Rowe.* (Maine District Court, Case CV-07-127-B-W, Testified December 2007).  My testimony focused on the appropriate social scientific methodology for measuring the impacts of restricting the commercial use of prescriber identifiable data.

I testified in federal district court for *IMS Health Inc. v. Sorrell.* (Vermont District Court, Case 2:2007cv00188, Testified July 2008).  My testimony focused on the appropriate social scientific methodology for measuring the impacts of restricting the commercial use of prescriber identifiable data.

I provided an expert report in *Harris vs. Trans Union* (District Of South Carolina, Greenville Division, Civil Action No. 6:-6-cv-01811-GRA, Submitted January 2009).  My report concerned the provision of an impact analysis to measure the effects of including or excluding credit limit information in credit files on the credit scores using various credit-scoring models on a sample of Capitol One cardholders, using widely-used credit scoring models.  I also discussed the issue of data accuracy as it pertains to consumer credit reporting, and potential harm that may result from the inclusion of inaccurate data in a consumer's credit file.

I submitted an expert report in *David L. Jackson, Sr vs. Trans Union* (District of Oregon, Case No. 3:08-cv-08-0060-MO, Submitted October 2009).   My report concerned whether the defendant acted as required by the FCRA dispute resolution system and regarding the effectiveness of the FCRA dispute system.

**Appendix C:  List of Publications**

Michael Turner and Patrick Walker, *Predicting Financial Account Delinquencies with Utility and Telecom Payment Data*, PERC (2015).

Michael Turner, Michael Staten, and Patrick Walker, *Is CROA Choking Credit Report Literacy?*, PERC (2015).

Michael Turner, Robin Varghese, and Sukanya Chaudhuri, *Research Consensus Confirms Benefits of Alternative Data*, PERC (2015).

Michael Turner, Patrick Walker, Robin Varghese, and Sukanya Chaudhuri, *The Impacts of Information Sharing on Competition in Lending Markets*, PERC (2014).

Michael Turner, Patrick Walker, and Robin Varghese, *Credit Bureaus in Emerging Markets: Overview of Ownership & Regulatory Frameworks*, PERC (2014).

Michael Turner, Patrick Walker, Robin Varghese, and Sukanya Chaudhuri, *Comparing FTC and PERC Studies on Measuring the Accuracy of U.S. Consumer Credit Reports*, PERC (2013).

Michael Turner, Patrick Walker, Robin Varghese, Sukanya Chaudhuri, and Walter Kitchenman, *A Reexamination of Who Gains and Who Loses From Credit Card Payments*, PERC (2013).

Michael Turner, Patrick Walker, Robin Varghese, and Sukanya Chaudhuri, *The Credit Impacts on Low-Income Americans from Reporting Moderately Late Utility Payments*, PERC (2012).

Michael Turner, Patrick Walker, Robin Varghese, Joseph Duncan and Sukanya Chaudhuri, *Credit Impacts of More Comprehensive Alternative Data Credit Reporting in Australia and New Zealand*, PERC (2012).

Michael Turner, Patrick Walker, Robin Varghese and Sukanya Chaudhuri, *A New Pathway to Financial Inclusion: Alternative Data, Credit Building, and Responsible Lending in the Wake of the Great Recession*, PERC (2012).

Michael Turner, Robin Varghese, and Patrick Walker, *U.S. Consumer Credit Reports: Measuring Accuracy and Dispute Impacts*, PERC (2011).

Michael Turner, Robin Varghese, and Patrick Walker, *Louisiana Small Businesses Five Years Post-Katrina: Assessing LDRF Program Impacts and Measuring Existing Needs*, PERC (2011).

Michael Turner, Robin Varghese, and Patrick Walker, Assessment of Small Business Aid and Needs in Louisiana Five Years After Hurricane Katrina: Overview of Case Studies, PERC (2011).

Michael Turner, Robin Varghese, and Patrick Walker, *The Economic Consequences of Credit Information Sharing*, Organization for Economic Cooperation and Development (2010).

Michael Turner, Robin Varghese, and Patrick Walker, *Financial Inclusion through Credit Reporting: Hurdles and Solutions*, PERC (2010).

Michael Turner, Robin Varghese, and Patrick Walker, *The Consequences of Prohibiting Credit Inquiry Data in Chilean Credit Files*, PERC (2010).

Michael Turner, Robin Varghese, and Patrick Walker, *Credit Reporting Customer Payment Data*, PERC (2009).

