IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CHARLES EDWARD STEED, *on behalf of himself and all others similarly situated*, and AMY SUMMERS, *on behalf of herself and all others similarly situated*, | |
| Plaintiffs, | CIVIL ACTION FILE NO. |
| v. | 1:14-cv-00437-SCJ-CMS |
| EQUIFAX INFORMATION SERVICES, LLC, | |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION

On February 14, 2014, Plaintiffs Charles Edward Steed and Amy Summers ("Plaintiffs"), on behalf of themselves and certain proposed classes of consumers, filed a complaint against Defendant Equifax Information Services, LLC ("Equifax" or "Defendant") alleging that Equifax willfully violated sections 1681i(a)(1) and (2) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, by failing to reinvestigate certain disputed inquiries reflected in the Plaintiffs' consumer credit files; by failing to notify the source of the inquiry(ies) about the Plaintiffs' dispute(s); by failing to provide the source of the inquiry(ies) with all relevant information Plaintiffs

provided to Equifax; and/or by failing to delete the inquiry(ies) from the consumers' files.  (Doc. 1, Compl.).

Equifax has moved for summary judgment.  (Doc. 51).  Equifax's motion for summary judgment has been fully briefed and is before the court for consideration.

After a careful and thorough review of the record, including, *inter alia*, the parties' briefs and memoranda of law, declarations, deposition transcripts and exhibits, the parties' expert reports and testimony, cited authority, and supplemental authority, and for the reasons discussed below, I recommend that Defendant Equifax's motion for summary judgment be **GRANTED**.

## I.      LEGAL STANDARD

On a motion for summary judgment, the court must view all evidence and factual inferences in the light most favorable to the non-movant.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986); McCabe v. Sharrett, 12 F.3d 1558, 1560 (11th Cir. 1994).  Summary judgment is proper when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant carries its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case."   Celotex v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).

AO 72A
(Rev.8/8
2)

"Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Fed. R. Civ. P. 56(c). "Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment." Bald Mountain Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989). Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986).

## II.   BACKGROUND

### A.   The Fair Credit Reporting Act and Consumer Reports

The FCRA was enacted "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit ... in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b).

AO 72A
(Rev.8/8
2)

To achieve its purpose, the FCRA places distinct obligations on three types of entities: consumer reporting agencies ("CRAs"), furnishers of information to CRAs ("furnishers"), and users of consumer reports ("users").  See Chipka v. Bank of America, 355 F. App'x 380, 382 (11th Cir. 2009) (citing 15 U.S.C. §§ 1681b, 1681m, and 1681s-2).

CRAs collect consumer information for the purpose of creating consumer reports, which may be used by a variety of entities, including credit grantors, insurance companies, employers, landlords, and other entities in making eligibility decisions affecting consumers.  (Doc. 54-1, Equifax's Unredacted Statement of Undisputed Material Facts ["DSMF"], ¶ 1[citing Federal Trade Comm'n ("FTC"), "40 Years of Experience with the Fair Credit Reporting Act" ("40 Years Report") at 1]).  For purposes of this lawsuit, it is undisputed that Equifax is a CRA and is subject to the FCRA.

Most of the data that CRAs collect, including information about a consumer's credit history and payment patterns, is reported to the CRAs by third-party data furnishers.  (DSMF ¶ 2).  Under the relevant FCRA implementing regulations, "furnisher" is defined as "an entity that furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report."  12 C.F.R. § 1022.41(c).  Although the universe of data furnishers and users of consumer

reports may at times overlap, the regulations make a distinction between a furnisher of information and an entity or user that merely provides identifying information regarding a particular consumer in order to obtain a consumer report from Equifax: "An entity is not a furnisher [pursuant to the FCRA] when it ... [p]rovides information to a consumer reporting agency solely to obtain a consumer report."   12 C.F.R. § 1022.41(c)(1).

### B.    Permissible Purposes

Section 1681b of the FCRA limits the provision of consumer reports by a CRA to a user (or entity other than the individual consumer) to certain "permissible purposes," including, in pertinent part, the following:

> (1)  In response to a court order, or in response to a subpoena issued in connection with a federal grand jury proceeding;
>
> (2) in accordance with the written instructions of the consumer to whom it relates;
>
> (3)  to a person which the CRA has reason to believe--
>
>> (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
>>
>> (B) intends to use the information for employment purposes; or

(C)  intends to use the information in connection with the underwriting of insurance involving the consumer; or

...

(F)  otherwise has a legitimate business need for the information--

> (i) in connection with a business transaction that is initiated by the consumer; or
>
> (ii) to review an account to determine whether the consumer continues to meet the terms of the account.

15 U.S.C. § 1681b.  Equifax maintains a certification process for users in order to certify that the users are valid companies with a permissible purpose to obtain a credit report.  (Doc. 78-41, Deposition of Daniel Parzych ["Parzych Dep."] at 74).[1]

## C.    Inquiries

The FCRA expressly requires CRAs, upon request by a consumer, to identify each person or entity (i.e., user) that procured a consumer report on that individual, for employment purposes, during the 2-year period preceding the date on which the request was made, and for any other purpose, during the 1-year period preceding the date on which the request was made.  15 U.S.C. § 1681g(a)(3)(A)(i)-(ii).  An "inquiry" is a factual record of when a consumer's credit file was accessed by a user and the user

---

[1]  Unless otherwise noted, the undersigned's references to deposition pages are to the page number of the hardcopy transcripts rather than to the CM/ECF page numbers noted at the top of each of the electronic versions filed with the Court.

received information about a particular consumer.[2]  (Doc. 79-13 at 14).  To document the inquiry, Equifax enters a notation on the individual consumer's credit file showing the name of the company and date the user obtained a copy of the individual's consumer report.  (DSMF ¶ 4).  Because inquiries are generated internally by each CRA to reflect which users accessed a particular consumer's information, inquiries are unique to each CRA.  (DSMF ¶ 7).  For example, if a person seeks an automobile loan and the lender (or user) accesses Equifax's credit files, Equifax notes that access as an inquiry, whereas a different CRA from whom the user did not request a report would not have any notation reflecting an inquiry.  (DSMF ¶ 8).

Inquiries take two forms: hard and soft.  (DSMF ¶ 9).  A "hard" inquiry indicates that a user accessed the consumer's report for the purpose of making a credit decision.  Such access is normally initiated in response to a consumer seeking credit, such as a mortgage, credit card, auto loan, or personal finance loan.  (Doc. 79-1, Deposition of Alicia Fluellen ["Fluellen Dep."] at 39-40).  By contrast, "soft" inquiries generally indicate that a consumer's report was accessed for reasons other than a transaction initiated by a consumer, such as account reviews or prescreened

---

[2]  An Equifax document describes inquiries as follows:  "A request for your credit history is called an inquiry.  Inquiries remain on your credit report for two years.  These inquiries are made by companies with whom you have applied for a loan or credit."  (Doc. 79-2 at 2 [Ex. 8]; Fluellen Dep. at 97-98).

7

transactions. (DSMF ¶ 11). Both hard and soft inquiries are included on the consumer records provided to consumers in response to their requests for a copy of their credit file. However, only hard inquiries are included in the reports that CRAs, including Equifax, sell or provide to third party users. One reason Equifax includes hard inquiries in the reports it provides to third parties is to let potential creditors know where the consumer has sought credit, when, and with whom. (Fluellen Dep. at 41). In the case of identity theft, multiple hard inquiries may tip a credit grantor off that the consumer may be a victim of identity theft, and the credit grantor can contact the consumer or other credit grantors listed on the report for more information. (Id. at 75).

