IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHARLES EDWARD STEED, :
and AMY SUMMERS, :
    Plaintiffs, :
:
                                  :    CIVIL ACTION NO.
v. :    1:14-CV-0437-SCJ
:
EQUIFAX INFORMATION :
SERVICES, LLC, :
:
    Defendant. :

## ORDER

This matter appears before the Court for consideration of the July 15, 2016, Report and Recommendation ("R&R") (Doc. No. [92]) in which The Honorable Catherine M. Salinas, United States Magistrate Judge, recommended that the Court grant Defendant's Motion for Summary Judgment (Doc. No. [51]). Plaintiffs have filed objections to the R&R (Doc. No. [97]), Defendant Equifax Information Services, LLC ("Equifax") has filed a response (Doc. No. [99]), and the matter is now ripe for consideration.

I.    BACKGROUND

Plaintiff Amy Summers received an alert from Equifax's own credit monitoring services in February 2012. Doc. No. [78-19], pp. 22, 39. The alert related to two accounts, one with Dish Network and one with DirecTV, opened in Charlotte,

North Carolina. Id. p. 22. Upon learning of the accounts, Summers contacted the police and called Equifax, because she believed her identity had been stolen, as she in fact lived in Fairbanks, Alaska. Id. pp. 24–25; see also Doc. No. [65], pp. 5–6, ¶¶104–07. Summers asked Equifax to remove all information related to the fraudulent accounts. Doc. No. [54-1], p. 16, ¶74.

Shortly thereafter, Summers provided Equifax with a variety of documentation to support her claim that her identity had been stolen including: a report from her local Alaska police department, a report from the Charlotte police department, and copies of her driver's license, social security card, and birth certificate. Doc. No. [78-19], pp. 186–87. Because the accounts were in collections at the time of the dispute, Equifax contacted the collection agency, and the agency confirmed that the collection notations should be deleted from Summers's credit report. Doc. No. [65], p. 8, ¶113. Equifax deleted the collection information, but refused to delete the credit inquiries. Id. ¶¶113–14. Pursuant to its policy, Equifax did not delete the inquiries because the fraudulent accounts were not listed in Summers's credit file. Doc. No. [78-1], pp. 71–72, 109–11.

Plaintiff Charles Steed, in a letter dated July 2, 2010, disputed a variety of information in his credit report, including an inquiry by ClearPoint Financial ("CCCS

of Va").[1] Doc. No. [66-1], pp. 2–3. Steed asserted that the incorrect information did not relate to him, but rather related to other people with similar names. See id. Equifax sent a response to Steed on July 28, 2010. Doc. No. [66-2]. In the opening paragraph, Equifax stated that it "contacted each source directly" and that its investigation was complete. Id. p. 2. Although Equifax removed some of the disputed information in Steed's credit file, it did not delete the CCCS of Va credit inquiry. See id. pp. 2–3. With reference to the CCCS of Va credit inquiry, Equifax merely stated, "Inquiries are a factual record of file access. If you believe this was unauthorized, please contact the creditor." Id. p. 3. When an individual claims that an inquiry on their credit report pertains to another individual, Equifax will delete the inquiry if it is associated with an account that has been verified as belonging to the other person. See Doc. No. [54-2], p. 37. Otherwise, Equifax directs the consumer disputing the inquiry to contact the creditor directly. Id.

Plaintiffs filed this suit on February 14, 2014. Doc. No. [1]. They allege that Equifax willfully violated 15 U.S.C. § 1681i(a)(1) and (2) of the Fair Credit Reporting Act ("FCRA"), by failing to either delete or adequately reinvestigate the disputed

---

[1] As the Magistrate Judge noted, the parties have assumed that ClearPoint Financial and CCCS of VA are the same entity, and the Court will do the same. Doc. No. [92], p. 20 n.5.

AO 72A
(Rev.8/82)

inquiries, and failing to provide notice to the sources of the inquiries. See id. pp. 15-19, ¶¶46-65. Plaintiffs do not assert a claim for negligent noncompliance and offer no actual damages as a result of Equifax's failure to remove the disputed inquiries. See Doc. No. [1]; see also 15 U.S.C. § 1681o(a). Instead, they seek damages for Equifax's alleged willful noncompliance with the FCRA. See Doc. No. [1], pp. 15-19, ¶¶46-65; see also 15 U.S.C. § 1681n(a).