Michael Turner, Robin Varghese, and Patrick Walker, *New to Credit from Alternative Data*, PERC (2009).

Michael Turner, Robin Varghese, Patrick Walker, and Joseph Duncan, *Information Sharing and SMME Financing in South Africa: A Review of the Landscape*, PERC (2008).

Michael Turner, Roadmap to Reform: *Lessons from Around the World to Guide Consumer Credit Reporting Reform in Australia*, PERC (2008).

Michael Turner, Recovering But Not Recovered: *Gulf Coast Small Business Three Years Later*, PERC Press (2008).

Michael Turner, Alyssa Lee, Eugene Gurenko, Robin Varghese, and Patrick Walker, *Financial Impacts of Disaster: What We Can Learn From Credit File Data*, PERC (2008).

Michael Turner, Alyssa Lee, Robin Varghese, and Patrick Walker, *You Score, You Win—The Consequences of Giving Credit Where Credit is Due*, PERC (2008).

Michael Turner and Amita X. Agarwal, *Using Non-Traditional Data for Underwriting Loans to Thin-File Borrowers: Evidence, Tips, and Precautions*,  Journal of Risk Management for Financial Institutions (2008).

Michael Turner and Robin Varghese, *The Structure of Information Sharing and Credit Access: Lessons for Policy*, PERC (2008).

Michael Turner and Robin Varghese, *Economic Fairness Through Smarter Lending: Some Factors to Consider on the Eve of Brazilian Credit Reporting Reform*, PERC (2007).

Michael Turner, Robin Varghese, and Patrick Walker, *Recovery, Renewal, and Resiliency: Gulf Coast Small Businesses Two Years Later*, PERC (2007).

Michael Turner, *Economic Impacts of Payment Reporting Participation in Latin America*, PERC Press (2007).

Michael Turner, Joseph Duncan, Robin Varghese, and Patrick Walker, *The Impact of Provider-Identifiable Data on Healthcare Quality and Cost*, PERC (2007).

Michael Turner, Robin Varghese, and Patrick Walker, *On the Impact of Credit Payment Reporting on the Financial Sector and Overall Economic Performance in Japan*, PERC (2007).

34

Michael Turner, Alyssa Lee, Robin Varghese, and Patrick Walker, *Give Credit Where Credit is Due: Increasing Access to Affordable Mainstream Credit Using Alternative Data*, Brookings Institution (2006).

Michael Turner, *Toward a Rational Personal Data Breach Notification Regime*, PERC (2006).

Michael Turner, *Giving Underserved Consumers Better Access to the Credit System: The Promise of Non-traditional Data*, PERC (2005).

Michael Turner, *How Safe and Secure Is It?: An Assessment of Personal Data Privacy and Security in Business Process Outsourcing Firms in India*, Information Policy Institute with the Financial Services Roundtable (2005).

Michael Turner, Pete A. Johnson, and Daniel Balis, *Privacy Rights and Policy Wrongs: How Data Restrictions Can Impair Information Led Development in Emerging Markets*, The Information Policy Institute (2003).

Michael Turner, *The Fair Credit Reporting Act: Access, Efficiency, and Opportunity*, The National Chamber Foundation of the United States Chamber of Commerce (2003).

Michael Turner, *The Fair Credit Reporting Act: Access, Efficiency, and Opportunity II*, The National Chamber Foundation of the United States Chamber of Commerce (2003).

Michael Turner, *Consumers, Citizens, Charity and Content: Attitudes Toward Teleservices*, The Information Policy Institute (2002).

Michael Turner, *Measuring the True Cost of Privacy: A Rebuttal to 'Privacy, Consumers, and Costs'*, The Information Policy Institute, (2002).

Michael Turner and Lawrence G. Buc, *The Impact of Data Restriction on Fundraising for Charitable and Nonprofit Institutions*, The Information Services Executive Council and the Privacy Leadership Initiative (2002).

Michael Turner and Robin Varghese, *Making Sense of the Privacy Debate: A Comparative Analysis of Leading Consumer Privacy Surveys* (2001).

Michael Turner, *The Cost of Data Restrictions on Consumer Distance Shopping*, Privacy Leadership Initiative and the Information Services Executive Council of The DMA (2001).

Michael Turner, *Regulating Personal Medical Information: Fears, Facts, and a Framework Setting the Record Straight*, The Direct Marketing Association (2000).