Hard inquiries are generally considered in credit score development and are often a factor in a consumer's credit score, but soft inquiries are not. (DSMF ¶ 12; Doc. 54-2 at 18). Only hard inquiries are at issue in the current lawsuit.

### D.    Credit Bureau Scores

"Credit bureau scores are computed by means of algorithms that are specified by the developer and programmed for use by a credit bureau or other party accessing credit information." (Doc. 54-2, Patrick Culhane Expert Report ["Culhane Report"], at 5). Depending on the credit scoring model and/or algorithm(s) used by a particular credit industry participant, hard inquiries may be assigned different weights. Fair Isaac credit bureau scores (known as FICO) generally range from 300 to 850. The impact

8

of any particular hard inquiry on a consumer's credit score is dependent upon what else is in the consumer's credit file, including account tradelines, payment history, public records, other inquiries, and date of scoring, as well as the particular scoring model or algorithm applied to create the score. (Id.). For example, under the VantageScore 3.0 model, hard inquiries and opened credit accounts together account for only five percent of a consumer's credit score. (DSMF ¶ 17). FICO assigns hard inquiries to a similar category that includes "new credit" and accounts for approximately ten percent of a consumer's credit score. (DSMF ¶ 18). Patrick Culhane, one of Equifax's testifying experts, opined that even if a particular model considers hard inquiries, an inquiry will have only a minor impact on an individual's credit score. (Culhane Report at 5). For example, one inquiry may lower a consumer's credit score by five points. (Doc. 67-13, Deposition of Patrick Culhane ["Culhane Dep."] at 82).

By contrast, a large number of hard inquiries in a short period of time may indicate that a consumer may be overextending himself and possibly facing financial distress in the immediate future. (DSMF ¶ 14). In other words, a large number of inquiries may correlate to a higher credit risk, and may have a more significant impact on a consumer's credit score. FICO's website notes that individuals with six inquiries or more on their credit scores can be up to eight times more likely to declare bankruptcy than people with no inquiries on their credit reports. (Culhane Dep. at 82-

83).

However, even if a hard inquiry impacts a consumer's credit score, the effect may be relatively short-lived because the length of time inquiries remain on a consumer's report is significantly shorter than other consumer data, such as account tradelines, collections, and public records, which may affect a consumer's score for up to ten years.  Equifax reports hard inquiries on a consumer's report for only two years. (Parzych Dep. at 65; DSMF ¶ 22; Doc. 84-4, Deposition of Michael A. Turner, Ph.D. ["Turner Dep."], at 190).  The FICO credit scoring model considers hard inquiries for only one year.  (Turner Dep. at 191).

### E.  Reinvestigations of Disputed Information

The FCRA requires CRAs to reasonably "reinvestigate"[3] disputed items of

---

[3]  Some portions of the statute use the term "investigation" while others use the term "reinvestigation."  If a consumer disputes the completeness or accuracy of any item of information contained in the consumer's file at a CRA and the consumer notifies the CRA directly, Section 1681i of the FCRA uses the term "reasonable reinvestigation" to describe the investigation process a CRA is required to conduct to determine whether the disputed information is inaccurate or incomplete. See 15 U.S.C. § 1681i ("Reinvestigations of disputed information"); Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1160 (11th Cir. 1991).  Section 1681s-2(b)(1) of the FCRA uses the term "investigation" in the context of articulating a furnisher's duties in the consumer dispute process outlined by the FCRA.  Johnson v. MBNA Am. Bank, NA, 357 F.3d 426, 431 (4th Cir. 2004).  Section 1681s-2(b)(1) requires furnishers of information, after receiving notice of a consumer dispute from a credit reporting agency, to "conduct an investigation" of their records to determine whether the disputed information can be verified.  Id.

information in consumer reports.  Section 1681i(a) provides, in pertinent part, as

follows:

> [I]f the completeness or accuracy of any item of information
> contained in a consumer's file at a consumer reporting
> agency is disputed by the consumer and the consumer
> notifies the agency directly, or indirectly through a reseller,
> of such dispute, the agency shall, free of charge, conduct a
> reasonable reinvestigation to determine whether the
> disputed information is inaccurate and record the current
> status of the disputed information, or delete the item from
> the file in accordance with paragraph (5), before the end of
> the 30-day period beginning on the date on which the
> agency receives the notice of the dispute from the consumer
> or reseller.

15 U.S.C. § 1681i(a)(1)(A).  The statute does not define the terms "item" or "item of

information."

Unless the CRA determines that the dispute is frivolous or irrelevant, the CRA

must provide prompt notice of the dispute to the furnisher of the disputed information:

> Before the expiration of the 5-business-day period
> beginning on the date on which a consumer reporting
> agency receives notice of a dispute from any consumer or a
> reseller in accordance with paragraph (1), the agency shall
> provide notification of the dispute to any person who
> provided any item of information in dispute, at the address
> and in the manner established with the person. The notice
> shall include all relevant information regarding the dispute
> that the agency has received from the consumer or reseller.

15 U.S.C. § 1681i(a)(2)-(3).

If, after any reinvestigation of any information disputed by a consumer, an item

11

of information is found to be inaccurate or incomplete or cannot be verified, the CRA must promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation, and promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer.  Id. § 1681i(a)(5).  The CRA must also provide written notice to the consumer of the results of its reinvestigation no later than 5 business days after the completion of the reinvestigation, by mail or, if authorized by the consumer for that purpose, by other means available to the CRA.  Id. § 1681i(a)(6)(A).

### F.    The e-OSCAR System

The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to a CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other CRAs.  Id. § 1681i(a)(5)(D).   To comply with the automated dispute reinvestigation requirements of the FCRA, the three national CRAs (Equifax, Experian, and Trans Union), along with Innovis, developed and implemented a web-based platform called e-OSCAR to process consumer disputes.  (DSMF ¶¶ 23-24).  If a consumer objects to a tradeline or account item on his or her credit report, Equifax (and the other national CRAs) use e-OSCAR to send the disputing consumer's

12

identifying information to the relevant furnisher(s), along with information about the nature of the dispute (e.g., the consumer asserts that the account was "Paid on time" or "Not my account").  (DSMF ¶ 25).  After investigating the claim, the furnisher reports its findings back to Equifax (or the relevant CRA(s)) also through e-OSCAR. (DSMF ¶ 26).

### G.     Disputed Inquiries

Consumer disputes about hard inquiries are handled differently.  Each of the three national CRAs maintains and discloses inquiries as required by Section 1681g(a)(3) of the FCRA, but they do not consider inquiries to be an "item of information" subject to the reinvestigation obligations set forth in 15 U.S.C. § 1681i(a).  (See Doc. 51-6, Declaration of TransUnion LLC ["TransUnion Decl."], ¶¶ 3-4; Doc. 51-7, Declaration of Experian Information Solutions, Inc. ["Experian Decl."], ¶¶ 3-4).  Equifax considers inquiries to be categorically accurate because they merely reflect the fact that a consumer's credit file was accessed by a user.[4]  None of

---

[4] By contrast, Plaintiffs appear to be contending that the accuracy of an inquiry depends on whether the user (or potential credit grantor) accessed the consumer's credit file in response to a request for credit from that specific consumer or whether the consumer's file was accessed in error due, for example, to fraud, identity theft, or a mixed file.  Plaintiffs contend that under the latter circumstances, the inquiry falsely appears as part of the consumer's credit history, because the inquiry was actually initiated in response to a request for credit from someone other than that particular consumer.  (See Fluellen Dep. at 74-78; Doc. 63, Pls.' Resp. Br., at 8-9).

the national CRAs, including Equifax, TransUnion, and Experian, use e-OSCAR to investigate (or reinvestigate) disputed inquiries.  (DSMF ¶ 27; TransUnion Decl. ¶ 4; Experian Decl. ¶ 4).  One of Equifax's experts, Gary Poch, avers that because the e-OSCAR system was designed to allow furnishers and CRAs to communicate about furnished data, the platform was never intended or designed to be used to resolve disputes about internally-generated data, such as hard inquiries.   (Doc. 51-5, Declaration of Gary Poch ["Poch Decl."], ¶¶ 5, 7-8).