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether the moving party

AO 72A
(Rev.8/82)

has met this burden, this Court must consider the facts in the light most favorable to the nonmoving party. See Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id. All reasonable doubts, however, are resolved in the favor of the nonmoving party. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

### III.  ANALYSIS

In reviewing an R&R, the Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Plaintiffs makes three objections to the R&R. They argue that the Magistrate Judge erred by concluding that (1) they had not proven that the disputed inquiries were inaccurate information, (2) they did not present sufficient evidence to show that any alleged violation of the FCRA was willful, and (3) Plaintiff Charles Steed's claim was barred by the statute of limitations. See Doc. No. [97], pp. 5–18. The Court addresses each of these objections in turn.

The FCRA requires Credit Reporting Agencies ("CRAs"), like Equifax, to reasonably "reinvestigate" disputed items of information in consumer reports. 15 U.S.C. § 1681(a). Specifically, § 1681i(a) provides that if the "accuracy of any item of information contained in a consumer's file" is disputed, the CRA shall "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file." 15 U.S.C. § 1681i(a)(1)(A). The principal questions at issue are whether the disputed credit inquiries are "item[s] of information" and whether they are "inaccurate," within the meaning of this provision.

The first question is whether credit inquiries are "item[s] of information contained in a consumer's file" within the meaning of § 1681i(a)(1)(A). Equifax contends that this phrase is a term of art that does not actually refer to any and all information in a consumer's credit report. Doc. No. [99], pp. 8–10. In support of this argument, it points to the FCRA section dealing with disclosures to consumers, which has a subsection dealing with "information in the consumer's file" and a separate subsection dealing with end-users "that procured a consumer report" — i.e. credit inquiries. 15 U.S.C. § 1681g(a)(1), (3). Equifax further asserts that applying § 1681i(a) to credit inquiries would cause "absurd" results. Doc. No. [99], pp. 9–10.

Specifically, § 1681i(a)(2) and (5) require the CRA to notify "any person who provided any item of information in dispute" and "the furnisher of the information" respectively. 15 U.S.C. § 1681i(a)(2), (5). According to Equifax, these subsections would be meaningless with respect to credit inquiries because end-users who procure a consumer's credit report are not furnishers of information. Doc. No. [99], p. 10.

However, interpretation of any statute must begin with the plain meaning of the words used, because courts "must presume that Congress said what it meant and meant what it said." CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001). Section 1681i(a) refers to "any item of information contained in a consumer's file." 15 U.S.C. § 1681i(a)(1)(A). A credit inquiry is indisputably information. It is a notation that communicates a fact—namely, who has obtained a copy of the consumer's credit report. Moreover, credit inquiries are not just immaterial bits of data. They have an impact on a consumer's credit score and can be used as a basis for a denial of credit. Doc. No. [67-8], pp. 3–4. Despite Equifax's arguments, § 1681i(a) does not distinguish between information provided by a furnisher and information added by the CRA. The fact that Equifax would not be

required to notify a furnisher when a credit inquiry is disputed does not prove that credit inquiries are not "information contained in a consumer's file."

In addition to arguing that the credit inquiries are not "information," Equifax also argues that they were not inaccurate. Specifically, it contends that the credit inquiries are "categorically accurate because they are factual records that a consumer's credit file was accessed by a user." Doc. No. [99], p. 20. However, Plaintiffs note that the definition of a hard inquiry Equifax uses in its own fair credit reporting policy is an "inquiry that results from transactions initiated by the Consumer when applying for credit." Doc. No. [97], p. 4–5, ¶16; see also Doc. No. [54-2], p. 18. Equifax itself admitted that a credit inquiry that results from identity theft "misstates" the consumer's credit history because it would wrongly lead someone reading the credit report to believe that it was the consumer who had initiated the transaction. See Doc. No. [67-11], pp. 10–11. As noted above, such an inaccuracy is material because hard inquiries can lower a consumer's credit score and be used as a basis for a denial of credit. Doc. No. [67-8], pp. 3–4.