There are also some practical reasons for not using e-OSCAR to investigate inquiry disputes.  Many users who access consumer reports -- thus generating inquiries on consumer files -- are not data furnishers and thus do not have access to the  e-OSCAR system.  (DSMF ¶¶ 28, 30).  Such users include, but are not limited to, energy utility companies, media companies, small credit unions, certain types of insurance companies, landlords, and employers.  (DSMF ¶ 29).

Neither Equifax nor any other major CRA has a large-scale, automated mechanism (similar to e-OSCAR) to communicate with users of consumer reports about disputed inquiries.  (DSMF ¶ 31; Fluellen Dep. at 91).  Instead, in response to a consumer dispute about an inquiry, the CRAs typically notify the consumer, either online or in written correspondence, that an inquiry is a factual record of who has seen the consumer's file.  (See TransUnion Decl. ¶ 3; Experian Decl. ¶ 3).

14

Depending on whether the consumer submits an inquiry dispute online, over the phone, or in writing, Equifax notifies the consumer (online, on the phone, or in writing) as follows:

> **Results Of Your Investigation[.]  We have reviewed the inquiry information for _____ (name of user)**.  **The results are:**  Inquiries are a factual record of file access.  If you believe this was unauthorized, please contact the creditor.  If you have additional questions about this item please contact: _____ (name of creditor/user), at _____ (user's address).

(Doc. 1-1 at 2; Fluellen Dep. at 36-37).  TransUnion explains to consumers that an inquiry is a factual record of who has seen the consumer's file, and under certain narrow circumstances, conducts an investigation using means of communication other than e-OSCAR, including telephone, email, and/or written correspondence with the credit report user.  (TransUnion Decl. ¶ 4).  Experian typically reinvestigates internally, checking to ensure that the inquiry was pulled using the correct consumer's identification, and if so, notifies the consumer that an inquiry is a factual record of who has seen the consumer's file, and as such must be maintained.  (Experian Decl. ¶ 3).  In limited instances, Experian states that it employs "heightened reinvestigation procedures" for certain inquiry disputes.  (Id.).

At Equifax, if a consumer disputes an inquiry because the consumer does not recognize it as concerning him or her, then the consumer will receive the

15

communication quoted above, and the inquiry remains on his or her credit report as a factual record of file access. (Fluellen Dep. at 88). In that circumstance, the consumer is notified that if the consumer believes the file access was unauthorized or the consumer has additional questions, the consumer should contact the creditor directly at the address provided. Equifax provides contact information for the relevant user so that the consumer can -- if he or she wishes -- directly address the inquiry with the user, who is in the best position to explain why the inquiry was made and/or take any appropriate remedial action, such as requesting that Equifax remove the inquiry. (Fluellen Dep. at 71; Poch Decl. ¶ 9).

If a consumer claims an inquiry was the result of fraud or identity theft and presents valid documentation supporting that assertion, such as a police report, and if there is a corresponding account that is verified as fraudulent, then Equifax will delete the account and related inquiry from the consumer's file. (Fluellen Dep. at 70-73, 137). If no account was ever opened, or Equifax investigates the disputed account and does not verify the account as fraudulent, the inquiry is not removed from the consumer's file. (Id. at 71-72).

If a consumer claims that his or her credit file may be mixed with another individual's with the same or similar name or two credit files are merged ("mixed file") (Doc. 79-25 at 104), and a disputed inquiry relates to an account that has been verified

16

as pertaining to a different consumer, Equifax will reassign the related inquiry to the correct person and delete the inquiry from the disputing consumer's file. (Doc. 54-2 at 37; Fluellen Dep. at 29, 77-78, 127-28, 150, 228). Equifax will also remove an inquiry at a user's or a furnisher's request when the consumer's report was accessed either in error or without a permissible purpose. (DSMF ¶ 40). Otherwise, the inquiry remains on the file. (DSMF ¶ 41; Fluellen Dep. at 70, 152; Turner Report ¶ 32).

In 2008, Equifax briefly adopted a policy of deleting all disputed inquiries, but changed back to its current policy after consumers abused the policy by disputing accurate inquiries in an effort to improve their credit scores, and both credit grantors and other CRAs questioned the integrity of Equifax's files. (Fluellen Dep. at 173-75, 187-88; Doc. 78-51, Deposition of Gary Poch ["Poch Dep."] at 81-86). In January of 2010, Equifax again attempted to institute a policy whereby all inquiries disputed as fraud would be automatically deleted from the consumer's credit file. (DSMF ¶ 49). Two years later, however, Equifax returned to its current policy because of the same or similar problems that arose in 2008. (Fluellen Dep. at 208-09, 214-15).

Equifax receives hundreds of thousands of inquiry disputes every year. There are many reasons that consumers dispute the accuracy of inquiries on their credit files. For example, some consumers dispute inquiries because they do not recognize the name of the user who obtained their information. (Fluellen Dep. 85-86). Other

17

consumers simply forget about accounts they opened, and dispute inquiries thinking the accounts do not belong to them.  (Turner Report ¶ 32; Turner Dep. at 260-61).  Consumers may dispute inquiries because they do not understand that particular users, such as utilities, can access their credit reports.  (See Poch Dep. at 40).  Some consumers have disputed inquiries and even submitted false police reports in an effort to get the inquiries deleted from their file in the hope that their credit score will improve.  (Poch Dep. at 80-82; Fluellen Dep. at 186-87; Turner Dep. at 223).  Over the period 2012 to 2014, more than 1.4 million people disputed inquiries to Equifax, but only 99,000 people had the disputed inquiry deleted.  (PSMF ¶¶ 143, 145; Fluellen Dep. at 59).  Consumers whose disputed inquiries are not deleted receive Equifax's form response stating that inquiries are a factual record of file access, and instructing the consumer to contact the creditor if the consumer believes the inquiry was unauthorized.  (Fluellen Dep. at 44).

## III.  **FACTS**

In light of the foregoing summary judgment standard, the Court finds the following facts for the purpose of resolving Equifax's motion for summary judgment only.

AO 72A
(Rev.8/8
2)

### A.    Plaintiff Charles Edward Steed

In July 2010, Plaintiff Charles Edward Steed ("Steed") reviewed his credit report and noticed that in addition to certain accounts that Steed recognized as pertaining to him, Equifax was reporting various items that he did not recognize and that he believed pertained to someone other than himself. (Doc. 78-31, Deposition of Plaintiff Charles Edward Steed ["Steed Dep."], at 23; Compl. ¶ 12; Doc. 66-1 at 2-3).

On July 2, 2010, Steed sent a letter to Equifax disputing the accuracy of his credit report. (Doc. 66-1 at 2-3, Steed's "July 2, 2010 Dispute Letter"). Steed's July 2, 2010 Dispute Letter shared, *inter alia*, his concern that Equifax was including in his credit file information that possibly related to someone else in Atlanta with the name Charles E. Steed or his brother, Craig Eugene Steed, who lived at a different address than Plaintiff. Steed also complained about incorrect employment information; outdated information on closed accounts; and certain credit inquiries that Steed contended did not belong to him.