More than simply comporting with the plain language of the statute, Plaintiffs' interpretation best serves to advance the purpose of FCRA's reinvestigation requirements—ensuring the accuracy of the information used by creditors to

determine a consumer's creditworthiness. As the Eleventh Circuit has noted, the standard of accuracy imposed by the FCRA "should be interpreted in an evenhanded manner toward the interests of both consumers and potential creditors in fair and accurate credit reporting." Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1158 (11th Cir. 1991). The interests of consumers and potential creditors are best served by deletion of hard inquiries that Equifax itself admits "misstate[ ]" the consumer's credit history. Consumer's credit scores are negatively impacted by fraudulent or inaccurate credit inquiries, and creditors are provided with an inaccurate portrait of the consumer's credit history. The only entity that benefits is Equifax, which does not have to expend resources reinvestigating disputed credit inquiries.

In its response to Plaintiffs' objections, Equifax argues that consumer's may benefit from its reporting of fraudulent credit inquiries because they may become aware of identity theft. Doc. No. [99], p. 21. Indeed, Plaintiff Summers learned her identity had been stolen because of an alert from Equifax's credit monitoring services. Doc. No. [78-19], pp. 22–25. However, Plaintiff Summers is not suing Equifax for alerting her of the fraudulent information in her credit report. She is suing because Equifax refused to remove the fraudulent credit inquiries, or even

AO 72A
(Rev.8/82)

investigate them, despite the fact that Summers provided ample supporting documentation to show that her identity was stolen. See id. pp. 186–87; see also Doc. No. [65], p. 8, ¶¶113–14. It is difficult to see how Summers benefitted in any way from Equifax's refusal to investigate the disputed inquiries after she was already aware of them and had reported them to the police.

However, unfortunately for Plaintiffs, their claims still fail because they cannot show that Equifax "either knowingly or recklessly violated the requirements of the [FCRA]." Levine v. World Fin. Network Nat. Bank, 554 F.3d 1314, 1318 (11th Cir. 2009). To show a reckless violation, Plaintiffs cannot merely show that Equifax's interpretation of the FCRA was erroneous; they must show that Equifax's interpretation was "objectively unreasonable" in light of the available "authoritative guidance." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 69–70, 127 S. Ct. 2201, 2215–16, 167 L. Ed. 2d 1045 (2007). This they cannot do. The Court cannot say that Equifax's interpretation of the phrase "information contained in a consumer's file" is objectively unreasonable in light of the requirements of the reinvestigation provision and the way that phrase is used elsewhere in the FCRA. See Doc. No. [99], pp. 8–10. None of the cases cited by Plaintiffs have addressed the issue of whether credit

inquiries are "information contained in a consumer's file," and this Court can find no case on the point. See Doc. No. [97], pp. 10–13, ¶¶31–33, 35–36.

Plaintiffs' best piece of evidence supporting their contention that Equifax must reinvestigate disputed inquiries is a "40 year staff report" produced by the Federal Trade Commission's ("FTC"), which offered a summary of interpretations of FCRA provisions. Doc. No. [67-16]. In the report, the FTC stated:

> When a CRA receives a dispute from a consumer alleging that an inquiry that appears in his/her file was not made by a person who had a permissible purpose for obtaining the consumer report, and those allegations are supported by the CRA investigation, the CRA has two options. It may either delete the inquiry as inaccurate, or amend the file to make the item "complete" by reflecting clearly that the inquiry was generated by a party who did not have a permissible purpose to obtain a consumer report on the consumer.

Id. p. 3, ¶5. While the interpretation merely deals with inquiries that were not made with a permissible purpose, the same logic would seem to apply to other inquiries that do not accurately reflect the consumer's credit history — e.g. credit inquiries that result from identity fraud or mixed files. Additionally, although it does not say as much directly, the interpretation implicitly assumes that the CRA has a duty to investigate the disputed inquiry. See id. (stating that the CRA must either delete or

11

amend an impermissible inquiry if the consumer's "allegations are supported by the CRA investigation").

Nevertheless, the 40 year report does not show that Equifax's interpretation of the statute is objectively unreasonable. The staff report does not necessarily constitute "authoritative guidance." See Levine, 554 F.3d at 1319 (holding that "two staff opinion letters from the [FTC]" did not constitute authoritative guidance); see also Safeco, 551 U.S. at 70 (noting that the FTC "has only enforcement responsibility, not substantive rulemaking authority" for FCRA provisions). Moreover, even if the FTC report were authoritative guidance, the interpretation does not directly address credit inquiries that result from identity fraud or mixed files. While the interpretation lends support to Plaintiffs' interpretation, it does not definitively show that Equifax's interpretation is "objectively unreasonable." See Safeco, 551 U.S. at 70 (citing Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) for the proposition that a legal rule must be "clearly established" at the time of the violation to show the contrary interpretation was unreasonable).