With regard to inquiries, Steed's July 2, 2010 Dispute Letter to Equifax stated, "Your current credit inquiries for my report list the following which I have nothing to do with--have not authorized-- had no contact with--have no agreement with--in short-- they are NOT MY accounts or my person." (Doc. 66-1 at 2). Among other disputed inquiries, Steed specifically listed, "ClearPoint Financial--Misc--11/2008--Not Mine."

19

(Id.; Steed Dep. at 198).  Steed's claim in the current lawsuit pertains solely to his July 2, 2010 dispute of the hard inquiry from ClearPoint Financial (also referred to in the record as CCCS of VA).[5]  (DSMF ¶ 72).

In response to Steed's July 2, 2010 Dispute Letter, Equifax sent Steed a letter dated July 28, 2010 with the results of its investigation.  (Doc. 66-2 at 2, "Equifax's Results Response").  The first paragraph of Equifax's Results Response states:

> Below are the results of your request for Equifax to reinvestigate certain elements of your Equifax credit file. Equifax contacted each source directly and our investigation is now completed.  If you have additional questions or concerns, please contact the source of that information directly.

(Id.).  With regard to the credit accounts that Steed was disputing, Equifax provided, for each disputed account, the account number, the results of its investigation, including whether the account had been verified as belonging to Steed, and for certain other accounts, notification that Equifax had  deleted the disputed credit account item from Steed's credit file.  (Id. at 2-3).  Equifax's Results Response noted that Equifax had also reviewed Steed's concerns about inaccurate names reporting on his credit file, and noted that his brother' s address was not currently being reported in his credit file.

---

[5] Throughout this litigation, the parties have assumed that ClearPoint Financial and CCCS of VA are the same entity, and the Court will do the same for purposes of this motion for summary judgment.  (Steed Dep. at 168-69).

AO 72A
(Rev.8/8
2)

Steed was further notified that his employment information had been updated and inaccurate former employment information had been deleted from his credit file. (Id.).

With regard to the disputed inquiry information for CCCS of VA, Equifax's Results Response contained the standard form response quoted earlier: "**We have reviewed the Inquiry Information for CCCS of VA. The results are**: Inquiries are a factual record of file access. If you believe this was unauthorized, please contact the creditor. If you have additional questions about this item please contact: **CCCS of VA, 4660 Laburnum Ave, Richmond, VA 23231-2424**." (Id. at 3) (bolding in original). Steed testified in his deposition that after receiving Equifax's Results Response, he never contacted CCCS of VA (a/k/a ClearPoint Financial) to follow up. (See Steed Dep. at 24, 26 ["the issue of the ClearPoint and all the inquiries were kind of minimal in my mind at the time versus the -- my identity had been changed and I thought some important things were being left off."]). When asked during his deposition whether he had ever been denied credit based upon the CCCS inquiry appearing on his credit file, Steed answered, "I don't know." (Steed Dep. at 27). Steed gave a similar answer in response to the question, "Do you  know whether the appearance of the CCCS inquiry on your credit file has ever caused your credit score to be higher or lower than it otherwise would have been?" Steed responded, "I don't

21

know that." (Id.).  Steed made no further contact with Equifax about the inquiry before filing suit.  (See Doc. 78-35 at 11-12).

### B.   Plaintiff Amy Summers

On or about February 18, 2012, Plaintiff Amy Summers received an online alert from Equifax's credit monitoring service about her credit file.  Summers placed an online order for a copy of her credit file, and after receiving her report, noticed inquiries from DirecTV and Dish Network. (Doc. 78-19, Deposition of Amy Summers ["Summers Dep."], at 22, 39, 97, 130-31).  At the time Summers learned of the access, the utility accounts were in collection.  (Id. at 22, 39-42).  As Summers lived in Fairbanks, Alaska at the time, and the DirecTV and Dish Network utility accounts appeared to have been opened in Charlotte, North Carolina, Summers became concerned that her identity had been stolen.  (See id. at 22, 24-25, 78; see also Doc. 65, Pls.' Stmt. of Add'l Mat. Facts ["PSMF"], ¶ 107).  The same day, Summers contacted Equifax and asked it to remove all information related to DirecTV and Dish Network. (DSMF ¶ 74).

In a letter dated February 19, 2012, Equifax informed Summers that it had placed a fraud alert on her credit file.[6]  (Summers Dep. at 62).  Later, Summers

---

[6]   A fraud alert is "a statement in the file of a consumer that notifies all prospective users of a consumer report ... that the consumer may be a victim of fraud." 15 U.S.C. § 1681a(q)(2).

AO 72A
(Rev.8/8
2)

submitted two separate police reports to Equifax concerning her claim of fraud and/or identity theft.[7]   (DSMF ¶ 76).   The police report from Alaska simply identified Summers as a victim of identity theft and provided a case number; it did not reference or identify the DirecTV or Dish Network inquiries.   (Summers Dep. at 188-90; Doc. 79-18 at 88 ["Alaska police report" dated 2/18/12]).   The second police report (issued by the Charlotte-Mecklenburg Police) included Plaintiff's statement that sometime between November 3, 2010 and February 13, 2012, an unknown suspect had somehow gained access to Plaintiff's first name, date of birth and Social Security number and, using a North Carolina address, set up service accounts with Dish Network and DirecTV in Charlotte, North Carolina.   (Summers Dep. at 191-92; Doc. 79-18 at 101 ["North Carolina police report" dated 2/23/12]).   As with the Alaska police report, the North Carolina police report did not mention inquiries relating to Dish Network or DirecTV.

In response to notification by Equifax of Summers's dispute, the collection agency for the North Carolina utility account(s) verified to Equifax that the collection notation(s) should be deleted from Plaintiff's file.   Accordingly, Equifax deleted the collection information from Summers's credit file.   (Fluellen Dep. at 102-05; PSMF

---

[7]   Under the FCRA, the term "identity theft" means a fraud committed using the identifying information of another person.   15 U.S.C. § 1681a(q)(3).

23

¶ 113).  However, because there were no corresponding Dish Network or DirecTV accounts listed in Plaintiff's credit file that were being disputed as fraudulent (just notations of collections based on those accounts), the Dish Network and DirecTV inquiries were not deleted, pursuant to Equifax's policies and procedures.  (See Fluellen Dep. at 107, 109-11).

Approximately one year later, Summers submitted an online dispute to Equifax with respect to the following three inquiries: DirecTV on July 13, 2011; DirecTV on September 29, 2011; and Dish Network on February 12, 2012.  (DSMF ¶ 80). Summers selected "identity theft" or "fraud" from an online menu as the basis for her dispute, and stated that she had never opened a DirecTV or Dish Network account. (Summers Dep. at 47; Fluellen Dep. at 115-16).  In accordance with Equifax's policies, Summers's online dispute submission was automatically processed by a computer, and Summers was sent a copy of her credit file and a form letter stating that Equifax had reviewed the inquiry information for DirecTV and Dish Network.  (PSMF ¶ 120; Fluellen Dep. at 117, 119-20).  The letter's introductory paragraph stated, in part:

> Enclosed is a copy of your Equifax credit file.  Please review it for any unauthorized accounts or inquiries.  If unauthorized information is reporting on your Equifax credit file, you may start an investigation immediately on-line at www.investigate.equifax.com.

24

(Doc. 67-7 at 2; PSMF ¶ 123).  The letter explained that "[i]nquiries are a factual record of file access.  If you believe this was unauthorized, please contact the creditor." (DSMF ¶¶ 81-82).  Equifax then provided contact information for both DirecTV and Dish Network.  (DSMF ¶ 83).  The letter asked Summers to advise Equifax if she had any documents that might help Equifax in its reinvestigation, such as an identity theft report or letters from credit grantors.  (Doc. 67-7 at 2).  She was further advised to contact the credit grantors that were reporting information she believed was fraudulent and to ask them to explain their fraud investigation process.  The letter also asked Plaintiff to request a letter or documentation from the credit grantor stating the results of its investigation, and upon receipt, to forward a copy of that letter to Equifax.  (Id.).