The Court also cannot say that Equifax's position that credit inquiries are categorically accurate is objectively unreasonable. Plaintiffs note that the definition of a hard inquiry Equifax uses in its own fair credit reporting policy is an "inquiry

that results from transactions initiated by the Consumer when applying for credit." Doc. No. [97], p. 4–5, ¶16; see also Doc. No. [54-2], p. 18. However, Equifax responds that its definition of hard inquiry is simply a matter of internal policy, and that there is no binding authority adopting this definition of hard inquiries. Doc. No. [99], p. 21 n.5. In short, there is simply no authoritative guidance definitively holding that CRAs must investigate disputed inquiries. Most telling of all, perhaps, is the fact that Plaintiffs' own expert describes the matter at bar as "a case of first impression." Doc. No. [78-44], pp. 122–24.

Plaintiffs also argue that Equifax committed knowing violations of the FCRA because it made "misrepresentations" to Plaintiff Steed and used an automated system in handling Plaintiff Summers' dispute. Neither argument is availing. The letter Steed received from Equifax dealt with a variety of disputes. Although the opening paragraph stated that Equifax had "contacted each source directly," Equifax persuasively argues that this meant it had contacted outside sources of information, when applicable. See Doc. No. [66-2], p. 2. The credit inquiries did not require Equifax to contact outside sources of information, because credit inquiries are internally generated pieces of information. Equifax specifically explained in the letter that "[i]nquiries are a factual record of file access" and that Steed needed to "contact

the creditor" if he believed the inquiry should be removed. Id. p. 3. No reasonable jury could find that Equifax deliberately intended to mislead Plaintiff Steed.

Plaintiffs also argue that Hinkle v. Midland Credit Mgmt., Inc., No. 15-10398, 2016 WL 3672112, (11th Cir. July 11, 2016) stands for the proposition that use of an automated system is *per se* an inadequate review, and that Equifax thus knew that its procedures violated the FCRA. See Doc. No. [97], pp.16–17, ¶44. However, Hinkle was decided long after the alleged violations in this action, and thus could not have put Equifax on notice that its procedures were deficient. Furthermore, in Hinkle, the use of the automated system violated the FCRA because the defendant in that case had a clear obligation to perform a reasonable reinvestigation and failed to do so. See Hinkle, 2016 WL 3672112, at *4. Here, as discussed above, there is no authoritative guidance dictating that Equifax reinvestigate disputed inquiries. Because Equifax's position that it does not need to reinvestigate disputed inquiries is not objectively unreasonable, Plaintiffs cannot show that Equifax knew it had a duty to reinvestigate the inquiries.

As a final matter, Plaintiff Steed argues that his claim is not barred by the statue of limitations. See Doc. No. [97], pp. 18–20, ¶¶48–53. While not necessary to the resolution of his claim, the Magistrate Judge correctly concluded that the statue

of limitations applied. See Doc. No. [82], pp. 26–29. A cause of action for a violation of 15 U.S.C. § 1681i arises when the plaintiff discovers "the facts that give rise to a claim," not when he "discovers that those facts constitute a legal violation." Mack v. Equable Ascent Fin., L.L.C., 748 F.3d 663, 666–67 (5th Cir. 2014). Plaintiff Steed's claim, thus, arose in July 2010 when he received the letter informing him of how Equifax had handled his inquiry dispute. It is of no consequence that, at the time, Steed did not believe Equifax's handling of the dispute was a violation of the FCRA. See Mack, 748 F.3d at 666–67. Given that his claim arose in July 2010, Steed indisputably did not file suit within the two-year statute of limitations period.

## IV.   CONCLUSION

The R&R (Doc. No. [92]) is hereby **ADOPTED** as the order of the Court. Plaintiffs' objections to the R&R (Doc. No. [97]) are **OVERRULED**. Defendant's Motion for Summary Judgment (Doc. Nos. [51], [54]) is **GRANTED**. Defendant's Motion to Decertify the Class (Doc. No. [86]) is **DENIED** as moot.

IT IS SO ORDERED, this 31st day of August, 2016.

_____
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)