It is undisputed that Equifax handled the inquiry disputes for both Mr. Steed and Ms. Summers consistent with its policies and procedures in effect at the relevant times. (DSMF ¶ 84).

## IV.   **DISCUSSION**

### A.    **The FCRA's Statute of Limitations**

As a preliminary matter, Equifax argues that Plaintiff Steed's claim is barred by the FCRA's two-year statute of limitations.   (Doc. 54, Def.'s Br., at 30).  Section 1681p of the FCRA provides as follows:

> An action to enforce any liability created under this subchapter may be brought in any appropriate United States

25

district court, without regard to the amount in controversy, or in any other court of competent jurisdiction, *not later than the earlier of* --

> (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or

> (2) 5 years after the date on which the violation that is the basis for such liability occurs.

15 U.S.C. § 1681p (italics added). Courts generally measure this two-year period from the date the plaintiff discovered "the facts that give rise to a claim and not when a claimant discovers that those facts constitute a legal violation." Mack v. Equable Ascent Fin., L.L.C., 748 F.3d 663, 665-66 (5th Cir. 2014); see also Merck & Co. v. Reynolds, 559 U.S. 633, 645, 130 S. Ct. 582 (2010) (stating that when "discovery" is written directly into a statute, "state and federal courts have typically interpreted the word to refer not only to actual discovery, but also to the hypothetical discovery of facts a reasonably diligent plaintiff would know.").

Steed has acknowledged that his claim in this case relates solely to his 2010 inquiry dispute. (Doc. 64, Pls.' Resp. to DSMF ¶ 72; Steed Dep. at 23-24). Yet he waited nearly four years to bring this action.[8] Steed testified that in July 2010, he reviewed his credit report and thought that Equifax was reporting information that did

---

[8] Plaintiffs' lawsuit was filed in this court on February 14, 2014. (Doc. 1, Compl.).

AO 72A (Rev.8/8 2)

not belong to him, including a ClearPoint Financial inquiry that appeared on his credit file (which Equifax subsequently identified as pertaining to CCCS of VA).  (Steed Dep. at 16, 20, 23).  The evidence shows that on July 28, 2010, Equifax sent Steed the written results of its reinvestigation.   When asked why he waited so long after he received the July 28, 2010 letter from Equifax to file a lawsuit over the disputed inquiry, Steed testified that he received the letter and attached printout of his credit file, and read them both, and both contained information pertaining to his inquiry disputes. Steed explained that he focused more on things Equifax had added, such as "Jr." to his name, and mortgages for two properties, rather than the ClearPoint Financial inquiry and other inquiries listed.  (Id. at 25-26).  Steed testified that he really did not know or understand what Equifax did or did not do in response to Steed's inquiry dispute until much later, after he consulted attorneys and became more aware of the issue and saw two items on Ms. Summers's report.  (Id. at 28-29).  Steed argues that the two-year statute of limitations should not bar his claim, because at the time he received Equifax's Results Response, Steed did not know what actions Equifax had taken in response to his dispute and did not know that Equifax had not complied with the requirements of § 1681i(a).  This argument is without merit.

On  July  28,  2010,  Equifax  provided  Steed  with  the  results  of  Equifax's investigation.  Equifax's Results Response informed Steed that Equifax had reviewed

AO 72A
(Rev.8/8
2)

the inquiry information for CCCS of VA, that the inquiry was a factual record of file access, and that if Steed believed the access was unauthorized or had additional questions, he should contact the creditor. (Doc. 66-2 at 3). Steed contends in this case that Equifax failed to comply with the reinvestigation requirements of § 1681i(a). It is from this alleged failure to follow the procedures outlined in § 1681i(a) that Equifax's liability, if any, would arise. See Barron v. Trans Union Corp., 82 F. Supp. 2d 1288, 1293-94 (M.D. Ala. 2000). Under 15 U.S.C. § 1681i -- the provision that Plaintiffs are asserting Equifax violated -- a cause of action arises when the consumer reporting agency "allegedly violated its duty under the FCRA to reinvestigate." Id. (citing Williams v. Colonial Bank, 826 F. Supp. 415, 419 (M.D. Ala.1993), aff'd, 29 F.3d 641 (11th Cir. 1994)). The two-year statute of limitations period runs from the date the plaintiff discovered "the facts that give rise to a claim and not when a claimant discovers that those facts constitute a legal violation." Mack, 748 F.3d at 665-66. Thus, Steed's FCRA cause of action arose, if at all, in July 2010 when he received and reviewed Equifax's written report of what it had done in response to Steed's dispute letter.

Equifax's Results Response clearly indicates that Equifax took different actions with regard to the various credit accounts that Steed was disputing ("we have *researched*" the credit accounts) as opposed to what Equifax did with regard to Steed's

inquiry dispute(s) ("we have *reviewed* the inquiry information for CCCS of VA."). (Doc. 66-2 at 3) (italics added).  Thus, Steed was on notice upon receipt and review of Equifax's Results Response dated July 28, 2010 of the steps Equifax took to investigate Steed's credit history in response to his July 2, 2010 letter.  Under 15 U.S.C. § 1681p, Steed was required to bring his suit within two years of the date he received Equifax's Results Response in order to have a viable claim.  See Mack, 748 F.3d at 665 (rejecting the plaintiff's argument that "he did not become aware of the actual violation of the [FCRA] statutory provision until he engaged in substantial study and research of the [FCRA] commencing in April 2011 and thereafter reviewed the report he had previously obtained and discovered the violation.").

For the reasons stated, Steed's claim is time barred pursuant to § 1681p(1) because he did not file suit within two years of receiving the July 2010 Results Response.

Even if Steed's claim were not time-barred, summary judgment would still be warranted on Steed's claims as well as those of his co-plaintiff Summers for the reasons set forth below.

### B.      Sections 1681i(a) and 1681n(a)

To prevail on a claim for a violation of Section 1681i(a) of the FCRA, a plaintiff must allege and prove that (1) the consumer's credit report contained inaccurate or

29

incomplete information; (2) the consumer notified the credit reporting agency of the alleged inaccuracy; (3) the dispute was not frivolous or irrelevant; (4) the agency failed to respond or conduct a reasonable reinvestigation of the disputed item(s); and (5) the failure to reinvestigate caused the consumer to suffer out-of-pocket losses or intangible damages such as humiliation or mental distress. Lazarre v. JPMorgan Chase Bank, N.A., 780 F. Supp. 2d 1330, 1334 (S.D. Fla. 2011) (citing Burmudez v. Equifax Information Services, LLC, No. 6:07-cv-1492-Orl-31GJK, 2008 WL 5235161, at *4 (M.D. Fla. Dec. 15, 2008)).

The FCRA creates a private right of action allowing injured consumers to recover "any actual damages" caused by negligent violations (§ 1681o(a)), and actual, statutory, and even punitive damages for willful noncompliance (§ 1681n(a)). See TRW Inc. v. Andrews, 534 U.S. 19, 23, 122 S. Ct. 441, 444-45 (2001) (citing 15 U.S.C. §§ 1681n, 1681o (1994 ed.)). In the current action, Plaintiffs have not asserted a cause of action for negligent noncompliance with the FCRA, and have made no claim for "any actual damages."

Instead, Plaintiffs' complaint alleges that Defendant Equifax willfully violated Sections 1681i(a)(1) and (2) of the FCRA, 15 U.S.C. § 1681, *et seq.*, by failing to reinvestigate certain disputed inquiries [which Equifax describes as historical records of access to a consumer's credit report by a user of Equifax's credit reporting system];

30

by failing to notify the source of the inquiry(ies) about the Plaintiffs' dispute(s); by failing to provide the source of the inquiry(ies) with all relevant information Plaintiffs provided to Equifax; and/or by failing to delete the inquiry(ies) from the consumers' files.  (Doc. 1, Compl.).  See 15 U.S.C. § 1681n(a) ("Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer ...").  In other words, Plaintiffs claim that Equifax should have treated disputed inquiries the same way it treats disputed information provided by third party furnishers, such as banks and credit card companies.  As noted above, Plaintiffs do not allege that either of them suffered actual damages; instead, Plaintiffs seek statutory and punitive damages,  attorneys' fees and costs.  (Compl. at 19-20).

To prevail on a claim for willful violation of the FCRA, a plaintiff must demonstrate that a CRA "either knowingly or recklessly violated the requirements of the Act."  Levine v. World Fin. Network Nat'l Bank, 554 F.3d 1314, 1318 (11th Cir. 2008) (citing Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 70, 127 S. Ct. 2201 (2007)).[9]  A CRA recklessly violates the FCRA when its actions are "not only a violation under a reasonable reading of the statute's terms, but [the plaintiff] shows

---

[9] In Safeco, the Supreme Court concluded that "knowing violations are sensibly understood as a more serious subcategory of willful [violations]."  Safeco, 551 U.S. at 59-60, 127 S. Ct. at 2210.

AO 72A
(Rev.8/8
2)

that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." Id. (quoting Safeco, 551 U.S. at 69, 127 S. Ct. at 2215). "Thus, even if a consumer reporting agency engages in an erroneous reading of the statute, it is not reckless unless [the reading] was objectively unreasonable." Smith v. HireRight Sols., Inc., 711 F. Supp. 2d 426, 434 (E.D. Pa. 2010) (citing Safeco). To prove a reckless violation, a plaintiff must show that the defendant's interpretation was "'objectively unreasonable' under either the text of the Act or 'guidance from the courts of appeals or the Federal Trade Commission that might have warned [the agency] away from the view it took." Levine, 554 F.3d at 1318 (quoting Safeco, 551 U.S. at 68-69, 127 S. Ct. at 2215-16).

### C.   Plaintiffs' Allegations and Arguments

Plaintiffs allege and argue that the FCRA requires Equifax to treat disputes related to inquiries the same way that it treats disputes related to account information provided by third-party furnishers on a consumer report (such as a bank or credit card company), and that by not doing so, Equifax willfully violated, and continues to violate, the dispute procedure set forth in Section 1681i. Plaintiffs further allege that Equifax violated the FCRA's dispute procedure provision by failing to notify the source of the inquiries about the dispute(s) and provide the source with all relevant information Plaintiffs provided to Equifax, or delete the inquiry(ies). (Doc. 1,

32

Compl.).

Plaintiffs argue that the FCRA dispute procedure is clear on its face: the statute requires CRAs such as Equifax to reinvestigate "*any item of information contained in a consumer's file*" that is disputed by a consumer.   (Doc. 63, Pls.' Br., at 3, citing 15 U.S.C. § 1681i(a)(1)(A)).  The FCRA defines the term "file," when used in connection with information on any consumer, as meaning "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored."  15 U.S.C. § 1681a(g).  Plaintiffs argue that an "inquiry" is an "item of information" that is contained in a consumer's credit file, just as account information or data provided by third-party furnishers are "items of information." Plaintiffs assert that the FCRA therefore required Equifax, as a CRA, to reinvestigate Plaintiffs' disputes of what Plaintiffs contended was false inquiry information in their credit files in the same way -- and using the same procedures -- as Equifax investigates disputed information provided to Equifax by third-party furnishers.  Plaintiffs argue that the form letters that Equifax sends to consumers regarding disputed inquiries give the false impression that Equifax has in fact reinvestigated the disputed inquiries in accordance with the requirements of Section 1681i when, in fact, Equifax has not. Accordingly, Plaintiffs argue that the investigation results letters that Equifax sent to Plaintiffs (and sends to thousands of other consumers making similar disputes) prove

33

a knowing, and thus willful, violation of the FCRA.

Plaintiffs further argue that the purpose of a reinvestigation under Section 1681i is to ensure that disputed inaccurate information is removed from a consumer's file. Plaintiffs contend that Section 1681i therefore requires Equifax, as part of its reinvestigation, to notify the person or entity that provided the disputed information, and that entity or person must also do an investigation into the accuracy of the disputed inquiry, and report back to the CRA. Plaintiffs contend that if the disputed information cannot be verified as accurate, Section 1681i(a)(5)(A)(i) requires that the disputed inquiry must be deleted or removed from the file. Plaintiffs further contend that instead of complying with the provision's requirements, Equifax "blatantly ignores these Congressionally mandated procedures," never notifies the person who made the inquiry about the consumer's dispute, never actually investigates the disputed inquiry, and most of the time leaves the disputed inquiry on the consumer's report. Plaintiffs generally allege and argue that this gives a false portrayal of a consumer's credit history and causes additional harm by lowering consumers' credit scores. (Compl. ¶ 28; Pls.' Resp. Br. at 5).[10]

---

[10] Plaintiffs' complaint, however, does not allege that Equifax's purported violation of Section 1681i(a) actually lowered Plaintiffs' credit scores. Nor have Plaintiffs pointed to any probative evidence that would quantify such a claim.

34

### D.    Equifax's Arguments

In response, Equifax unequivocally rejects Plaintiffs' interpretation that the dispute procedures set forth in Section 1681i of the FCRA apply to inquiries and inquiry disputes.  Equifax contends that its reading of the FCRA statute as a whole, and sections 1681i(a) and 1681g in particular, is not objectively unreasonable.

Equifax acknowledges that Section 1681i requires CRAs to "conduct a reasonable reinvestigation" when a consumer disputes "the completeness or accuracy of any item of information contained in a consumer's file."  (Doc. 54, Equifax Br., at 20 [citing 15 U.S.C. § 1681i(a)(1)(A)]).  However, the FCRA does not define "information," and Equifax argues that the court must interpret the statutory language "in the context of the entire statute, as assisted by the canons of statutory construction." (Id. [citing Edison v. Douberly, 604 F.3d 1307, 1310 (11th Cir. 2010)]).  Equifax argues that while "information" standing alone, may have a broad meaning, in context, "any item of information in a consumer's file" does not mean -- as Plaintiffs apparently read it -- "any information *whatsoever*."  (Id.).  Equifax maintains that inquiries are not the same as information about consumers that lenders and others furnish to Equifax, and the FCRA does not require that Equifax handle inquiry disputes the same way it handles other disputes.  According to Equifax, a factual notation that someone (a user) has obtained a consumer's credit report is different from data reported by furnishers,

and is not "information on that consumer recorded and retained" by Equifax; rather, an inquiry is information about an Equifax user that requested and received a credit report.  (Id. at 21 [citing 15 U.S.C. § 1681g(a)(3)(A)]).

Equifax argues that numerous provisions of Section 1681i would be rendered absurd if they are read to apply to inquiry disputes, as Plaintiffs contend.  For example, Section 1681i(a)(2) requires CRAs to provide prompt notice of a consumer's dispute to the *furnisher* of the information in dispute.  15 U.S.C. § 1681i(a)(1)-(2) (italics added).  Because Equifax is the entity that records which users have been provided a copy of a consumer's credit report (i.e., makes a record of the inquiry), Plaintiffs' reading of the statute would require Equifax to promptly notify itself that the notation it created is in dispute.  Moreover, as discussed earlier, the regulations enacted to implement the FCRA make a clear distinction between "furnishers" and "users," and expressly provide that "[a]n entity is not a furnisher when it ... [p]rovides information to a [CRA] solely to obtain a consumer report."  (Doc. 54 at 22 [citing 2 C.F.R. § 1022.41(c)(1); Hendricks Dep. at 84-86]).  Because Section 1681i(a)(2) makes clear that prompt notice of a consumer's dispute shall be made to the *furnisher* of the information, Equifax argues that the notice provision cannot reasonably be read to require notice to users.

36

Equifax argues that the same is true for Section 1681i(a)(5), which outlines a CRA's obligations when the CRA concludes that disputed information is inaccurate or unverifiable.  Under those circumstances, a CRA must "(i) promptly delete that item of information from the file of the consumer, or modify that item of information ... *and* (ii) promptly notify the *furnisher of that information* that the information has been modified or deleted from the file of the consumer."  Id. § 1681i(a)(5)(A)(i)-(ii) (italics added).  Because a user who initiates an inquiry and obtains a credit report is not a "furnisher" of that information under the FCRA, Equifax argues that it would be unreasonable and unnatural to read the FCRA's reinvestigation requirements as applying to inquiry disputes.  (Doc. 54 at 22 [citing Obarski v. Associated Recovery Sys., Inc., No. CIV.A. 13-6041 JLL J, 2014 WL 3748236, at *3 (D.N.J. July 29, 2014) ("[B]y making a 'hard inquiry' into Plaintiff's Experian credit report, Defendant did not report or furnish any information about Plaintiff's alleged debt to Experian.")]).

Equifax argues that the automated reinvestigation system that the FCRA mandates be put in place also expressly applies to "furnishers of information," which again does not include users who request a consumer's credit report.  (Doc. 54 at 23 [citing 15 U.S.C. § 1681i(a)(5)(D) ("Any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall implement an automated system through which furnishers of information to that consumer reporting agency

may report the results of a reinvestigation ...."); 12 C.F.R. § 1022.41(c)(1)]). As noted earlier, to comply with that automated reinvestigation system requirement, Equifax, Experian, TransUnion, and Innovis created e-OSCAR to reinvestigate data furnished by third-parties -- not to reinvestigate data generated internally *by the CRAs* to track users to satisfy the disclosure requirements of 15 U.S.C. § 1681g(a)(3).

In addition, Equifax argues that the statute itself structurally distinguishes between information in the consumer's file, sources of information (i.e., data furnishers), and inquiries. Section 1681g of the FCRA sets forth the requirements for disclosures to consumers. Section 1681g(a)(1) provides disclosure requirements pertaining to "information in the consumer's file." Section 1681g(a)(2) addresses the disclosure requirements pertaining to "sources of the information." Section 1681g(a)(3) sets forth the disclosure requirements pertaining to the identification of each person or user that procured a consumer report (or "inquiry"), which CRAs are separately obligated to record and disclose under that provision. Equifax argues that because the statute is structured to address "inquiries" separately from "information in the consumer's file," it is reasonable to conclude that inquiries are not "information on that consumer"; rather, they are internally-generated records that CRAs create and maintain (as required by the FCRA) reflecting only that a consumer's credit report was provided to the identified user.

38

In sum, Equifax argues that its inquiry-dispute policies are consistent with the statutory framework of the FCRA as well as the industry-wide practice that has been in place for years. The evidence submitted in support of Equifax's motion for summary judgment shows that all of the nationwide CRAs, including Equifax, treat inquiry disputes differently from disputes regarding third-party furnished data.

According to Equifax, Plaintiffs' lawsuit is asking this Court to effect a sea change in the credit reporting industry by adopting Plaintiffs' "sweeping" yet totally unsupported interpretation of Section 1681i of the FCRA, despite the absence of any authority that could have or should have put Equifax (or the other nationwide CRAs) on notice that they were allegedly misreading the law. Plaintiffs seemingly recognize that their statutory interpretation is novel; their own expert describes this case as a "case of first impression."[11] (Doc. 78-44, Deposition of Evan Hendricks ["Hendricks Dep."] at 22, 121-23). Plaintiffs' expert testified that not only has he never been qualified by a court to testify as an expert on inquiry dispute procedures, he is not aware of any court decision or regulatory agency guidance -- including from the FTC and, more recently, the Consumer Financial Protection Bureau ("CFPB") -- directing

---

[11] Equifax's expert is likewise unaware of any published regulatory guidance on this point. (Turner Dep. at 32 [Ex. XX]).

AO 72A
(Rev.8/8
2)

CRAs to treat inquiry disputes in the same way that they treat disputes of "furnished" information.  (Id.).

### E. Analysis

As noted earlier, to sustain a claim under 15 U.S.C. § 1681i(a), Plaintiffs must prove that: (1) their credit reports contained inaccurate or incomplete information; (2) they notified Equifax directly of that information; (3) their disputes were not frivolous or irrelevant; (4) Equifax failed to respond or conduct a reasonable reinvestigation; and (5) this failure caused Plaintiffs to suffer damages. See Lazarre v. JP Morgan Chase Bank, N.A., 780 F. Supp. 2d 1330, 1334 (S.D. Fla. 2011).

Plaintiffs do not dispute the fact that DirecTV, Dish Network, and ClearPoint Financial accessed their consumer files -- that is, made "inquiries."  Nor do they dispute that the inquiries reflected on their credit files were accurate records of file access.  (Summers Dep. at 65-66; Steed Dep. at 38-39; DSMF ¶¶ 71, 83).  Rather, Plaintiffs contend that the inquiries at issue in this lawsuit were inaccurate because the Plaintiffs did not seek credit with those entities, and the inquiries therefore misrepresented the Plaintiffs' actual credit history.  (PSMF ¶¶ 124, 140).

Plaintiffs, however, have failed to present any probative evidence showing that their disputed inquiries were not accurate notations of users who had requested and obtained access to Plaintiffs' credit files.  Nor have Plaintiffs cited any legal authority to support their argument that the accuracy of an inquiry somehow depends on whether the particular consumer's credit file should have been accessed, or was accessed in error, due to fraud or a mixed file.  The Eleventh Circuit has determined that:

> Although a credit reporting agency has a duty to make a reasonable effort to report "accurate" information on a consumer's credit history, it has no duty to report only that information which is favorable or beneficial to the consumer. Congress enacted [the] FCRA with the goals of ensuring that such agencies imposed procedures that were not only "fair and equitable to the consumer," but that also met the "needs of commerce" for accurate credit reporting. Indeed, the very economic purpose for credit reporting companies would be significantly vitiated if they shaded every credit history in their files in the best possible light for the consumer.  Thus, the standard of accuracy embodied in section 607(b) is an objective measure that should be interpreted in an evenhanded manner toward the interests of both consumers and potential creditors in fair and accurate credit reporting.

Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1158 (11th Cir. 1991).

Plaintiffs have failed to satisfy the first element of a claim under Section 1681i(a).

Under the FCRA, if a reinvestigation does not resolve the dispute–i.e., the CRA finds insufficient reason to believe that the information is inaccurate–the individual may file a brief statement of the dispute with the CRA. 15 U.S.C. § 1681i(b).  Plaintiffs

AO 72A
(Rev.8/8
2)

have pointed to no evidence in the record showing that either plaintiff filed a statement of dispute with Equifax after receiving their results letters explaining that inquiries were a factual record of file access.  (See Doc. 78-35 at 11-12; Doc. 78-23 at 7-8).

The parties have exhausted numerous pages discussing the pros and cons and feasibility of treating inquiries like other furnished data; whether inquiries always or only sometimes have a negative impact on a consumer's credit score; whether the e-OSCAR system is capable or incapable of accommodating the processing of inquiry disputes, and if not, whether alternative methods of contacting users to notify them about consumers' inquiry disputes exist and make economic sense.  However, those questions are not currently before this Court.

The only question before this Court is whether Equifax willfully violated Section 1681i of the FCRA by failing to reinvestigate Plaintiffs' disputed inquiries in the same manner as the FCRA requires CRAs to reinvestigate furnished data, or delete the inquiries that Plaintiffs disputed.  (Compl. at 15-18).

Plaintiffs argue that Equifax knowingly violated the statute by sending Steed a letter that falsely stated in the opening paragraph that Equifax had "contacted each source directly" when it had not.  The letter does not define the word "source." According to Plaintiffs, Equifax's statement is untrue because, while Equifax contacted some of the companies identified in Steed's dispute letter, Equifax did not, in fact,

42

contact CCCS of VA in response to Steed's inquiry dispute.  Plaintiffs argue that this false statement amounts to a tacit admission on the part of Equifax that Section 1681i(a) applies to inquiry disputes.  (Doc. 63 at 15-18).  The content of the letter, however, belies this argument.  (Doc. 66-2 at 2-3).  The statement about Equifax having "contacted each source directly" is in the second sentence of the letter, and is part of the introduction.  That introductory paragraph is followed by a detailed listing of each disputed item under the heading "Results of Your Investigation," which addresses, among other things, Steed's concerns about certain credit accounts, his name, his employment history, and the CCCS of VA inquiry.  (Doc. 66-2 at 2-4).  On page 2 of the letter, Equifax addresses the CCCS of VA inquiry specifically, stating "The results are:  Inquiries are a factual record of file access. If you believe this was unauthorized, please contact the creditor.  If you have additional questions about this item please contact CCCS of VA, 4660 S Laburnum Ave, Richmond, VA 23231-2424." (Doc. 66-2 at 3).  While the letter may seem contradictory in places and perhaps even confusing in the way it is formatted, it in no way amounts to a "tacit admission" or acknowledgement by Equifax that it has a duty to reinvestigate inquiry disputes pursuant to the requirements of Section 1681i(a), thus constituting a knowing violation of the statute.  Nor have Plaintiffs shown that Equifax willfully violated Section 1681i by falsely suggesting to Summers in its letter to her that Equifax had or

43

would contact the entities that had requested and received copies of her credit report pursuant to the requirements of Section 1681i(a), as it would in the case of disputed information furnished to Equifax by a lender or other third party data furnisher.  (See Pls.' Resp. Br. at 16-17).   Instead, the letter directed Summers, if she believed the inquiries were unauthorized, to contact the credit grantors directly.  (Doc. 67-7 at 2).

Equifax unequivocally denies that the FCRA requires it to handle inquiry disputes the same way it handles disputes about furnished data, and has provided extensive testimony about its inquiry dispute policies and procedures (and those of the other national CRAs) for reinvestigating hard inquiries, especially with regard to mixed files and identity fraud.  Because Plaintiffs are proceeding under the statutory provision that requires willfulness, it is their burden to show that Equifax's reading is "objectively unreasonable."   See Levine, 554 F.3d at 1318 ("To prove a willful violation, a consumer must prove that a consumer reporting agency either knowingly or recklessly violated the requirements of the Act.").  Plaintiffs have failed to meet their burden.

None of the cases cited by Plaintiffs hold that a CRA must reinvestigate disputed inquiries the same way a CRA reinvestigates furnished information.  Plaintiffs have pointed to no court of appeals decision addressing this issue; nor have Plaintiffs provided any authoritative regulatory guidance from the FTC or the CFPB issued

44

either before or during the time period at issue in this lawsuit that would have warned Equifax away from the view it took (and currently takes).[12]  See id. at 1318 (citing Safeco, 127 S. Ct. at 2215-16).

The closest thing to regulatory guidance put forward by Plaintiffs is a recent consent order from the CFPB that obliquely addresses inquiry disputes in the context of a non-party to this lawsuit making inquiries on consumers' files without a permissible purpose.  (Doc. 67-18 at 9).  However, even if the cited consent order constituted definitive guidance from the CFPB (which it does not), the consent order was not even issued until December 1, 2015, which was three or more years after the relevant events in this case.  Thus, the consent order could not have put Equifax on notice that Equifax and all of the other nationwide CRAs have been misinterpreting the FCRA such that Equifax can be found to have willfully violated the FCRA with respect to Plaintiffs.

Plaintiffs also point to the FTC staff's "40 Years Report" as evidence to support their claim that the FTC has "held" that disputes of inquiries are covered by Section 1681i of the FCRA and that CRAs are required to reinvestigate inquiry disputes pursuant to that provision.  (Doc. 63 at 26 [citing Doc. 67-16, FTC's "40 Years

---

[12]  Moreover, it is evident that reading the statute in the manner Plaintiffs propose would be unreasonable because it would lead to nonsensical results.

45

Report" at 77, ¶ 5]).  In fact, the paragraph that Plaintiffs cite does not "hold" that CRAs must reinvestigate inquiry disputes the same way they reinvestigate disputes of furnished information; rather, the paragraph addresses what actions a CRA should take when it receives a dispute from a consumer alleging that an inquiry appearing in his or her file "was not made by a person who had a permissible purpose for obtaining the consumer report."  (Doc. 67-16 at 77, ¶5).  The paragraph provides two options: (1) the CRA may delete the inquiry as inaccurate; or (2) amend the file to make the item "complete" by reflecting clearly that the inquiry was generated by a party who did not have a permissible purpose to obtain a consumer report on the consumer.   (See id.). Plaintiffs' complaint does not allege that any of the inquiries disputed by Plaintiffs involved a user who did not have a permissible purpose.

Plaintiffs have not shown that either the CFPB's recent consent order regarding a non-party to this lawsuit, or the FTC staff's 40 Years Report provided the kind of "authoritative guidance" necessary to put Equifax and the other national CRAs on notice that their industry-wide practice for handling inquiry disputes violates the requirements of Section 1681i of the FCRA.  See Safeco, 551 U.S. at 70, 127 S. Ct. at 2216 (citing Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151 (2001) for the proposition that a defendant's conduct must be objectively unreasonable in light of "legal rules that were '*clearly established*' at the time" of the purported violation)

46

(italics added).

Section 1681i is silent on whether the term "items of information" includes inquiries. Equifax's reading of the statute has a foundation in the statutory text. Given the lack of any relevant legal authority establishing that Equifax's interpretation of Section 1681i of the FCRA is objectively unreasonable, Plaintiffs have failed to provide sufficient factual support and/or legal authority such that a reasonable jury could find for the Plaintiffs and conclude that Equifax willfully violated the requirements of Section 1681i of the FCRA by failing to reinvestigate the disputed inquiries reflected in the Plaintiffs' consumer credit files pursuant to the procedures set out in Section 1681i. "Given this dearth of guidance and the less-than-pellucid statutory text," the undersigned does not find that Equifax's reading was objectively unreasonable, and its reading "falls well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability." See Safeco, 551 U.S. at 50, 127 S. Ct. at 2205. Steed's claim is also time-barred.

Accordingly, for all the reasons stated, I **RECOMMEND** that Defendant Equifax's Motion for Summary Judgment (Doc. 51) be **GRANTED**.

47

V. <u>**CONCLUSION**</u>

For all the reasons stated, I **RECOMMEND** that Defendant Equifax's Motion for Summary Judgment (Doc. 51) be **GRANTED**.

**IT IS SO RECOMMENDED**, this 15th day of July, 2016.

_____
**CATHERINE M. SALINAS**
**UNITED STATES MAGISTRATE JUDGE**

48